UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ISHMEAL ELMORE,

                            Plaintiff,

                                                          5:23-cv-00508-GTS-TWD

v.

ONONDAGA COUNTY SHERIFFS et al.,

                            Defendants.
_____

APPEARANCES:

ISHMEAL ELMORE
*Plaintiff, pro se*
1012 Cadillac St.
Apt. 1
Syracuse, NY 13208

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>ORDER AND REPORT-RECOMMENDATION</u>

        The Clerk has sent the Court a civil rights complaint filed by Ishmeal Elmore ("Plaintiff")

for initial review pursuant to 28 U.S.C. § 1915.  (Dkt. No. 1.)  Plaintiff filed a motion to proceed

*in forma pauperis* ("IFP"), and he also requests the appointment of counsel.  (Dkt. Nos. 2, 3.)

For the reasons discussed below, the undersigned recommends the Court conclude Plaintiff's

Fourth Amendment claim brought pursuant to 42 U.S.C. § 1983 for an unreasonable search

survives initial review and requires a response.  (*See* Dkt. No. 1.)  The undersigned further

recommends the Court dismiss Plaintiff's other claims with leave to amend.  *See id.*

I.      **IFP APPLICATION**

Plaintiff has not paid the filing fee for this action and seeks leave to proceed IFP.  (Dkt. No. 2.)  After reviewing Plaintiff's application, this Court finds he is financially eligible for IFP status.  Therefore, Plaintiff's IFP application is granted.

II.     **SUFFICIENCY OF THE COMPLAINT**

Having found Plaintiff meets the financial criteria for commencing this action IFP, the Court must consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915(e).

A.      **Standard of Review**

Section 1915 "provide[s] an efficient means by which a court can screen for and dismiss legally insufficient claims."  *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citing *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)).  The Court shall dismiss a complaint in a civil action if the Court determines it is frivolous, malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief.  *See* 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

A claim is frivolous when it "lacks an arguable basis either in law or in fact."  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *see also Denton v. Hernandez*, 504 U.S. 25, 33 (1992) (holding that "a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible"); *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ("[A]n action is frivolous when either: (1) the factual contentions are clearly baseless . . . or (2) the claim is based on an indisputably meritless legal theory.") (internal citation and quotations omitted).

2

A complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief.  Fed. R. Civ. P. 8(a)(2).  This short and plain statement of the claim must be "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The statement of the claim must do more than present "an unadorned, the-defendant-harmed-me accusation."  *Id*.  It must "give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555 (internal quotations, citation, and alterations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*.

In reviewing a *pro se* complaint, the court has a duty to show liberality toward *pro se* litigants.  *See Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990).  The court should exercise "extreme caution . . . in ordering sua sponte dismissal of a pro se complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond."  *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (emphasis in original) (citations omitted).  While the Court will generally afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal, leave to amend pleadings may be denied when any amendment would be futile.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

B.      **Summary of the Complaint**

On August 1, 2022, at approximately 5:30PM, Plaintiff was pulled over by Onondaga Sheriff's Deputy C. Atieh, shield number 2911, in the parking lot of Hometown Inn located at 6611 Old Collamer Rd. S., East Syracuse, NY 13057.  (Dkt. No. 1 at 5.)  Deputy Atieh told Plaintiff he pulled him over due to his car's illegal window tint.  *Id.*  Plaintiff claims his vehicle "met all DMV requirements to operate on New York State roadways."  *Id.*  Plaintiff nonetheless handed Deputy Atieh his license and other requested documents and Deputy Atieh returned to his vehicle.  *Id.*  While Deputy Atieh was in his vehicle, Unknown Sheriff's Deputy arrived on the scene.[1]  *Id.*  Deputy Atieh and Unknown Sheriff's Deputy then approached each side of Plaintiff's vehicle.  *Id.*  Plaintiff explained to both officers he was returning to his hotel room with his passenger, then-girlfriend Monica Landry, for the evening.  *Id.*

Deputy Atieh then stated he smelled marijuana coming from Plaintiff's vehicle and saw a marijuana cigarette, or "joint," in his ashtray.  *Id.*  Ms. Landry told the officers "the joint's mine,[] I was smoking it earlier, and he . . . does not smoke marijuana."  *Id.*  Plaintiff repeated that the joint was not his and he does not smoke marijuana.  *Id.*  Deputy Atieh directed Plaintiff to get out of his vehicle and he complied.  *Id.*  Deputy Atieh ushered Plaintiff to the back of his vehicle, told Plaintiff he was going to be frisked for weapons, and then "roughly" frisked Plaintiff in front of the "growing crowd of other hotel guests and on-lookers."  *Id.*  Deputy Atieh then told Plaintiff he was going to conduct a field sobriety test.  *Id.*  Plaintiff repeated that he was not under the influence of marijuana and does not smoke marijuana.  *Id.*  While Deputy Atieh conducted the sobriety test, Unknown Sherriff's Deputy told Ms. Landry to exit and move away from Plaintiff's vehicle so he could conduct a search.  *Id.*  Plaintiff told Deputy Atieh he did not

---

[1]  Plaintiff does not identify this Defendant by name.  He will therefore be referred to as "Unknown Sheriff's Deputy" throughout the decision.  (*See* Dkt. No. 1 at 2.)

consent to a search of his vehicle and "what his partner [was] doing is illegal." *Id.* Unknown Sheriff's Deputy continued to search the vehicle for "the next five minutes." *Id.*

During the sobriety test, Plaintiff was "unexpectedly and roughly pulled backwards from behind by an unknown arriving officer" and was "tripped by that officer's foot." *Id.* at 6. "While stumbling trying to gain footing," Plaintiff "was tackled to the ground extremely roughly" and approximately six more officers became involved. *Id.* "From the momentum of being yanked backwards unexpectedly coupled with the added force of being tackled" Plaintiff's head hit the bumper of his car "tremendously hard" which caused him to "temporarily black out" while four to five other officers "took turns bending" his arms and legs "to impossible angles." *Id.* One officer then put his knee on Plaintiff's neck, and Plaintiff struggled to breathe. *Id.* Plaintiff felt "an instinctive sense of panic" as if he was "going to die" with the officer's knee on his neck. *Id.* Plaintiff "screamed in panic" with "the last breath [he] could muster" that he was "not resisting." *Id.* Ms. Landry began to record the incident with her cellphone, but an officer stepped in front of her phone and "shout[ed]" she was not allowed to record. *Id.* Ms. Landry attempted to side step the officer but was then also placed under arrest. *Id.*

Plaintiff and Ms. Landry were taken to the Onondaga County Sheriff's Office North Station located at 7120 Henry Clay Blvd., Liverpool, NY 13088. *Id.* Plaintiff complied with another field sobriety test which he passed "without incident." *Id.* Plaintiff and Ms. Landry stayed in the holding cell for over four hours and in the early morning of August 2, 2022, they were transferred to the Onondaga County Justice Center to await arraignment. *Id.* At his arraignment, the judge ordered Plaintiff to be detained without bail. *Id.* On August 5, 2022, a preliminary hearing was held and Plaintiff's lawyer, Nikki Platenik, told him "that all physical

evidence recovered from the traffic stop ha[d] been suppressed and that [he] was due to be released from jail." *Id.* Plaintiff was released from jail later that evening. *Id.*

Plaintiff lists his first cause of action as "Racial Profiling/Unreasonable Search & Seizure." *Id.* at 7. Plaintiff alleges his stop, seizure, search of his vehicle, and arrest were "constitutionally unreasonable" and was the result of racial profiling because there was "no probable cause." *Id.* He also alleges his incarceration violated his Fourth Amendment rights. *Id.* Liberally construed, Plaintiff alleges Deputy Atieh, Unknown Sheriff's Deputy, and the Onondaga County Sheriff falsely arrested, falsely imprisoned, and maliciously prosecuted him.[2]

Plaintiff lists "Excessive Force" as his second cause of action. *Id.* Plaintiff claims he never resisted arrest and "was compliant throughout the entire encounter." *Id.* He alleges "the level of force, tactics, and number of officers employed" to place Plaintiff under arrest "was unjustifiable" and violated his Fourth Amendment rights. *Id.* Since his arrest, Plaintiff alleges he has developed anxiety, he experiences infrequent migraines from hitting his head, and experiences infrequent muscle spasms in his hand and numbness in his finger due to "the severe tightness" of the handcuffs that were placed on him. *Id.*

Plaintiff lists his third cause of action as "Impound Fees And Damages To Vehicle." *Id.* Plaintiff claims it cost him $536 to get his car out of the impound. *Id.* Additionally, his vehicle's convertible top sensors were damaged during "a later" police search and there were paw prints and scratches on the top of his hood which required repair and a paint job. *Id.*

---

[2] Because Plaintiff alleges he was arrested but never convicted, the Court construes the complaint as asserting a malicious prosecution claim under the Fourth Amendment. *See Lanning v. City of Glens Falls*, 908 F.3d 19, 28 (2d Cir. 2018) ("A § 1983 claim for malicious prosecution essentially alleges a violation of the plaintiff's right under the Fourth Amendment to be free from unreasonable seizure.").

### C.      Analysis

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States."  *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (internal quotations and citations omitted).  To state a valid claim under 42 U.S.C. § 1983, a plaintiff must allege that the challenged conduct: (1) was attributable to a person acting under color of state law; and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.  *Whalen v. Cty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997).  To establish liability under the statute, a plaintiff must plead that each government official defendant violated the Constitution through that official's own individual actions. *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020).  An official may not be held liable for constitutional violations simply because he held a high position of authority.  *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016).  "Section 1983 claims against municipal employees sued in their official capacity are treated as claims against the municipality itself."  *Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 361 (W.D.N.Y. 2021) (internal quotations and citation omitted).  A municipality cannot be held liable under Section 1983 unless the challenged action was undertaken pursuant to a municipal policy, custom, or practice.  *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

### 1.  Onondaga County Sheriffs

Plaintiff lists "Onondaga County Sheriffs" as a defendant in the caption of his complaint. To the extent Plaintiff meant to list the Onondaga County Sheriff's Office as a defendant, "[a] police department cannot sue or be sued because it does not exist separate and apart from the municipality and does not have its own legal identity."  *Baker v. Willett*, 42 F. Supp. 2d 192, 198

(N.D.N.Y. 1999) (dismissing claims against county sheriff's department) (citations omitted); *see also Jackson v. Cty. of Nassau*, 07-CV-245, 2010 WL 335581, at *5 (E.D.N.Y. Jan. 22, 2010) ("Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued."); *see, e.g.*, *La Grande v. Town of Bethlehem Police Dep't*, No. 1:08-CV-0738 (LEK/DRH), 2009 WL 2868231, at *2 (N.D.N.Y. Sept. 1, 2009) ("Since the Bethlehem Police Department cannot be sued pursuant to 42 U.S.C. § 1983, [the plaintiff's] [c]omplaint is dismissed as against the Town of Bethlehem Police Department."); *Jenkins v. Liadka*, No. 5:10-CV-1223 (GTS/DEP), 2012 WL 4052286, at *5 (N.D.N.Y. Sept. 13, 2012) ("Because the Syracuse Police Department is merely an administrative arm of the City of Syracuse, it is not a proper defendant.").

Therefore, the Court recommends dismissing the complaint against the Onondaga County Sheriffs with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B).

### 2.   Deputy Atieh and Unknown Sheriff's Deputy

#### a.      Racial Profiling

Plaintiff's Fourth Amendment claim is frivolous because a dispositive defense exists on the face of the complaint. *See Livingston*, 141 F.3d at 437.  The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the individual officers involved—"the Fourth Amendment's concern with reasonableness allows certain actions to be taken in certain circumstances, whatever the subjective intent." *Whren v. United States*, 517 U.S. 806, 813-14 (1996) (internal quotations omitted).  "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810.  "[C]ourts have found that a violation of New York's Vehicle and Traffic Law prohibiting the operation of vehicles with excessively tinted windows provides the police with

8

probable cause or reasonable suspicion to stop a car." *United States v. Ferguson*, 130 F. Supp. 2d 560, 565 (S.D.N.Y. 2001) (citations omitted); *United States v. Harrell*, 268 F.3d 141, 148-49 (2d Cir. 2001) (police officers' observation that car had tinted windows and a defective brake light sufficient cause to stop car); *Woods v. Candela*, 921 F. Supp. 1140, 1144-45 (S.D.N.Y. 1996) (officer "was authorized to stop [driver] for excessively tinted windows . . . . As [the officer] witnessed the infraction, under New York law, he was therefore authorized to arrest the" driver.); *see also United States v. Garcia*, 279 F. Supp. 2d 294, 298 (S.D.N.Y. 2003) (suspected violation of excessively tinted windows sufficient cause for vehicle stop).

Plaintiff's Fourth Amendment racial profiling claim against Deputy Atieh is accordingly frivolous because a dispositive defense (i.e., there was probable cause for the traffic stop) appears on the face of the Complaint. *See, e.g., Aikman v. Cnty. of Westchester*, 491 F. Supp. 2d 374, 381 (S.D.N.Y. 2007) (dismissing the claimant's Fourth Amendment racial profile claim where the officers "had probable cause to believe [he] violated New York traffic laws"); *Viator v. City of Rochester*, No. 02-CV-6453, 2005 WL 1876064, at *5 (W.D.N.Y. Aug. 8, 2005) (dismissing the claimant's Fourth Amendment racial profile claim because the officer observed him fail to signal in violation of New York State Vehicle and Traffic Law § 1163(a)). Plaintiff claims the traffic stop was the result of racial profiling because the stop was unjustified. (Dkt. No. 1 at 7.) However, at the same time, the complaint alleges Deputy Atieh told Plaintiff he pulled him over due to the tinted windows of his car. *Id.* at 5. The undersigned accordingly recommends that the Court dismiss Plaintiff's Fourth Amendment traffic stop claim on the grounds that it is frivolous. *See* 28 U.S.C. § 1915(e)(2)(B)(i).

### b.    Unreasonable Search and Seizure

The Fourth Amendment recognizes "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const.

amend. IV.  The "ultimate touchstone" of the Fourth Amendment is "reasonableness," which is

"a matter generally determined by balancing the particular need to search or seize against the

privacy interests invaded by such action."  *United States v. Singletary*, 798 F.3d 55, 59 (2d Cir.

2015) (quoting *Riley v. California*, 573 U.S. 373, 381–82 (2014), and *United States v. Bailey*,

743 F.3d 322, 331 (2d Cir. 2014)).  Although this balancing "usually demands that searches be

conducted pursuant to judicial warrants supported by probable cause," it is well-settled that

"neither a warrant nor probable cause . . . is an indispensable component of reasonableness in

every circumstance."  *Id.* (alteration in original) (quoting, in part, *Nat'l Treasury Emps. Union v.

Von Raab*, 489 U.S. 656, 665 (1989)).

### i.    Unreasonable Seizure

"Temporary detention of individuals during the stop of an automobile by the police, even

if only for a brief period and for a limited purpose, constitutes a seizure of persons within the

meaning of the Fourth Amendment."  *United States v. Gomez*, 877 F.3d 76, 86 (2d Cir. 2017)

(internal punctuation omitted) (quoting *Whren*, 517 U.S. at 809-10).  In *Terry v. Ohio*, 392 U.S. 1

(1968), however, the Supreme Court recognized that "police officers may in 'appropriate

circumstances and in an appropriate manner approach a person for purposes of investigating

possibly criminal behavior even though there is no probable cause to make an arrest.'"  *Dancy v.

McGinley*, 843 F.3d 93, 106 (2d Cir. 2016) (quoting *Terry*, 392 U.S. at 22).  The Supreme Court

has described routine traffic stops as "relatively brief" encounters that are more analogous to

*Terry* stops than to formal arrests.  *Rodriguez v. United States*, 575 U.S. 348, 354 (2015); *see*

*Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (observing that most traffic stops "resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*").

In general, to justify a *Terry* stop, an officer must have "reasonable suspicion," defined as "a reasonable basis to think that the person to be detained is committing or has committed a criminal offense." *Dancy*, 843 F.3d at 106 (internal quotation marks omitted) (quoting *Bailey*, 743 F.3d at 332). Reasonable suspicion requires "more than an 'inchoate suspicion or mere hunch,'" *id.* (quoting *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000)); it "demands specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting legal wrongdoing," *Singletary*, 798 F.3d at 59 (citations and internal quotation marks omitted). The reasonable suspicion standard is not high. *United States v. Weaver*, 9 F.4th 129, 140 (2d Cir. 2021). Rather, it requires "only facts sufficient to give rise to a reasonable suspicion that criminal activity may be afoot." *Dancy*, 843 F.3d at 106 (internal quotation marks omitted).

Plaintiff alleges that "footage will show that [his] windows were rolled down on this hot summer day," he has "not received any tickets stemming from this encounter," and despite "Deputy Atieh's claim alleging illegal window tint[, his] vehicle met all DMV requirements to operate on New York State roadways." (Dkt. No. 1 at 5.) But, as noted, reasonable suspicion of *any* traffic violation provides a sufficient basis for a traffic stop. *See Stewart*, 551 F.3d at 193. Plaintiff states Deputy Atieh told Plaintiff he pulled him over due to illegal window tint. (Dkt. No. 1 at 5.) With what information Plaintiff has provided and without more, Plaintiff essentially pleads Deputy Atieh had at least reasonable suspicion to conduct a traffic stop.

Plaintiff's Fourth Amendment unreasonable seizure claim against Deputy Atieh is therefore also frivolous because a dispositive defense (i.e., there was probable cause for the

traffic stop) appears on the face of the complaint.  *Ferguson*, 130 F. Supp. 2d at 565; *Harrell*,

268 F.3d at 148-49; *Woods*, 921 F. Supp. at 1144-45; *see also Garcia*, 279 F. Supp. 2d at 298.

The undersigned accordingly recommends the Court dismiss Plaintiff's Fourth Amendment

unreasonable seizure claim because it is frivolous.  *See* 28 U.S.C. § 1915(e)(2)(B)(i).

### ii.    Unreasonable Search

"A 'search' in the context of the Fourth Amendment occurs when the police intrude upon

a person's reasonable expectation of privacy or if the police otherwise trespass upon one's

person, house, papers, or effects for the purpose of acquiring information." *Jennings v. Decker*,

359 F. Supp. 3d 196, 207-08 (N.D.N.Y. 2019) (citations omitted).

The automobile exception to the warrant requirement of the Fourth Amendment permits

officers to "conduct a warrantless search of a vehicle if they have probable cause to believe it

contains contraband or other evidence of a crime." *United States v. Wilson*, 699 F.3d 235, 245

(2d Cir. 2012).  Probable cause requires only a "fair probability" that evidence of a relevant

violation will be found in the place to be searched.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

When the exception applies, officers may search any area of the vehicle in which they have

"probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500

U.S. 565, 580 (1991); *see also United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable

cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the

vehicle and its contents that may conceal the object of the search."); *see also United States v.

Harris*, No. 21-CR-376(EK), 2022 WL 13798289, at *2 (E.D.N.Y. Oct. 21, 2022).

Courts within this Circuit have previously found the sight of marijuana was enough to

conduct a warrantless search of a vehicle.  *See United States v. Carter*, 173 F. App'x 79, 81 (2d

Cir. 2006) ("the fact that a marijuana cigarette was seen in the open ashtray . . . gave rise to a fair

probability that contraband or evidence of a crime would be found elsewhere in the vehicle")
(citation and internal punctuation omitted); *United States v. Forbes*, No. 20-CR-6140-FPG-MJP,
2022 WL 6786271, at *25 (W.D.N.Y. June 10, 2022) *report and recommendation adopted*, No.
20-CR-06140-FPG, 2022 WL 4545256 (W.D.N.Y. Sept. 29, 2022) (concluding that "probable
cause existed to search the vehicle because when law enforcement approached the [vehicle] they
'smell[ed] marijuana emanating from the car and observ[ed] marijuana in plain view in the
car.'") (citation omitted); *see also United States v. Balkisoon*, 579 F. Supp. 3d 367, 371-73
(E.D.N.Y. 2022) (finding officers had probable cause to search Balkisoon's backpack pursuant to
the automobile exception to the warrant requirement after observing rolling paper and marijuana
in plain view).  However, the circumstances here appear to be different.

Plaintiff alleges when Deputy Atieh and Unknown Sheriff's Deputy approached his car,
Deputy Atieh stated he smelled marijuana and saw a joint in the ashtray.  (Dkt. No. 1 at 5.)
Deputy Atieh then ordered him out of his vehicle and Unknown Sheriff's Deputy told Ms.
Landry to step out of the vehicle because he was going to conduct a search.  *Id.*  Plaintiff told the
officers he objected to the search of his vehicle.  *Id.* at 6.  Plaintiff alleges he asked "each officer
involved in [his] arrest 'what was the probable cause for the stop and search of my vehicle?'" *Id.*
Deputy Atieh replied "he had a right to search [Plaintiff's] vehicle because he had smelled and
seen marijuana." *Id.*  Plaintiff told the officers the search was illegal under New York State law.
*Id.*

Plaintiff is correct to an extent.  Pursuant to N.Y. Penal Law § 222.05 (McKinney),
effective March 31, 2021,

> Except as provided in subdivision four of this section, in any
> criminal proceeding including proceedings pursuant to section
> 710.20 of the criminal procedure law, no finding or determination
> of reasonable cause to believe a crime has been committed shall be

> based solely on evidence of the following facts and circumstances, either individually or in combination with each other: (a) the odor of cannabis; (b) the odor of burnt cannabis; [and] (c) the possession of or the suspicion of possession of cannabis or concentrated cannabis in the amounts authorized in this article.

*Id.*

At the same time, (3)(b) does not apply when a law enforcement officer is investigating whether a person is operating a motor vehicle while impaired by drugs or the combined influence of drugs or of alcohol and any drug or drugs.  N.Y. Penal Law § 222.05(4) (McKinney).  "During such investigations, the odor of burnt cannabis shall not provide probable cause to search any area of a vehicle that is not readily accessible to the driver and reasonably likely to contain evidence relevant to the driver's [alleged] condition."  *Id.*  While Plaintiff alleges the officers made him take at least two field sobriety tests, Deputy Atieh specifically told Plaintiff he was allowed to search his vehicle because he had smelled and seen marijuana.  *Id.* at 6.

It is not entirely clear if Deputy Atieh and Unknown Sherriff's Deputy searched the vehicle to investigate whether Plaintiff was "operating a motor vehicle while impaired by drugs" or whether they based their search solely on the sight and smell of marijuana.  *See* N.Y. Penal Law § 222.05(4).  Given what is alleged, albeit tenuous, the Court recommends Plaintiff's unreasonable search claim survives initial review under 28 U.S.C. § 1915(e) and requires a response.  In so recommending, the undersigned expresses no opinion regarding whether the claim could survive a properly filed motion to dismiss or motion for summary judgment.

### c.    False Arrest, False Imprisonment, and Malicious Prosecution

The Court liberally construes Plaintiff's complaint as alleging false arrest, false imprisonment, and malicious prosecution claims against the Deputy Atieh and Unknown Sherriff's Deputy.  "A Section 1983 claim for false arrest [or false imprisonment] rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest

14

without probable cause." *Cea v. Ulster Cty.*, 309 F. Supp. 2d 321, 329 (N.D.N.Y. 2004)

(citations and quotations omitted).  Such claims are one and the same because "[f]alse arrest and

false imprisonment overlap; the former is a species of the latter."  *Wallace v. Kato*, 549 U.S. 384,

388 (2007).

The elements of a claim for false arrest under § 1983 are the same elements as a claim for

false arrest under New York law.  *Lewis v. City of New York*, 18 F. Supp. 3d 229, 235 (E.D.N.Y.

2014) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).  "Under New York law, the

elements of a false arrest and false imprisonment claim are: '(1) the defendant intended to

confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not

consent to the confinement and (4) the confinement was not otherwise privileged.'"  *Hernandez

v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (quoting *McGowan v. United States*, 825 F.3d

118, 126 (2d Cir. 2016)).  "For purposes of the privilege element of a false arrest and

imprisonment claim, an act of confinement is privileged if it stems from a lawful arrest supported

by probable cause."  *De Lourdes Torres v. Jones*, 26 N.Y.3d 742, 759 (N.Y. 2016); *Ackerson v.

City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) ("Probable cause is a complete defense to an

action for false arrest.") (citation and internal quotation marks omitted).

"To prevail on a Section 1983 claim for malicious prosecution, 'a plaintiff must show a

violation of his rights under the Fourth Amendment . . . and must establish the elements of a

malicious prosecution claim under state law.'"  *Butler v. Hesch*, 286 F. Supp. 3d 337, 355

(N.D.N.Y. Feb. 15, 2018) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir.

2010) (citations omitted)).  "The elements of a malicious prosecution claim under § 1983 are

substantially the same as the elements under New York law."  *Kelly v. Guzy*, No. 8:20-cv-721

15

(GTS/CFH), 2021 WL 5232749, at *4 (N.D.N.Y. Nov. 10, 2021), *report-recommendation adopted*, 2022 WL 160305 (N.D.N.Y. Jan. 18, 2022) (internal quotations and citations omitted).

To state a malicious prosecution claim under New York law, the plaintiff must allege facts plausibly showing: (1) the initiation of a criminal proceeding; (2) its termination favorably to plaintiff; (3) lack of probable cause; and (4) malice. *Manganiello v. City of N.Y.*, 612 F.3d 149, 161 (2d Cir. 2010). "Under New York law, police officers 'initiate' prosecution by filing charges or other accusatory instruments." *Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) (citation omitted). A police officer may also be liable for malicious prosecution when he provides false information. *Watkins v. Town of Webster*, 592 F. Supp. 3d 96, 113 (W.D.N.Y. 2022); *see also Oudekerk v. Doe 1*, No. 5:23-cv-00288 (BKS/TWD), 2023 WL 3267908, at *5 (N.D.N.Y. May 5, 2023) (cleaned up).

Plaintiff's false arrest, false imprisonment, and malicious prosecution claims all fail for the same reason: the dispositive defense of probable cause appears on the face of the complaint. *Ferguson*, 130 F. Supp. 2d at 565 (excessively tinted windows provided police with probable cause or reasonable suspicion to stop a car); *Woods*, 921 F. Supp. at 1144-45 (same). The undersigned accordingly recommends the Court dismiss Plaintiff's false arrest, false imprisonment, and malicious prosecution claims on the grounds that they are frivolous. *See* 28 U.S.C. § 1915(e)(2)(B)(i).

### d.    Excessive Force

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). The standard governing excessive force is "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard

to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989).  "[T]he Second Circuit has held that even minor injuries, including scrapes and bruises, can support an excessive-force claim." *Matthews v. City of New York*, 889 F. Supp. 2d 418, 442 (E.D.N.Y. 2012) (internal quotations and citations omitted).

### i.      Pat and Frisk

Plaintiff summarily states that Deputy Atieh and Unknown Sherriff's Deputy "roughly [f]risked" him.  (Dkt. No. 1 at 5.)  No other facts are alleged and Plaintiff does not contend he sustained any injury as a result of the frisk.  To the extent Plaintiff's complaint may be construed to assert an excessive force claim against Deputy Atieh and Unknown Sherriff's Deputy for the frisk, the Court recommends that claim be dismissed.  *See Burroughs v. Petrone*, 138 F. Supp. 3d 182, 214 (N.D.N.Y. 2015) (excessive force claim based on rough pat and frisk and push by officers, without other facts or injury alleged, dismissed).

### ii.      Other Force

Plaintiff alleges during his arrest he was "unexpectedly and roughly pulled backwards from behind by an unknown arriving officer" and was then "tripped by that officer's foot."  (Dkt. No. 1 at 6.)  He was then "tackled to the ground extremely roughly by the help of a half dozen officers."  *Id.*  "From the momentum of being yanked backwards unexpectedly coupled with the added force of being tackled, [Plaintiff's] head hit [his] car bumper tremendously hard causing [him] to temporarily black out" while "4 to 5 officers took[] turns bending [his] arms and legs to impossible angles."  *Id.*  Plaintiff further alleges another officer put "his knee [on Plaintiff's] neck disrupting [his] breathing" and felt as if he was "going to die."  *Id.*  Since his arrest, Plaintiff alleges he has developed anxiety, he experiences infrequent migraines from hitting his

head, and experiences infrequent muscle spasms in his hand and numbness in his finger due to "the severe tightness" of the handcuffs that were placed on him.  (Dkt. No. 1 at 7.)

While these allegations are certainly troubling, Plaintiff has not alleged Deputy Atieh or Unknown Sherriff's Deputy took part in these instances of force.  Instead, he alleges multiple other Sheriff's deputies, who remain unidentified, tripped him, tackled him, bent his arms and legs, and put a knee on his neck.  *Id.*  Plaintiff also does not identify who handcuffed him.  *Id.*

A party not named in the caption of the complaint is not a party to the action.  *Abbas v. U.S.*, No. 10-CV-0141, 2014 WL 3858398, at *2 (W.D.N.Y. Aug. 1, 2014) (the failure to name a party in the caption makes it "infeasible for the Court to determine which of the individual officers mentioned in the body of the complaint should be deemed to be defendants to which claims").  If "people are not also named in the caption of the [ ] complaint, they will not be defendants in the case."  *Whitley v. Krinser*, No. 06- CV-0575, 2007 WL 2375814, at *1 (W.D.N.Y. Aug. 15, 2007).  In this instance, while Plaintiff describes the actions of other Sheriff's deputies, the aforementioned individuals are not identified as defendants in the caption of the complaint or the list of parties.  Thus, the Court will not and cannot construe the complaint to include any claims or causes of action against these individuals.  The Court therefore recommends dismissing the excessive force claims with leave to amend so that Plaintiff may include the names of the other Sherriff's deputies in the caption of his complaint, should he choose to pursue such claims.

### e.    Impound Fees and Damages to Vehicle

"District courts have supplemental jurisdiction over all state law claims that are so related to federal claims over which they exercise original jurisdiction that they form part of the same case or controversy under Article III of the Constitution."  *Ramrattan v. New York*, No. 9:22-CV-

0025 (GTS/ATB), 2022 WL 4225226, at *6 (N.D.N.Y. Sept. 13, 2022), *reconsideration denied sub nom. Ramrattan v. Guzman*, No. 9:22-CV-0025 (GTS/ATB), 2022 WL 16744278 (N.D.N.Y. Nov. 7, 2022) (citing 28 U.S.C. § 1367(a) (2000)).

"Supplemental jurisdiction turns on whether those federal claims and the parties' many and varied state claims stem from the same common nucleus of operative fact." *LaChapelle v. Torres*, 37 F. Supp. 3d 672, 680 (S.D.N.Y. 2014) (citations and internal quotations omitted). "Put differently, the question at hand is whether the relationship between the federal and state claims is such that the plaintiff would ordinarily be expected to try them all in one judicial proceeding." *Id.* (citations and internal quotations omitted). To make this determination, courts have traditionally asked whether "the facts underlying the federal and state claims substantially overlapped . . . [or] the federal claim necessarily brought the facts underlying the state claim before the court." *Id.* (quoting *Achtman v. Kirby, McInerney & Squire LLP*, 464 F.3d 328, 335 (2d Cir. 2006)) (cleaned up); *see also Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 704 (2d Cir. 2000) (supplemental jurisdiction exists where "the federal claim necessarily brought the facts underlying the state claim before the court"). Supplemental jurisdiction is lacking "when the federal and state claims rest[ ] on essentially unrelated facts." *LaChapelle*, 37 F. Supp. 3d at 680 (quoting *Lyndonville Sav. Bank*, 211 F.3d at 704) (internal quotations omitted) (alteration in original).

In this case, the complaint purports to raise state law claims for property damage and reimbursement of impound fees.[3]  (Dkt. No. 1 at 7.)  Specifically, Plaintiff claims his vehicle was impounded and "was damaged during a later police search." *Id.*  To the extent these claims

---

[3]  Plaintiff's third cause of action is "Impound Fees And Damages to Vehicle."  (Dkt. No. 1 at 7.) All Plaintiff provides is "[t]he amount to get my vehicle out of the impound was $536.00." *Id.* The Court infers Plaintiff is seeking reimbursement for that amount.

resulted from the alleged unreasonable search of Plaintiff's car, the Court recommends exercising supplemental jurisdiction. *See LaChapelle*, 37 F. Supp. 3d at 686 (finding "Defendants' [state law] claims related to theft of fabricated works is sufficiently related to Plaintiffs' federal claims to fall within the Court's supplemental jurisdiction"); *Ramrattan*, 2022 WL 4225226, at *6 ("Because plaintiff's negligence claim arises out of the same facts upon which his federal claims are based, the Court will exercise supplemental jurisdiction over this claim"); *Yourman v. Verizon Commc'ns*, No. 20-CV-336 (BMC), 2020 WL 532457, at *2 (E.D.N.Y. Feb. 3, 2020) (holding the Court would exercise supplemental jurisdiction where Plaintiff's federal claim against Defendant Verizon and state law claim for property damage against Defendant repairman were related and arose from the same set of facts).  Accordingly, the undersigned recommends the District Court exercise supplemental jurisdiction over Plaintiff's state law claims inasmuch as they are a result of the alleged unreasonable search.

## III.    MOTION FOR APPOINTMENT OF COUNSEL

Plaintiff has filed a motion for appointment of counsel.  (Dkt. No. 3.)  The Court finds that a more fully developed record would be necessary for an assessment to be made as to whether counsel should be appointed.  *See Hendricks v. Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997) (court must look to the likelihood of merit of the underlying dispute in determining whether to appoint counsel).  Moreover, Plaintiff's motion does not include evidence of an attempt by him to find counsel to represent him on his own as is required before seeking appointment of counsel from the court.  *See Terminate Control Corp. v. Horowitz*, 28 F.3d 1335 (2d Cir. 1994).  Therefore, the motion is denied without prejudice at this time.

**ACCORDINGLY**, it is hereby

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED**,[4] and it is

**RECOMMENDED** that Plaintiff's unreasonable search claim against Deputy Atieh and Unknown Sheriff's Deputy **survive *sua sponte*** review; and it is further

**RECOMMENDED** that Plaintiff's racial profiling, unreasonable seizure, false arrest, false imprisonment, malicious prosecution, and excessive force claims against Deputy Atieh and Unknown Sheriff's Deputy be **DISMISSED WITH LEAVE TO AMEND**; and it is further

**RECOMMENDED** that the District Court exercise supplemental jurisdiction over Plaintiff's state law claims for property damage and reimbursement of impound fees to the extent they are a result of the alleged unreasonable search of Plaintiff's vehicle; and it is further

**ORDERED** Plaintiff's Motion for Appointment of Counsel (Dkt. No. 3) be **DENIED WITHOUT PREJUDICE**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), Plaintiff has fourteen days within which to file written objections to the foregoing report.[5]  Such objections shall be filed with the Clerk of the Court.

---

[4]  Plaintiff should note that although his motion to proceed IFP has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

[5]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1)

(Supp. 2013); Fed. R. Civ. P. 72, 6(a).


Dated: June 29, 2023
      Syracuse, New York

                                    Therese Wiley Dancks
                                      United States Magistrate Judge

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Hogan v. County of Lewis, N.Y.,   N.D.N.Y.,   March 8, 2013

2010 WL 335581

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
E.D. New York.

Erwin JACKSON, Plaintiff,

v.

COUNTY OF NASSAU, Nassau County
Police Department, and Office of the Nassau
County District Attorney, Defendants.

No. 07-CV-245 (JFB)(AKT).

|

Jan. 22, 2010.

**Attorneys and Law Firms**

Erwin Jackson, pro se.

Ralph J. Reissman and Sara A. Wells of the Nassau County Attorney's Office, Mineola, NY, for defendants.

**MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge.

 **\*1**  On January 17, 2007, pursuant to 42 U.S.C. § 1983, *pro se* plaintiff Erwin Jackson ("plaintiff" or "Jackson") brought this action against defendants County of Nassau ("the County"), Nassau County Police Department, and the Office of the Nassau County District Attorney alleging that defendants violated plaintiff's rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution. Specifically, Jackson claims that his constitutional rights were violated during his pretrial proceedings when police officers allegedly withheld exculpatory evidence, made perjurous statements, and falsely verified felony complaints against plaintiff when they had no personal knowledge of the underlying facts. Jackson further contends that the County of Nassau has a policy of committing these constitutional violations. Jackson also alleges that the County of Nassau

has a policy of failing to investigate criminal complaints regarding these types of violations if they are filed by pretrial detainees or criminal defendants. The defendants now move, jointly, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants' motion is granted.

**I. FACTS**

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' respective Rule 56.1 statements of facts. [1] Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. *See Capobianco v. City of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2001). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it. [2]

[1]    The Court notes that plaintiff failed to file and serve a response to defendant's Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see also Gilani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at \*2 (E.D.N.Y. Apr. 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In plaintiff's opposition papers, he specifically identified those paragraphs of defendants' Rule 56.1 statement with which he agreed that there were no material disputed issues of fact. The Court, in its discretion, thus relies on those paragraphs as equivalent to plaintiff's Rule 56 .1 statement of facts for the purposes of this

opinion. In the exercise of its broad discretion and given plaintiff's *pro se* status, the Court will also only deem admitted those facts in defendant's Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05.

2    Because plaintiff is *pro se,* the Court has independently reviewed plaintiff's deposition testimony. Plaintiff's deposition contains no additional evidence other than plaintiff's speculation and conclusory allegations.

A. The Underlying Prosecution

On November 22, 2005, plaintiff Erwin Jackson was arrested by Nassau County police officers for attempted robbery of the Bank of America located in Baldwin, New York, on November 21, 2005. (Defs.' 56.1 Statement ¶ 4.) Plaintiff was brought to the Bellmore police station, where he was questioned about the November 21, 2005 robbery. (Deposition of Irwin Jackson, Defs.' Ex. E (hereinafter "Pl.'s Dep.") at 32-33.) At the station, Jackson was also questioned about other bank robberies. (*Id.* at 34-35.) Plaintiff was arrested and arraigned on November 23, 2005. He was charged for the November 21 robbery and four additional robberies that had occurred in Nassau County on November 13, 2005, October 1, 2005, September 2, 2005, and July 23, 2005. (*Id.* at 40-41; Defs.' 56.1 Statement ¶ 5.) Plaintiff was indicted by a grand jury on thirteen counts on December 19, 2005. (Pl.'s Dep. at 44-45.) In June 2006, a pretrial suppression hearing was held, at which Police Officer Joseph Hughes testified. (*Id.* at 45-46.) Plaintiff proceeded to trial on the charges and, on February 6, 2007, was found guilty on nine counts of Robbery in the First Degree (New York Penal Law 160.15) and one count of Conspiracy in the Fourth Degree (New York Penal Law 105.10). (*Id.* at 53-54.) On July 30, 2008, Jackson was sentenced to fifteen years for each of the nine counts of Robbery in the First Degree, plus one year and four months for Conspiracy in the Fourth Degree. (Defs.' 56.1 ¶ 8.) Jackson's minimum aggregate sentence was set at twenty-five years, eight months and sixteen days. (*Id.* ¶ 9.)

B. Officer Hughes

**\*2**  By letter dated September 17, 2006, while a pretrial detainee, Jackson filed three criminal complaints against Police Officer Joseph Hughes with the Nassau County District Attorney's Criminal Complaint Unit. (*Id.* ¶ 10.) The complaints were based on Officer Hughes's allegedly inconsistent testimony at a pretrial suppression hearing. Jackson alleges that while testifying before the Grand Jury in December 2005, Officer Hughes stated that he observed five black males fleeing a four-door Buick wearing face masks. During a subsequent pretrial hearing on July 10, 2006, plaintiff cross-examined Officer Hughes. At that hearing, Officer Hughes stated that only some of the males he observed were wearing face masks. The testimony at the July 10 pretrial hearing was as follows:

Q: This individual jumps out of the car. This is the individual that you pursued after?

A: Correct. * * *

Q: Did he have mask on? A: No mask.

Q: No mask. You testified in the grand jury that all five of the occupants of that car that fled had masks on?

A: I was incorrect about that. I stated that before.

Q: That information wasn't true?

A: It was incorrect. * * *

Q: You testified they all had masks on. Now, you're saying, you take the mask off one-

A: I believe in that statement. I was describing all the occupants. I said, they all had masks on. I was incorrect. I should have said, some had masks on.

(*Id.* ¶ 12 (citing Ex. AB at 485-86).)

Jackson also claims Officer Hughes made a "punishable false written statement" and committed the crime of "offering a false instrument for filing" by verifying and signing five felony complaints against plaintiff, although Officer Hughes had no personal knowledge of the information contained in those complaints and relied on information provided by other officers. (*Id.* ¶¶ 13-14.) According to Jackson, during the pretrial hearing and trial of his co-defendant Paul Henry, Officer Hughes testified that it was police procedure for officers to verify and swear to felony complaints even though they lacked knowledge of the underlying facts or crimes alleged therein. (Pl.'s Dep. at 61.) Jackson also alleges that Hughes testified to this at Jackson's own trial on cross-examination. (*Id.* at 61-62.)

On September 21, 2006, Assistant District Attorney ("ADA") Thurer transferred plaintiff's perjury complaint against Officer Hughes to ADA Barbara Kornblau, Chief of the Public Corruption Bureau. (*Id.* ¶ 15.) ADA Kornblau reviewed plaintiff's complaint against Officer Hughes. Because plaintiff's case was still pending and "the issues alleged by plaintiff all pertained to credibility," (Defs.' Ex. K ¶ 6), ADA Kornblau notified Daniel Looney, the ADA prosecuting plaintiff, and plaintiff's attorney, Jeffrey Groder, of plaintiff's claims. The District Attorney's Office later informed Jackson that it also forwarded the case to the Internal Affairs Bureau of the Nassau County Police Department for administrative action at their discretion. (Pl.'s Dep. at 56; Defs.' 56.1 ¶ 16.) After receiving plaintiff's complaint from the District Attorney's Office, the Nassau County Police Department's Internal Affairs Bureau "determined that plaintiff's complaint against Officer Hughes for perjury was unfounded, since plaintiff had been convicted in a jury trial on February 6, 2007." (Defs.' 56.1 ¶ 18.)

### C. Detective Comiskey

**\*3** Jackson also filed criminal complaints against Detective Joseph Comiskey with the Nassau County District Court. (Pl.'s Dep. at 58-59.) According to Jackson, Detective Comiskey committed "official misconduct" and perjury for allegedly failing to provide plaintiff with "exculpatory material" in July 2006 at a pretrial hearing, and for advising the court that he had turned over all of his notes when, according to Jackson, he had not done so. (Defs.' 56.1 ¶ 19.) ADA Steven L. Schwartz, Chief of the Nassau County District Attorney's District Court Bureau, investigated these two complaints against Detective Comiskey, and found the claims in them unfounded. (*Id.* ¶ 20.) Plaintiff was subsequently informed that the District Attorney's Office declined to prosecute these complaints. (*Id.*) These complaints were also reviewed by ADA Kornblau, who determined that Detective Comiskey's actions were not a crime. (*Id.* ¶ 22.) Subsequently, as she had done with the complaint against Officer Hughes, she forwarded the complaints to the Nassau County Police Department Internal Affairs Bureau. (*Id.* ¶ 22.) ADA Kornblau also sent a letter to Jeffrey Groder, plaintiff's trial counsel, informing him of plaintiff's allegations, since they pertained to an incident in which Groder was involved. (*Id.*)

### D. The Instant Complaint

Jackson alleges eleven causes of action against the County of Nassau and two of its administrative arms, the Nassau County District Attorney's Office and the Nassau County Police Department, arguing that these entities had unconstitutional policies, practices, and customs that infringed his constitutional rights. Jackson asserts three claims specifically against the County of Nassau. First, he alleges that the County had a policy of failing to discipline its employees for any alleged perjury or cover-ups with respect to evidence. (Compl. at 5; Pl.'s Dep. at 93.) Jackson's second cause of action claims that the County has a policy, practice, procedure and custom of failing to take steps to terminate the unconstitutional practices of "its legal subordinates," defendants Nassau County Police Department and the Nassau County District Attorney's Office. (Compl. at 5; Pl.'s Dep. at 93-94.) Jackson's third cause of action alleges that the County has failed to properly train and supervise its employees with regard to "the proper constitutional and statutory requirements in the exercise of their authority." (Compl. at 5; Pl.'s Dep. at 94.)

Jackson asserts four claims against the Nassau County Police Department. The fourth cause of action in Jackson's complaint alleges that the Nassau County Police Department has a policy that authorizes subordinates to falsely verify and file criminal felony complaints without "knowledge of or knowledge based upon belief" of the underlying facts. (Compl. at 5; Pl.'s Dep. at 95.) The fifth cause of action alleges that the Nassau County Police Department failed to properly train and supervise its employees in the processing of arrestees. (Compl. at 5-6.) Specifically, Jackson contends that, due to inadequate training, employees of the Nassau County Police Department do not realize "that they are not authorized to swear or fill out a felony complaint that they have absolutely no knowledge of." (Pl.'s Dep. at 96.) The sixth cause of action in Jackson's complaint claims that the Nassau County Police Department has an illegal practice or custom that condones and sanctions its employees who commit perjury, which is demonstrated by the fact that plaintiff, a pretrial criminal defendant, attempted to file criminal charges against the defendants' subordinates, but the defendants took no corrective actions. (*Id.* at 96-97; Compl. at 6.) Jackson's seventh cause of action alleges that the Nassau County Police Department, as a policy maker, has a defective and illegal policy whereby it does not correct or punish wrongdoings,

such as those alleged in causes of action numbers four, five, and six. (Compl. at 6; Pl.'s Dep. at 97-98.)

**\*4** Jackson asserts his four final claims against the Nassau County District Attorney's Office. Jackson's eighth cause of action alleges that the Nassau County District Attorney's Office has a history and practice of ignoring criminal defendants' and arrestees' complaints, ignoring evidence of police misconduct, and shielding police officers and other assistant district attorneys from prosecution. (Compl. at 6.) Jackson's ninth cause of action alleges that the Nassau County District Attorney's Office does not give "any credence to pretrial criminal defendants who seek to file and give any credence to pretrial criminal defendants that seek to commence criminal actions in the court against public officials." (*Id.* at 130.) Specifically, plaintiff contends that the Nassau County District Attorney's Office declines to investigate, arrest, and/or prosecute public officials when illegal conduct is alleged by pretrial or criminal defendants. (Compl. at 6-7.) Jackson's tenth cause of action alleges that the Nassau County District Attorney's Office has failed to punish the illegal practices and wrongdoings of their employees and the Nassau County Police Department. (Compl. at 7.) Jackson's eleventh and final cause of action contends that the Nassau County District Attorney's Office has a policy and procedure whereby the district court clerk does not submit or file any claims or complaints against a public official made by criminal defendants. (Compl. at 7.)

## II. PROCEDURAL HISTORY

Jackson filed the complaint in this action on January 17, 2007. The Court granted plaintiff leave to proceed *in forma pauperis* on January 31, 2007. Defendants filed an answer to the complaint on May 23, 2007. On March 14, 2008, plaintiff filed a motion to amend the complaint. This Court denied that motion on February 13, 2009. On May 15, 2009, defendants submitted their motion for summary judgment and provided *pro se* plaintiff with the notice required by Local Civil Rule 56.2. Defendant submitted supplemental papers to their motion on June 5, 2009. Plaintiff submitted opposition papers on May 28, 2009. [3] Defendants filed their reply to plaintiff's opposition on June 5, 2009. Plaintiff also submitted a motion for sanctions against defendants on June 10, 2009. Defendants submitted their opposition to the motion for sanctions on June 11, 2009. This matter is fully submitted.

[3] Due to delay, it appears that plaintiff's response was not filed with the Court until June 11, 2009.

## III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

**\*5** Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*' " *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (emphasis in original)). As the Supreme Court stated in *Anderson,* "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary

2010 WL 335581

judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (quoting *Research Automation Corp.,* 585 F.2d at 33).

Where the plaintiff is proceeding *pro se,* the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)). Though a *pro se* litigant's pleadings and other submissions are afforded wide latitude, a *pro se* party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat a motion for summary judgment. *Shah v. Kuwait Airways Corp.,* --- F.Supp.2d ----, No. 08 Civ. 7371(GEL), 2009 WL 2877604, at *2 (S.D.N.Y. Sept. 9, 2009) ("Even a *pro se* party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting *Auguste v. N.Y. Presbyterian Med. Ctr.,* 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

## IV. DISCUSSION

### A. Proper Defendants

Plaintiff alleges specific causes of action against the Nassau County Police Department and Nassau County District Attorney's Office as defendants. However, "under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued." *See Davis v. Lynbrook Police Dep't,* 224 F.Supp.2d 463, 477 (E.D.N.Y.2002) (dismissing claim against Lynbrook Police Department); *see also Hall v. City of White Plains,* 185 F.Supp.2d 293, 303 (S.D.N.Y.2002) ("Because plaintiff has named the City of White Plains as a defendant, any claims against the [White Plains Department of Public Safety] are redundant. WPDPS does not have its own legal identity, and therefore the claims against it are dismissed."); *Polite v. Town of Clarkstown,* 60 F.Supp.2d 214, 216 (S.D.N.Y.1999) ("[M]unicipal departments in this State-such as the Clarkstown Police Department-are not amenable to suit, and no claims can lie directly against them."); *Wilson v. City of New York,* 800 F.Supp. 1098, 1101 (E.D.N.Y.1992) ("The court also dismisses the claims against the New York City Police Department, which cannot be sued

independently because it is an agency of the City of New York." (citations omitted)). Plaintiff's allegations against the Police Department are more properly raised in claims against Nassau County, which plaintiff has also brought in his first, second, and third causes of action. Accordingly, the Nassau County Police Department is dismissed as a defendant.

**\*6** For the same reason, plaintiff cannot bring claims against the Nassau County District Attorney's Office. *See Conte v. County of Nassau,* No. 06-CV-4746 (JFB)(ETB), 2008 WL 905879, at *1 n. 2 (E.D .N.Y. Mar. 31, 2008) (dismissing Section 1983 claims against the Nassau County District Attorneys Office because the entity is an " 'administrative arm[ ]' of the same municipal entity-the County ... and thus lack[s] the capacity to be sued"). Plaintiff's allegations against the District Attorneys Office are more properly brought as claims against Nassau County. Plaintiff has brought substantially the same claims against the District Attorney's Office as he has brought against the County of Nassau. Accordingly, the Nassau Count District Attorney's Office is dismissed as a defendant in this case. [4] Because the plaintiff is proceeding *pro se,* the Court, in its discretion, does not dismiss plaintiff's fourth through eleventh causes of action in their entirety, but rather construes those claims, which are largely duplicative of causes of action one through three, as against the County of Nassau.

[4]    The Court further notes that it has previously denied plaintiff's attempt to amend his complaint to state claims against Lawrence Mulvey, the Commissioner of the Nassau County Police Department, and Kathleen Rice, the Nassau County District Attorney. *See Jackson v. County of Nassau,* No. 07-CV-0245 (JFB)(AKT), 2009 WL 393640 (E.D.N.Y. Feb. 13, 2009).

### B. Section 1983 Liability

As stated *supra,* Jackson has brought his claims pursuant to Section 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan,* 443 U.S. 137, 145 n. 3 (1979). [5] For claims under Section 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of

the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citation omitted). Here, the parties do not dispute that defendants were acting under color of state law. The question presented, therefore, is whether defendants' conduct deprived Jackson of the rights he asserts.

[5]    Specifically, Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

42 U.S.C. § 1983.

Although *pro se* plaintiff alleges eleven separate causes of action against the County of Nassau and its administrative arms, the claims alleged by plaintiff in his complaint are as follows: (1) the County of Nassau has a policy or practice of permitting its employees (or employees of its administrative arms) to commit perjury and a policy or practice of failing to discipline its employees who do commit perjury; (2) the County of Nassau has a policy or practice of permitting its police officers to falsely verify criminal complaints; and (3) the County of Nassau has a policy of not investigating, responding to, or prosecuting complaints or cross-criminal complaints of pretrial detainees and criminal defendants that allege crimes and misconduct against police officers and assistant district attorneys. (Plaintiff's Opposition (hereinafter "Opp.") at 14.)

Defendants argue that they are entitled to summary judgment on the grounds that Jackson has failed to provide any evidence that would raise a genuine issue of fact as to municipal liability for any of these claims. As set forth below, the Court agrees. First, plaintiff has failed to provide any evidence that there was an underlying constitutional violation with respect to his arrest and conviction, which would be a necessary element of any municipal liability claim. In fact, under well-settled Supreme Court and Second Circuit precedent, plaintiff's valid conviction precludes him from litigating any of his claims in the instant case because success on such claims (that is, demonstrating his constitutional rights were violated in connection with the investigation and prosecution of his case) would necessarily implicate the unconstitutionality of his conviction. Second, plaintiff has

provided absolutely no evidence of an unconstitutional policy or custom of the County of Nassau and, thus, his municipal liability claims against the County cannot survive summary judgment.

(1) Plaintiff Cannot Demonstrate
Violation of His Constitutional Rights

**\*7** To bring a successful Section 1983 claim, plaintiff must first demonstrate that he was injured as a result of a constitutional violation. In the instant case, plaintiff cannot do so. First, Supreme Court precedent prevents a prisoner, like Jackson, from bringing a Section 1983 claim where success on the claim necessarily would implicate the unconstitutionality of the prisoner's conviction or sentence. Second, even assuming this rule did not apply, plaintiff has presented no evidence of any constitutional violations relating to his conviction.

a. *Heck v. Humphrey*

As a threshold matter, although not explicitly raised by defendants, plaintiff's claims fail as a matter of law, by virtue of his conviction. Specifically, the Supreme Court's decision in *Heck v. Humphrey,* 512 U.S. 477 (1994), entitles defendants to a decision in their favor as a matter of law with respect to these claims.

i. The *Heck* Rule

In *Heck v. Humphrey,* the Supreme Court "confronted the question of whether, given the overlap between § 1983 and the federal habeas corpus statute, a prisoner seeking civil damages may proceed with a § 1983 claim where success on the claim necessarily would implicate the unconstitutionality of the prisoner's conviction or sentence." *Amaker v. Weiner,* 179 F.3d 48, 51 (2d Cir.1999) (citing *Heck,* 512 U.S. at 480-90). The Supreme Court in that case explained:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a

§ 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

512 U.S. at 486-87 (footnote omitted) (emphasis in original); *see also Wilkinson v. Dotson,* 544 U.S. 74, 81 (2005) ("Heck specifies that a prisoner cannot use § 1983 to obtain damages where success *would* necessarily imply the unlawfulness of a (not previously invalidated) conviction or sentence." (emphasis in original)).

Thus, pursuant to *Heck,* courts routinely dismiss claims brought under Section 1983 when such claims bear on the validity of an underlying conviction or sentence. *See, e.g., Guerrero v. Gates,* 442 F.3d 697, 703-04 (9th Cir.2006) (holding that Heck bars plaintiff's § 1983 claims of wrongful arrest, malicious prosecution, and conspiracy); *Amaker,* 179 F.3d at 51-52 (holding that *Heck* applies to Section 1983 conspiracy); *Perez v. Cuomo,* No. 09 Civ. 1109(SLT), 2009 WL 1046137, at *7 (E.D.N.Y. Apr. 17, 2009) ("A § 1983 claim for the violation of the due process right to a fair trial is, in essence, a claim for damages attributable to an unconstitutional conviction.... Since plaintiff's conviction remains valid, plaintiff's claim for violation of his right to a fair trial is not cognizable under § 1983, and must be dismissed as to all defendants[.]") (internal quotation marks and citations omitted); *Younger v. City of N.Y.,* 480 F.Supp.2d 723, 730 (S.D.N.Y.2007) (holding that plaintiff's claims for false arrest/imprisonment and malicious prosecution were barred by his plea of guilty pursuant to *Heck); cf. Jovanovic*

*v. City of N.Y.,* No. 04 Civ. 8437, 2006 WL 2411541, at *12 (S.D.N.Y. Aug. 17, 2006) (applying *Heck* to a Section 1983 claim for denial of the right to a fair trial in the context of a statute of limitations issue).

### ii. Application

**\*8** Here, as stated *supra,* Jackson was convicted after a trial in state court of nine counts of Robbery in the First Degree and one count of Conspiracy in the Fourth Degree on July 30, 2008. It is apparent that Jackson is still incarcerated for this conviction and, to date, has been unsuccessful in challenging his conviction or has not even attempted to do so. Under these circumstances, the Supreme Court's holding in *Heck* precludes plaintiff from bringing claims in this Court under Section 1983 for municipal liability, because a plaintiff bringing such claims must demonstrate a constitutional violation in connection with his conviction, and a successful result in this case on any one of plaintiff's claims would bear on the validity of that underlying conviction.

Indeed, *Heck'* s application to the instant matter is straightforward. Plaintiff's complaint claims that he was "subsequently indicted based upon officer Hughes['s] 'inaccurate' testimony." (Compl.¶ 9.) Plaintiff also contends that during his pretrial hearings there was extensive "late disclosure of [exculpatory] material." (*Id.* ¶ 11.) Although it is true that not all claims brought under Section 1983 necessarily implicate the validity of the underlying conviction, in this case, plaintiff's assertions of perjury, withheld evidence, and falsely sworn documents during his trial by police officers do necessarily implicate the validity of his conviction and are thus barred by the *Heck* rule. [6] *See, e.g., McCloud v. Jackson,* 4 F. App'x 7, 10 (2d Cir.2001) ("[Plaintiff] could not assert [municipal liability] claims under § 1983 against the county defendants for holding him in jail because any claim for money damages which, as here, necessarily imputes the invalidity of a conviction, is barred under *Heck v. Humphrey,* 512 U.S. 477, 484, 486-87 (1994), until such time as the conviction is vacated or otherwise invalidated."); *Channer v. Mitchell,* 43 F.3d 786, 787-88 (2d Cir.1994) (per curiam) (affirming *Heck*-based dismissal of claim that police officers committed perjury and coerced witnesses to identify plaintiff wrongfully); *Williams v. Schario,* 93 F.3d 527, 529 (8th Cir.1996) ("[A] judgment in Williams's favor on his damages claim that defendants engaged in malicious prosecution and presented perjured testimony would 'necessarily imply the invalidity of his conviction or sentence' " (quoting *Heck,*

512 U.S. at 487)); *Smithart v. Towery,* 79 F.3d 951, 952-53 (9th Cir.1996) (per curiam) (affirming *Heck*-based dismissal of § 1983 claim of conspiracy to "bring unfounded criminal charges" against plaintiff); *Jasper v. Fourth Court of Appeals,* No. 08 Civ. 7472(LAP), 2009 WL 1383529, at *1 (S.D.N.Y. May 18, 2009) ("The Court liberally construes this complaint as asserting that plaintiff was denied his constitutional right to a fair trial. [However, s]ince plaintiff's conviction remains valid, plaintiff's fair trial claim is not cognizable under § 1983, and it must be dismissed as to all defendants[.]"); *Perez,* 2009 WL 1046137, at *7 ("A § 1983 claim for the violation of the due process right to a fair trial is, in essence, a claim for damages attributable to an unconstitutional conviction.... Since plaintiff's conviction remains valid, plaintiff's claim for violation of his right to a fair trial is not cognizable under § 1983, and must be dismissed as to all defendants[ .]") (internal quotation marks and citations omitted); *Fernandez v.. Holzbach,* No. 3:04 Civ. 1664(RNC), 2007 WL 1467182, at *1 (D.Conn. May 15, 2007) (holding that plaintiff's allegations that his convictions were based on perjury and fabricated evidence pursuant to a conspiracy to violate his federal rights "necessarily impl[ied] that he was wrongly convicted" and could not be litigated "until he show[ed] that the convictions have been invalidated"); *Duamutef v. Morris,* 956 F.Supp. 1112, 1115-16 (S.D.N.Y.1997) (dismissing § 1983 claims for, *inter alia,* malicious prosecution, false arrest, and perjury during trial due to a failure to state a claim under *Heck* because of the valid underlying criminal conviction). Thus, in order to bring a cognizable Section 1983 claim in this Court for the harms alleged, plaintiff must first establish the invalidity of his state court conviction.

6      With respect to plaintiff's claim that the County of Nassau has a policy of declining to investigate criminal complaints filed by pretrial detainees and criminal defendants, as discussed *infra,* plaintiff has failed to present any evidence that his claim was not investigated, whereas the County has presented substantial evidence demonstrating that plaintiff's claim was, in fact, investigated. Moreover, the prosecution of plaintiff's criminal complaints against Officer Hughes and Detective Comiskey would have implicated the validity of his underlying conviction, in contravention of the *Heck* rule. Accordingly, *Heck* can be construed to preclude all of plaintiff's Section 1983 claims.

**\*9** The fact that plaintiff is seeking to assert municipal liability claims against the County of Nassau, rather than against individual defendants, does not vitiate the application

of the *Heck* rule to plaintiff's claims. To prevail against the County of Nassau in his Section 1983 action under any of these theories, a plaintiff must plead and prove: (1) there was an official municipal policy or custom; and (2) that policy or custom caused him to be subjected to a denial of a constitutional right. *See Monell v. Dep't Soc. Servs.,* 436 U.S. 658, 690-91 (1978). There must be a "direct causal link" between the alleged municipal action and the deprivation of the plaintiff's constitutional rights. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989); *Vippolis v. Vill. of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985); *see also Lynch v. Suffolk County Police Dep't,* No. 07-3684-cv, 2009 WL 3287565, at *2 (2d Cir. Oct. 14, 2009) ("In order to prevail on a claim against a municipality under *Monell,* a plaintiff must allege, among other things, that a 'municipal policy of some nature caused a constitutional tort.' " (citations omitted)). In the instant case, because the Court finds as a matter of law on summary judgment that *Heck v. Humphrey* prevents a finding that a constitutional violation was committed against plaintiff by any of the defendants, *see supra,* no *Monell* claim can lie against the County of Nassau pursuant to § 1983. [7] *See, e.g., Lynch,* 2009 WL 3287565, at *2 ("Insofar as plaintiff alleges that a municipal policy caused prosecutorial misconduct in the trial that led to his felony convictions, plaintiff's claim seeks to 'recover damages for [an] allegedly unconstitutional conviction or imprisonment' and is barred by *Heck,* 51 U.S. at 486." (alteration in original)); *Segal v. City of N.Y.,* 459 F.3d 207, 219 (2d Cir.2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *accord Vippolis,* 768 F.2d at 44 ("A plaintiff who seeks to hold a municipality liable in damages under section 1983 must prove that the municipality was, in the language of the statute, the 'person who ... subjected, or cause[d][him] to be subjected,' to the deprivation of his constitutional rights." (citing 42 U.S.C. § 1983)); *see also Ewolski v. City of Brunswick,* 287 F.3d 492, 516 (6th Cir.2002) ("Having concluded that the Appellant has not shown a genuine issue of material fact as to any of the asserted constitutional claims, we therefore conclude that the district court correctly dismissed the Appellant's municipal liability claims.").

7      In any event, summary judgment would also be warranted in favor of the County of Nassau because, as discussed *infra,* plaintiff has failed to proffer any evidence of a policy, custom, or

failure to train, that led to any alleged constitutional violation.

In sum, even accepting plaintiff's allegations as true and drawing all reasonable inferences in plaintiff's favor, the Court finds that plaintiff cannot successfully bring a claim because the *Heck* rule, as a matter of law, prevents plaintiff from demonstrating a violation of his constitutional rights, which is a necessary predicate to any municipal liability claim pursuant to Section 1983.

### b. No Evidence of Violation of Plaintiff's Constitutional Rights

**\*10** Moreover, even assuming that the validity of plaintiff's underlying conviction is not implicated by his claim that the County of Nassau had a policy of ignoring criminal complaints filed by pretrial detainees and criminal defendants, he has presented no evidence to support his contention that the County did not investigate his claims. Thus, because there is no evidence from which a rational jury could find a violation of his constitutional rights, there is no predicate for his municipal liability claim.

The only forms of evidence offered by plaintiff on this issue are his bald assertions and the fact that the County did not prosecute Officer Hughes or Detective Comiskey for their alleged misconduct in relation to plaintiff's trial. Plaintiff's exhibits consist merely of copies of the letters and complaints that he filed with Nassau County entities. Plaintiff presents no evidence to contradict the evidence put forth by defendants, which demonstrates that plaintiff's complaints were investigated. In two affidavits submitted by ADA Kornblau, former Bureau Chief of the District Attorney's Public Corruption Bureau, she asserts that she personally investigated plaintiff's complaints against the officers. (*See* Defs.' Exs. K, X.) According to ADA Kornblau's affidavit, upon investigating Jackson's complaints, "[it] was clear from the minutes that [Jackson's] criminal attorney raised the issue of the failure to turn over *Rosario* material to the trial court, which is the proper venue for such an allegation." (Defs.' Ex K ¶ 4.) Subsequently, ADA Kornblau determined that the remainder of plaintiff's claims were unfounded, and declined to prosecute the matter. (*See id.* ¶ 4 ("Subsequent to reviewing Jackson's complaint and after determining that the [complaint] did not allege conduct which constituted a crime, I referred the matter to the Internal Affairs Bureau of the Nassau County Police Department ...."); *id.* ¶ 6 ("In view of the fact that the trial of this case

was still pending, and the issues alleged by [Jackson] all pertained to credibility, I notified Daniel Looney, the Assistant District Attorney assigned to Jackson's prosecution, as well as defense counsel, Jeffrey Groder, of Jackson's claims. I also forwarded Jackson's complaint to the Internal Affairs Bureau of the Nassau County Police Department for whatever administrative action they deemed necessary.").) In a separate affidavit, ADA Steven L. Schwartz, Bureau Chief of the District Court Trial Bureau in the Nassau County District Attorney's Office, states that he personally investigated plaintiff's proposed accusatory instruments and found them to be unfounded; accordingly, they were not prosecuted. (Defs.' Ex. Q ¶ 9.) [8]

[8]      The Court further notes that in the absence of any evidence that the Nassau County District Attorney's Office failed to investigate Jackson's complaints, the decision not to prosecute those complaints is protected by prosecutorial immunity. *See, e.g., Fields v. Soloff,* 920 F.2d 1114, 1119 (2d Cir.1990) ("[U]nless a prosecutor proceeds in the clear absence of all jurisdiction, absolute immunity exists for those prosecutorial activities intimately associated with the judicial phase of the criminal process.... This protection extends to the decision to prosecute as well as the decision not to prosecute." (internal quotations and citations omitted)).

Here, as in *Staley v. Grady,* 371 F.Supp.2d 411 (S.D.N.Y.2005), "[s]imply because defendants disagreed with plaintiff as to the merits of the proposed [complaint] and chose not to prosecute the same, does not give rise to an equal protection violation." *Id.* at 417. Here, too, the Nassau County District Attorney's Office received Jackson's criminal complaints, reviewed and investigated them, and declined to prosecute them based upon the conclusion that the complaints were without merit. (*See* Defs.' Exs. K, Q.)

**\*11** In short, due to plaintiff's inability to set forth any evidence from which a rational jury could find a deprivation of his constitutional rights, plaintiff's *Monell* claims against the County of Nassau cannot survive summary judgment.

### (2) Plaintiff Has Set Forth No Evidence to Support a *Monell* Claim

Even assuming *arguendo* that plaintiff had put forth evidence to create a genuine issue of fact on whether his constitutional rights were violated, his municipal liability claims still cannot survive summary judgment because there is no evidence of a policy, practice or custom to support a finding by a rational jury of municipal liability under *Monell.*

### i. Applicable Standard

Municipalities cannot be held vicariously liable for the actions of an employee under § 1983. *Monell,* 463 U.S. at 691 ("[A] municipality cannot be held liable solely because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."). Thus, "[a] municipality will not be held liable under Section 1983 unless the plaintiff can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken pursuant to a policy or custom 'officially adopted and promulgated by that [municipality's] officers.' " *Abreu v. City of N.Y.,* No. 04-CV-1721 (JBW), 2006 U.S. Dist. LEXIS 6505, at *11 (E.D.N.Y. Feb. 22, 2006) (quoting *Monell,* 436 U.S. at 690) (alteration in original). " '[M]unicipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers ." *City of Canton,* 489 U.S. at 389 (quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 483-84 (1986)). Thus, an individual's misconduct will not result in *respondeat superior* liability for his supervisors absent specific allegations that he acted pursuant to an official policy or custom. *Ricciuti v. N.Y.C. Transit A uth .,* 941 F.2d 119, 123 (2d Cir.1991). However, "[a] court may draw the inference of the existence of a policy or custom 'when a plaintiff presents evidence that a municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.' " *Caidor v. M & T Bank,* No. 05-CV-297 (FSJ), 2006 U.S. Dist. LEXIS 22980, at *35-36 (N.D.N.Y. Mar. 27, 2006) (quoting *Grifin-Nolan v. Providence Wash. Ins. Co.,* No. 04-CV-1453 (FJS), 2005 U.S. Dist. LEXIS 12902, at *10 (N.D.N.Y. June 20, 2005) (quotation omitted)). But, " 'the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.' " *Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995) (quoting *Dwares v. City of N.Y.,* 985 F.2d 94, 100 (2d Cir.1993)).

### ii. Application

Even if plaintiff could prove that his constitutional rights were violated, whether at trial or by the subsequent failure to prosecute his criminal complaint for the actions by municipal actors at his trial, this is not sufficient to demonstrate a policy or custom by the County of Nassau. "[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Ricciuti,* 941 F.2d at 123; *see also Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *McAllister v. N.Y.C. Police Dep't,* 49 F.Supp.2d 688, 706 (S.D.N.Y.1999) (same); *Palmer v. City of Yonkers,* 22 F.Supp.2d 283, 290 (S.D.N.Y.1998) ("[T]he court will not infer the existence of a municipal policy from a single incident."). As discussed *supra,* " 'the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.' " *Zahra,* 48 F.3d at 685 (quoting *Dwares,* 985 F.2d at 100). [9]

[9]   Plaintiff contends that the persons who violated his constitutional rights were policymakers. (Opp. at 14 ("All of plaintiff's claims were made against the 'policy makers' and not against employees below the policy making level.").) First, as discussed *supra,* plaintiff's claims regarding alleged perjury, withholding of evidence, or falsely verified complaints relating to his trial are barred by *Heck.* In addition, however, plaintiff presents no evidence in support of this argument. Moreover, for purposes of plaintiff's causes of action regarding the failure to investigate his criminal complaints against those persons, plaintiff would need to allege that the persons who allegedly failed to investigate his accusations were policymakers. Plaintiff does not do so. Instead, he acknowledges that the policy maker is District Attorney Kathleen Rice, and the individuals who submitted the defendants' supporting affidavits-those who investigated plaintiff's allegations-are subordinates to the policy maker. (Opp. at 15.)

For the reasons contained in our earlier opinion, this Court declines to add District Attorney Rice as a defendant in this action. *See Jackson, 2009 WL 393640, at \*3-5.* In light of Jackson's repeated argument that the actions of the Nassau County District Attorney's Office's and Nassau County Police Department's actions were part of a policy, procedure, or custom, the Court interprets his complaint and opposition papers to argue municipal liability based only on a theory of municipal policy, procedure, or custom, and not on a theory of unconstitutional action by a policymaker.

**\*12** Plaintiff's complaint, statements at his deposition, and opposition papers to defendants' motion for summary judgment contain vague allegations regarding the existence of a policy or procedure by the County of Nassau of refusing to investigate criminal complaints of pretrial detainees and criminal defendants. (*E.g.,* Opp. at 5-6 ("Plaintiff also stated that he never received any response or letters of acknowledgment from either office though he wrote numerous letters inquiring about the status of his complaints and criminal charges."); Opp. at 6 ("The complaints were never investigated and plaintiff never received any response."); Opp. at 7 ("During the deposition plaintiff continuously testified to the fact that no one ever investigated nor responded to his complaints and grievances.").) These conclusory allegations as to the existence of a policy or custom are insufficient to withstand summary judgment. *See Bishop v. Toys "R" Us-NY, LLC,* No. 04 Civ. 9403(PKC), 2009 WL 440434, at \*4 (S.D.N.Y. Feb. 19, 2009) ("[P]roceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." (quoting *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1995)). Indeed, mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Id* . (citing *Matsushita,* 475 U.S. 574, 587 (1986)); Order, *McCrary v. County of Nassau,* No. 06 CV 4982(SJF)(ARL) (E.D.N.Y. Sept. 22, 2008) ("Magistrate Judge Lindsay properly found that [p]laintiff had proffered no evidence to support his assertion that a custom, policy and/or practice, which precludes the consideration of criminal charges brought by an accused against police officers and assistant district attorneys, existed" when plaintiff merely asserted that a police officer was "aware of alleged police misconduct regarding Plaintiff's apprehension, [the] affidavits in support of County

Defendants' summary judgment motion were not sufficiently detailed, and that there was no record of any investigation having been conducted by [County Defendants] in regards to the [complaints]"). Plaintiff has presented no actual evidence of a policy or custom whereby the County would decline to review the criminal complaints of pretrial detainees or criminal defendants.

The County of Nassau, however, has put forward extensive evidence regarding the policies that it has in place to review criminal complaints filed by all citizens. In two separate affidavits, ADA Kornblau affirms that the County does investigate criminal complaints against police officers and ADAs-including those made by pretrial and criminal defendants: "[M]any of the [District Attorney's Public Corruptions Bureau's] cases are referred from members of the public, including direct complaints of police misconduct that the Bureau receives from defendants and/or their attorneys." (Defs.' Ex. X. ¶ 5.) Similarly, "[t]o facilitate the investigation into complaints by incarcerated individuals including pretrial detainees, the Public Corruption Bureau maintains a hotline in the Nassau County Correctional Center for the purpose of allowing inmates to file complaints directly with the Public Corruption Bureau, without having to have their complaints reviewed first by any other entity, agency, or person." (*Id.*) Moreover, ADA Kornblau's affidavit states that "[e]ach criminal complaint is afforded individual attention and investigation ... [and if] after investigation, it is determined that a complaint is supported by credible evidence, the Nassau County District Attorney's Public Corruption Bureau will recommend prosecution, after which those cases will be prosecuted in criminal court." (*Id.* ¶¶ 6-7).

**\*13** The County of Nassau has also submitted evidence that the system utilized by the Nassau County District Attorney's Office for examining criminal complaints filed by private citizens does not differentiate between complaints based on the individual who files the complaint. ADA Kornblau explains that:

> Complaints are retrieved from within the computerized complaint system in one of three ways: (1) a complainant's name; (2) a defendant's name; or, (3) a complaint number. Therefore, there is no way to retrieve criminal complaints made specifically by pretrial detainees from within the computer complaint

system since complaints are placed into the system without complainant classification (e.g., civilian, pretrial detainee, police officer, etc.).

(*Id.* ¶ 8; *see also* Defs.' 56.1 ¶ 47; Defs.' Ex. W ¶ 11.) In plaintiff's opposition papers, he stated that he did not dispute these facts. (Opp. at 12.)

The County of Nassau also submitted an affidavit from ADA Warren Thurer, the Bureau Chief of the Nassau County Criminal Complaint Unit. According to ADA Thurer, "[s]pecifically with respect to allegations of an assistant district attorney's or police officer's criminal conduct, such allegations will be individually investigated and if appropriate, will be forwarded to the Public Corruption Bureau of the Nassau County District Attorney's Office." (Defs.' Ex. W ¶ 10; *see also* Defs.' Ex. Q ¶ 10 ("There is no policy, practice, or custom within the Nassau County District Attorney's Office that precludes the consideration, investigation, and/or acceptance of criminal cross-complaints brought by an accused against police officers and/or assistant district attorneys based upon the status of the complainant as a pretrial detainee").) An affidavit provided by ADA Steven L. Schwartz, Bureau Chief of the District Court Trial Bureau in the Nassau County District Attorney's Office, states that:

> All proposed accusatory instruments are given individual attention and investigation. There is no distinction made for the status of the complainant and pretrial detainees are not treated any differently than other individuals proposing accusatory instruments to be filed. Each proposed accusatory instrument is investigated for possible criminalityand, if appropriate, any case may be forwarded and assigned to one of the investigative bureaus within the District Attorney's Office, or prosecuted within the District Attorney's District Court Bureau. If the allegations in a proposed accusatory instrument are determined to be unfounded, I send a letter to the Associate Court Clerk stating that the District Attorney's Office has declined

to prosecute the matter.... Specifically, with respect to allegations of an assistant district attorney's or police officer's criminal conduct, such allegations are individually investigated and if appropriate, are forwarded to the Nassau County District Attorney's Office Public Corruption Bureau.

**\*14** (Defs.' Ex. Q ¶¶ 7-8.) Plaintiff has presented no evidence to contradict the information contained in these affidavits or to suggest otherwise.

Nor has plaintiff presented evidence of a policy or custom of committing perjury, withholding evidence, or falsely verifying criminal complaints. Plaintiff has merely asserted that "he can testify based upon personal knowledge to the undisputed facts and that he has credible witnesses and documental evidence to support said factual claims." (Opp. at 11.) Plaintiff has not alleged with specificity other instances of perjury, withheld evidence, or falsified complaints, nor has he presented any other evidence of police officers' commission of perjury, withholding of evidence, or filing of falsely sworn complaints. The County of Nassau, by contrast, has put forward evidence regarding its arrest processing procedures and arrest records. (*See* Defs.' Ex. Z.) Nowhere in the County's arrest policies is false verification of criminal complaints, withholding of evidence, or perjury authorized. Furthermore, the "collective knowledge doctrine" or "fellow officer rule" permits arresting officers to rely upon other law enforcement officers' knowledge to justify probable cause to arrest. *See Savino v. City of New York,* 331 F.3d 63, 74 (2d Cir.2003) ( [F]or the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation, ... the knowledge of one is presumed shared by all.' "); *Stokes v. City of New York,* No 05-CV-0007 (JFB) (MDG), 2007 U.S. Dist. LEXIS 32787, at \*17 (E.D.N.Y. May 3, 2007) ("[U]nder the collective knowledge doctrine, defendant Buskey is permitted to rely on knowledge obtained by any other officers during the investigation"); *Phelps v. City of New York,* No. 04 CIV. 8570(DLC), 2006 U.S. Dist. LEXIS 42926, at \*9-10 (S.D.N.Y. June 29, 2006) ("The rationale behind the [collective knowledge] doctrine is that in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on

facts known only to his superiors or associates. Although the doctrine is typically used to establish probable cause for the purpose of admitting evidence at trial, it is equally applicable here. As the Supreme Court has recognized, police officers called upon to aid other officers in making an arrest are entitled to assume that the officers requesting aid have acted properly." (internal quotations and citations omitted)). Accordingly, it is not improper for an officer to verify a criminal complaint based upon facts learned from another officer and plaintiff has put forth no evidence of a policy, practice, or custom of Nassau County police officers falsifying information in criminal complaints or committing perjury.

Moreover, the County of Nassau has put forward an affidavit from a former Nassau County ADA, who investigated and prosecuted a complaint against a Nassau County Police Officer in an unrelated matter that alleged that the officer had committed perjury by falsely testifying before the grand jury. (Defs.' Ex. Y ¶¶ 2-5.) That police officer was prosecuted and convicted of perjury in the third degree. (*Id.* ¶ 8.) In the face of this undisputed evidence of the County prosecuting perjury when it is uncovered, plaintiff has not identified any specific instances of police officers' commission of perjury that were not prosecuted.

**\*15** In sum, the undisputed facts demonstrate the following: (1) plaintiff's conviction prevents him from disputing any alleged constitutional violations relating to his trial; (2) defendants did investigate plaintiff's criminal complaints regarding Officer Hughes's and Detective Comiskey's alleged behavior; (3) defendants do have in place policies and procedures whereby criminal complaints filed by private citizens are investigated-even if those citizens are pretrial detainees or criminal defendants; and (4) the County of Nassau does not have a policy or procedure of permitting its employees to commit perjury, to falsely verify criminal complaints, or to withhold exculpatory evidence at trial. In short, plaintiff has failed to provide any factual support for his conclusory allegations that the defendants have engaged in unconstitutional policies or procedures. Accordingly, defendant's motion for summary judgment is granted.

### C. Motion for Sanctions

The Court has also reviewed plaintiff's motion for sanctions and, for the reasons stated throughout this opinion, finds plaintiff's claims to be without merit. Accordingly, plaintiff's motion for sanctions is also denied. *See S.E. C. v. Shainberg, 316 F. App'x 1, 2 (2d Cir.2008).*

### V. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment in its entirety. Because the Court grants defendants' motion for summary judgment in its entirety, it also denies plaintiff's motion for sanctions against defendant.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).*

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 335581

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2868231

2009 WL 2868231
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Quentin LA GRANDE, Plaintiff,

v.

TOWN OF BETHLEHEM POLICE
DEPARTMENT, et al., Defendants.

No. 1:08–CV–0738 (LEK/DRH).
|
Sept. 1, 2009.

**Attorneys and Law Firms**

Quentin La Grande, Albany, NY, pro se.

Nannette R. Kelleher, Bailey, Kelleher Law Firm, Albany, NY, for Defendants.

**_DECISION AND ORDER_**

LAWRENCE E. KAHN, District Judge.

**\*1** Plaintiff _pro se_ Quentin La Grande ("Plaintiff" or "La Grande") commenced the instant action against Defendants Robert Helligrass [1], Stephen Kraz [2] and the Town of Bethlehem Police Department (collectively, "Defendants") pursuant to 42 U.S.C. § 1983. Complaint (Dkt. No. 1). Presently before this Court is Defendants' Motion to dismiss (Dkt. No. 13) and Plaintiff's Motion for summary judgment (Dkt. No. 12). For the following reasons, Defendants' Motion to dismiss is granted and Plaintiff's Motion for summary judgment is denied.

[1]  Incorrectly named in the Complaint as "R.J. Helliergrass." _See generally_ Complaint (Dkt. No. 1).

[2]  Incorrectly named in the Complaint as "William Craz." _See generally_ Complaint.

**I. BACKGROUND**

According to Plaintiff, "[o]n April 1, 2008 I was threaten by Patrol Officer William Craz. Patrol Officer called me a 'Nigger,' and also threaten to cause bodily harm to me. On April 2, 2008 I met with Seargent R.J. Helliergrass and was

interogated, and racial harrassed. On or about April 5, 10, 15, May 6, 8, 10, 15, and June 6, 2008, I have been followed by the Bethlehem Police Department." Compl. at 2. Plaintiff's jurisdictional statement asserts that the Complaint is being brought pursuant to 42 U.S.C. § 1983. _Id._ at 1.

In lieu of filing an answer, on March 11, 2009, Defendants filed the Motion to dismiss presently before the Court. Mot. to Dismiss (Dkt. No. 13). Plaintiff also filed a Motion for summary judgment on February 24, 2009, which is now before the Court. Mot. for Sum. Judg. (Dkt. No. 12).

**II. DISCUSSION**

**A. Defendants' Motion to Dismiss**

**a. Standard of Review**

In order to withstand a motion to dismiss, "a [pleading] must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " _Ashcroft v. Iqbal,_ ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting _Bell Atlantic Corp. v. Twombly,_ 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A party must plead with such factual detail so as to sufficiently " 'nudge [ ][its] claims ... across the line from conceivable to plausible.' " _Iqbal,_ 129 S.Ct. at 1950–51 (quoting _Twombly,_ 550 U.S. at 570). While stating a claim does not require the recitation of detailed factual allegations, it does, however, require facts sufficient to state a claim to relief that is _prima facie_ plausible. _Iqbal,_ 129 S.Ct. at 1949 (citing _Twombly,_ 550 U.S. at 555). The Court must accept the allegations in the well-pleaded complaint as true, _Albright v. Oliver,_ 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), and draw all inferences in favor of the non-moving party. _Scheuer v. Rhodes,_ 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1973); _Global Network Commc'ns, Inc. v. City of New York,_ 458 F.3d 150, 154 (2d Cir.2006); _King v. Am. Airlines, Inc.,_ 284 F.3d 352, 356 (2d Cir.2002).

In assessing the legal sufficiency of the Complaint, the Court is mindful that La Grande is a _pro se_ litigant and his submissions are subject to "less stringent standards than formal pleadings drafted by lawyers." _Hughes v. Rowe,_ 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (quoting _Haines v. Kerner,_ 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). The Court must "read the pleadings of a _pro se_ plaintiff liberally and interpret them 'to raise the strongest arguments they suggest.' " _McPherson v. Coombe,_ 174 F.3d 276, 280 (2d Cir.1999); _see Hemphill v. New York,_ 380 F.3d

680, 687 (2d Cir.2004) (" "It is well-established that 'when a plaintiff proceeds *pro se* the court is obligated to construe his pleadings liberally, particularly when they allege civil rights violations' ") (quoting *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004)). However, a plaintiff's *pro se* status "does not exempt [him] from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck,* 710 F.2d 90, 92 (2d Cir.1983).

#### b. Analysis
**\*2** Defendants move to dismiss Plaintiff's Complaint in its entirety pursuant to Rules 12(b)(6) of the Federal Rules of Civil Procedure.[3] Mot. to Dismiss (Dkt. No. 13) at 1. Defendants specifically argue that all causes of action against the Town of Bethlehem Police Department must be dismissed as it is not a legal entity subject to suit under 42 U.S.C. § 1983 and further that Plaintiff's entire Complaint should be dismissed for failing to state a cause of action. *Id.* at 4.

[3]     Defendants argue, alternatively, that Plaintiff's Complaint should be dismissed pursuant to 28 U.S.C. § 1915(e) and for failing to adhere to Rule 8(a) of the Federal Rules of Civil Procedure. The Court need not address these arguments as it is dismissing Plaintiff's Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

#### i. Town of Bethlehem Police Department
The Town of Bethlehem moves to dismiss Plaintiff's Complaint on the ground that it is not susceptible to suit under 42 U.S.C. § 1983. While a municipality may be susceptible to suit under 42 U.S.C. § 1983, a municipal police department is not. *See Walker v. Waterbury Police Dep't.,* 08–cv–959 (JG)(AKT), 2009 U.S. Dist. LEXIS 7933, at \*5, 2009 WL 261527 (E.D.N.Y. Feb. 4, 2009). "Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued." *Id.* (citing *Hall v. City of White Plains,* 185 F.Supp.2d 293, 303 (S.D.N.Y.2002)). Accordingly, claims asserted under 42 U.S.C. § 1983 will be dismissed against a municipality's police department. *See Walker,* 2009 U.S. Dist. LEXIS 7933, at \*5, 2009 WL 261527 (internal citation omitted); *see also Baker v. Willett,* 42 F.Supp.2d 192, 198 (N.D.N.Y.1999).

Here, Plaintiff has sued the Town of Bethlehem Police Department along with two individual officers of the

department. *See generally* Compl. Plaintiff's Complaint asserts that it is brought pursuant to 42 U.S.C. § 1983 and does not provide any other basis for the claims. *Id.* at 1. Since the Bethlehem Police Department cannot be sued pursuant to 42 U.S.C. § 1983, Plaintiff's Complaint is dismissed as against the Town of Bethlehem Police Department.

Even assuming *arguendo* that Plaintiff's claims against the Town of Bethlehem Police Department can be construed as a claim against the Town of Bethlehem, Plaintiff's Complaint would still be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

In order to state a cause of action for municipal liability under 42 U.S.C. § 1983, "a plaintiff must allege that the municipality has adopted a custom or policy which is the moving force behind the [alleged constitutional violation]." *Zappala v. Albicelli,* 980 F.Supp. 635, 649 (N.D.N.Y.1997). A municipality cannot be held liable on the basis of *respondeat superior* and "a single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Campanaro v. City of Rome,* 999 F.Supp. 277, 281 (N.D.N.Y.1998); *see also Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993).

Plaintiff's Complaint is devoid of any allegations that the Town of Bethlehem had a policy or custom of violating constitutional rights, nor does plaintiff allege or even allude that the Town was deliberately indifferent to his constitutional rights. The complete failure to plead such warrants dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, as the Complaint fails to state a cause of action for which relief can be granted under 42 U.S.C. § 1983. *See Campanaro,* 999 F.Supp. at 281; *Dwares,* 985 F.2d at 100.

#### ii. Defendants Kraz and Helligrass
**\*3** La Grande's Complaint alleges that between April and June 2008, he was "racially harassed," "threatened" and "interrogated" by Defendants Kraz and Helligrass, two officers of the Bethlehem Police Department. Compl. at 2. Specifically, La Grande alleges that on multiple occasions the officers addressed him with a racial epithet and followed him through town. *Id.* It is well settled in this Circuit that "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Murray v. Pataki,* No. 9:03–cv–1263, 2007 U.S. Dist. LEXIS 26959, at \*22, 2007 WL 956941 (N.D.N.Y. Mar. 29, 2007) (Kahn, J.) (quoting *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003)) (collecting cases).

2009 WL 2868231

"[V]erbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Murray,* 2007 U.S. Dist. LEXIS, at * 22 (quoting *Moncrieffe v. Witbeck,* 2000 U.S. Dist. LEXIS, at *3, 2000 WL 949457 (N.D.N.Y. June 29, 2000)); *see also Zeno v. Cropper,* 650 F.Supp. 138, 141 (S.D.N.Y.1986) ("vile and abusive language ... no matter how abhorrent or reprehensible cannot form the basis for a § 1983 claim) (internal citation and quotation omitted). Further, "threats do not amount to violations of constitutional rights." *Murray,* 2007 U.S. Dist. LEXIS, at *23 (quoting *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995)).

In this case, Plaintiff's claim for verbal harassment in the form of racial slurs and threats is not actionable under § 1983 and, therefore, fails to state a claim entitled to relief. Compl. at 2.

**B. Plaintiff's Motion for Summary Judgment**

Even assuming *arguendo* that this Court did not grant Defendants' Motion to dismiss, Plaintiff's Motion for summary judgment would still be denied. Under the Local Rules, *"all* motions ... require a memorandum of law, supporting affidavit, and proof of service on all the parties." N.D.N.Y. L.R. 7.1(a) (emphasis added). "All memoranda of law shall contain a table of contents and, wherever possible, parallel citations." *Id.* at 7 .1(a)(1). Further "[a]ny motion for summary judgment shall contain a Statement of Material Facts ... *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*" *Id.* at 7 .1(a)(3) (emphasis in original).

Here, not only did the Plaintiff fail to submit a memoranda of law in support of his Motion for summary judgment and an affidavit but he also failed to submit a Statement of Material Facts. In fact, in his Motion for summary judgment filed on February 24, 2009, Plaintiff explicitly stated, "I will provide this Court with a 'Law Memorandum' in support of my motion; such will contain applicable law, and case law. I will submit this to the Court on or before March 6, 2009." Mot. for Sum. Judg. at 1. To date, this Court has not received said memorandum of law. While this Court recognizes Plaintiff's *pro se* status, he has failed to comply with *all* of the Local Rules. *See Traguth v. Zuck,* 710 F.2d 90, 92 (2d Cir.1983) (a plaintiff's *pro se* status "does not exempt [him] from compliance with relevant rules of procedural and substantive law"). Accordingly, Plaintiff's Motion for summary judgment

is denied for failing to comply with the relevant rules of procedure. *See, e.g.,* N.D.N.Y. L.R. 7.1(a), 7.1(a)(3).

**C. Amended Complaint**

**\*4** Plaintiff also moves to amend his Complaint. Response (Dkt. No. 27). While *pro se* litigants are generally afforded wide latitude and an opportunity to amend, a District Court need not permit an amendment to a Complaint where it would be futile. *See Forman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (holding that although leave to amend should be freely given where justice so requires, a district court need not grant leave if amendment would be futile); *Acito v. Imcera Group, Inc.,* 47 F.3d 47, 55 (2d Cir.1995).

Here, Plaintiff's Complaint does not state any viable causes of action under 42 U.S.C. § 1983. Further, Plaintiffs Complaint does not state which, if any, of his constitutional rights were violated by Defendants nor does it plead any facts to establish municipal liability. Plaintiff's Complaint also does not plead any facts supporting his allegations that he was "racially harassed," "threatened" or "interrogated." Since, as the Court discussed above, none of the complained of actions provides the basis for a cognizable cause of action, leave to cure these defects would be futile. These deficiencies may have been excusable, albeit not cureable, had this Court not previously informed Plaintiff of the requirements for pleading a cause of action under 42 U.S.C. § 1983 against a municipality. *See La Grande v. Albany Police Dep't,* 1:07–CV–757 (Dkt. No. 4). [4] Given that leave to amend would be futile, this Court denies Plaintiff's request.

[4]    Notably, Plaintiff has also filed numerous Complaints in the Northern District, many of which include assertions of civil rights violations and racial discrimination or harassment, wherein Plaintiff has been granted leave to amend his complaints. Plaintiff has filed eleven suits in the Northern District since 2000, including the instant matter. In fact, on May 12, 2008, Chief United States District Judge Norman A. Mordue entered an order enjoining Plaintiff from filing any further actions or pleadings in this district without the prior permission of the Chief Judge. Dkt. No. 6. This Order was entered based on a record of vexatious and frivolous pleadings previously filed by La Grande.

Case 5:23-cv-00508-GTS-TWD   Document 12   Filed 06/29/23   Page 39 of 135
La Grande v. Town Of Bethlehem Police Dept., Not Reported in F.Supp.2d (2009)
2009 WL 2868231

### III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that Defendants' Motion to dismiss (Dkt. No. 13) is **GRANTED in its entirety;** and it is further

**ORDERED,** that Plaintiff's request to amend his Complaint (Dkt. No. 27) is **DENIED;** and it is further

**ORDERED,** that Plaintiff's Motion for summary judgment (Dkt. No. 12) is **DENIED in its entirety;** and it is further

**ORDERED,** that the Clerk serve a copy of this Decision and Order on all parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2868231

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4052286
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Sylvia JENKINS, Plaintiff,
v.
Mr. LIADKA, Syracuse Police Officer; Mr. Sands,
Syracuse Police Officer; John Doe, Syracuse Police
Officer; and Syracuse Police Dep't, Defendants.

No. 5:10–CV–1223 (GTS/DEP).
|
Sept. 13, 2012.

**Attorneys and Law Firms**

Sylvia Jenkins, Syracuse, NY, pro se.

Hon. Mary Anne Dougherty, Corporation Counsel for
City of Syracuse, Catherine Ena Carnrike, Esq., Assistant
Corporation Counsel, of Counsel, Syracuse, NY, for
Defendants.

### *MEMORANDUM–DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Sylvia Jenkins ("Plaintiff") against Mr. Liadka,
Mr. Sands, John Doe, and Syracuse Police Department
("Defendants"), is Defendants' motion to dismiss Plaintiff's
Complaint for insufficient service of process pursuant to
Fed.R.Civ.P. 12(b)(5) and/or for failure to state a claim
pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 13.) For the
reasons set forth below, Defendants' motion is granted in part
and denied in part.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Complaint
Generally, construed with the utmost of special liberality,
Plaintiff's Complaint asserts three claims against Defendants
arising from an investigatory stop in September 2010, in
Syracuse, New York: (1) a claim that three Syracuse Police
Officers unreasonably searched her in violation of the Fourth
Amendment; (2) a claim that they unlawfully seized, and
failed to return, her personal property in violation of the

Fourth, Fifth, and/or Fourteenth Amendments; and (3) a claim
that they subjected her to excessive force in violation of
the Fourth Amendment. (*See generally* Dkt. No. 1 [Plf.'s
Compl.].)

Generally, in support of these claims, Plaintiff alleges as
follows: (1) on the evening of September 9, 2010, she was
stopped on Butternut Street in the City of Syracuse by
two officers, who questioned her regarding a call they had
received; (2) when she told the two police officers that she
did not know what they were talking about and "attempted
to go on about [her] business," the officers became "uptight,
rude, [and] abnormal in their conversations [and] behavior,"
and threatened her; (3) the officers then proceeded to conduct
a search of "all [of Plaintiff and her] personal property,"
and, in the process of doing so, twisted her arm and forced
her onto the front of their police vehicle; (4) a third police
officer arrived, and she was assaulted by all three officers
(hereinafter "Defendants"), who hit her on the back and threw
her onto the police vehicle; (5) following the deprivation on
September 9, 2010, Defendants denied her a post-deprivation
remedy through a combination of threats, intimidation and/
or nonresponsiveness; and (6) Defendants took these actions
against her intentionally because they did not personally like
her, given her previous interactions with the Syracuse Police
Department. (*Id.*)

Plaintiff further alleges that, as a result of this incident,
she suffered various injuries and losses, including (1) a
"tremendous setback in already trying to recover in an [sic]
grave overall manner of my life [and] lifestyle involving
officials internally [and] externally," (2) head and back pain,
and mental suffering, (3) loss of personal property, and, (4)
loss of employment. (*Id.*) As relief, Plaintiff requests an award
of twelve thousand dollars ($12,000) in damages. (*Id.* at ¶ 6.)

Familiarity with the remaining factual allegations supporting
Plaintiff's three claims is assumed in this Decision and Order,
which is intended primarily for review by the parties. (*See
generally* Dkt. No. 1.)

### B. Defendants' Motion
**\*2** On May 6, 2011, Defendants filed a motion to dismiss.
(Dkt. No. 13, Attach 2.) Generally, in support of their motion,
Defendants assert the following two arguments: (1) because
the Complaint was not served within the time allowed by
Fed.R.Civ.P. 4 or Local Rule 4.1 of the Local Rules of Practice
for this Court, the Court lacks jurisdiction over Defendants in
accordance with Fed.R.Civ.P. 4; and (2) the Complaint fails

to state a claim upon which relief can be granted, because (a) the Complaint fails to identify what constitutional rights Plaintiff is attempting to vindicate, (b) even if the Complaint has sufficiently identified a constitutional violation, the Complaint fails to allege facts plausibly suggesting the personal involvement of the individual Defendants in any such constitutional violation, (c) the City of Syracuse Police Department does not have the legal capacity to be sued, (d) even if Plaintiff's Complaint can be liberally construed as attempting to assert a claim against the City of Syracuse, the Complaint fails to allege facts plausibly suggesting that the individual Defendants' actions the result of a city policy or custom sufficient to confer municipal liability upon the City, (e) the Fifth Amendment does not govern a plaintiff's deprivation-of-property claim against state actors, (f) the Complaint fails to allege facts plausibly suggesting that force was used or that if force was used it was excessive for purposes of a Fourth Amendment claim, and (g) based on Plaintiff's factual allegations, Defendants Liadka and Sands are protected from liability as a matter of law by the doctrine of qualified immunity. (*See generally* Dkt. No. 13, Attach. 2.)

On June 2, 2011, Plaintiff filed a response to Defendants' motion. Generally, Plaintiff's response, which is handwritten and three pages in length, states that she "definitely oppose[s] [Defendants'] request" for the dismissal of her Complaint. (*See generally* Dkt. No. 17.) However, Plaintiff's response does not address the legal arguments asserted by Defendants for the dismissal of Plaintiff's Complaint. (*Compare* Dkt. No. 17 *with* Dkt. No. 13, Attach. 2.) Although Plaintiff's response was submitted two days after the expiration of the responsedeadline, the Court has accepted it, out of an extension of special solicitude to her as a *pro se* civil rights litigant.

In addition, Plaintiff has filed three letters to the Court on the following dates: July 6, 2011, August 22, 2011, and January 13, 2012. (Dkt. No. 18–20.) Generally, these letters contain assertions that Plaintiff believes that the police are treating her, treating her negatively, and responding unsatisfactorily to her telephone calls. (*Id.*) To the extent that these three letters are intended to constitute papers in opposition to Defendants' motion, the Court will not consider them, because (1) they are not responsive to the motion, and/or (2) they were not submitted in a timely manner. Moreover, to the extent that these three letters are intended to constitute a request for relief, the Court will not consider them, because do not state the relief sought, state with particularity the grounds for seeking the order, and attach a memorandum of law and affidavit, as required by Fed.R.Civ.P. 7(b) and Local Rule 7.1 of the Local Rules of Practice for this Court.

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions to Dismiss for Insufficient Service of Process

**\*3** Rule 4(m) of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

> If a defendant is not served within 120 days after the complaint is filed, the court-on motion or its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed.R.Civ.P. 4(m).

The Local Rules of Practice for this Court shorten the service requirements under Fed.R.Civ.P. 4. Specifically, Local Rule 4.1(b) requires "service of process upon all defendants within sixty (60) days of the filing of the complaint. This expedited service is necessary to ensure adequate time for pretrial discovery and motion practice. In no event shall service of process be completed after the time specified in Fed.R.Civ.P. 4." N.D.N.Y. L.R. 4.1(b).

### B. Legal Standard Governing Motions to Dismiss for Failure to State Claim

It has long been understood that a defendant may base a motion to dismiss for failure to state a claim upon which relief can be granted on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such motions are often based on the first ground, a few words on that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading

2012 WL 4052286

contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n. 17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

 **\*4** Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turning on the *conceivability* of an actionable claim,

the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* [1]

[1]   It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not show[n]-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 [internal quotation marks and

citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[2] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[3] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28.

[2]     See *Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N . Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[3]     See *Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

**\*5** Finally, a few words are appropriate regarding what documents are considered on a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). The court may consider the following documents without triggering the summary judgment standard: "(1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference into the complaint (and provided by the parties),

(3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case." *Planck v. Schenectady Cnty.,* 12–CV–0336, 2012 WL 1977972, at \*5 (N.D.N.Y. June 1, 2012) (Suddaby, J.). Moreover, "a pro se plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may be considered as effectively amending the allegations of [her] complaint-to the extent those papers are consistent with the allegations in the complaint." *Planck,* 2012 WL 1977972, at \*5.

### C. Legal Standard Governing Unopposed Motions

In this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b) (3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at \*1, n. 1 (N.D.N.Y.Oct.30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, 2009 WL 2473509, at \*2 & n. 3 (N.D.N.Y. Aug.7, 2009) (Suddaby, J.) (collecting cases).

### D. Legal Standards Governing Plaintiff's Claims

Because the Court has, in its Decision and Order of March 7, 2011, addressed the relevant points of law contained in the legal standards governing Plaintiff's claims in this action, the Court will not again recite, in their entirety, those legal standards in this Decision and Order, 9 which is intended primarily for review by the parties. (*See generally* Dkt. No. 5 [Decision and Order].)

### E. Legal Standards Governing Defendants' Defenses

#### 1. Defense of Lack of Separate Identity

"Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality, and therefore, cannot sue or be sued." *Davis v. Lynbrook Police Dept.,* 224 F.Supp.2d 463, 477 (E.D.N.Y.2002). "Pursuant to Fed.R.Civ.P. 17, New York governs the capacity of

2012 WL 4052286

a police department to sue or be sued. In New York, police departments like the defendant, which are merely administrative arms of a municipal corporation, do not have a legal identity separate and apart from the town." *Loria v. Irondequoit* 775 F.Supp. 599, 606 (W.D.N.Y.1990). While a municipality can sue or be sued, the police department, which does not exist separate from that municipality, can not. *Baker v. Willett,* 42 F.Supp.2d 192, 198 (N.D.N.Y.1999).

### 2. Defense of Limited Municipal Liability

**\*6** It is well established that "[a] municipality may not be held liable in a Section 1983 action for the conduct of a lower-echelon employee solely on the basis of *respondeat superior.*" [4] "Rather, to establish municipal liability under § 1983 for unconstitutional acts by a municipality's employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy." [5] "Thus, to hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to ... prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." [6]

[4]   *Powell v. Bucci,* 04–CV–1192, 2005 WL 3244193, at *5 (N.D.N.Y. Nov.30, 2005) (McAvoy, J.); *see also Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."); *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("[A] [municipality] may not be held for the actions of its employees or agents under a theory of *respondeat superior.*").

[5]   *Powell,* 2005 WL 3244193, at *5; *Monell,* 436 U.S. at 690–691 ("[L]ocal governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."); *Batista,* 702 F.2d at 397 ("[M]unicipalities may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation, or decision."); *Smith v. City of New York,* 290 F.Supp.2d 317, 321 (S.D.N.Y.2003) ("In order to establish the liability of [municipal] defendants in an action under §

1983 for unconstitutional acts by [its] employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy.").

[6]   *Batista,* 702 F.2d at 397, *accord, Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995), *McKeon v. Daley,* 101 F.Supp.2d 79, 92 (N.D.N.Y.2000) (Hurd, J.), *Merriman v. Town of Colonie, NY,* 934 F.Supp. 501, 508 (N.D.N.Y.1996) (Homer, M.J.); *Douglas v. Cnty. of Tompkins,* 90–CV–0841, 1995 WL 105993, at *12 (N.D.N.Y. March 2, 1995) (McCurn, J.), *Keyes v. Cnty. of Albany,* 594 F.Supp. 1147, 1156 (N.D.N.Y.1984) (Miner, J.).

With regard to the first element (the existence of a policy or custom), a "[p]laintiff may establish the 'policy, custom or practice' requirement by demonstrating: (1) a formal policy officially endorsed by the municipality ...; (2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question ...; (3) a practice so consistent and widespread that it constitutes a 'custom or usage' sufficient to impute constructive knowledge to the practice of policymaking officials ...; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to 'deliberate indifference' to the rights of those who come in contact with the municipal employees...." [7] With regard to the second element (causation), a plaintiff must show "a direct causal link" or "an affirmative link" between the municipal policy or custom and the alleged constitutional deprivation (i.e., that the policy or custom was the "moving force" behind the deprivation). [8]

[7]   *Dorsett–Felicelli, Inc.,* 371 F.Supp.2d 183, 194 (N.D.N.Y.2005) (Kahn, J.) (citing three Supreme Court cases for these four ways), *accord, Dunbar v. Cnty. of Saratoga,* 358 F.Supp.2d 115, 133–134 (N.D.N.Y.2005) (Munson, J.); *see also Clayton v. City of Kingston,* 44 F.Supp.2d 177, 183 (N.D.N.Y.1999) (McAvoy, J.) (transposing order of second and third ways, and citing five more Supreme Court cases).

[8]   *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional

2012 WL 4052286

deprivation."); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, n. 8, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) ("The fact that municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell′* s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between [for example] the training inadequacies alleged, and the particular constitutional violation at issue."); *Monell,* 436 U.S. at 694 ("[I]t is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983. Since this case unquestionably involves official policy as the moving force of the constitutional violation [at issue] ... we must reverse the judgment below."); *Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) ("A plaintiff who seeks to hold a municipality liable in damages under section 1983 must prove that ... an official policy or custom [was] the cause of the deprivation of constitutional rights.... [T]he plaintiff must establish a causal connection-an affirmative link-between the policy and the deprivation of his constitutional rights.") [internal quotation marks and citation omitted]; *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiff's injury, *Monell* prohibits a finding of liability against the City."); *Powell,* 2005 WL 3244193, at *5 ("Ultimately, the plaintiff must demonstrate a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation.") [internal quotation marks and citation omitted].

### 3. Defense of Qualified Immunity

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d

Cir.2004) [citations omitted], *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007) [citations omitted].

In determining the second issue (i.e., whether it would be clear to a reasonable official that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*7** *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) [citations omitted], *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). [9] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007) [citations omitted]. [10] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). [11] As the Supreme Court has explained,

[9] *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

[10] *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)

2012 WL 4052286

("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") [citation omitted]; *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

11    *See also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.[12]

12    *See also Hunter v. Bryant,* 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks and citation omitted].

## III. ANALYSIS

### A. Whether Plaintiff's Complaint Should Be Dismissed for Failure to Serve Process in Timely Manner

After carefully considering the matter, the Court must answer this question in the negative. By Defendants' own calculations, Plaintiff's Complaint was served on April 18, 2011–a mere 42 days after the Court granted Plaintiff's motion to proceed *in forma pauperis,* approved the filing of her

Complaint, and directed the Clerk of the Court to issue summonses and forward them with the Complaint to the United States Marshal's Service, for service on Defendants. (Dkt. No. 5 [Decision and Order filed March 7, 2011].) Indeed, Defendants acknowledge that Plaintiff completed the Civil Summonses and USM285 form, and returned them to the Clerk's Office (so that the Clerk's Office could forward them to the U.S. Marshal's Service for service of Plaintiff's Complaint) less than eight days after receiving them from the Clerk's Office. (Dkt. No. 13, Attach. 1, at ¶¶ 6–7; Dkt. No. 13, Attach. 2, at 9 [attaching page "8" of Defs.' Memo. of Law]; *see also* Dkt. Nos. 6, 8.) After that point in time, service was largely if not entirely outside of Plaintiff's control.

Under the circumstances, the Court finds that good cause exists to extend the deadline for service by 42 days. The Court notes that a contrary conclusion (e.g., a conclusion that Plaintiff had to serve her Complaint by December 13, 2010 pursuant to Local Rule 4.1, or even February 11, 2011 pursuant to Fed.R.Civ.P. 4) would render meaningless the Court's directive to the Clerk of the Court, on March 5, 2011, to take sufficient action to enable the United States Marshal's Service to effect service for Plaintiff.

### B. Whether Plaintiff's Complaint Should Be Dismissed for Failure to State a Claim Upon Which Relief Can Be Granted

### 1. Whether Plaintiff's Complaint Should Be Dismissed for Failing to Sufficiently Identify What Constitutional Rights She Is Attempting to Vindicate

**\*8**  After carefully considering the matter, the Court must answer this question also in the negative. In construing the pleadings of a *pro se* civil rights litigant in this Circuit, a district court's imagination should be limited only by the plaintiff's factual allegations, not by the legal claims set out in his or her pleadings. *See Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, Phillips has raised. In so doing, the court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.").

Here, based on Plaintiff's (albeit scant and confused) factual allegations, the Court can imagine that she is attempting to assert the following three claims: (1) a claim of an unreasonable search under the Fourth Amendment; (2) a claim of an unlawful seizure of, and failure to return, her personal property under the Fourth, Fifth and/or Fourteenth

Amendments; and (3) a claim of excessive force under the Fourth Amendment.

**2. Whether Plaintiff's Claims Against the Individual Defendants Should Be Dismissed for Failing to Allege Facts Plausibly Suggesting Their Personal Involvement in the Constitutional Violations Alleged**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 13 [attaching page "12" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. *See, supra,* Part III.C. of this Decision and Order. [13] Second, in any event, the Court would reach the same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, and finally, even when construed with the utmost of special liberality, the Complaint does not identify the precise location of the incident, which officers were responsible for violating her rights, how she suffered the head injury she alleges, what property was taken from her, and how Defendants frustrated her efforts to recover that property. *See Vogeler v. Colbath,* 04–CV–6071, 2005 U.S. Dist. LEXIS 44658, at *29, 2005 WL 2482549 (S.D.N.Y. Oct. 6, 2005) ("Plaintiffs must also allege ... the personal involvement of the Defendant in the actions underlying their claim."). [14]

[13]    Under the circumstances, the Court finds that Plaintiff had sufficient notice of the consequences of failing to respond to the arguments asserted in Defendants' motion. For example, on October 14, 2010, Plaintiff was given a courtesy copy of the District's *Pro Se* Handbook and a courtesy copy of the Local Rules of Practice for the Northern District of New York. (Dkt. No. 4.) In addition, on May 6, 2011, Defendants advised Plaintiff of her need to respond to their arguments. (Dkt. No. 15.) Also, Plaintiff had extensive experience as a *pro se* civil rights litigant in this District, before responding to the motion in question. *See, infra,* Part III.D. of this Decision and Order.

[14]    Indeed, the Court notes that one of the officers that Plaintiff lists in her Complaint has not been

identified. In a prior decision by the Court, Plaintiff was ordered to take reasonable steps to ascertain the identity of the unnamed officer, immediately notify the Court, amend her complaint to include the identity of the third Defendant, and also to have that officer served. (Dkt. No. 5, at 14.) Because Plaintiff has not done so, her alleged physical injuries remain attributable to an unidentified person.

For all of these alternative reasons, Plaintiff's claims against the individual Defendants are dismissed.

**3. Whether the Syracuse Police Department Should Be Dismissed as a Defendant**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach 2, at 13.) The Court would add only the following three brief points.

**\*9** First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach the same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, and finally, "as Plaintiff has been told several times, under New York State law, departments, like the Onondaga County Sheriff's Department, that are merely administrative arms of a municipality, do not have a legal identity separate from the municipality and may not sue or be sued." *Jenkins v. Onondaga Cnty. Sheriff's Dep't,* 12–CV–0855, Report–Recommendation, at 5 (N.D.N.Y. filed June 28, 2012) (Baxter, J.) (citing *Hayes v. Cnty. of Sullivan,* 07–CV–0667, 2012 WL 1129373, at *24 [S.D.N.Y. March 30, 2012]). Because the Syracuse Police Department is merely an administrative arm of the City of Syracuse, it is not a proper defendant in this case. The real party in interest is the City of Syracuse itself.

For all of these alternative reasons, the Syracuse Police Department dismissed as a Defendant.

**4. Whether, Even if the City of Syracuse Were Substituted for the Police Department, Plaintiff's Claims Against the City Should Be Dismissed for Failing to Allege Facts Plausibly Suggesting Municipal Liability**

2012 WL 4052286

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 14–15 [attaching pages "13" and "14" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, even when it is construed with the utmost of special liberality, Plaintiff's Complaint has not alleged facts plausibly suggesting a widespread policy or custom promulgated by the municipal policy maker necessary to hold the City liable for her injuries. As indicated above in Part II.E.2. of this Decision and Order, Plaintiff must allege facts plausibly suggesting that the municipality "has adopted a 'custom' or 'policy' which is the 'moving force' behind [the violation]." *Zappala v. Albicelli,* 980 F.Supp. 635, 639 (N.D.N.Y.1997) (Scullin, J.) (citing, *inter alia, Monell v. Dept. of Soc. Servs. of City of New York,* 436 U.S. 658, 689 [1978] ). However, Plaintiff has not alleged *any* official policy or custom adopted by the City of Syracuse or its Police Department,[15] let alone one responsible for the alleged injuries she received. Because *Monell* prohibits the finding of liability against a City when there is no causal connection between a municipal policy and a resulting injury, Syracuse City Police Department cannot be responsible for Plaintiff's alleged injuries. *Monell,* 436 U.S. at 692. As a result, the City of Syracuse cannot be maintained as a Defendant in this action, and Plaintiff's Section 1983 claims against it are dismissed.

[15] In addition to not alleging facts plausibly suggesting the existence of a department-wide policy or custom, Plaintiff has not alleged facts plausibly suggesting that Officers Liadka, Sands, and the unnamed officer created or promulgated that policy, or even that they were final policymakers. "A municipal official that exercises discretion, whether it be in a constitutional or unconstitutional manner, in an area of which that official is not the final policymaker, cannot, by itself, establish municipal liability." *Clayton v. City of Kingston,* 44 F.Supp.2d 177, 184 (N.D.N.Y.1999) (McAvoy, C.J.).

**\*10** For all of these reasons, Plaintiff's claims against the City of Syracuse Police Department and/or the City of Syracuse are dismissed on this alternative ground.

### 5. Whether, in the Alternative, Plaintiff's Deprivation–of–Property Claim Should Be Dismissed to the Extent It Is Grounded on the Fifth Amendment

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 16–17 [attaching pages "15" and "16" of Defs.' Memo. of Law].) The Court would add only the following four brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach the same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, a takings claim is not ripe where a state remedy is potentially available. *Vandor Inc. v. Militello,* 301 F.3d 37, 39 (2d. Cir.2002). As the Supreme Court has explained,

> An unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy.

*Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Police are not required to provide the owner with notice for state-law remedies, which are "established by published, generally available state statutes and case law." *City of W. Covina v. Perkins,* 525 U.S. 234, 240–241, 119 S.Ct. 678, 142 L.Ed.2d 636 (1999). "Once the property owner is informed that his property has been seized,

he can turn to these public sources to learn about the remedial procedures that are available to him. The City need not take other steps to inform him of his options." *City of W. Covina, 525 U.S. at 241.* Here, Plaintiff has not alleged facts plausibly suggesting that she attempted to recover her property in the proper manner (or even what property was taken). Fourth, and finally, Plaintiff does not allege facts suggesting that her property was taken for public use in an unconstitutional manner that would require her to be paid just compensation. Instead, Plaintiff alleges that, after she attempted to escape from their investigation and was restrained by officers, she was searched and had property taken from her.

For all of these alternative reasons, Plaintiff's deprivation-of-property claim is dismissed to the extent that it is grounded on the Fifth Amendment.

**6. Whether, in the Alternative, Plaintiff's Excessive Force Claim Should Be Dismissed for Failing to Allege Facts Plausibly Suggesting Either that Force Was Used or that Any Such Force Was Excessive**

 **\*11**  After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 17–18 [attaching pages "16" and "17" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, as stated in the Court's Decision and Order of March 7, 2011, in evaluating a Fourth Amendment excessive-force claim, "courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." (Dkt. No. 5, at 13.) [16] Here, Plaintiff alleges the following facts, which could be construed as plausibly suggesting that, at the time the incident occurred, she had given Defendants probable cause to use the force at issue against her: (1) Defendants were dispatched to that location regarding a problem; (2) Defendants specifically chose to question Plaintiff about the incident; (3) Plaintiff was attempting to get away from Defendant when they were attempting to question her; (4) she acted in such a way as to cause Defendants to become "worked up"; (5) it became

necessary for a third unnamed officer to step in and assist Defendants Sands and Liadka in controlling Plaintiff. (Dkt. No. 1, at ¶ 4 & Attachment.) Simply stated, it is plausible, based on Plaintiff's factual allegations, that the amount of force used by the officers to pull her hands behind her back and detain her was necessary to keep her from getting away and "going about [her] business." (*Id.* at ¶ 4.) It is important to note that Plaintiff does not allege facts plausibly suggesting any physical injury other than vague "head & back pains." (*Id.* at ¶ 5.) [17]

[16]   More specifically, the standard governing constitutional excessive-force claims against government officials in "the course of making an arrest, investigatory stop, or other seizure" of a person is the Fourth Amendment's objective reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 388, 391, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Pursuant to this standard, three elements must be objectively examined to determine whether excessive force was used for Fourth Amendment violations: "(1) the need for the application of force; (2) the relationship between that need and the amount of force that was used; and (3) the extent of the injury inflicted." *Graham,* 490 U.S. at 390, 397. It is essential to look at surrounding circumstances in each case, and analyze "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The "extent of intrusion on the suspect's rights" must be balanced against the "importance of governmental interests." *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

[17]   More specifically, Plaintiff's Complaint does not allege facts plausibly suggesting that her injuries were significant, how long the pain lasted, or that medical treatment was necessary (or even sought) following the incident. *See Smith v. City of New York,* 04–CV–3286, 2010 U.S. Dist. LEXIS 88774, at \*27, 2010 WL 3397683 (S.D.N.Y. Aug. 27, 2010) ("Courts in this Circuit have consistently held that an injury is de minimis when it is temporary and/or minor in severity.") (collecting cases).

For all of these reasons, Plaintiff's excessive force claim is dismissed on this alternative ground.

**7. Whether, in the Alternative, Plaintiff's Claims Against the Individual Defendants Should Be Dismissed Because, Based on the Factual Allegations of the Complaint, Defendants Are Protected from Liability as a Matter of Law by the Doctrine of Qualified Immunity**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 19–20 [attaching pages "18" and "19" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would the reach same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, as indicated above in Part I.E.3. of this Decision and Order, "[u]nder federal law, a police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of New York,* 478 F.3d 76, 87 (2d Cir.2007) (internal quotations and other citations omitted). Here, based on Plaintiff's own factual allegations, it is plausible that police officers of reasonable competence could disagree as to whether Defendants' actions were unlawful (e.g., given their need to question her, and her attempt to flee the scene).

**\*12** For all of these reasons, Plaintiff's claims against the individual Defendants are dismissed on this alternative ground.

**C. Whether the Court Should Give Plaintiff an Opportunity to File an Amended Complaint Before Dismissing This Action**

Generally, when a district court dismisses a *pro se* action, the plaintiff will be allowed to amend his action. *See Gomez v. USAA Fed. Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999). However, an opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. As the Second Circuit has explained, "[w]here it appears that

granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted), *accord, Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") (citation omitted); *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (denial not abuse of discretion where amendment would be futile); *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.") (citation omitted); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (citation omitted); *Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990) ("[W]here ... there is no merit in the proposed amendments, leave to amend should be denied").

This rule applies even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103; *Brown,* 1997 WL 599355, at *1. As explained above in Part II.B. of this Decision and Order, while the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12; rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.

Here, the Court has some difficulty finding that the referenced defect in Plaintiff's Complaint is merely formal. Nor is the Court confident that granting Plaintiff an opportunity to amend her Complaint will be productive. The Court notes that the errors made by Plaintiff in this action were previously made by her, and not corrected, on many occasions. Plaintiff has been ordered numerous times to file amended complaints at risk of dismissal of her case. [18] Of the seven times an amended complaint was required, Plaintiff submitted an amended complaint only three times. [19] Two of these were one page documents which did not state a claim upon which relief could be granted and were rejected by the Court, and the other did not correct the deficiencies of the original complaint. [20] Plaintiff did not comply with the Court's order

to amend her complaint at all on four occasions. [21] In one case, Plaintiff was given an additional thirty day period to file her amended complaint after she failed to do so within the first 30 day period granted to her. *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006). Similarly, in a separate case, Plaintiff did not follow up on her original claim because she failed to appear for three hearings the Court rescheduled despite warnings of her need to comply with the Court Orders. *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457 (N.D.N.Y. filed Nov. 21, 2005). All seven of these cases resulted in dismissal, most for failure to prosecute, failure to comply with Court Orders, or failure to state a claim. Five of Plaintiff's cases were not given leave to amend because granting such leniency would have been futile. [22]

[18]    *Jenkins v. Comm'r of Soc. Sec. Admin.,* 06–CV–0059 (N.D.N.Y. filed Jan 17, 2006); *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621 (N.D.N.Y. filed May 19, 2006); *Jenkins v. Onondaga Sheriff's Dep't.,* 06–CV–1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Sheriff's Dep't.,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. Murphy,* 08–CV–0921 (N.D.N.Y. filed Aug. 8, 2008); *Jenkins v. Onondaga Cnty. Sheriff's Dep't.,* 12–CV–0855 (N.D.N.Y. filed May 23, 2012).

[19]    *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621 (N.D.N.Y. filed May 19, 2006); *Jenkins v. Comm'r of Soc. Sec. Admin.,* 06–CV–0059 (N.D.N.Y. filed Jan 17, 2006); *Jenkins v. Sheriff's Dep't.,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007).

[20]    *Id.*

[21]    *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Onondaga Sheriff's Dep't.,* 06–CV–1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Murphy,* 08–CV–0921 (N.D.N.Y. filed Aug. 8, 2008); *Jenkins v. Onondaga Cnty. Sheriff's Dep't.,* 12–CV–0855 (N.D.N.Y. filed May 23, 2012)

[22]    *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Mohawk Corr. Facility,* 06–CV–1167 (N.D.N.Y. filed Sept. 29, 2006); *Jenkins v. Sheriff's*

*Dep't,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. USA,* 09–CV0603 (N.D.N.Y. filed May 11, 2009); *Jenkins v. Rice,* 11–CV–1037 (N.D.N.Y. filed Aug. 31, 2011).

**\*13** However, the Court is mindful of the special solicitude that should be afforded to *pro se* civil rights litigants. For these reasons, before the Court dismisses Plaintiff's action, the Court will afford her an opportunity to file an Amended Complaint correcting the above-described pleading defects within thirty (30) days from the date of the filing of this Decision and Order.

If Plaintiff submits an Amended Complaint, she is encouraged to describe the acts of misconduct alleged therein and identify each individual who participated in the misconduct. Moreover, Plaintiff is advised that her Amended Complaint must be a complete pleading that will replace and supersede her original Complaint in its entirety. Finally, Plaintiff is cautioned that, if she fails to file, in a timely fashion, an Amended Complaint that successfully states a claim upon which relief can be granted, her action will be dismissed with prejudice without further Order of the Court.

### D. Whether This Case Should Be Forwarded to the Chief Judge with a Recommendation that an Anti–Filing Injunction Order Be Issued Against Plaintiff

A review of Plaintiff's litigation history on Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service reveals that, before filing the current action on October 13, 2010, she filed thirteen *pro se* civil actions in this District alone-twelve of which have been dismissed and the thirteen of which is being considered for dismissal. [23] A review of Plaintiff's litigation history has caused the undersigned to believe that (1) Plaintiff lacks a good-faith expectation in prevailing in her lawsuits, (2) she is vexatious and indeed incorrigible when proceeding pro se, (3) she has caused needless expense to other parties and placed an unnecessary burden on the Court and its personnel, and (4) no lesser sanctions (e.g., such as dismissal or chastisement) would be adequate to protect the Court and other parties.

[23]    *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457 (N.D.N.Y. filed Nov. 21, 2005); *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621 (N.D.N.Y. filed May 19, 2006); *Jenkins Comm'r of Soc. Sec. Admin.,* 06–CV–0059 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. City*

*of Syracuse,* 06–CV–1005 (N.D.N.Y. filed Aug. 21, 2006); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Mohawk Corr. Facility,* 06–CV–1167 (N.D.N.Y. filed Sept. 29, 2006); *Jenkins v. City of Syracuse,* 07–CV–0930 (N.D.N.Y. filed Sept. 7, 2007); *Jenkins v. Sheriff's Dep't,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. Murphy,* 08–CV–0921 (N.D.N.Y. filed Aug. 8, 2008); *Jenkins v. USA,* 09–CV–0603 (N.D.N.Y. filed May 11, 2009); *Jenkins v. Rice,* 11–CV–1037 (N.D.N.Y. filed Aug. 31, 2011); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855 (N.D.N.Y filed May 23, 2012).

For example, eight of Plaintiff's actions have resulted in a dismissal for failure to state a claim or frivolousness, another has resulted in the pending recommendation of a dismissal on that ground, three others have resulted in a dismissal for lack of subject-matter jurisdiction, and another has resulted in a dismissal for failure to prosecute. [24]

[24]   *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457, Decision and Order (N.D.N.Y. filed Apr. 25, 2006) (Scullin, J.); *Jenkins Comm'r of Soc. Sec. Admin.,* 06–CV–0059, Decision and Order (N.D.N.Y. filed March 29, 2007) (Hurd, J.); *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060, Memorandum–Decision and Order (N.D.N.Y. filed April 14, 2006) (Scullin, J.); *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621, Decision and Order (N.D.N.Y. filed July 5, 2006) (Kahn, J.); *Jenkins v. City of Syracuse,* 06–CV–1005, Order (N.D.N.Y. filed Oct. 5, 2006) (Mordue, C.J.); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV–1092, Decision and Order, (N.D.N.Y. filed Oct. 6, 2006) (McAvoy, J.); *Jenkins v. Mohawk Corr. Facility,* 06–CV–1167, Decision and Order (N.D.N.Y. filed Oct. 12, 2006) (Mordue, C.J.); *Jenkins v. City of Syracuse,* 07–CV–0930, Decision and Order (N.D.N.Y. filed Oct. 7, 2007) (Mordue, C.J.); *Jenkins v. Sheriff's Dep't,* 07–CV–0939, Decision and Order (N.D.N.Y. filed Nov. 21, 2007) (Hurd, J.); *Jenkins v. Murphy,* 08–CV–0921, Order (N.D.N.Y. filed Oct. 14, 2008) (McCurn, J.); *Jenkins v. USA,* 09–CV–0603, Decision and Order (N.D.N.Y. filed May 28, 2009) (McAvoy, J.); *Jenkins v. Rice,* 11–CV–1037, Decision and Order (N.D.N.Y. filed Oct. 11, 2011) (Kahn, J.); *Jenkins*

*v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855, Report–Recommendation (N.D.N.Y filed June 28, 2012) (Baxter, M.J.).

Moreover, Plaintiff has sued the Onondaga County Sheriff's Department four times. [25] As a result, she has been repeatedly instructed on the legal standard for suing a municipality. For example, on October 6, 2006, she was specifically informed of the need to establish a custom or policy which is the moving force behind a resulting injury. *Jenkins v. Onondaga Cnty. Sheriff's Dep't.,* 06–CV–1092, Decision and Order, at 4 (N.D.N.Y. filed Oct. 6, 2006) (McAvoy, J.). However, despite receiving that specific information, she has *repeatedly* continued to file improper claims against the Onondaga County Sheriff's Department. [26]

[25]   *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457 (N.D.N.Y. filed Nov. 21, 2005); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV–1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Sheriff's Dep't,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855 (N.D.N.Y filed May 23, 2012).

[26]   *Jenkins v. Sheriff's Dep't,* 07–CV–0939, Decision and Order at 3 (N.D.N.Y. filed Oct. 2, 2007) (Hurd, J.); *Jenkins v. Sheriff's Dep't,* 07–CV–0939, Decision and Order at 2 (N.D.N.Y. filed Nov. 21, 2007) (Hurd, J.); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV0855, Decision and Order, at 4–5 (N.D.N.Y filed May 24, 2012) (Baxter, M.J.); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855, Report–Recommendation, at 5–6 (N.D.N.Y filed June 28, 2012) (Baxter, M.J.); *see also, supra,* Part III.B.4. of this Decision and Order.

Finally, Plaintiff has repeatedly had to be ordered to comply with the Local Rules, and reminded that all factual allegations should be contained in the complaint itself, that paragraphs ought to be numbered, and that the individuals she alleges violated her rights must be identified. *See, e.g., Jenkins v. Dep't Corr. Servs.,* 06–CV–0621, Decision and Order (N.D.N.Y. filed July 5, 2006) (Kahn, J.); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV–1092, Order (N.D.N.Y. filed Oct. 6, 2006) (McAvoy, J.).

**\*14** Under such circumstances, a federal district court may impose reasonable filing restrictions on a *pro se* litigant in that particular court, pursuant to 28 U.S.C. § 1651(a) and its inherent authority to control and manage its own docket

so as to prevent abuse in its proceedings. For example, a federal district court may, after providing an appropriate opportunity to be heard, prohibit a vexatious litigant from filing, in that particular court, any action *pro se* (that is, without counsel), without prior leave of that court. *See Hong Mai Sa v. Doe,* 406 F.3d 155, 158 (2d Cir.2005) ("If a litigant has a history of filing vexatious, harassing or duplicative lawsuits, courts may impose sanctions, including restrictions on future access to the judicial system.") [internal quotations and citations omitted]; *In re Sassower,* 20 F.3d 42, 44 (2d Cir.1994) (where a *pro se* plaintiff has demonstrated a "clear pattern of abusing the litigation process by filing vexatious and frivolous complaints," a "leave to file" requirement may be instituted by the court as an appropriate sanction); *Moates v. Barkley,* 147 F.3d 207, 208 (2d Cir.1998) ( "[T]he district court may not impose a filing injunction on a litigant *sua sponte* without providing the litigant with notice and an opportunity to be heard."); *Azubuko v. Unknown Boston Police Officers,* 08–CV–0330, 2008 WL 1767067, at * 1 (N.D.N.Y. Apr.16, 2008) (McCurn, J.).

For all of these reasons, this case is forwarded to Chief United States District Judge Gary L. Sharpe with a recommendation that an Anti–Filing Injunction Order be issued against Plaintiff.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 13) is ***GRANTED* in part** and ***DENIED* in part;** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is conditionally ***DISMISSED;*** and it is further

**ORDERED** that Plaintiff is permitted to file an Amended Complaint within **THIRTY (30) DAYS** of the filing date of this Order; and it is further

**ORDERED** that, *if Plaintiff fails to timely file an Amended Complaint, the Clerk shall enter judgment dismissing this action without further Order of this Court;* and it is further

**ORDERED** that, upon filing of the Amended Complaint, this file in this matter be returned to the Court for further review; and it is further

**ORDERED** that the Clerk of the Court is directed to forward this case to Chief United States District Judge Gary L. Sharpe with the recommendation of the undersigned that an AntiFiling Injunction Order be issued against Plaintiff.

*The Court hereby certifies, for purposes of 28 U.S.C. § 1915(a) (3), that any appeal taken from the Court's final judgment in this action would not be taken in good faith.*

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4052286

---

**End of Document**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   14

2005 WL 1876064
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Dumka VIATOR, Plaintiff,
v.
CITY OF ROCHESTER, Rochester Police Department,
Police Officer Mitchell (True First Name Unknown),
Individually and in his Official Capacity, State
of New York, New York State Police, County of
Monroe, Monroe County Sheriff's Office, Police
Officers "John Doe 1-10", (Last Ten Names Being
Fictitious, True Names Unknown, Said Persons
Being Police Officers, Employees and/or Agents of
Defendants, Who Stopped, Detained, Questioned and
Searched Plaintiff's Person and Vehicle), Defendants.

No. 02-CV-6453.
|
Aug. 8, 2005.

**Attorneys and Law Firms**

Michael Cobbs, Stephen J. Clar, Brown & Hutchinson,
Rochester, NY, for Plaintiff.

John M. Campolieto, City of Rochester Law Department,
Charles D. Steinman, New York State Attorney General's
Office Department of Law, Howard A. Stark, Monroe County
Department of Law, Rochester, NY, for Defendants.

DECISION & ORDER

INTRODUCTION

TELESCA, J.

**\*1** Plaintiff Dumka Viator ("plaintiff") brings this action
against the City of Rochester (the "City") and Rochester
Police Officer John Mitchell ("Officer Mitchell") pursuant
to 42 U.S.C. § 1983, alleging that he was racially profiled
and that his constitutional rights were violated when Officer
Mitchell and other officers from the Rochester Police
Department detained him, interrogated him and searched
his automobile during the course of a traffic stop.[1] The
City contends that the police officers were members of an

interdiction team dedicated to stopping the flow of illegal
narcotics into Monroe County, and that they had probable
cause to stop and search plaintiff's automobile. Officer
Mitchell also claims that he is entitled to qualified immunity
under 42 U.S.C. § 1983, since the alleged violation occurred
in the course of his official duties.

[1]     By Decision and Order dated December 17, 2002,
        plaintiff's claims against New York State and the
        New York State Police Department were dismissed
        with prejudice. (Doc. No. 13). By Stipulation
        and Order filed November 8, 2004, plaintiff's
        claims against defendants Monroe County and
        Monroe County Sheriff's Office were dismissed
        with prejudice. (Doc. No 31). By Order filed July
        14, 2005, plaintiff's claims against the remaining
        State defendants were dismissed with prejudice.
        (Doc. No. 36).

A bench trial was held before the Court on August 2 and
3, 2005. Five witnesses testified at trial, including: plaintiff
Dumka Viator; Rochester Police Officer John Mitchell:
plaintiff's wife Sharon Viator; Rochester Police Officer Eden
Torres; and Rochester Police canine Officer Tim Waterman.
The following constitutes my findings of fact and conclusions
of law in accordance with Rule 52(a) of the Federal Rules of
Civil Procedure.

FINDINGS OF FACT

Plaintiff was born in Nigeria and immigrated to the United
States approximately seventeen years ago. For at least the last
four years, he has resided in the town of Irondequoit, a suburb
of Rochester, New York, with his wife and five children. He
is presently employed as a senior sales representative and
finance advisor at Webster Chrysler Jeep, but previously was
employed as an automobile salesman at Irondequoit Dodge
when the events that gave rise to this controversy occurred.
One of the perks of his employment at Irondequoit Dodge
was that he was able to select any of the demo vehicles at the
dealership for his personal use.

Plaintiff testified that on Wednesday August 29, 2001, he
drove from Rochester to New York City in a gold-colored
2001 Jeep Grand Cherokee which was registered to the
dealership. His father had recently passed away and he needed
to renew his passport at the Nigerian embassy so that he could
attend his father's burial in Nigeria. While in New York City,

he also planned to watch a tennis match at the U.S. Open. He accomplished both goals and drove back to Rochester the following day, August 30, 2001. He traveled the New York State Thruway directly from New York City, and stopped only to refill his gas tank and purchase coffee. At approximately 6:00 p.m., he exited the Thruway at Exit 45, where he stopped to pay a toll of $9.95 and continued westbound on Route 490 West towards Rochester.

At that time, Rochester Police Officer Christopher Tuttle was positioned near the Exit 45 toll booths as a member of a drug interdiction detail comprised of New York State Troopers, Monroe County Sheriff's deputies, and Rochester Police Department officers named the "Metro Rochester Narcotics Unit" ("MRNU"). MRNU's mission was to interdict and prevent the flow of illegal narcotics into Monroe County. Knowing that much of Rochester's illicit drug supply comes from New York City, Officer Tuttle's role was to observe any vehicles that paid a $9.95 toll, which is the toll for a vehicle making a direct trip from New York City. He would then inform plainclothes officers who were stationed nearby of the make, model and license plate of such a vehicle, who in turn would conduct a moving surveillance of that vehicle. The plainclothes officers, who were driving unmarked cars would coordinate their surveillance with uniformed officers driving marked cars and follow the "vehicle of interest." If the driver committed a traffic violation, it would then be stopped and issued a ticket. Such a stop would give the uniformed officer the opportunity to question the driver and determine whether there existed probable cause to search the vehicle for illicit narcotics. If the driver of a vehicle of interest did not commit a traffic violation, he would not be stopped.

*2 On August 30, 2001, Officer Tuttle observed that plaintiff paid a $9.95 toll, and radioed Officer Torres and a Monroe County Sheriff's Deputy that a gold-colored Jeep Grand Cherokee had just returned from New York City exiting on Interstate Route 90 at Exit 45. The officers then followed plaintiff as he continued on Route 490 West for approximately six miles before they radioed to Officer Mitchell, who was positioned nearby and directed that he should take over monitoring the vehicle. Officer Mitchell, in his marked police car, entered Route 490 West at the Penfield Road exit and followed plaintiff for approximately one to two miles before he directed him to pull over for failing to signal when making a lane change.

*A. The Traffic Stop*

Plaintiff testified that once through the toll booth, he traveled in the far right lane of Route 490 West until he reached the Penfield Road exit. He then moved into the far left lane, or the "fast lane," to allow cars to merge onto Route 490 West from the right. He first noticed a Rochester Police vehicle when he was passing the location where Route 590 North merged into Route 490 West. According to plaintiff, the officer pulled into the fast lane just behind him and almost immediately activated the vehicle's emergency lights, signaling that plaintiff should pull over to the side of the road. Plaintiff decelerated and used his turn signal to indicate that he was changing lanes, and stopped his vehicle on the right shoulder of Route 490 near the Winton Road exit. He alleges that he never changed lanes without first signaling.

Officer Mitchell testified that he was assisting MRNU on the night of August 30, 2001, when he received a radio call from Officer Torres alerting him to an approaching vehicle of interest. According to Officer Mitchell, he entered Route 490 at the Penfield Road exit-several miles before the Route 590 off ramp. He noticed plaintiff in the fast (far left) lane, and followed him for several miles before he observed plaintiff moving from the fast lane to the middle lane without signaling the lane change. Officer Mitchell, realizing that a failure to signal a lane change is a violation of the New York State Vehicle and Traffic Law, then turned on his emergency lights to signal plaintiff to pull over. Plaintiff complied and stopped his vehicle on the right shoulder of Route 490 near the Winton Road exit.

Officer Torres also testified that he initiated the moving surveillance of plaintiff's automobile once plaintiff paid the $9.95 toll at Exit 45 of the New York State Thruway. He then followed plaintiff in his unmarked car along Route 490 West and advised Officer Mitchell to take over the surveillance near Penfield Road. He observed Officer Mitchell enter Route 490 at the Penfield Road Exit and follow plaintiff. Officer Torres then dropped back and did not see the illegal lane change because vehicles ahead of him were in his line of sight.

Based on these facts adduced at trial, I find that Officer Mitchell observed plaintiff changing lanes without signaling. Both Officer Mitchell and Officer Torres testified that Officer Mitchell was positioned on Linden Avenue when he received the call to follow plaintiff's vehicle and entered Route 490 West from the Penfield Road entrance. I find the officers' versions of events to be more credible than plaintiff's. Moreover, I find that plaintiff's credibility is compromised since he admitted on re-direct examination that he had lied

while under oath on at least three prior occasions concerning the identity of his female passenger on August 30, 2001. Accordingly, I find that the evidence clearly establishes that plaintiff changed lanes without signaling.

### B. The Search of Plaintiff's Vehicle

#### 1. Plaintiff Consented to the Search of His Vehicle

**\*3** Once plaintiff stopped his automobile on the right shoulder of Route 490 West near the Winton Road exit, Officer Mitchell parked his patrol car a short distance behind him. Officer Mitchell then approached the car and spoke with plaintiff.

Plaintiff testified that Officer Mitchell first informed him that he was being stopped for speeding. Plaintiff replied that he had his cruise control set within the legal speed limit. Officer Mitchell then asked where plaintiff was coming from, to which plaintiff responded "New York City." According to plaintiff, Officer Mitchell then returned to his patrol car. Approximately five minutes later Officer Mitchell returned to plaintiff's vehicle and again asked where he was coming from. Plaintiff asked if there was a problem and Officer Mitchell informed him that he had been stopped for changing lanes without signaling. Plaintiff then inquired of Officer Mitchell about the discrepancies in the reasons offered to him for stopping his vehicle. Officer Mitchell replied by engaging in a line of questioning (to which plaintiff took offense), including whether plaintiff knew anything about narcotics and why he was driving a car that was not registered to him. Officer Mitchell then asked plaintiff for consent to search his vehicle. Plaintiff asked if he needed a warrant first, to which Officer Mitchell replied that a police dog would not need a warrant. At that point, plaintiff alleges that Officer Mitchell lunged toward the driver's door, grabbed the handle, and "yanked" it open. Plaintiff testified that Officer Mitchell's aggressive actions frightened him and he exited the vehicle. He then consented to Officer Mitchell's request to search his vehicle on the condition that he could watch, "to make sure that [they] didn't put anything in my car." He further testified that Officer Mitchell never asked him for his driver's license or vehicle registration card, and that he did not receive a traffic ticket until he later prompted Officer Mitchell for some documentation of the stop. He admitted that he did not try to stop the search at any point, and that he was never handcuffed, personally searched, or placed in police custody.

Officer Mitchell testified that upon approaching plaintiff's vehicle on August 30, 2001, he tried to engage plaintiff in

small talk to put him more at ease and immediately asked for plaintiff's driver's license and vehicle registration card. He also testified that as he approached plaintiff's vehicle he noticed in plain view that plaintiff had only a gym bag and lap top computer in the rear of the vehicle, which he thought suspicious since plaintiff had informed him that he and his passenger had been in New York City for "several days." He returned to his patrol car where he ran plaintiff's license plate and learned that the car was not registered in plaintiff's name, but in the name of an automobile dealership. While in his patrol car, he also radioed Officer Torres, who was nearby, and informed him of his suspicions and that he planned to ask for consent to search the vehicle. Officer Mitchell also contacted Officer Waterman to request that he travel to the scene with police dog "Griz" to conduct an exterior search of plaintiff's vehicle.

**\*4** Officer Mitchell testified that when he returned to plaintiff's vehicle he asked for plaintiff's consent to search the vehicle. According to Officer Mitchell, plaintiff acquiesced on the condition that he could watch the search. He did not recall plaintiff inquiring about a search warrant, nor did he observe another officer nearby when plaintiff gave consent to search.

Officer Torres arrived on the scene just after Officer Mitchell returned to plaintiff's vehicle. He parked behind Officer's Mitchell's patrol car and walked toward plaintiff's vehicle. He testified that although he did not hear Officer Mitchell ask plaintiff's consent to search the vehicle he did hear plaintiff agree to the search provided he could watch.

Based on these facts, I find that plaintiff gave Officer Mitchell his consent to search his vehicle. Both Officer Mitchell and Officer Torres testified that plaintiff agreed to the search on the condition that he could watch. In addition, I find inconsistencies in plaintiff's version of events that lead me to doubt his credibility. For instance, had Officer Mitchell never asked for plaintiff's driver's license, as plaintiff testified, he could not have issued the traffic ticket because information from the driver's license was needed to complete the traffic summons. Moreover, plaintiff gave three different versions of the identity of his female passenger, but explained that he did so to protect his "family interests." Accordingly, I find that the evidence clearly establishes that plaintiff consented to the search of his vehicle on the condition that he could observe the search.

#### 2. The Canine Searches

Plaintiff testified that before the manual search of his vehicle began, a canine search was conducted. He claimed that the police dog, a large German Shepard, was removed from the rear seat of a patrol car and led directly to the driver's seat of his vehicle. Plaintiff recalled that the police dog had sniffed everything in the car, including the inside of his tennis and laptop bags. He further testified that after the search of the interior of his vehicle, the canine was led directly back to the patrol car. Plaintiff did not see the police dog search the perimeter of the exterior of the vehicle, nor did he see the dog "alert" or "hit" during the search.

According to Officer Mitchell's testimony, the police dog arrived just after plaintiff consented to the search of his vehicle. Upon arriving at the scene, Officer Waterman leashed Griz before removing him from the patrol car and led the dog to plaintiff's vehicle. Griz first circled the perimeter of the vehicle to search the exterior. At the vehicle's driver's side rear bumper, Griz started to bark, scratch and swat, indicating that he had detected the scent of narcotics. After completing the exterior search, Officer Waterman placed Griz in plaintiff's car where he conducted an interior search, and again indicated that he found the scent of narcotics in the back of the vehicle. Officer Waterman then returned Griz to his patrol car and left the scene.

**\*5** Plaintiff's attorney called Officer Waterman, the canine handler, to testify at trial but did not address whether he conducted a search of the exterior of the vehicle with Griz or whether Griz indicated that he had detected the scent of narcotics. Instead, his inquiry of Officer Waterman was limited to the nature of the charge and content of the traffic summons issued to the plaintiff by Officer Mitchell.

I find that the evidence established at trial clearly demonstrates that a canine search of the exterior of plaintiff's vehicle was conducted, and that the police dog indicated that he detected the scent of an illicit substance.

### 3. The Manual Search

Plaintiff, Officer Mitchell and Officer Torres each testified that the manual search conducted subsequent to the canine searches revealed no illicit substances.

### CONCLUSIONS OF LAW

Plaintiff alleges that he was discriminated against on the basis of his race in violation of 42 U.S.C. § 1983. Section 1983 allows an individual to sue for deprivation of any federally protected right by a person acting "under the color of any statute, ordinance, regulation, custom or usage of any State or Territory of the District of Columbia...." 42 U.S.C. § 1983. Specifically, plaintiff claims that on August 30, 2001, he was the subject of racial profiling and the unreasonable stop and search of his vehicle by Officer Mitchell and other officers from the Rochester Police Department in violation of his constitutionally protected right to be free from an unreasonable search under the Fourth Amendment.

Plaintiff bears the burden of proving by a preponderance of the evidence that he was deprived of a right secured by the Constitution or by the laws of the United States and that the person or persons depriving the party of the right acted under color of state law. *Ruggiero v. Krzeminski,* 928 F.2d 558, 562-63 (2d Cir.1991).

For the reasons set forth below, I find that plaintiff has failed to establish by a preponderance of the evidence that any of his constitutionally protected rights were violated as alleged under 42 U.S.C. § 1983, and his complaint, therefore, is dismissed.

### A. Officer Mitchell Had Probable Cause to Stop Plaintiff

Plaintiff first argues that Officer Mitchell did not have probable cause to stop his vehicle on the evening of August 30, 2001, that he was stopped principally because he is black, and that the traffic violation was a pretext to investigate possible drug trafficking.

It is well-established that an automobile stop is reasonable under the Fourth Amendment if an officer has probable cause to believe that a traffic violation has occurred, even if the traffic violation is only a pretextual reason for the stop. *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). "[A]n observed traffic violation legitimates a stop even if the detectives do not rely on the traffic violation." *United States v. Dhinsa,* 171 F.3d 721, 725 (2d Cir.2001).

**\*6** As explained above, Officer Mitchell witnessed plaintiff move from the fast lane to the middle lane without signaling the change, and cited plaintiff with a violation of New York State Vehicle and Traffic Law § 1163(a), which provides that "[n]o person shall ... move right or left on a roadway unless such movement can be made with reasonable safety." N.Y.

2005 WL 1876064

VEHICLE AND TRAFFIC LAW § 1163(a) (McKinney's 1959).

Plaintiff argues that § 1163(a) requires a motorist only to make a safe lane change, and that since plaintiff made a safe lane change there was no traffic violation. However, this argument ignores an entire sentence of § 1163(a) which provides that "[n]o person shall so turn in any vehicle *without giving an appropriate signal* in the manner herein after provided." N.Y. VEHICLE AND TRAFFIC LAW § 1163(a) (McKinney's 1959). (Emphasis added.) That sentence explicitly incorporates § 1163(d) which prohibits drivers from changing lanes without first signaling the change. *See* N.Y. VEHICLE AND TRAFFIC LAW § 1163(d) (McKinney's 1959). As such, I find that plaintiff's failure to signal his lane change constitutes probable cause for the August 30, 2001 traffic stop by Officer Mitchell. [2] *See United States v. Scopo,* 19 F.3d 777, 781 (2d Cir.1994) (Probable cause to stop defendant where he failed to signal a lane change.).

[2]   It is irrelevant that the traffic ticket in question was later dismissed because Officer Mitchell testified that he did not appear to support the ticket because he was never informed of the hearing date.

While plaintiff alleges that he was the victim of racial profiling because his vehicle was targeted by MRNU simply because he is black, the only tangible proof presented by plaintiff of racial profiling is his skin color. No reasonable inference can be made from that fact alone that the sole reason for the traffic stop was the color of his skin. Plaintiff also failed to prove that the City maintains a policy of racial profiling as part of the MRNU drug interdiction program. However, the City did prove by a preponderance of the evidence that there was a reasonable basis to consider plaintiff's automobile to be a "vehicle of interest," given that it was traveling from New York City, and was registered to an automobile dealership-two possible signs of drug trafficking which was supported by the testimony of two experienced police officers-Mitchell and Torres.

*B. Officer Mitchell Had Probable Cause to Search Plaintiff's Automobile*

Plaintiff next contends that the search of his vehicle violated his Fourth Amendment rights because the officers had neither consent nor probable cause to conduct the search. Based on the facts adduced at trial, I find that the search of plaintiff's automobile was both reasonable and valid since plaintiff consented to the search. I also find that plaintiff's consent

was not necessary to conduct the search since the alert by the police dog alone provided sufficient probable cause to conduct the search.

Although plaintiff alleges that he never consented to the search of his vehicle, the evidence proves otherwise. Both Officer Mitchell and Officer Torres heard plaintiff acquiesce to the search on the condition that he could watch. He also admitted that he never asked the officers to stop searching once they started.

 **\*7** Moreover, to the extent that plaintiff alleges that he only consented because he was frightened by the officers, there is no proof in support of that claim. Plaintiff testified that Officer Mitchell "yanked" the door of plaintiff's vehicle open, thus giving plaintiff no choice but to consent to the search of his vehicle. Also, plaintiff claims that he was intimidated into acquiescing to the search because he was surrounded by several armed police officers. In contrast, Officer Mitchell testified that he did not see any other officers in the area when plaintiff consented; Officer Torres testified that he was merely approaching plaintiff as he consented; and Officer Waterman testified that he did not arrive until after plaintiff had consented.

I find that there was sufficient probable cause for the search independent of plaintiff's consent. Under the automobile exception, a "warrantless search of a movable vehicle is permissible when the police have probable cause to believe that the vehicle contains contraband." *United States v. Harwood,* 998 F.2d 91, 96 (2d Cir.1993). "Probable cause exists where the facts and circumstances within ... [the officer's] knowledge and of which they had reasonable trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that evidence of a crime will be found in the place to be searched." *United States v. Gaskin,* 364 F.3d 438, 456 (2d Cir.2004) (quoting *Brinegar v. United States,* 338 U.S. 160, 175-76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)) (internal quotation mark omitted). Further, an officer's experience and training may allow him to form probable cause where a layman might not. *Id.* at 457.

Before the interior of plaintiff's vehicle was searched, Officer Mitchell knew that: (1) the police dog had indicated that he detected the scent of contraband, specifically a narcotic; (2) plaintiff made a direct trip from New York City to Rochester Exit 45 prior to the stop; (3) plaintiff was driving a vehicle that was not registered to him; and (4) there appeared to be

little luggage for what plaintiff told Officer Mitchell was a trip to New York City of several days duration for two people.

The fact that the K-9 dog Griz indicated that he detected the scent of narcotics by itself is sufficient probable cause to search plaintiff's vehicle. In *Illinois v. Caballes,* the Supreme Court held that a canine search of a vehicle during a lawful traffic stop "does not implicate legitimate privacy interests." *United States v. Caballes,* --- U.S. ----, ----, 125 S.Ct. 834, 838, 160 L.Ed.2d 842 (2005). Moreover, an alert by a police dog in the course of a traffic stop is sufficiently reliable to establish probable cause for a full search of the vehicle. *United States v. Waltzer,* 685 F.2d 370, 370 (2d Cir.1982). *United States v. Fronk,* 173 F.R.D. 59, 73 (W.D.N.Y.1997). As such, I find that there existed probable cause to search the entirety of plaintiff's vehicle.

*CONCLUSION*

For the reasons set forth above, I find that plaintiff has failed to carry his burden of proving by a preponderance of the evidence that his constitutional rights were violated in the course of the August 30, 2001 traffic stop and subsequent search. Failure to signal prior to changing lanes is a moving

violation of the New York State Vehicle and Traffic Law and provides probable cause for police to conduct a traffic stop. Furthermore, the evidence demonstrates that plaintiff gave Officer Mitchell permission to search his vehicle-conditioned on the fact that he observe the search as it was conducted. The proof clearly establishes that the plaintiff and his passenger (who did not testify) were present during the search.

**\*8** In addition, since plaintiff's constitutional rights were not violated in the course of the August 30, 2001 traffic stop and search, there is no need to determine whether Officer Mitchell is entitled to qualified immunity under § 1983. *See* 42 U.S.C. § 1983; *Warren v. Dwyer,* 906 F.2d 70, 74 (2d Cir.1990). Accordingly, I grant judgment in favor of defendants City of Rochester and Officer Mitchell, and the Clerk of the Court is hereby directed to enter judgment in favor of defendants Officer John Mitchell and the City of Rochester, dismissing plaintiff's claims in all respects.

ALL OF THE ABOVE IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1876064

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 13798289
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

UNITED STATES of America
v.
Dennis HARRIS, Defendant.

21-CR-376(EK)
|
Signed October 21, 2022

**Synopsis**
**Background:** Defendant, who was charged with being felon in possession of firearm, moved to suppress.

**Holdings:** The District Court, Eric R. Komitee, J., held that:

[1] warrantless search of defendant's vehicle was justified under automobile exception, and

[2] inevitable discovery doctrine applied to gun found during warrantless search of fuse box in defendant's vehicle.

Motion denied.

**Procedural Posture(s):** Pre-Trial Hearing Motion.

West Headnotes (11)

[1]  **Searches and Seizures** 🔑 Probable or reasonable cause

Automobile exception to warrant requirement permits officers to conduct warrantless search of vehicle if they have probable cause to believe it contains contraband or other evidence of crime. U.S. Const. Amend. 4.

[2]  **Searches and Seizures** 🔑 Probable Cause

Probable cause to search requires only fair probability that evidence of relevant violation will be found in place to be searched. U.S. Const. Amend. 4.

[3]  **Searches and Seizures** 🔑 Scope; trunk, compartments, containers, and luggage

When automobile exception to warrant requirement applies, officers may search any area of vehicle in which they have probable cause to believe contraband or evidence is contained. U.S. Const. Amend. 4.

[4]  **Automobiles** 🔑 Object, Product, Scope, and Conduct of Search, Seizure, or Inspection

**Automobiles** 🔑 Plain view; observation

**Searches and Seizures** 🔑 Motor Vehicles

Police officer had probable cause to believe that evidence of driving while under the influence of alcohol or drugs would be found within defendant's vehicle, and thus warrantless search of vehicle was justified under automobile exception; officer observed defendant sleeping, or passed out, in car, with engine running, in midst of active roadway, as officer reached across defendant's chest to secure transmission in "park" and remove keys from ignition, officer smelled alcohol on defendant's breath, defendant remained non-responsive, officer observed loose marijuana in door panel and vape pen on driver-side floor, when defendant exited vehicle, his speech was slurred, and he had bloodshot, watery eyes. U.S. Const. Amend. 4.

[5]  **Searches and Seizures** 🔑 Emergencies or exigencies

Even if police officer's act of reaching through car window to put car in park and remove keys amounted to search and seizure, act was justified under emergency-aid exception to warrant requirement, where defendant was sleeping, or passed out, in car, with engine running, in midst of active roadway. U.S. Const. Amend. 4.

[6]  **Arrest** 🔑 Nature of offense; felony or misdemeanor

Police officers may effectuate arrest even for violation. U.S. Const. Amend. 4.

---

[7]     **Searches and Seizures**  🔑  Motor Vehicles

Automobile exception permits the warrantless search of a vehicle even in pursuit of evidence of a violation. U.S. Const. Amend. 4.

---

[8]     **Criminal Law**  🔑  Inevitable discovery

Inevitable discovery doctrine applied to gun found during warrantless search of fuse box in defendant's vehicle; evidence would have been discovered in course of inventory search, police department was within its rights to remove car from active roadway, and, given defendant's inability to drive, police department was entitled to transport vehicle to impound lot and to conduct inventory search. U.S. Const. Amend. 4.

---

[9]     **Criminal Law**  🔑  Inevitable discovery

Under "inevitable discovery doctrine," evidence that was illegally obtained will not be suppressed if the government can prove that the evidence would have been obtained inevitably even if there had been no statutory or constitutional violation. U.S. Const. Amend. 4.

---

[10]    **Automobiles**  🔑  Time and place; impoundment, inventory, or booking

**Searches and Seizures**  🔑  Inventory and impoundment; time and place of search

Authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.

---

[11]    **Criminal Law**  🔑  Inevitable discovery

To invoke doctrine of inevitable discovery in context of inventory search, government must prove three things: (1) that police had legitimate custody of vehicle or other property being searched, so that inventory search would

have been justified; (2) that when police in police agency in question conducted inventory searches, they did so pursuant to established or standardized procedures; and (3) that those inventory procedures would have inevitably led to discovery of challenged evidence.

---

**Attorneys and Law Firms**

Patrick J. Campbell, Chand Warren Edwards-Balfour, Government Attorneys, United States Attorney's Office, Brooklyn, NY, for United States of America.

James Darrow, Public Defender, Federal Defenders of New York, Brooklyn, NY, for Defendant.

---

**MEMORANDUM & ORDER**

ERIC KOMITEE, United States District Judge:

**\*1**  Defendant Dennis Harris is charged with violating the felon-in-possession statute, 18 U.S.C. § 922(g). He argues that the search that led to the discovery of the gun at issue violated the Fourth Amendment. Harris now moves to suppress the gun as well as other evidence resulting from that search. The Court held a suppression hearing on August 2, 2022. *See* Tr. of August 2, 2022 Suppression Hr'g ("Tr."), ECF No. 48. For the reasons set forth below, Harris's motion is denied.

---

**I. Background**

The government called one witness at the hearing: Officer Benjamin Rodriguez of the New York City Police Department. Rodriguez's testimony and the government's physical evidence established the following. On the afternoon of March 14, 2021, NYPD officers responded to reports that a blue sedan was at a standstill on Fulton Street in Brooklyn. Tr. 9:17–10:21. Because Fulton Street has only one lane of traffic in each direction at that location, vehicles approaching behind the sedan had to maneuver into the lane of oncoming traffic to get around the sedan. Tr. 85:16–86:14.

As Officer Rodriguez approached the sedan with two other officers, he saw Harris "sleeping" behind the wheel. Tr.

11:16–18. The officers gave verbal commands, such as "Sir, are you okay?" and "What's going on?"; Harris did not respond. Tr. 11:22–12:1. Noting that the sedan's engine was running and the transmission was in the "drive" position, Rodriguez reached through the open driver's side window and across Harris to the center console, put the vehicle into park, and removed the keys from the ignition. Tr. 12:2–13, 13:10–13. These maneuvers did not wake Harris. Tr. 12:14–15.

Rodriguez then opened the driver's side door and shook Harris. Tr. 13:3–5. When this did not work, he "applied four knuckles onto [Harris's] chest and began to rub it," upon which Harris gained consciousness. Tr. 13:4–7. Rodriguez's supervisor asked Harris to exit the vehicle, which he did without assistance. Tr. 13:17–23. Rodriguez observed Harris to be "tired" and "slurring his speech," with "watery" and "red" eyes. Tr. 13:24–14:5.

After Harris exited the sedan, but before he closed the door, Rodriguez saw (from about three feet away) "a plastic bag containing marijuana on the door panel, the driver's side," "in the center of the door" where "the door handle and electronic window controls are located. Tr. 15:2–11, 16:10–12, 26:22–27:20. Rodriguez testified that the bag could be seen in footage from Sergeant Lopez's body-worn camera. On video, the bag appears as a white, opaque object in the door panel. Tr. 45:7–47:20, 68:9–70:16; Gov't Ex. 2, at 0:00 to 0:02. In reality, it is a clear plastic bag containing marijuana, tied into a knot at the top. Tr. 44:23–45:2, 72:2–73:2.

Harris then closed the car door. Gov't Ex. 2, at 0:02 to 0:04. Rodriguez saw through the still-open window "a marijuana oil pen on the floor mat of the driver's side of the vehicle." Tr. 15:12–21, 27:21–28:5. The pen was located on the floor, on top of a brown napkin, near the center tunnel; its location is shown in a still image from Rodriguez's body camera footage. *See* Gov't Ex. 1-A; Tr. 18:2–10, 23:11–25, 50:5–13. (As discussed below, Harris argues that Rodriguez's testimony as to when he first saw these marijuana-related items contradicted his grand jury testimony.)

**\*2** Accompanied by multiple officers, Harris then walked to a nearby ambulance that had arrived. Tr. 16:13–20. Meanwhile, Rodriguez searched Harris's sedan; while searching in the driver's area, he opened a fuse compartment located near the steering wheel and saw a silver firearm. Tr. 28:21–29:1. Photographs of the driver's side dashboard, with the exterior and interior of the fuse compartment visible, were

admitted into evidence. *See* Gov't Exs. 3, 4; Tr. 29:4–20, 30:14–31:3.

Rodriguez then signaled for other officers to arrest Harris. Tr. 29:1–3. After Harris's arrest, the NYPD towed his sedan to the precinct, where Rodriguez and other officers inventoried it later that day. Tr. 39:4–17. During the inventory search, Rodriguez recovered the bag of marijuana and vape pen that he previously saw in the sedan. Tr. 40:17–41:11.

## II. Discussion

The search of Harris's sedan was permitted under the Fourth Amendment, despite the officers' not having obtained a warrant, on two separate bases: the automobile exception to the warrant requirement, and the inevitable discovery doctrine.

### A. Automobile Exception

**[1] [2] [3]** The automobile exception to the warrant requirement permits officers to "conduct a warrantless search of a vehicle if they have probable cause to believe it contains contraband or other evidence of a crime." *United States v. Wilson*, 699 F.3d 235, 245 (2d Cir. 2012).[1] Probable cause requires only a "fair probability" that evidence of a relevant violation will be found in the place to be searched. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). When the exception applies, officers may search any area of the vehicle in which they have "probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); *see also United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.").

[1]    Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

### 1. The Officers Had Probable Cause to Arrest Harris

**[4] [5]** Officer Rodriguez testified that, prior to searching the fuse box that contained the gun, he had observed the following: Harris sleeping (or passed out) in a car, with the engine running, in the midst of an active roadway.

Moreover, as he reached across Harris's chest to secure the transmission in "Park" and remove the keys from the ignition, Rodriguez smelled alcohol on Harris's breath. [2] Despite this action, Harris remained non-responsive. As discussed below, I credit Rodriguez's testimony regarding these events. And these observations amounted to probable cause *even before* Rodriguez observed the loose marijuana in the door panel and the vape pen on the driver-side floor. Rodriguez's observation of those items — in plain view, through the open car door and window, respectively — only buttressed that cause. Accordingly, Rodriguez was justified in his belief that the fuse box drawer might contain additional evidence of criminality — specifically, driving under the influence.

[2]    One might reasonably ask whether Rodriguez's act of reaching through the car window to put the car in Park and remove the keys was a Fourth Amendment event. Several courts have suggested that it does not. *E.g., United States v. Townsend*, 206 F. App'x 444, 449 (6th Cir. 2006) ("[S]eizure of the car keys from the ignition was a minimal intrusion, a reasonable and prudent safety precaution. Because [the defendant] [was asleep and] had not responded to verbal inquiry, the nature of his condition was unknown to the officers and they could not know how he would react when he awoke."); *United States v. Huff*, No. CRIM.A. 11-20111-01, 2013 WL 66032, at *3 (D. Kan. Jan. 4, 2013) ("Because Officer Lancaster reasonably believed that defendant might try to drive away, he opened the passenger door, leaned into the car and removed the keys from the ignition. Considering the totality of the circumstances, the Court concludes that Officer Lancaster's decision to remove the keys was reasonably necessary to secure officer safety and assume unquestioned command of the situation."), *modified on other grounds on reconsideration*, No. CRIM.A. 11-20111-01, 2013 WL 441063 (D. Kan. Feb. 5, 2013), *aff'd*, 782 F.3d 1221 (10th Cir. 2015). Even if Rodriguez's removal of the keys did amount to a search and seizure, no warrant was required: the act was justified under the emergency-aid exception to the warrant requirement. *See, e.g., Batt v. Buccilli*, 725 F. App'x 23, 25–26 (2d Cir. 2018) (warrantless search valid under emergency aid exception where an individual "needed medical assistance" or "could [have been] in danger"); *United States v. Kelly*, 267 F. Supp. 2d 5, 8–9

(D.D.C. 2003) (no Fourth Amendment violation where officer entered car "to assist [the defendant], who was in obvious distress," having been involved in a car crash). *See generally United States v. Toussaint*, 838 F.3d 503, 508 (5th Cir. 2016) ("[A] person's privacy interest in his or her vehicle is less substantial than is the interest in one's house. Forcing officers to ignore other evidence when they stop vehicles to render emergency aid would not meet the needs of law enforcement or the demands of public safety.").

**\*3**    The Seventh Circuit addressed a similar situation in *United States v. Paige*, 870 F.3d 693 (7th Cir. 2017). In *Paige*, the defendant had fallen asleep in the driver's seat of his vehicle, which had been parked in the drive-through lane of an open McDonald's restaurant for an hour and which prompted an employee to call 911. *Id.* at 696. After a responding fire captain roused the defendant, a police officer detected a "strong odor of fresh marijuana" when she approached him. *Id.* at 697. She also "observ[ed] a bottle of alcohol on the driver's seat" of the defendant's car. *Id.* The officer testified that the defendant "appeared sleepy, keeping his eyes low and walking slowly." *Id.* The Seventh Circuit held that the officer's subsequent search of the vehicle was justified under the automobile exception because she "certainly had a reasonable basis for believing that the vehicle contained evidence of the offenses of arrest" — namely, "marijuana possession and impaired driving." *Id.* at 702.

The same is true here. The facts show that there was at least a fair probability that the officers would find evidence that Harris was driving under the influence of alcohol or drugs or was in unlawful possession of marijuana. It is undisputed that Harris was sleeping (or unconscious) behind the wheel of a vehicle stopped in the middle of an active roadway, that a baggie of marijuana and a marijuana vape pen were in plain view in the car, and that Harris did not respond to the officers' questions or even rouse when Rodriguez "shook" him. Tr. 11:16–12:18; 15:2–16:12, 26:12–28:5. While reaching into the sedan to turn it off, Rodriguez also smelled the odor of an alcoholic beverage coming from Harris. Tr. 76:17–18. That observation was later corroborated by a breath analysis test, which indicated a BAC of 0.166. Gov't Ex. 5; Tr. 33:1–34:19. [3]

[3]    As discussed below, Rodriguez's reaching into the sedan did not violate the Fourth Amendment because it did not constitute a search, and even if it

did, the search was justified under the "emergency aid" exception.

The Second Circuit has, not surprisingly, held a similar state of affairs to suggest probable cause to believe a person has been driving under the influence. *See Oquendo v. City of New York*, 774 F. App'x 703, 705 (2d Cir. 2019) (probable cause existed to support arrest for driving while intoxicated where driver "had fallen asleep while his vehicle remained in drive in a traffic lane after attending a party in the early morning hours," his eyes were watery, and "there was an open, half-full bottle of beer in the car's center console"); *United States v. Guy*, 1 F. App'x 410, 411, 413 (6th Cir. 2001) (warrantless search justified under the automobile exception where officers "found [the defendant] asleep with a crank pipe in his hands" in a " 'pull-off' area on the side of the road" because "the officers had probable cause to believe that contraband would be found in [the defendant's] car"). [4]

[4] *Cf. United States v. Hylton*, No. 2:17-CR-86, 2017 WL 6521322, at *6 (D. Nev. Nov. 15, 2017) (finding probable cause where defendant was "asleep in a running vehicle in the middle of an intersection; he was dazed and confused when he awoke; and he failed several steps of the Field Sobriety Tests," and officers detected a "strong odor of marijuana" coming from the vehicle), *report and recommendation adopted,* No. 2:17-CR-86, 2017 WL 6520915 (D. Nev. Dec. 20, 2017), *aff'd,* 30 F.4th 842 (9th Cir. 2022), *petition for cert. docketed,* No. 22-5741 (U.S. Oct 03, 2022); *United States v. Guy*, 1 F. App'x 410, 413 (6th Cir. 2001) ("Wampler first found Guy asleep with a crank pipe in his hands. The officers then arrested Guy for possession of the pipe and Driving Under the Influence. As a result, the officers had probable cause to believe that contraband would be found in his car.")

In this case, there was more: When Harris exited the vehicle, his speech was slurred, and he had bloodshot, watery eyes. Both a vape pen and a bag of marijuana were in plain view in the vicinity of the driver's seat. Taken together, these facts easily establish probable cause to believe that additional "evidence of criminal activity," *i.e.* driving while under the influence of alcohol or drugs, would be found within the vehicle. *Paige*, 870 F.3d at 702; *see also, e.g., Ross*, 456 U.S. at 825, 102 S.Ct. 2157; *Acevedo*, 500 U.S. at 580, 111 S.Ct. 1982; *United States v. Navas*, 597 F.3d 492, 497 (2d Cir. 2010). Thus, the search fell within the automobile exception.

## 2. Rodriguez's Alleged Inconsistencies Do Not Vitiate the Probable Cause

**\*4** During the suppression hearing, Harris argued that I should find Rodriguez's testimony either "not credible" or "so equivocal that it's not possible for the government to meet its burden" of proving beyond a preponderance of the evidence that the search happened under lawful circumstances. Tr. 92:17–93:6; *see United States v. Matlock*, 415 U.S. 164, 177 n.14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."). In support of this argument, Harris points to two claimed inconsistencies between Rodriguez's testimony at the hearing, on the one hand, and his testimony before the grand jury and the state/court complaint he filed, on the other. Harris also argues that Rodriguez could not have seen marijuana through the plastic bag that held it. Tr. 105:5–106:2. I discuss each of these arguments in turn.

### a. Rodriguez's Grand Jury Testimony: Timeline

The first alleged inconsistency relates to the timing of when Rodriguez first saw the two marijuana items in Harris's car. At the hearing, Rodriguez testified that he first observed marijuana in Harris's sedan — both the vape pen and the plastic bag — after Harris got out of the car, as described in the background section above. *See* Tr. 14:24–15:6; 60:8–17. Rodriguez presented as credible throughout his testimony; perhaps more importantly, this testimony was corroborated by Sergeant Lopez's body camera footage, which shows Harris exiting the vehicle while Rodriguez stood very close to the vehicle, in a position to see the door panel. *Compare* Tr. 21:22–22:1, 26:22–27:6, *with* Gov't Ex. 2, at 0:00 to 0:02. After Harris closes the door, the footage shows Rodriguez peering into the open window with his flashlight, at a natural angle to see the vape pen in its undisputed location. *Compare* Tr. 27:6–10, 27:21–28:5, *with* Gov't Ex. 2, at 0:14 to 0:20.

However, at the hearing, defense counsel invoked Rodriguez's grand jury testimony:

Q: What happened when you arrived?

A: We stopped the vehicle. We approached the blue sedan and we began to give verbal commands.

Q: What were those commands?

A: Sir, may you -- sir, what's going on?

Q: How did he respond?

A: He did not respond.

Q: What did you do next?

A: I then put the vehicle into park and removed the keys from the ignition.

Q: Did you smell anything as you opened the vehicle?

A: Yes.

Q: What did you smell?

A: I smelled the odor of alcohol.

Q: Where was the odor of alcohol coming from?

A: Eliminated from the defendant's breath.

*Q: Did you observe anything inside the vehicle?*

*A: Yes.*

*Q: What did you observe?*

*A: I observed a Ziploc containing marijuana on the door panel of the driver's side of the vehicle. I also observed the marijuana oil pen on the floor mat of the vehicle.*

Q: What did you with the defendant next?

A: I dispatched EMS to the scene and I asked the defendant to step out of the vehicle.

Tr. 62:13–63:19 (emphasis added).

At the hearing, Rodriguez reaffirmed that he gave this testimony and that it was accurate and truthful. Tr. 63:21–64:11. Harris argues that this testimony should be read in chronological order and that, so viewed, Rodriguez should be understood to have testified to the grand jury that he first saw the marijuana when he reached into the car to turn it off. Tr. 94:22–96:16. That would be inconsistent with his hearing testimony that he only saw the marijuana once Harris exited the car.

But viewed in context, the grand jury testimony is better understood to reflect that the questioning proceeded without a precise focus on the timeline. Rodriguez did not affirmatively

testify that he saw the marijuana-containing items *when he reached in* to turn off the car; rather, he discussed observing those items in response to a question by the prosecutor that was about those items specifically. Direct examination is a combined effort at storytelling by two partners — questioner and witness. Because the lawyer frames the questions, it can be difficult for the witness to ensure that the testimony unfolds in strict chronological order. *See generally* Richard B. Klein & Roberto Aron, *Trial Communication Skills* § 22:2 (2d ed.) ("In direct examination, the dialogue develops in terms of questions and answers; the theme is established by the lawyer, and the witness must answer, without changing the subject of the question."), Westlaw (Nov. 2021 Update). And "minor gaps in the record do not undermine [the] conclusion that the officer[ ] testified credibly." *United States v. Cancel,* 167 F. Supp. 3d 584, 590 (S.D.N.Y. 2016). Here, the testimony and body camera footage, taken together, make clear that Rodriguez testified credibly concerning the order of events (an order that Harris does not affirmatively dispute).

### b. The "Ziploc" Bag Testimony

**\*5** The second claimed inconsistency relates to the type of plastic bag that contained the marijuana. In his grand jury testimony and the state-court complaint that he swore, Rodriguez identified the bag as a "Ziploc" bag. Tr. 63:11–14, 75:19–76:12; State-Court Complaint 1 ("[T]he deponent did observe one (1) cannabidiol vape pen on the floor in front of the driver's seat of seat vehicle and one (1) ziplock bag containing marihuana in the driver's door of said vehicle."), ECF No. 14-2. At the hearing, Rodriguez testified that the bag was knotted at the top, not "zip-locked." Tr. 72:6–18. The government introduced the bag into evidence, and it was indeed knotted. Tr. 106:24–107:14. But this difference in terminology is immaterial: Rodriguez's use of the name "Ziploc" can easily be understood to refer to the category of plastic, sandwich-sized bags rather than any particular brand, much like people use "Q-tips" to describe cotton swabs in common parlance, and "Band-Aids" for adhesive bandages.

### c. Rodriguez's Ability to See the Bag's Contents

Harris also asks the Court to reject Rodriguez's testimony that he could see through the bag to its contents while it was in the door panel. Tr. 48:3–30. This testimony, Harris claims, is belied by the body camera footage in which the bag appears as a small white (rather than clear) mass. Tr.

92:10–93:1. But it should go without saying that objects do not always appear on video as they do to the naked eye, and that this is especially true when the camera and the naked eye are observing from different vantage points. Here, the body camera footage that Harris invokes is from Sergeant Lopez's camera, not Rodriguez's. It shows Rodriguez looking at the bag from a position right next to the driver's door; Sergeant Lopez is standing near the rear of the car, at a considerably farther distance. *See generally* Seth W. Stoughton, *Police Body-Worn Cameras*, 96 N.C. L. Rev. 1363, 1402–05 (2018) (discussing the limitations of body-worn cameras, including effects of image compression).

In any event, the quality of Rodriguez's visibility into the marijuana bag is academic in the probable-cause analysis. Harris does not meaningfully dispute Rodriguez's testimony that could see the vape pen and identify it as containing marijuana, and one example of contraband is enough. For that matter, it is also undisputed that the officers discovered Harris asleep (or unconscious) behind the wheel in an active roadway, smelling of alcohol, and that he did not awaken even after police shouted commands at him and physically shook him. These indications provided sufficient cause to search the sedan, even in the total absence of the plastic bag.

### 3. Probable Cause For a "Violation" Was Sufficient

[6] [7] Harris argues that the suspected marijuana possession at issue here did not rise to the level of "criminal activity" because it was punishable only by a fine. Def. Letter in Supp. of Mot. to Suppress 5-6; *see Arizona v. Gant*, 556 U.S. 332, 347, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). This argument fails for two reasons. First, it is well established that police officers may effectuate an arrest even for a violation. *See, e.g., Atwater v. City of Lago Vista*, 532 U.S. 318, 345–55, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001); *Kee v. City of New York*, 12 F.4th 150, 159–60 (2d Cir. 2021). Similarly, the automobile exception permits the warrantless search of a vehicle even in pursuit of evidence of a violation. *See Gant*, 556 U.S. at 343–44, 129 S.Ct. 1710. Marijuana possession remained a violation under New York law at the time the search here was effectuated (and for approximately two weeks thereafter). *See* N.Y. Penal Law § 221.05 (repealed effective Mar. 31, 2021); *see also* N.Y. Crim. Proc. Law § 140.10(1)(a); N.Y. Penal Law § 10.00(1). Thus, just as Harris could be arrested based on probable cause that he had committed a violation, his vehicle could be searched based on probable cause that it contained additional evidence of that violation.

Second, *driving* while under the influence of marijuana of course remained, at all relevant times, a crime. *See* N.Y. Veh. & Traf. Law § 1192(4). And the facts established at the hearing show that the officers had ample cause to think that evidence of that offense, such as additional marijuana, could be contained in the vehicle. *Cf. United States v. Carter*, 173 F. App'x 79, 81 (2d Cir. 2006) (holding that "the fact that a marijuana cigarette was seen in the open ashtray ... gave rise to a fair probability that contraband or evidence of a crime would be found" elsewhere in the vehicle); *United States v. Vereen*, No. 20-CR-566, 2021 WL 3771989, at *6 (S.D.N.Y. Aug. 23, 2021) ("[W]hen a search is justified by the odor of marijuana and the officer then finds some amount of marijuana, it would be reasonable for him to conclude that, if he continues to search, there is a 'fair probability' that he will find more."). [5]

[5]     Harris does not argue that the officers violated the Fourth Amendment when they asked him to exit the vehicle. And in any event, the officers were plainly justified in asking him to exit the vehicle given the indications that he was in no condition to be driving and possibly needed medical attention. *See, e.g., Sakoc v. Carlson*, No. 11-CV-290, 2012 WL 3929904, at *8 (D. Vt. Sept. 10, 2012) (officers had reasonable suspicion sufficient to justify asking driver to exit vehicle where driver's "responses to questions were delayed and evidenced some confusion," among other indicia of impairment).

**\*6** Thus, Rodriguez's search of Harris's sedan was justified under the automobile exception.

## B. Inevitable Discovery Doctrine

[8] [9] [10] Even if the automobile exception did not apply, Rodriguez's search of the fuse box was justified by the doctrine of inevitable discovery. Under that doctrine, "evidence that was illegally obtained will not be suppressed if the government can prove that the evidence would have been obtained inevitably even if there had been no statutory or constitutional violation." *United States v. Mendez*, 315 F.3d 132, 138 (2d Cir. 2002). Here, the evidence would been discovered in the course of an "inventory search," even absent probable cause. This is because (a) the NYPD was within its rights to remove the car from the active roadway. "The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *South Dakota v. Opperman*, 428 U.S. 364, 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). And (b) given Harris's inability to drive, the

NYPD was entitled to transport the vehicle to an impound lot and, once there, to conduct an inventory search. *See United States v. Lopez*, 547 F.3d 364, 369 (2d Cir. 2008) (An inventory search "is not done to detect crime or to serve criminal prosecutions. It is done for quite different reasons: (1) to protect the owner's property while it is in police custody; (2) to protect the police against spurious claims of lost or stolen property; and (3) to protect the police from potential danger.").

**[11]** To invoke the doctrine of inevitable discovery in this context, "the government must prove three things":

> (1) that the police had legitimate custody of the vehicle or other property being searched, so that an inventory search would have been justified; (2) that when the police in the police agency in question conducted inventory searches, they did so pursuant to 'established' or 'standardized' procedures; and (3) that those inventory procedures would have 'inevitably' led to the 'discovery' of the challenged evidence.

*Mendez*, 315 F.3d at 138.

All three requirements are met here. First, it is undisputed that Harris's sedan was parked in an active roadway, which satisfies the first element. *Opperman*, 428 U.S. at 369, 96 S.Ct. 3092.

Second, the evidence showed that NYPD officers conduct inventory searches of vehicles regularly — as a standard practice, and pursuant to established procedures. Rodriguez testified that "any time" officers "take a vehicle into possession," they "search the vehicle for contraband, weapons, and basically any property left within the vehicle and ... document any such property being discovered." Tr. 34:23–35:3. These inventory searches are performed pursuant to the NYPD Patrol Guide, which officers are trained on (and which Rodriguez had reviewed prior to the search). Tr. 36:3–15. A portion of the Patrol Guide, which was introduced into evidence as Government's Exhibit 8, directs officers to "[s]earch the interior of the vehicle thoroughly," including "any area that may contain valuables." Gov't Ex. 8, at 1.

Harris has raised no objection to the way the inventory search of his sedan was actually conducted later that evening, despite body camera footage of that search having been produced and admitted into evidence. *See* Gov't Ex. 9.

**\*7** Finally, the inventory search procedures in the NYPD's Patrol Guide — introduced into evidence by the government — would inevitably have resulted in officers finding the firearm. Gov't Ex. 8, at 1. Rodriguez testified that although the Patrol Guide does not list fuse boxes specifically as a location to be searched, he would search a fuse box if he thought "something could be concealed" inside and that the tray could be opened without damage. Tr. 37:10–23. This is consistent with the Patrol Guide, which instructs officers to "[s]earch the interior of the vehicle thoroughly," "includ[ing] any area that may contain valuables." Gov't Ex. 8, at 1; *see also United States v. Miller*, No. 18-CR-395, 2019 WL 2088248, at \*6 (E.D.N.Y. May 13, 2019) ("The Patrol Guide ... describes *examples* of areas to be searched; it does not proscribe an exhaustive list.").

Indeed, officers are permitted to do even more than Rodriguez did — including to "[f]orce open [a] trunk, glove compartment, etc." if it "can be done with minimal damage" or if officers "[r]easonably suspect that the item contains weapons, explosives, hazardous materials or contraband." Gov't Ex. 8, at 1. Given that, it is permissible to open a fuse box during an inventory search. *See Miller*, 2019 WL 2088248, at \*6 (opening "a fuse box that ... was designed to and did open easily by hand ... is fundamentally different from forcing open door panels of a vehicle that were not designed to opened easily"); *accord United States v. Zimmerman*, 480 F. Supp. 3d 446, 454–55 (E.D.N.Y. 2020) (holding that a fuse box was properly subjected to an inventory search because "[t]hough not intended for that purpose, the fuse box was large enough to hide valuables, including the firearm at issue, and an inventory search is designed to ferret out such hiding places to protect both the police and the vehicle's owner in the event property is claimed to be lost.").

Thus, the search was independently justified under the inevitable discovery doctrine.

### III. Conclusion

For the foregoing reasons, the motion to suppress is denied.

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2022 WL 13798289

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2022 WL 6786271
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

UNITED STATES of America,

v.

Robert FORBES, Jr. a/k/a Ra Ra a/k/a Henny, Defendant.

20-CR-6140-FPG-MJP
|
Signed June 10, 2022

**Attorneys and Law Firms**

For the United States: Robert Marangola, Assistant U.S. Attorney, U.S. Attorney's Office, 100 State Street, Rochester, NY 14614, 585-263-6760.

For the Defendant: Peter J. Pullano, Esq., Tully Rinckey, PLLC, 400 Linden Oaks, Suite 110, Rochester, NY 14625, 585-492-4700.

## REPORT AND RECOMMENDATION

Pedersen, United States Magistrate Judge

**\*1** In a superseding indictment filed on August 12, 2021 ("Indictment"), the Grand Jury charged defendant Robert Forbes, Jr., a/k/a Ra Ra a/k/a Henny, with nine crimes including: two counts of Hobbs Act Conspiracy (Counts 1 & 8); one count of Hobbs Act robbery (Count 2); 4 counts of Use of a Firearm During and in Relation to a Crime of Violence (Counts 3, 5, 7, & 9); and two counts of Attempted Hobbs Act Robbery (Counts 4 & 6). (ECF No. 68.)

On October 25, 2020, Defendant filed an omnibus discovery motion, with attached Exhibits A through G. (Not. of Mot., ECF No. 94.) The government submitted a response to Defendant's motion on November 19, 2021. (Gov't's Resp., ECF No. 101.) Defendant thereafter filed a supplemental motion on February 17, 2022, which attached as Exhibit H Defendant's standing affidavit. (Not. of Mot., ECF No. 120.) The government filed its response to the supplemental motion on March 2, 2022. (Gov't's Mem. of Law, ECF No. 121.) The undersigned heard oral argument on March 10, 2022, and issued a decision on all the issues raised in Defendant's motion, except for reserving on those aspects of Defendant's motion seeking (1) dismissal of the Indictment on various

grounds; (2) suppression of identification; (3) suppression of tangible evidence; and (4) suppression of statements. (*Id.* at 127.)

At the March 10, 2022, oral argument, the undersigned provided Defendant with two weeks to submit the photo arrays that he contends were suggestive, together with a memorandum describing how the photo arrays were suggestive, in support of his motion to suppress identification testimony. (ECF No. 124.) In addition, in connection with that aspect of Defendant's motion seeking to suppress statements, the undersigned provided Defendant with two weeks to submit an affidavit from someone with personal knowledge regarding the statement(s) Defendant seeks to suppress, together with a supporting memorandum of law. (*Id.*) Defendant submitted his second supplemental motion addressing these issues on April 21, 2022 (ECF No. 128), including an affidavit from Defendant, sworn to on March 30, 2022, in support of his motion to suppress statements (Def.'s Aff., ECF No. 128-1), and the challenged photo array (ECF No. 128-2). The government filed its response to Defendant's second supplemental motion to suppress statements and identifications on April 28, 2022, which included a compact disc containing Defendant's April 2020 interview in connection with which Defendant seeks to suppress his post-arrest statements. (ECF No. 129.) The undersigned held a hearing on May 3, 2022, regarding the existence of probable cause for law enforcement to conduct the March 26, 2020, traffic stop. (*Id.*) Finally, on May 6, 2022, the government submitted its response on the limited issue of Defendant's arguments made during the May 3, 2022, evidentiary hearing related to the photo array. (ECF No. 132.)

After hearing oral argument, reviewing all the motion papers, conducting a hearing regarding the March 26, 2020, traffic stop, and conducting an *in camera* review of Defendant's April 2020 interview, the undersigned recommends that the District Court deny those aspects of Defendant's motion seeking to (1) dismiss the Indictment on various grounds; (2) suppress physical evidence seized from 953 Dewey Avenue and the 2019 Mitsubishi Outlander; (3) suppress physical evidence seized from a Kia Sportage; (4) suppress Defendant's statements; (5) suppress identification testimony; (6) challenge the existence of probable cause for the March 26, 2020, traffic stop of Defendant's Mitsubishi Mirage; (7) challenge the existence of probable cause to conduct the warrantless search of the Mitsubishi Mirage on March 26, 2020; (8) challenge the existence of probable cause for the issuance of the April 1, 2020, search warrant for Defendants

Motorola E6 cellular phone and suppression of any evidence resulting from a search of the contents of that phone; and (9) challenge the existence of probable cause for the issuance of the April 21, 2020, search warrant for Defendant's 2019 Mitsubishi Mirage after it was impounded and suppression of evidence resulting from that search.

## STANDARD OF LAW

**\*2** The Honorable Frank P. Geraci, Jr. referred this matter to the undersigned as follows: "[a]ll pre-trial matters in this case are referred to the above-named United States Magistrate Judge, including all pre-trial matters that a Magistrate Judge may hear and determine pursuant to 28 U.S.C. Section 636(b)(1)(A), and those which a Magistrate Judge may hear and thereafter file a report and recommendation for disposition pursuant to Section 636(b)(1)(B). All procedural aspects of matters properly before the Magistrate Judge under this Order, including scheduling and the filing of briefs or other supporting material, shall be determined by the Magistrate Judge. All motions or applications shall be filed with the Clerk and made returnable before the Magistrate Judge." (Text Order of Referral, ECF No. 23.)

## DISCUSSION

### *Findings of Fact Regarding Defendant's Motion to Dismiss Counts 4 and 6 of the Indictment for Insufficiency.* [1]

[1] Defendant moves to dismiss the Indictment on several different grounds. However, the undersigned found it somewhat difficult to decipher on which grounds Defendant seeks to dismiss which counts of the Indictment. The undersigned has endeavored to ensure that all grounds for dismissal are addressed herein.

It appears that Defendant seeks to dismiss Counts 4 and 6,[2] both charging Defendant with "Attempted Hobbs Act Robbery," for failing to include "the factual allegations of the elements of the offense." (Pullano Aff. ¶ 100.) Defendant contends that the Indictment "does no more than recite types of crimes, without any specific facts describing alleged criminal acts." (*Id.* ¶ 103.)

[2] The heading in Defendant's papers seeking this relief reads "Motion for Dismissal of Counts 1, 2 and 3 of the Indictment." (Affidavit of Peter J. Pullano at 24, Oct. 25, 2021 ("Pullano Aff."), ECF No. 94 (the page number refers to the one automatically assigned when the document was electronically filed, and which can be found in the upper right-hand corner of the document.)) Defense counsel indicated at oral argument that the heading is incorrect.

Count 4 of the Indictment provides:

> On or about March 22, 2020, in the Western District of New York, the defendants, ROBERT FORBES, JR. a/k/a Ra Ra a/k/a Henny, and RAEKWON GREEN a/k/a Bundy a/k/a Bundles, did unlawfully attempt to obstruct, delay and affect, commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), and the movement of articles and commodities in commerce, by robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), in particular, the attempted robbery of controlled substances and United States currency derived from the sale of controlled substances belonging to a person engaged in the unlawful possession and distribution of controlled substances, from, and in the presence of, Victim B and Victim C, persons known to the Grand Jury. All in violation of Title 18, United States Code, Sections 1951(a) and 2.

(Indictment at 3, ECF No. 68.)

Count 6 of the Indictment provides:

> On or about March 25, 2020, in the Western District of New York, the defendant, ROBERT FORBES, JR. a/k/a Ra Ra a/k/a Henny,

did unlawfully attempt to obstruct, delay and affect, commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), and the movement of articles and commodities in commerce, by robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), in particular, the attempted robbery of controlled substances and United States currency belonging to a person believed by the defendant to be engaged in the unlawful possession and distribution of controlled substances, from, and in the presence of, Victim D, a person known to the Grand Jury. All in violation of Title 18, United States Code, Sections 1951(a) and 2.

\*3    (*Id.* at 4.)

***Conclusions of Law Regarding Defendant's Motion to Dismiss Counts 4 and 6 the Indictment for Insufficiency.***

Federal Rule of Criminal Procedure 7(c)(1) requires, among other things, that an indictment contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged ..." *Id.* There are two constitutional requirements for an indictment to be sufficient: (1) it must contain " 'the elements of the offense charged and fairly inform[ ] a defendant of the charge against which he must defend,' " and (2) it must enable the defendant " 'to plead an acquittal or conviction in bar of future prosecutions for the same offense.' " *United States v. Resendiz-Ponce,* 549 U.S. 102, 108, 127 S.Ct. 782, 166 L.Ed.2d 591 (2007) (quoting *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)). "Nevertheless, 'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.' " *United States v. Alfonso,* 143 F.3d 772, 776 (2d Cir. 1998) (quoting *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir. 1992), *cert. denied,* 504 U.S. 926, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992)). "Generally, the indictment does not have to specify evidence or details of how the offense was committed. Simply put, the validity of an indictment is tested by its allegations, not by whether the Government can prove its case." *United States v. Walters,* 963 F. Supp. 2d 125, 130

(E.D.N.Y. 2013) (citations omitted); *see also United States v. Raniere,* 384 F. Supp. 3d 282, 301 (E.D.N.Y. 2019) ("[T]here is a difference between what the Government must prove at trial and what it must plead in the indictment.").

In view of the forgoing principles, the undersigned believes that Defendant's allegations regarding the insufficiency of Counts 4 and 6 are unpersuasive. The language of Counts 4 and 6 sufficiently track that of 18 U.S.C. § 1951(a), as charged in the Indictment. Moreover, Counts 4 and 6 go beyond the language of statute, providing factual allegations, including but not limited to, the dates of the attempted Hobbs Act robberies and the targets of the attempted robberies— controlled substances and United States currency derived from the sale of controlled substances. (Indictment at 3, 4, ECF No. 68.) In addition, the Indictment states the place of the attempted robberies, the Western District of New York. (*Id.*) For these reasons, the undersigned believes Counts 4 and 6 meet the basic requirements for a Hobbs Act indictment and recommends that the District Court deny this aspect of Defendant's motion.

***Findings of Fact Regarding Defendant's Motion to Dismiss Counts 2, 4, 6, and 8 for Failure to Allege Mens Rea.***

Defendant seeks to dismiss Counts 2, 4, 6, and 8, which consist of two counts of "Hobbs Act Robbery" and two counts of "Attempted Hobbs Act Robbery," for failure to allege *mens rea.* (Pullano Aff. ¶¶ 95–103, ECF No. 94.) Defendant contends that since these counts "lack necessary allegations of criminal intent ... [they] do not properly allege an offense against the United States." (*Id.* ¶ 105, internal quotation marks and citations omitted.) Defendant asserts that use of the word "unlawfully" is not sufficient to satisfy the element of *mens rea.* (*Id.* ¶ 106.)

\*4    The government contends that Defendant's motion should be dismissed because other cases in the Second Circuit and the Western District of New York have found the charging language in Counts 2, 4, 6, and 8 to be legally sufficient. (Gov't's Resp. at 12.) Specifically, with respect to Defendant's argument regarding the failure to allege *mens rea,* the government asserts that all four counts properly allege this element as they include the language "obstruct" and/or "attempt to obstruct" commerce "by robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1)." (*Id.* at 12.) The government argues that since "robbery" implies "knowing" and "willful" conduct, the *mens rea* element is satisfied. (*Id.*)

***Conclusions of Law Regarding Defendant's Motion to Dismiss Counts 2, 4, 6, and 8 for Failure to Allege Mens Rea.***

Courts in this Circuit have held that the statutory definition of "robbery" in 18 U.S.C. § 1951(b)(1) implies "knowing" and "willful" conduct, and an indictment is sufficient even if it does not explicitly reference those terms. *United States v. Jackson*, 513 F. App'x 51, 55 (2d Cir. 2013), *cert. denied*, 569 U.S. 939, 133 S.Ct. 1848, 185 L.Ed.2d 852 (2013) (summary order) (holding that "[a]lthough the indictment did not specifically contain the words 'knowingly' or 'willfully,' the plain and common-sense reading of the indictment put the defendant on notice of what the charges against him were, such that he was not prejudiced in the preparation of his defense."); *United States v. Tobias*, 33 F. App'x 547, 549 (2d Cir. 2002), *cert. denied*, 538 U.S. 933, 123 S.Ct. 1598, 155 L.Ed.2d 332 (2003) ("The indictment tracked the language of 18 U.S.C. § 1951, using the term 'robbery,' which necessarily implies knowing and willful conduct."); *United States v. McGee*, No. 15-CR-6079 (JWF), 2017 WL 667199, at *2 (W.D.N.Y. Feb. 17, 2017), *report and recommendation adopted*, No. 15-CR-6079-FPG, 2017 WL 2880121 (W.D.N.Y. July 6, 2017) (holding that an indictment was "sufficient to assert the *mens rea* element of robbery even though it does not contain the words 'knowingly' or 'willfully.' "); *United States v. McCoy*, 14-CR-6181 EAW, 2016 WL 6952351, at *3-5 (W.D.N.Y. Nov. 28, 2016) ("[T]he grand jury in this case plainly determined that there was probable cause to believe that Defendants committed a Hobbs Act robbery.... Under settled Second Circuit precedent, this is plainly sufficient to allege the *mens rea* element of 'knowingly' and 'willfully' for a Hobbs Act violation").

The undersigned believes that the Indictment is sufficient to assert the *mens rea* element of robbery even though it does not contain the words "knowingly" or "willfully." The Indictment specifically references "robbery" and its statutory definition, and thereby imputes the necessary *mens rea* therein.[3] Therefore, Counts 2, 4, 6, and 8 not only track the language of 18 U.S.C. § 1951(b)(1) but also include the requisite *mens rea* requirement. For these reasons, the undersigned recommends that the District Court deny this part of Defendant's motion.

[3]     "The term 'robbery' means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means

of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining." 18 U.S.C. § 1951(b)(1).

***Findings of Fact Regarding Defendant's Motion to Dismiss Counts 2 through 9 for Lack of a Nexus to Interstate Commerce and Failing to Allege Facts to Support a Claim of Aiding and Abetting.***

**\*5** Defendant seeks dismissal of Counts 2 through 9 of the Indictment on the grounds that they "do not make any specific allegations as to what was actually attempted, nor do they allege how the defendants [sic] attempted to interfere with interstate commerce." (*Id.* ¶ 112.)

Similarly, Defendant seeks dismissal of all counts in the Indictment on the basis that the robberies did not affect interstate commerce because "the taking of small sums of money from an individual has its primary and direct impact only on that individual and not the national economy" (*Id.* ¶ 27 [4] at 38) and that "[c]ourts have been hesitant to find the requisite interstate commerce nexus in cases involving robberies of individuals that have some connection with interstate commerce, and especially involving robberies of individuals in their homes." (*Id.* ¶ 30 at 39.) Defendant contends that the Indictment's reliance on the notion that the robberies were to obtain drug proceeds is the government's attempt to bring the robberies under the purview of the Hobbs Act. (*Id.* ¶ 35, p. 43.)

[4]     Defense counsel's affidavit reaches paragraph 128 on page 35, but the next paragraph is numbered 23. The paragraphs continue to be misnumbered up to paragraph 37 until page 43 of the affidavit, where defense counsel picks back up with paragraph 129. To quell any confusion, when referring to any of the misnumbered paragraphs the undersigned will also refer to the page number of the affidavit.

In response, the government argues that courts have found the language included in the Indictment to be legally sufficient to allege an effect on interstate commerce because it states that Defendant knowingly stole or attempted to steal drugs or drug proceeds and the market for illegal drugs falls under federal jurisdiction. (Gov't's Resp. at 13, ECF No. 101.) In particular, the government argued that

Count 2 alleges that the defendant obstructed commerce by "the robbery of controlled substances and United States currency derived from the sale of controlled substances." (Document No. 68, at p. 2). Count 4 alleges that the defendant attempted to obstruct commerce by "the attempted robbery of controlled substances and United States currency derived from the sale of controlled substances." (*Id.* at pp. 3 [sic]). Count 6 alleges that the defendant attempted to obstruct commerce by "the attempted robbery of controlled substances and United States currency belonging to a person believed by the defendant to be engaged in the unlawful possession and distribution of controlled substances." (*Id.* at p. 4). Count 8 alleges that the defendant obstructed commerce by the robbery "of United States currency derived from the sale of controlled substances." (*Id.* at p. 5).

(*Id.* at 12–13.)

With respect to Counts 2 through 9, Defendant also contends that "there are no allegations as to how the defendant is alleged to have 'aided and abetted' in any of those counts." (Pullano Aff. ¶ 121.) Instead, Defendant asserts that the Indictment only includes the statutory citation to 18 U.S.C. § 2 and does not allege facts that would support a charge of aiding and abetting. (*Id.* ¶ 122.)

The government maintains that including the citation to 18 U.S.C. § 2 in Counts 2 through 9 put Defendant on notice that "the government intends to rely, at least in part, on an aiding and abetting theory at trial." (Gov't's Resp. at 13.) The government further asserts that even if the Indictment did not include a charge of aiding and abetting, a trial court could instruct the jury on such a charge at trial. (*Id.*)

***Conclusions of Law Regarding Defendant's Motion to Dismiss Counts 2 through 9 for Lack of a Nexus to Interstate Commerce and Failing to Allege Facts to Support a Claim of Aiding and Abetting.***

**\*6** "The Hobbs Act prohibits robberies that affect interstate commerce 'in any way or degree,' 18 U.S.C. § 1951(a); so the required showing of an effect on interstate commerce is *de minimis*." *United States v. Parkes*, 497 F.3d 220, 230 (2d Cir. 2007), *cert. denied*, 552 U.S. 1220, 128 S.Ct. 1320, 170 L.Ed.2d 133 (2008).

Defendant seeks dismissal of Counts 2 through 9 contending that the Indictment does not provide allegations as to what

was attempted or how Defendant attempted to interfere with interstate commerce. He also seeks dismissal of all counts asserting that the alleged robberies on which the Indictment is premised did not affect interstate commerce. However, at this point in the litigation, Defendant's arguments do not align with established Second Circuit and Supreme Court precedent.

As a general matter, it is well settled that Congress has the power to control purely local drug distribution activities because such local activities "are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005). In *Taylor v. United States*, 579 U.S. 301, 136 S.Ct. 2074, 195 L.Ed.2d 456 (2016), the Supreme Court addressed the contours of the interstate commerce requirement found in the Hobbs Act. The plaintiff in *Taylor* was charged with two home invasions of drug dealers, seeking to rob them of drugs and drug proceeds. *Id.* at 305, 136 S.Ct. 2074. The plaintiff argued that the government failed to satisfy the interstate commerce element of the Hobbs Act because it had not proven that the drugs subject to the robbery "originated or were destined for sale out of State," or that the victim drug dealers "operated an interstate business." *Id.* at 307, 136 S.Ct. 2074. Relying on its 2005 holding in *Raich*, the Supreme Court rejected the plaintiff's Commerce Clause arguments. The Court explained that its holding was simply a logical extension of *Raich*:

> The case now before us requires no more than that we graft our holding in *Raich* onto the commerce element of the Hobbs Act. The Hobbs Act criminalizes robberies affecting 'commerce over which the United States has jurisdiction.' § 1951(b)(3). Under *Raich*, the market for marijuana, including its intrastate aspects, is 'commerce over which the United States has jurisdiction.' It therefore follows as a simple matter of logic that a robber who affects or attempts to affect even the intrastate sale of marijuana grown within the State affects or attempts to affect commerce over which the United States has jurisdiction.

*Id.*

Thus, when a robber tries to steal drugs or drug proceeds from a drug dealer, "proof of such an attempt in itself supports the conclusion that the robber attempted to affect interstate commerce, and the robber is therefore convictable under the Hobbs Act." *United States v. Lee*, 834 F.3d 145, 152 (2d Cir. 2016), *cert. denied*, —— U.S. ——, 137 S. Ct. 1599, 197 L.Ed.2d 725 (2017).

The forgoing is not to say that Defendant's arguments here are irrelevant, but they are premature. The Court in *Taylor* explained that its holding "does not make the commerce provision of the Hobbs Act superfluous." *Taylor*, 579 U.S. at 308–09, 136 S.Ct. 2074. Indeed, there may be Hobbs Act trials where the conduct proven, "even in the aggregate, may not substantially affect commerce." *Id.* at 309, 136 S.Ct. 2074. But the Court also made clear that the nature of the proof needed to satisfy the commerce element focuses not on the specific interstate actions of the defendant, but on the nature of the defendant's activities. "[W]here the target of a robbery is a drug dealer, proof that the defendant's conduct in and of itself affected or threatened commerce is not needed. All that is needed is proof that the defendant's conduct fell within a category of conduct that, in the aggregate, had the requisite effect." *Id.* In alleging that Defendant targeted drug proceeds and controlled substances, the undersigned believes that the Indictment sufficiently alleges a nexus to interstate commerce.

**\*7** Moreover, with respect to Defendant's assertion that Counts 2 through 9 fail to sufficiently allege what Defendant attempted and how it was attempted such that his actions could have an impact on interstate commerce, the undersigned believes that the citation to 18 U.S.C. § 2 in each of those counts put Defendant on notice that aiding and abetting was a theory that the government might pursue. *United States v. Weintraub*, 27 F. App'x 54, 56 (2d Cir. 2001) ("[The defendant] could not have been surprised by the government's reliance on the aiding-and-abetting theory because the indictment cited the aiding-and-abetting statute ... 18 U.S.C. § 2.") Moreover, as the government correctly argued, "it is well established that a trial judge may properly give an aiding and abetting instruction even if the indictment does not expressly charge a violation of 18 U.S.C § 2." *United States v. Eisner*, 59 F. App'x 379, 382 (2d Cir. 2003), citing *United States v. Mucciante*, 21 F.3d 1228, 1234 (2d Cir. 1994) (internal citations omitted).

Furthermore, Defendant's argument that Counts 2 through 9 fail to allege "what was actually attempted [ ] or how the defendants attempted to interfere with interstate commerce" is not persuasive. Counts 2, 4, 6, and 8 refer to robberies/ attempted robberies that occurred on certain dates and geographical locations and provide the particulars of what Defendant is alleged to have done on the referenced dates. For example, Count 2 provides, in relevant part, that "[o]n or about February 18, 2020 ... [Defendant] ... did unlawfully

obstruct, delay and affect, and attempt to obstruct, delay and affect, commerce ... and the movement of articles and commodities in commerce, by robbery ... in particular, the robbery of controlled substances and United States currency derived from the sale of controlled substances." (Indictment at 2, ECF No. 68.)

Moreover, Counts 3, 5, 7, and 9 also refer to the specific dates on which the robberies/attempted robberies occurred and that Defendant allegedly "did knowingly and unlawfully use, carry and brandish, and in furtherance of such crime, did knowingly and unlawfully possess and brandish, a firearm." [5] (Indictment at 2–3.) Accordingly, the undersigned believes that Defendant's argument that Counts 2 through 9 fail to allege "what was actually attempted [ ] or how the defendants attempted to interfere with interstate commerce" is meritless. Based upon the forgoing, the undersigned recommends that the District Court deny this aspect of Defendant's motion.

[5]     Counts 3, 7, and 9 contain the quoted language verbatim as they are charged only against Defendant. Count 5 is charged against Defendant and his co-defendant so the last word in the quote —"firearm"—is plural.

### Findings of Fact Regarding Defendant's Motion to Dismiss Counts 3, 5, 7, and 9 Regarding 18 U.S.C. § 924(c) Issues

Defendant seeks to dismiss Counts 3, 5, 7, and 9, charging Defendant with "Use of a Firearm During and in Relation to a Crime of Violence," and which allege violations of 18 U.S.C. § 924(c)(1)(A)(ii) and 2. (Pullano Aff. ¶ 123). Defendant contends that the "government [must] prove beyond a reasonable doubt all of the elements of Section 924(c), one of which is that the defendant committed the underlying crime." (*Id.*) Defendant argues that if his challenge regarding the sufficiency of Count 2 (Hobbs Act Robbery) of the Indictment is successful, it then follows that Counts 3, 5, 7, and 9 must be dismissed. (*Id.*) He also, somewhat repetitively, contends that Counts 3, 5, 7, and 9 are "defective by default in that the offenses alleged within the Indictment set forth in counts [*sic*] 2, 4, 6, and 8 are not violations of the *Hobbs Acts* [*sic*] under Title 18 U.S.C. § 1951(a)." (*Id.* ¶ 37.) Defendant further argues that Counts 3, 5, 7, and 9 should be dismissed because the allegations of "aiding and abetting," and "attempting" a Hobbs Act robbery do not qualify as "crimes of violence" under 18 U.S.C. § 924(c). (*Id.* ¶¶ 124– 26.) Finally, Defendant contends that Counts 3, 5, 7, and 9 should be dismissed under the holding of a case referred to

and cited by Defendant only as "*Davis*," which held that 18 U.S.C. § 924(c)(3)(B) is unconstitutionally vague. [6] (*Id.* ¶ 126.) Defendant does not elaborate further on this argument.

[6]   The government clarified that Defendant appeared to be relying on *United States v. Davis*, ⸺ U.S. ⸺, 139 S. Ct. 2319, 204 L.Ed.2d 757 (2019) (Referring to 18 U.S.C. § 924(c)(3)(B)), the majority held: "Even the government admits that this language, read in the way nearly everyone (including the government) has long understood it, provides no reliable way to determine which offenses qualify as crimes of violence and thus is unconstitutionally vague." *Davis*, 139 S. Ct. at 2324.

**\*8**  The government rejects Defendant's argument that the Second Circuit has held that attempted Hobbs Act robbery and aiding and abetting an attempted Hobbs Act robbery do not constitute crimes of violence under 18 U.S.C. § 924(c)(3)(A). (Gov't's Resp. at 14.) The government also rejects Defendant's argument that the holding of *Davis* requires that Counts 3, 5, 7, and 9 be dismissed pursuant to 18 U.S.C. § 924(c)(3)(B) as unconstitutionally vague. (*Id.*) The government contends that the predicates for those counts —*i.e.*, Counts 2, 4, 6, and 8—constitute crimes of violence under 18 U.S.C. § 924(c)(3)(A). (*Id.*)

### Conclusions of Law Regarding Defendant's Motion to Dismiss Counts 3, 5, 7, and 9 Regarding 18 U.S.C. § 924(c) Issues.

Defendant alleges that Counts 3, 5, 7, and 9, charging Defendant with "Use of a Firearm During and in Relation to a Crime of Violence," must be dismissed because "attempting" and "aiding and abetting" Hobbs Act robbery and attempted Hobbs Act robbery do not constitute "crimes of violence" under 18 U.S.C. § 924(c).

However, in opposition, the government cites to the case of *United States v. McCoy*, in which the Second Circuit clearly provides that "we hold that Hobbs Act attempted robbery qualifies as a crime of violence under § 924(c) because an attempt to commit Hobbs Act robbery using force necessarily involves the 'attempted use ... of force' under § 924(c)(3) (A)." 995 F.3d 32, 57 (2d Cir. 2021). In that same case, the Second Circuit also disposed of Defendant's argument that "aiding and abetting" Hobbs Act robbery does not constitute a crime of violence, holding that:

There is no culpable aiding and abetting without an underlying crime committed by some other person; and aiding and abetting itself is not the predicate crime for firearm brandishing under § 924(c). The aiding-and-abetting concept describes the role of the defendant that makes him liable for the underlying offense. [W]hen a person is charged with aiding and abetting the commission of a substantive offense, the 'crime charged' is ... the substantive offense itself ... The crime charged in a prosecution for aiding and abetting a Hobbs Act robbery is thus Hobbs Act robbery ... If the underlying offense is a crime of violence, it is a predicate for § 924(c) liability; if the defendant aided and abetted that underlying offense, he is guilty of the underlying offense ... Hobbs Act robbery and Hobbs Act attempted robbery are crimes of violence within the meaning of § 924(c).

*Id.* at 58 (internal quotation marks and citations omitted).

With respect to Defendant's motion seeking to dismiss Counts 3, 5, 7, and 9 as unconstitutionally vague under 18 U.S.C. § 924(c)(3)(B), other than citing to a partial case name, Defendant does not provide any factual or legal support for this claim. The *Davis* case relied on by Defendant held that the language of § 924(c)(3)(B), in defining crime of violence in terms of a "risk" that physical force would be used, was unconstitutionally vague. 139 S. Ct. at 2336.

However, the undersigned believes that the government adequately opposed this part of Defendant's motion by reiterating that the predicates for Counts 3, 5, 7, and 9 (*i.e.*, Counts 2, 4, 6, and 8) charging crimes of Hobbs Act robbery, attempted Hobbs Act robbery, and aiding and abetting Hobbs Act robbery/attempted Hobbs Act robbery have already been found to constitute "crimes of violence" under 18 U.S.C. § 924(c)(3)(A) and, therefore, do not implicate 18 U.S.C. § 924(c)(3)(B), citing *McCoy. McCoy*, 995 F.3d at 54–

58 (concluding that Hobbs Act robbery, attempted Hobbs Act robbery, and aiding and abetting Hobbs Act robbery and attempted Hobbs Act robbery constitute "crime[s] of violence" under 18 U.S.C. § 924(c)(3)(A)); *accord United States v. Waite*, 12 F.4th 204, 212 (2d Cir. 2021) ("a § 924(c) conviction predicated on aiding and abetting a crime of violence is equivalent to one predicated on the commission of a crime of violence as a principal.")

**\*9** Finally, with respect to Defendant's contention that Counts 3, 5, 7, and 9, which charge Defendant with "Use of a Firearm During and In Relation to a Crime of Violence," are defective because the offenses alleged in Counts 2, 4, 6, and 8 ("Hobbs Act Robbery" and "Attempted Hobbs Act Robbery") are not violations of the Hobbs Act, the undersigned believes that Defendant's argument is flawed based upon the above discussion. In other words, Counts 2, 4, 6, and 8 are considered "crimes of violence" under the Hobbs Act and thus violative of the Hobbs Act. Accordingly, the undersigned believes that Counts 3, 5, 7, and 9 are not defective because they were properly charged in connection with predicate "crimes of violence."

For the forgoing reasons, the undersigned recommends that the District Court deny that aspect of Defendant's motion seeking to dismiss Counts 3, 5, 7, and 9 of the Indictment.

### *Findings of Fact Regarding Defendant's Motion to Dismiss Count 1 Based on Multiplicity.*

Defendant moves to dismiss Count 1 of the Indictment charging Hobbs Act Conspiracy as multiplicitous of Counts 2, 4, 6, and 8. (Pullano Aff. ¶ 130, ECF No. 94.) Counts 2 and 8 charge Defendant with "Hobbs Act Robbery" and Counts 4 and 6 charge Defendant with "Attempted Hobbs Act Robbery." (Indictment at 2–5, ECF No. 68.) Defendant contends that because Count 1 charges a "general conspiracy" and Counts 2, 4, 6, and 8 "have their own conspiracy element directly in the counts of the indictment" Defendant would effectively be charged twice with the same conspiracy. (Pullano Aff. ¶ 130.)

The government counters that Defendant's motion should be denied because Defendant incorrectly states that Counts 2, 4, 6, and 8 have "their own conspiracy element" and because Defendant did not cite to any legal authority to support his position. (Gov't's Resp. at 14.)

### *Conclusions of Law Regarding Defendant's Motion to Dismiss Count 1 Based on Multiplicity.*

During oral argument, defense counsel withdrew that portion of Defendant's motion seeking dismissal of Count 1 as multiplicitous of Counts 2, 4, 6, and 8. Defense counsel agreed with the undersigned that Count 1 (Hobbs Act Robbery) requires an agreement between those acting together, but that an agreement is not an element of Counts 4 and 6 (Attempted Hobbs Act Robbery). Further, defense counsel agreed that Count 1 is not multiplicitous of Counts 2 and 8 because a defendant could be acting alone and be charged with Counts 2 and 8, and no conspiracy is required. For these reasons, the undersigned recommends that the District Court deny this aspect of Defendant's motion.

### *Findings of Fact Regarding Defendant's Motion to Dismiss the Indictment Due to Selective/Vindictive Prosecution.*

Defendant moves to dismiss the Indictment on the basis of "selective/vindictive prosecution." (Pullano Aff. ¶¶ 123, 234–237.)[7] Defendant contends "upon information and belief" that his co-defendant was provided with the opportunity to cooperate and receive a lower sentence and that he "has been treated far more harshly than his alleged co-conspirator." (*Id.* ¶¶ 123, 234.) Defendant also alleges that for a period of three years prior to his arrest he was pulled over and "subjected to numerous illegal searches of his person, home and cars." (*Id.* ¶ 235.) Finally, Defendant contends that law enforcement caused excessive damage to his residence at 953 Dewey Avenue when executing a search warrant for that location. (*Id.*)

[7]   Defendant's argument seeking to dismiss the Indictment on the grounds of selective/vindictive prosecution begins on page 72 (the page number automatically assigned when the document was electronically filed) with paragraph number "123." (Pullano Aff. at p. 72.) However, the next paragraph after "123" is numbered "234" and the remainder of Defendant's argument on this issue continues with consecutively numbered paragraphs thereafter. (*Id.* at 73.)

**\*10** The government asserts that Defendant has failed to demonstrate selective and/or vindictive prosecution. It contends that Defendant was given the opportunity to, and did in fact begin to, cooperate with the government but then decided not to plead guilty and enter a cooperation agreement.

(Gov't's Resp. at 46.) The government further argues that Defendant's assertion that he was a target of the police is unsubstantiated and that such conclusory allegations are not sufficient to demonstrate selective prosecution. (*Id.* at 46.) With respect to vindictive prosecution, the government asserts that Defendant failed to demonstrate that the government is prosecuting him because of a "genuine animus" towards him. (*Id.*)

### Conclusions of Law Regarding Defendant's Motion to Dismiss the Indictment Due to Selective/Vindictive Prosecution.

The Second Circuit has provided that the standard required for dismissal of an indictment on the basis of selective prosecution is high. *United States v. Armstrong,* 517 U.S. 456, 463, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) ("Our cases delineating the necessary elements to prove a claim of selective prosecution have taken great pains to explain that the standard is a demanding one."). To be successful on a claim for selective prosecution, a defendant must establish that he was "treated differently from other similarly situated individuals and that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure [Defendant]." *United States v. Stewart,* 590 F.3d 93, 121 (2d Cir. 2009), *cert. denied sub nom., Sattar v. United States,* 559 U.S. 1031, 130 S.Ct. 1924, 176 L.Ed.2d 404 (2010) (internal quotation marks and citations omitted); *accord United States v. Moon,* 718 F.2d 1210, 1229 (2d Cir. 1983), *cert. denied sub nom.,* 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984) (providing that a defendant claiming selective prosecution "bears the burden of establishing *prima facie* both: (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, *i.e.,* based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.") (citation omitted).

As with a claim for selective prosecution, there is a high standard required for dismissal of an indictment based on vindictive prosecution. *United States v. Bout,* 731 F.3d 233, 238 (2d Cir. 2013). "[T]he decision as to whether to prosecute generally rests within the broad discretion of the prosecutor, and a prosecutor's pretrial charging decision is presumed legitimate." *United States v. Sanders,* 211 F.3d 711, 716

(2d Cir.), *cert. denied sub nom.,* 531 U.S. 1015, 121 S.Ct. 574, 148 L.Ed.2d 491 (2000) (internal quotation marks and citations omitted). Nonetheless, "a prosecution brought with vindictive motive, 'penalizing those who choose to exercise' constitutional rights, 'would be patently unconstitutional.' " *Id.* (quoting *North Carolina v. Pearce,* 395 U.S. 711, 724 (1969)). A court will dismiss an indictment if actual vindictiveness has been demonstrated, or if, under the circumstances, " 'there is a presumption of vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's action.' " *Id.* (quoting *United States v. Johnson,* 171 F.3d 139, 140 (2d Cir. 1999)). To demonstrate an actual vindictive motive, a defendant must show that "(1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse,' and (2) [the defendant] would not have been prosecuted except for the animus." *Id.* (citations omitted).

**\*11** The undersigned does not believe that Defendant has satisfied the high burden of demonstrating selective prosecution because his assertion that his co-defendant was given the opportunity to cooperate appears to be based on nothing more than speculation. Defendant's argument for selective prosecution is based "upon information and belief," but does not state the sources of such information and belief. Moreover, Defendant does not even address what "impermissible considerations" he contends were directed at him to satisfy his claim for selective prosecution.

In addition, Defendant has not presented any evidence that he has been treated more harshly than his co-defendant. His co-defendant entered into a plea agreement in which he agreed to plead guilty to all 3 Counts against him in the Indictment. (Green Plea Agreement at 1, ECF No. 113.) During oral argument on this omnibus motion, the parties indicated that they had discussed terms of a potential plea for Defendant. (Minute entry for 3/10/22 oral argument, ECF No. 126.) The government specifically stated that if Defendant chose to move forward with arguing the omnibus motion the potential resolution would be withdrawn. Defendant chose to argue his omnibus motion, thereby foreclosing the possibility of a pretrial resolution on the previously offered terms. In other words, the facts establish that Defendant was given the opportunity to take a plea, like his co-defendant, but he chose not to accept it.

Further, Defendant is incorrect in asserting that the criminal activities alleged in the Indictment are the same for both he

and his co-defendant. In fact, six out of the nine counts of the Indictment are charged solely against Defendant, including two counts of "Hobbs Act Robbery" (Counts 2 & 8), three Counts of "Use of Firearm During and in Relation to a Crime of Violence" (Counts 3, 7, & 9), and one count of "Attempted Hobbs Act Robbery" (Count 6). (Indictment at 2–6, ECF No. 68.) This also demonstrates that Defendant is not similarly situated to his co-defendant, which Defendant is required to establish to be successful on a claim for selective prosecution.

With respect to vindictive prosecution, while Defendant lists his encounters with law enforcement beginning in February 2017, he has not alleged that the prosecutor harbors any animus towards him or that the prosecutor was acting on behalf of someone else's animus towards Defendant, as is required to be successful on this claim. Nor has he demonstrated a presumption of vindictiveness, providing only speculation in support of his assertions that police "conducted numerous illegal searches of his person, home, and cars." (Pullano Aff. ¶ 235.)

Based upon the forgoing, the undersigned believes that Defendant has failed to satisfy the high burdens for demonstrating selective and/or vindictive prosecution and recommends that the District Court deny this aspect of Defendant's motion.

### Findings of Fact Regarding Suppression of Physical Evidence Seized from 953 Dewey Avenue and the 2019 Mitsubishi Outlander.

On March 26, 2020, Monroe County Judge Vincent Dinolfo issued search warrants for 953 Dewey Avenue and the 2019 Mitsubishi Outlander. (Pullano Aff. at Exhibits A & B, ECF No. 94-1.) [8] Defendant seeks to suppress all evidence seized from 953 Dewey Avenue, Rochester, New York, and the 2019 Mitsubishi Outlander. (Id. ¶ 156.) In his standing affidavit, Defendant asserts that "[o]n or about March 27, 2020, a search warrant was executed at my home at 953 Dewey Avenue, and my Mitsubishi Outlander NY license plate JJP6649." (Def.'s Suppl. Mot., Ex. H ("Standing Aff.") ¶ 3, ECF No. 120.) He further indicates that he resided at 953 Dewey Avenue, he regularly slept at that residence, he had the right to permit ingress or egress of individuals at that residence, and that he had "a reasonable expectation of privacy in the items." (Id. ¶¶ 4 & 6.)

[8]   Judge Dinolfo also issued a search warrant for 50 Almira Street, Rochester, New York on March

26, 2020. (Pullano Aff. at Exhibit D, ECF No. 94-1.) However, Defendant contends that "he has no connection to that location." (Id. at 54, ECF No. 94.)

**\*12**  Defendant asserts that the "state search warrants were unlawful since they were based upon tainted information unlawfully obtained in the first place." (Pullano Aff. ¶ 160.) In particular, Defendant alleges that the affidavit completed by Investigator Rohr [9] and submitted in support of the application for the warrants for 953 Dewey Avenue and the 2019 Mitsubishi Outlander did not provide Judge Dinolfo with all of the facts before the Judge issued the warrants. (Id.) Defendant asserts that Investigator Mackenzie [10] "provided Investigator Rohr with information that a vehicle registered to Robert Forbes was parked in the area on Avenue E ... [and that] [c]ritically, Investigator Mackenzie in his report states he cannot determine if the vehicle is even occupied." (Id.) Defendant contends that since this information was not included in the search warrant application presented to Judge Dinolfo, that the Judge was misled into believing that Defendant "was located close to the robbery at Avenue E and was the person speaking to the co-defendants [sic] who actually entered the location" to conduct a robbery. (Id. ¶ 195.)

[9]   Mark Rohr is an Investigator for the Rochester Police Department "assigned to patrol Section Investigations." (Affidavit of Investigator Mark Rohr, sworn to Mar. 27, 2020 ("Rohr Aff."), ECF No. 94-1.)

[10]   Pursuant to Investigator Rohr's affidavit, Andrew Mackenzie is an Investigator with the Rochester Police Department who was conducting surveillance on March 25, 2020, in the area of 200 Avenue E, Rochester, New York when the home invasion occurred at 222 Avenue E, Rochester, New York. (Rohr Aff. ¶ 4.)

Defendant also challenges his identification via Ring doorbell camera footage by Investigator Rohr and an ATF confidential informant in connection with a robbery at 64 Wellington Avenue, Rochester, New York on March 26, 2020. (Id. ¶ 160.)

The government contends that, based on the totality of the circumstances, Investigator Rohr's search warrant application was sufficient to establish probable cause for the issuance of warrants to search 953 Dewey Avenue and the 2019 Mitsubishi Outlander. (Gov't's Resp. at 23.) It also asserts that Defendant's identification by Investigator Rohr and an

ATF confidential informant are reliable based upon other information in Investigator Rohr's affidavit. (*Id.* at 28, 125 S.Ct. 2195.)

In his affidavit in support of the search warrant application for 953 Dewey Avenue and the 2019 Mitsubishi Outlander, Investigator Rohr indicated that he has served as a police officer and investigator for over twelve years combined. (Rohr Aff. ¶ 4, ECF No. 94-1.) Investigator Rohr further indicated that a home invasion robbery occurred on March 25, 2020, at 222 Avenue E, during which a victim told him that it appeared like the two individuals who unlawfully entered that residence with guns were talking on the phone to a third individual who was telling them where to go in the house. (*Id.*)

In the early hours of March 26, 2020, another home invasion occurred at 64 Wellington Avenue, wherein a male kicked in the door and two other males entered the residence, one holding a handgun. (*Id.* at 12–13, 125 S.Ct. 2195.) The individual who kicked in the door did not enter the house. (*Id.* at 12, 125 S.Ct. 2195.) Investigator Rohr obtained two clips of Ring doorbell camera footage from the robbery at 64 Wellington. (*Id.* 12–13, 125 S.Ct. 2195.) Relevant here, the second video clip "shows the heavier set black male walk up to the rear door and put his hand in front of the Ring Door Bell [sic]. He is wearing a mask over his face, a hooded sweatshirt with thick stripes down the sides of the arms ... the heavier set black male kicks in the door and two of the three suspects enter the home ... the heavier set male leaves." (*Id.* at 12, 125 S.Ct. 2195.) Without providing how, Investigator Rohr identifies the heavier set male as Defendant. In addition, Investigator Rohr was able to identify co-defendant Eric Lowe from the Ring doorbell camera footage because he was familiar with Lowe from other criminal investigations. (*Id.*)

Later, on March 26, 2020, one of the victims of the 64 Wellington robbery whose iPhone was stolen during that robbery indicated that when she utilized the Find My iPhone Application, it pinged at 50 Almira Street, the address of co-defendant Eric Lowe. (*Id.*) Also on March 26, 2020, Investigator Rohr spoke with Investigator Mackenzie, who was conducting surveillance on Avenue E on a separate case on March 25, 2022. (*Id.* at 12, 125 S.Ct. 2195.) Investigator Mackenzie ran license plate number JLS5469 in connection with a vehicle parked on Avenue E thirty minutes prior to when the robbery occurred, which revealed that the vehicle belonged to Defendant and that he resided at 953 Dewey Avenue. (*Id.*)

**\*13** At approximately 8:00 p.m. on March 26, 2020, law enforcement conducting surveillance saw a gray Mitsubishi four door sedan pull up to 50 Almira Street, Apt. #1—the home of co-defendant Eric Lowe. (*Id.* at 13–14, 125 S.Ct. 2195.) The gray Mitsubishi was the same vehicle Investigator Mackenzie saw on Avenue E prior to the robbery, which he identified as belonging to Defendant after running the license plate JLS5469. (*Id.* at 13, 125 S.Ct. 2195.) The vehicle pulled into Eric Lowe's driveway, picked up a male who looked like Eric Lowe, left the area, and came back shortly thereafter. (*Id.*) Eric Lowe then exited the vehicle, went inside, and then came back out to the vehicle. (*Id.*) The vehicle then proceeded to drive the in the wrong lane without turning on its headlights. (*Id.*) Law enforcement conducted a traffic stop and found Defendant, Eric Lowe, and one other individual in the vehicle. (*Id.*) In addition, they found zip ties, a black mask, and surgical masks in the gray Mitsubishi. (*Id.*)

On the evening of March 26, 2020, an ATF confidential informant positively identified Defendant as the heavyset individual kicking down the door of 64 Wellington Avenue, as it was captured on Ring doorbell camera footage during the robbery. (*Id.*) That same confidential informant indicated that Defendant "keeps a Kel-Tec handgun with an extended magazine in a black bag" in a 2019 Mitsubishi Outlander, with the license plate number JJP6649, which is registered to Defendant. (*Id.*) In addition, the confidential informant said Defendant had utilized his 2019 Mitsubishi Outlander during several robberies. (*Id.*) Finally, at the time Investigator Rohr wrote his affidavit, Defendant was on parole and his parole-approved address was 953 Dewey Avenue. (*Id.*)

### *Conclusions of Law Regarding Suppression of Physical Evidence Seized from 953 Dewey Avenue and the 2019 Mitsubishi Outlander.*

#### a. *Probable Cause.*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "To establish probable cause to search a residence, two factual showings are necessary—first, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located at the residence." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). Here, the dispute centers not on whether a crime was committed, but whether probable cause existed to believe that evidence of the crime would be located at 953 Dewey Avenue and in the 2019 Mitsubishi Outlander.

"[P]robable cause to search a place exists if the issuing judge finds a 'fair probability that contraband or evidence of a crime will be found in a particular place' and a federal court must apply a 'totality-of-the-circumstances analysis' in pursuing this inquiry." *United States v. Ponce*, 947 F.2d 646, 650 (2d Cir. 1991), *cert. denied*, 503 U.S. 943, 112 S.Ct. 1492, 117 L.Ed.2d 633 (1992) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). When reviewing the validity of a search warrant:

> the duty of [the] court ... is "simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing] that probable cause existed.' " *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S. Ct. 2317, 2332–39, 76, 76 L.Ed.2d 527 L.Ed.2d 1983 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S. Ct. 725, 736, 4 L.Ed.2d 697 (1960)). A search warrant issued by a neutral and detached magistrate is entitled to substantial deference, and "doubts should be resolved in favor of upholding the warrant." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983).

*United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993), *cert. denied*, 511 U.S. 1042 (1994); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("[A] reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate...."). "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit [applying for a warrant] should not take the form of *de novo* review." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 236, 103 S.Ct. 2317) (alteration in original). "[R]esolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Id.* (citation omitted); *see United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) ("Such deference derives not only from the law's recognition that probable cause is 'a fluid concept' that can vary with the facts of each case, but also from its 'strong preference' for searches conducted pursuant to a warrant, and its related concern that '[a] grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.' " (alteration in original) (citations omitted))

**\*14** With respect to probable cause, the undersigned believes that the totality of the circumstances, including the detailed information provided in Investigator Rohr's affidavit, afforded Judge Dinolfo a substantial basis for concluding that probable cause existed to issue the warrants for 953 Dewey Avenue and the 2019 Mitsubishi Outlander. Investigator

Rohr's affidavit indicates that a vehicle with the license plate JLS5469 was seen on March 25, 2020, in front of 200 Avenue E shortly before the first home invasion at 222 Avenue E. The license plate revealed Defendant as its owner and 953 Dewey Avenue as the residence of Defendant. It also indicates that Ring doorbell camera footage recorded three individuals trying to enter 64 Wellington in the early hours of March 26, 2020, with the "heavy set" individual breaking down the door. Further, an ATF confidential informant positively identified Defendant from the Ring doorbell camera footage. Law enforcement later observed Defendant and his vehicle— the same one seen on Avenue E on the night of the robbery —with co-defendant Eric Lowe, at Lowe's residence at 50 Almira Street and during the traffic stop on March 26, 2020. Further, during that traffic stop of the Defendant's vehicle with license plate JLS5469, law enforcement found zip ties, a black mask, and surgical masks. In addition, one of the victims of the robbery at 64 Wellington Avenue said the Find My iPhone Application pinged at 50 Almira Street on March 26, 2020. Finally, the ATF confidential informant stated that Defendant keeps a handgun in his 2019 Mitsubishi Outlander and that Defendant has utilized that vehicle for other robberies.

The undersigned does not believe that the lack of detail surrounding Defendant's identification from the Ring doorbell camera footage by Investigator Rohr and the ATF confidential informant are fatal to the probable cause analysis as the other evidence presented in Investigator Rohr's affidavit was sufficient to demonstrate probable cause to support the issuance of the warrants.

Based on the forgoing, the undersigned believes that the totality of the circumstances provided a fair probability that contraband or evidence of a crime would be found in Defendant's 2019 Mitsubishi Outlander and at Defendant's residence of 953 Dewey Avenue. Accordingly, the undersigned believes it was reasonable for Judge Dinolfo, viewing the evidence amassed by Investigator Rohr, to determine he had a substantial basis to conclude that the search warrants were supported by probable cause.

**b. *The Good Faith Exception Applies.***

Even if the warrant lacked probable cause and Defendant's Fourth Amendment rights were violated when law enforcement searched 953 Dewey Avenue and the 2019 Mitsubishi Outlander, the exclusionary rule does not automatically operate to suppress the seized evidence. "Indeed, exclusion has always been our last resort, not our first impulse." *Herring v. United States*, 555 U.S.

135, 140, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) (internal quotation marks and citation omitted). The exclusion of evidence obtained in violation of the Fourth Amendment is a "prudential" remedy, crafted by the Supreme Court to "compel respect for the constitutional guaranty." *Davis v. United States*, 564 U.S. 229, 236, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011) (internal quotation marks omitted). Neither a "personal constitutional right" nor a means to "redress the injury" of an unconstitutional search, the exclusionary rule is designed to deter future Fourth Amendment violations. *Id.* 236–37, 131 S.Ct. 2419 (internal quotation marks and citations omitted). Because the remedy exacts a heavy toll on the justice system, however, the exclusionary rule does not apply whenever suppressing evidence "might provide marginal deterrence." *Herring*, 555 U.S. at 141, 129 S.Ct. 695 (internal quotation marks omitted). The rule's corrective value justifies its cost "[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013), quoting *Davis*, 564 U.S. at 238, 131 S.Ct. 2419. "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence ... exclusion cannot pay its way." *Davis*, 564 U.S. at 238, 131 S.Ct. 2419 (internal quotation marks and citations omitted).

Considering these principles, courts have recognized that evidence obtained by officers "in objectively reasonable reliance" on a warrant subsequently invalidated by a reviewing court is not generally subject to exclusion. *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008), *cert. denied*, 558 U.S. 933, 130 S.Ct. 154, 175 L.Ed.2d 235 (2009) (citing *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1989)). When an officer genuinely believes that he has obtained a valid warrant from a magistrate and executes that warrant in good faith, there is no conscious violation of the Fourth Amendment, "and thus nothing to deter." *Leon*, 468 U.S. at 920–21, 104 S.Ct. 3405. However, the good faith exception cannot shield an officer who relies on a duly issued warrant in at least four circumstances: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *Clark*, 638 F.3d at 100 (citations omitted). The Supreme Court clarified that these limitations apply not merely in cases of deliberate police misconduct, but also in situations where an officer is "reckless" or "grossly negligent"

in seeking or executing a warrant. *Herring*, 555 U.S. at 144, 129 S.Ct. 695.

**\*15**  "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance on an invalidated warrant." *Clark*, 638 F.3d at 100 (internal quotation marks and citations omitted). Moreover, as counseled by the Second Circuit, in assessing whether the government has met its burden, a court must consider that "in *Leon*, the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within [the good faith exception's] protection." *Id.*

Here, Defendant contends that the first Leon circumstance applies—namely, that Judge Dinolfo was knowingly misled by Investigator Rohr's affidavit. Defendant argued that Investigator Rohr failed to include in his affidavit that Investigator Mackenzie could not determine if Defendant's car with the license plate JLS5469 was occupied when it was parked on Avenue E approximately a half hour prior to the robbery on that street. Defendant's argument misses the mark. Indeed, the government's contention that the relevance of Investigator Mackenzie's observation and Investigator Rohr's inclusion of that observation in his affidavit is more plausible —*i.e.*, that a vehicle registered to Defendant was seen in the area near the time of the robbery. (Gov't's Resp. at 28.)

While it is the government's burden to establish the good faith of its officers as provided in *Clark*, 638 F.3d at 100, to even obtain a hearing on whether a law enforcement affidavit contains knowing or reckless falsehoods, a defendant must make "a 'substantial preliminary showing' that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause." *Falso*, 544 F.3d at 125 (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). The undersigned believes that Defendant has fallen short of showing that Investigator Rohr made false statements to Judge Dinolfo. Accordingly, the undersigned recommends that the District Court find that the first *Leon* circumstance is not applicable here. In sum, the undersigned recommends that the District Court deny that aspect of Defendant's motion seeking to suppress evidence seized from 953 Dewey Avenue and the 2019 Mitsubishi Outlander.

***Findings of Fact Regarding Suppression of Evidence Seized from Defendant and Kia Sportage.***

Defendant seeks a hearing related to a traffic stop, which occurred on April 1, 2020, while Defendant was driving his brother's Kia Sportage, and which ultimately led to his arrest. (Pullano Aff. ¶ 177.) Defendant indicates that "[t]he stop occurred when the police obtained information from an unknown source indicating that there was a gun in the car in the area of Norton Street and N. Clinton Ave" and that "[o]fficers observed Forbes in the area of N. Clinton Avenue and attempted to top [sic] Forbes." (Pullano Aff. ¶ 178.)

In his standing affidavit, Defendant states that "[o]n April 1, 2020, I was driving my brother Darius Taylor's 2019 Kia Sportage, bearing the license plate MRDASH." (*Id.* ¶ 33, ECF No. 120.) Defendant alleges that on that date he "was called to a Family Dollar on N. Clinton Ave" by an acquaintance who asked Defendant for a gun. (*Id.* ¶ 34.) Defendant further alleges that he told the acquaintance that he did not have a gun and left the Family Dollar. (*Id.* ¶¶ 34–35.) Upon leaving, Defendant noticed "a significant line of police cars" following him. (*Id.* ¶ 36.) At one point officers turned on their emergency lights and Defendant alleges that he pulled over, but that once a police vehicle stopped behind him, he "drove off because [he] was scared." (*Id.* ¶ 41.) Defendant alleges that he was "later arrested and did not resist arrest." (*Id.* ¶ 43.) [11] He asserts that he did not provide permission to search either the vehicle or his phone located in the vehicle. (*Id.* ¶ 44.) Finally, Defendant alleges that up until the time the police engaged their emergency lights, he had not committed any traffic infraction or crime. (*Id.* ¶ 45.)

[11] Defense counsel's affidavit indicates that officers "attempted to top [sic] [Defendant]. He initially pulled over but then led the police on a high-speed chase for approximately 13 minutes. [Defendant] was ultimately stopped by the police and taken into custody." (Pullano Aff. ¶ 178.)

**\*16** The government contends that Defendant failed to demonstrate standing to challenge the search of the Kia Sportage as he did not provide any evidence that Defendant's brother actually owned that vehicle or that the brother gave Defendant permission to drive it. (Gov't Mem. of Law at 3–4, ECF No. 121.)

The government further alleges that when the police officers engaged their emergency lights, Defendant sped up and led the officers on a "high-speed pursuit ... [that] lasted for approximately 13 minutes, during which time the defendant drove on sidewalks and front lawns

in residential neighborhoods. The defendant's vehicle was eventually stopped after colliding with a marked RPD patrol car." (Gov't Resp. at 21, ECF No. 101.) The government provided further details about the incident in a later submission indicating that Defendant drove 100 miles per hour in a 55 mile per hour zone, drove over the sidewalk and across residential front lawns, and went the wrong way down a one-way street. (Gov't Mem. of Law at 6–7, ECF No. 121.)

The government also argues that Defendant never established any unlawful "seizure" under the Fourth Amendment because he admits that once he pulled over and the police pulled up behind him, he "drove off." The government asserts that Defendant failed to demonstrate "how he submitted to police authority, how his liberty was restrained, or how he was seized in any way" and analogizes this case to *United States v. Baldwin*, 496 F.3d 215 (2d Cir. 2007), *cert. denied*, 552 U.S. 1222, 128 S.Ct. 1324, 170 L.Ed.2d 135 (2008), discussed below. (Gov't Mem. of Law at 5, ECF No. 121.) The government concludes that Defendant's conduct amounted to evasion of police authority as opposed to a seizure. (*Id.* at 6, 125 S.Ct. 2195.)

The government further contends that Defendant's assertion that he did not commit any traffic violations or crimes prior to the time he was taken into custody fails because what is relevant to Defendant's suppression motion is his conduct after the attempted stop—fleeing a traffic stop, committing multiple traffic violations, and crashing into a police vehicle. (*Id.*) The government asserts that Defendant has failed to challenge the factual allegations supporting probable cause for his arrest and has also failed to articulate any basis to contest his arrest and search of the Kia Sportage. (*Id.* at 7, 125 S.Ct. 2195.)

*Conclusions of Law Regarding Suppression of Evidence Seized from Defendant and Kia Sportage.*

**a. *Standing to Challenge the Search of the Kia Sportage.***

"It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Padilla*, 508 U.S. 77, 81, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993) (citing *Alderman v. United States*, 394 U.S. 165, 171–72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) (additional citations omitted)). A defendant

may only invoke the protection of the Fourth Amendment where the government has "violated the defendant's own constitutional rights," as opposed to the rights of a third party. *United States v. Payner*, 447 U.S. 727, 731, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). This means that, in the context of a vehicle search, a defendant "must show, among other things, a legitimate basis for being in [the vehicle], such as permission from the owner." *United States v. Ponce*, 947 F.2d 646, 649 (2d Cir. 1991), *cert. denied*, 503 U.S. 943, 112 S.Ct. 1492, 117 L.Ed.2d 633 (1992) (citation omitted); *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980) (finding defendant could not object to the search of a car where he had demonstrated "neither ownership of the [vehicle], nor license from the owner to possess the [vehicle]."). The burden rests with the defendant to demonstrate that he received such permission from the owner. *Sanchez*, 635 F.2d at 64. "Mere control over a vehicle" is insufficient to meet this burden. *United States v. Ruggiero*, 824 F. Supp. 379, 392 (S.D.N.Y. 1993), *aff'd*, 44 F.3d 1102 (1995).

**\*17** Here, Defendant states that he "was driving in [his] brother Darius Taylor's 2019 Kia Sportage." (Standing Aff. ¶ 33.) However, Defendant provides no proof that his brother actually owned the Kia Sportage. Even if he had provided such proof, Defendant did not state that he had permission from his brother to drive that vehicle. For these reasons, the undersigned believes that Defendant lacks standing to seek to suppress evidence seized from the Sportage because he had no Fourth Amendment privacy interest in that vehicle. Accordingly, the undersigned recommends that the District Court deny Defendant's motion to suppress in this respect.

**b. *Defendant Was Not Unlawfully Seized.***

Even if the District Court finds that Defendant has demonstrated standing to challenge the search of the Kia Sportage, the undersigned believes that Defendant was not "seized" within the meaning of the Fourth Amendment. At oral argument, Defendant contended that law enforcement had no reason to stop the Kia Sportage in the first instance and that the stop constituted an unlawful seizure.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend IV. Seizure occurs within the meaning of the Fourth Amendment when "by means of physical force or show of authority," a law enforcement officer "has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889, (1968); *Florida v. Bostick*, 501 U.S. 429, 434,

111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (noting that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions ... Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred") (internal quotation marks and citations omitted). The test has an objective component: an individual can be considered seized when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). This, however, is "a *necessary*, but not a *sufficient*, condition for seizure." *California v. Hodari D.*, 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (emphasis in original).

When an individual claims to have been seized by a police officer's "show of authority," a seizure does not occur unless the individual yields to that show of authority. *Hodari D*, 499 U.S. at 626, 111 S.Ct. 1547; *Brendlin v. California*, 551 U.S. 249, 254, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) ("A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned.").

The submission to authority cannot be temporary; an individual must actually submit to the police authority. *Baldwin*, 496 F.3d at 218 ("to comply with an order to stop—and thus to become seized—a suspect must do more than halt temporarily; he must submit to police authority."); *United States v. Valentine*, 232 F.3d 350, 359 (3d Cir. 2000), *cert. denied*, 532 U.S. 1014, 121 S.Ct. 1748, 149 L.Ed.2d 670 (2001) (finding no submission to authority "in any realistic sense" when individual paused for a few moments and gave his name to officers before fleeing); *United States v. Hernandez*, 27 F.3d 1403, 1407 (9th Cir. 1994) *cert. denied*, 513 U.S. 1171, 115 S.Ct. 1147, 130 L.Ed.2d 1106 (1995) (finding no submission to authority where individual hesitated for a moment and made eye contact with officer before fleeing).

To determine whether conduct constitutes actual submission to police authority, courts must examine " 'the totality of the circumstances—the whole picture.' " *Baldwin*, 496 F.3d at 219 (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). In this regard, "it is the nature of the interaction, and not its length, that matters." *Id.*

(citing *Delaware v. Prouse*, 440 U.S. 648, 655, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)).

**\*18** The undersigned believes that the government is correct in asserting that the *Baldwin* case is analogous to the present case. In *Baldwin*, after receiving a tip that "two black men, one wearing a white t-shirt, were carrying firearms [and] standing next to a grey or silver Chevrolet Impala with Virginia license plates," police officers responded and saw the silver Chevrolet Impala with Virginia plates pass them. 496 F.3d at 216–17. The officers turned on their siren and emergency lights, followed the Impala, and pulled up behind it after it stopped. *Id.* at 217. Once the officers were walking towards the Impala, the defendant, who ignored several verbal instructions from the officers, sped away. *Id.* During the chase, the defendant violated traffic laws and barely avoided serious accidents, eventually slamming the Impala into an embankment. *Id.* He was apprehended soon after. *Id.* Law enforcement searched the defendant's person and the inside of the Impala, which revealed a large machine pistol, other guns and ammunition, and drugs. *Id.* The defendant moved to suppress evidence seized from his person and the Impala, contending that he was "seized as soon as he pulled to a stop in response to the patrol car's overhead lights and siren." *Id.* at 218. The Second Circuit held that the defendant's "conduct, all circumstances considered, amounted to evasion of police authority, not submission ... [and since the defendant's] momentary stop did not constitute submission to police authority, he had not been seized within the meaning of the Fourth Amendment." *Id.* at 219.

The case at bar is very similar. Here, Defendant indicated that he "pulled over [and] [o]nce the police car pulled behind me, I drove off because I was scared and wanted to make it to either my mothers [sic] house on Dewey Avenue or my brother's house on W. Ridge Road for my own safety." (Standing Aff. ¶ 41, ECF No. 120.) Based upon this admission, the undersigned believes that, like the defendant in *Baldwin*, Defendant was never seized under the Fourth Amendment, but that he instead tried to evade law enforcement. Defendant then led the police on a high-speed chase, only ending when Defendant crashed, at which time he was seized within the meaning of the Fourth Amendment. In viewing the totality of the circumstances, the undersigned does not believe that Defendant was unlawfully seized, and recommends that the District Court reject Defendant's argument in this respect.

**c. *Probable Cause Existed to Arrest Defendant.***

The undersigned believes that Defendant has not challenged, or even addressed the factual allegations that provided probable cause for his arrest. The undersigned believes that Defendant's evasion of law enforcement as described above provided ample probable cause to arrest Defendant. *United States v. Kiture*, 776 F. App'x 747, 749 (2d Cir. 2019) (summary order) (finding ample probable cause for the defendant's arrest after the defendant briefly pulled over, then sped off when police approached his vehicle, "engag[ing] the officers in a high-speed chase, run[ning] a red light, and driv[ing] into parked vehicles.")

For these reasons, the undersigned recommends that the District Court deny Defendant's motion to suppress evidence seized from Defendant and the Kia Sportage.

### *Defendant's Motions to Suppress Identification Testimony and Defendant's Statements.*

As indicated, *infra*, during the March 11, 2022, oral argument regarding Defendant's omnibus motions, and in the text order of that same date (ECF No. 124), the undersigned provided Defendant with two weeks after the argument —*i.e.*, until March 25, 2022—to: (1) submit any photo array or arrays which he contends are suggestive, along with any memorandum discussing the conclusions he desired the undersigned to draw from them regarding his motion to suppress identification testimony; and (2) submit an affidavit from an individual with personal knowledge relative to the statements made by Defendant which he seeks to suppress, along with a memorandum discussing the conclusions he desired the undersigned to draw from the allegations in the affidavit. (*Id.*) Defendant did not file supplemental papers on these issues until April 21, 2022—twenty-seven days after the Court-ordered deadline. Defendant did not request any extension of time to file the supplemental papers in the interim. For this reason, the undersigned recommends that the District Court deny those aspects of Defendant's motion seeking to suppress identification testimony and any statements made by Defendant. In the event that the District Court does not find it appropriate to dismiss these aspects of Defendant's motion for failure to comply with the Court-ordered deadline, the undersigned addresses the two issues below.

### *Findings of Fact Regarding Suppression of Defendant's Statements Taken from Defendant During a Custodial Interrogation*.

**\*19** Defendant seeks to suppress "all oral and written statements taken by law enforcement starting on April 1, 2020." (Pullano Aff. ¶ 211; Def.'s Aff. ¶ 2, ECF No. 128-1.) Defendant further contends that "under the totality of the circumstances test" his statements were made involuntarily. (*Id.* ¶ 218; Def.'s Aff. ¶ 14, ECF No. 128-1.)

Law enforcement took Defendant into custody on April 1, 2020, after leading police on a high-speed chase and crashing the Kia Sportage he was driving into a marked police vehicle. Defendant contends that while law enforcement interviewed him from approximately 10:22 p.m. to 4:20 a.m. in connection with his arrest, he suffered from a serious injury as a result of dog bites on his right leg and was "in a great deal of pain." (Def.'s Aff. ¶¶ 3, 5, & 6.) Defendant states that he was provided Tylenol for the pain when treated at the hospital prior to his interview, but that law enforcement informed the doctor not to provide him with pain medication because they were going to interview him. (*Id.* ¶ 5.) He said he was bleeding through his bandages. (*Id.* ¶ 3.) Defendant indicates that Agent Martineck read him his *Miranda* rights at 12:28 a.m. (*Id.* ¶ 7.) He further indicates that the agents interviewing him acknowledged his pain and that Defendant told them he was in pain, however Agent Martineck stated that "he had to get to the bottom of this" at approximately 12:36 a.m. (*Id.* ¶¶ 8, 11, & 13.)

Defendant contends he was on parole at the time of the interview and was concerned about parole violations. However, at 12:38–12:40 a.m., Agent Martineck and Investigator Rohr informed him that he would not be arrested for violating his parole curfew. (*Id.* ¶ 9.) Defendant further contends that Investigator Rohr told him that "all [Defendant] had to do was cooperate and [he] wouldn't get violated." (*Id.*) In addition, Defendant indicates that Agent Martineck said Defendant was "facing 75 years in prison" (*id.* ¶ 10) and that another agent mentioned another individual who received a life sentence for committing offenses like those charged against Defendant at 12:46 a.m. (*Id.*) Defendant also states that at 2:19 a.m., Investigator Rohr told him about an individual who was involved in 15 robberies and, because he was the first to cooperate, he only received a one-year sentence. (*Id.* ¶ 12.) Defendant said that "another investigator immediately told [Defendant] they couldn't promise [him] anything," but that it "set [Defendant's] expectations of extreme leniency in [his] case, if [he] cooperated." (*Id.*) Defendant states that all the above information induced him to make involuntary statements. (*Id.* ¶ 14.) Finally, Defendant indicates that he had not taken his mental health medication

for approximately a month prior to the interview. (*Id.* ¶¶ 3 & 14.)

On or around May 3, 2022, the government provided the undersigned with the video recording of Defendant's post-arrest interview, which took place from April 1, 2020 to April 2, 2020. The undersigned conducted an *in camera* review of law enforcement's interview with Defendant in reaching the conclusions below.

The government submitted that the video recording of Defendant's interview demonstrates that Defendant freely and voluntarily made statements to the police after receiving his *Miranda* warnings. (Gov't Resp. to Def.'s Second Suppl. Mot. at 2, ECF No. 129.) The government further contends that even if Defendant was in pain when making his post-arrest statements, such statements should not be suppressed because Defendant "was lucid, spoke coherently, and law enforcement was not relentless or abusive in their treatment of him." (*Id.*) Finally, the government asserts that even if Defendant's claims regarding promises of leniency are accurate, communicating the potential benefits of cooperation or leniency are not improper. (*Id.*)

***Conclusions of Law Regarding Suppression of Defendant's Statements Taken from Defendant During a Custodial Interrogation***.

**\*20** "The purpose of the *Miranda* warning is to ensure that the person in custody has sufficient knowledge of his ... constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary." *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007), *cert. denied sub nom.*, 552 U.S. 1144, 128 S.Ct. 1066, 169 L.Ed.2d 814 (2008), citing *Miranda v. Arizona*, 384 U.S. 436, 444–445, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The government bears the burden of demonstrating that the defendant's statements were voluntary. *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010). To determine whether a defendant's statements were made voluntarily, courts look to the totality of the circumstances surrounding the statements. *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).

In *United States v. Siddiqui*, the Second Circuit found that statements made by a hospitalized Defendant were voluntary where Defendant was "lucid and able to engage the agents in coherent conversation despite the pain attendant to her injury." 699 F.3d 690, 707 (2d Cir. 2012), *cert. denied*, 569 U.S. 986, 133 S.Ct. 2371, 185 L.Ed.2d 1089 (2013).

The Second Circuit provided that "courts tend to view a hospitalized defendant's statements as voluntary where the defendant was lucid and police conduct was not overbearing." *Id.*; *see also Pagan v. Keane*, 984 F.2d 61, 63 (2d Cir. 1993) (finding the defendant's post-*Miranda* statements voluntary where, despite having undergone surgery for significant injuries due to gunshot wounds twenty hours prior, a police officer that conducted the interview described the defendant as "very alert [and] able to answer all our questions with no problem," despite being in a weakened condition, the defendant tried to blame an accomplice demonstrating he understood the nature of the police questioning, and where medical records described him as "awake, alert, and orientated.").

Further, the Second Circuit has provided that

"Material misrepresentations based on unfulfillable or other improper promises might perhaps overbear a defendant's will," *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995), insofar as "they overcome his desire to remain silent," *United States v. Gaines*, 295 F.3d 293, 299 (2d Cir. 2002). A court will not, however, readily imply an improper promise or misrepresentation from vague or ambiguous statements by law enforcement officers. This is particularly so with respect to promises of leniency. *See id.* ("[V]ague promises of leniency for cooperation ... generally will not, without more, warrant a finding of coercion."); *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) ("Generally, promises of leniency will not render a confession involuntary."); *see also United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987) ("[A] confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials.").

*United States v. Haak*, 884 F.3d 400, 410 (2d Cir. 2018).

In reviewing the video, the undersigned observed that Defendant appears to fall asleep at around 12:02 a.m. as snoring can be heard. Snoring can once again be heard at around 3:46 a.m. and 4:08 a.m. after the interview was complete. The undersigned suggests that this undermines Defendant's contention that he was in such "excruciating pain from [his] injuries" throughout the interview as to render his statements involuntary. (Def.'s Aff. ¶ 14, ECF No. 128-1.)

In addition, Defendant stated that he was not under the influence of any drugs or alcohol at the time of his interview. He also appeared to provide timely, coherent answers to law enforcement's questions throughout the interview. While law enforcement does verbally acknowledge that Defendant appeared to be in pain, it was not in a cruel manner. In fact, at approximately 12:31 a.m., law enforcement asked how Defendant's pain was doing and, further asked whether he would like a chair on which to set his injured leg. When Defendant responded in the affirmative, an officer promptly left the room and returned with a chair. Once the officer brought in the chair, one of the law enforcement officers present helped him to adjust his chair so that he was more comfortable. At approximately 12:42 a.m., one of the officers noticed that Defendant was adjusting his injured leg and he asked whether there was anything else the officers in the room could do to make Defendant more comfortable. There were other instances where law enforcement asked Defendant if he was okay or if he needed anything—for example, helping him to the bathroom at approximately 3:27 a.m., and asking him if he needed anything at 3:29 a.m.

**\*21** Further, while law enforcement told anecdotal stories of leniency others received, they made it very clear that they could not guarantee any type of sentence to Defendant. In fact, at approximately 3:53 a.m., when Agent Martinello returned to the room in which Defendant was being held, he told Defendant he was definitely going to get some time, and that if he told Defendant otherwise, he would be lying. Law enforcement made no guarantee regarding the amount of time Defendant might have to serve related to his crimes, only telling him that cooperation typically resulted in the prosecutor providing some leniency.

In viewing the totality of the circumstances and after having conducted an *in camera* review of Defendant's interview, the undersigned believes that Defendant's statements were voluntary and that law enforcement interviewing him was not overbearing. For these reasons, the undersigned recommends that the District Court deny that part of Defendant's motion seeking to suppress statements.

### Findings of Fact Regarding Suppression of Identification Testimony.

In his omnibus motion, Defendant contended that "defendant was identified in separate photo array identification procedures and by showing Ring video to a CI," and argued that the identification procedures were unduly suggestive. (Pullano Aff. ¶¶ 204, 206.) In a later submission, Defendant also challenged an identification procedure wherein a witness was shown a single photograph of Defendant on an agent's smart phone and challenged not only the procedure but also any subsequent identification. (Affidavit of Peter J. Pullano,

Apr. 21, 2022 ("Pullano Suppl. Aff.") ¶ 4, ECF No. 128.) However, during an evidentiary hearing held before the undersigned on May 3, 2022, Defendant clarified that he is not challenging the identification procedures themselves, but rather arguing that the six-person photo array itself was unduly suggestive. In his papers, Defendant did not indicate how the array was unduly suggestive. However, during the evidentiary hearing, defense counsel argued that it was unduly suggestive because:

> (1) Defendant is in the central lower photo, which Defendant believes draws attention to him;

> (2) the lighting in Defendant's picture is different from that in pictures 2, 4, and 6, which show darker-skinned individuals in darker pictures such that Defendant is highlighted;

> (3) while Defendant has a small amount of facial hair, he contends that the individuals in the other pictures had more facial hair; and

> (4) every individual pictured aside from Defendant had a mustache.

In response, the government argues that the array was not unduly suggestive because it contained 6 photographs of African American males of a similar age and build, similar hair style and length, and all having some facial hair. (Gov't Resp. re: Photo Array at 3, ECF No. 132.) The government argued that there was nothing suggestive about Defendant's picture falling in the fifth position of the array and that Defendant does not support this contention with any case law. (*Id.* at 3, 88 S.Ct. 1868.) The government further contends that the lighting in photographs 1 and 3 is nearly identical to that in Defendant's photograph. (*Id.* at 4, 88 S.Ct. 1868.) In addition, the government argues that Defendant's skin tone is also nearly identical to that of the individuals in photographs 1 and 3, and similar to that of the individual in photograph 4. (*Id.*) The government also argues that the facial hair depicted in the other photographs is varying and that the individuals depicted in photographs 1 and 3 have very similar facial hair to that of the Defendant. (*Id.* at 5, 88 S.Ct. 1868.) Finally, and contrary to what Defendant has argued, the government asserts that it does appear that Defendant has a mustache "or shading of what appears to be a mustache." (*Id.*)

**\*22** With respect to the single photograph shown to a witness for identification purposes, in its response to Defendant's supplemental motion to suppress statements and

identifications (ECF No. 129), the government indicated that it conveyed to the defense that it does not intend to call the witness who made this identification.

### *Conclusions of Law Regarding Suppression of Identification Testimony*.

"When the appearance of participants in a lineup is not uniform with respect to a given characteristic, the principal question in determining suggestiveness is whether the appearance of the accused, *matching descriptions given by the witness*, so stood out from all of the other [s] [sic] ... as to suggest to an identifying witness that [that person] was more likely to be the culprit." *United States v. Wong*, 40 F.3d 1347, 1359–60 (2d Cir. 1994), *cert. denied*, 514 U.S. 1113 (1995) (internal quotation marks and citations omitted, emphasis in original). In addition, a photo array is not impermissibly suggestive where it contains six photographs. *United States v. McGee*, No. 99-CR-150E, 2000 WL 1520957, at *3 (W.D.N.Y. Oct. 10, 2000). Further, "[t]here is no requirement that a suspect in a lineup be surrounded by people identical in appearance." *United States v. Brown*, 167 F. Supp. 3d 447, 450 (W.D.N.Y. 2016) (citation omitted).

With respect to Defendant's first argument regarding the location of his picture as number five in the six-person array, the undersigned believes this argument should be rejected. Defendant has not provided any support for why he believes being fifth in the photo array is in any way unduly suggestive and cites to no case law to support this assertion.

Defendant's next argument is that the lighting in pictures 2, 4, and 6 is darker and depicts darker-skinned individuals such that Defendant is highlighted. In reviewing the array, it appears the complexion of the individuals in photographs 1 and 2 are similar to that of Defendant, and it can be argued that the individual depicted in photograph 4 is also similar. Accordingly, there are at least three other photographs that are similar to that of Defendant, which the undersigned believes defeats Defendant's argument that the photo array was unduly suggestive due to the lighting and depiction of two darker-skinned individuals. *United States v. Bautista*, 23 F.3d 726, 731 (2d Cir. 1994), *cert. denied*, 513 U.S. 862, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994) ("While it is true that the photograph of Minier-Contreras is slightly brighter and slightly more close-up than the others, we find that these differences did not render the array suggestive."); *Brown*, 167 F. Supp. 3d at 450 ("The other individuals pictured in the array have complexions similar and different than Defendant's in terms of darkness/lightness, but all appear to have similar racial

complexions, and the differences in the shades of some of the complexions of some of the individuals depicted does not render the photo array unduly suggestive.")

Finally, Defendant contends that the other individuals had more facial hair and that he was the only one depicted without a mustache. It appears that the individuals depicted in photographs 1 and 3 have very similar facial hair to that of Defendant. In addition, while Defendant contended that he was the only one pictured that did not have a mustache, it does appear that he has some hair growth above his lip, making it appear as though he does, in fact have a mustache. The undersigned believes that Defendant's challenges to the array in this respect lack merit. Based on the forgoing, the undersigned recommends that the District Court deny Defendant's motion to suppress the identification testimony.

**\*23** With respect to the single photograph identification, given the government's representations that it does not intend to call the witness who made the identification, the undersigned recommends that the District Court find this part of Defendant's motion to be moot.

### Findings of Fact Regarding Probable Cause to Conduct the Traffic Stop of Defendant's 2019 Mitsubishi Mirage on March 26, 2020.

Defendant alleges that law enforcement illegally stopped his 2019 Mitsubishi Mirage, license plate number JLS5469, on March 26, 2020. (Pullano Aff. ¶ 162, ECF No. 94.) Defendant alleges that law enforcement pulled him over and that he denies committing any traffic violations prior to the stop. (*Id.* ¶ 185.) He seeks to suppress all physical evidence seized during that traffic stop as fruit of the poisonous tree. (*Id.* ¶ 167.) Defendant requested a hearing to determine whether the stop was lawful in the first instance. (*Id.* ¶ 184.)

Approximately five months after Defendant filed his omnibus motion, he filed a standing affidavit in which he provides more detail about the stop. (ECF No. 120.) While he does not outright say that he is the owner of the Mitsubishi Mirage, he refers to the vehicle as "my vehicle" and indicates that when the police pulled him over it was a new car that he had just purchased. (*Id.* ¶¶ 11, 15.)

In addition, Defendant relies upon a Rochester Police Department Investigative Action Report, dated March 25, 2020, in which the investigating officer indicates that "a NYS DMV check revealed that the vehicle was a 2019 Mitsubishi Mirage registered to a Robert A. Forbes, Jr. ... and an address

of 953 Dewey Ave Rochester NY 14613." (Pullano Aff. ¶ 166 & Exhibit E.) Defendant alleges that he was driving the Mitsubishi Mirage on the date in question and that he did not commit any unlawful traffic offenses or crimes. (Standing Aff. ¶¶ 7, 11.) He said that he saw police following him and they pulled him over. (*Id.* ¶¶ 9, 10, 12.) An officer told him that he had a broken tail light but Defendant knew it was not broken because the car was new. (*Id.* ¶ 15.)

During the May 3, 2022, hearing before the undersigned, the government called Investigator Christopher Marsherall to testify. He testified that he has been a police investigator with the Rochester Police Department ("RPD") for over fifteen years and that he has been in the Special Investigations Section for three years. It is the Court's recollection that Investigator Marsherall was conducting surveillance at 50 Almira Street in Rochester in plainclothes in an unmarked vehicle on March 25, 2020. He had been asked by other members of the RPD to conduct surveillance relevant to home invasions and a gray 2019 Mitsubishi Mirage, license plate number JLS5469. The Court recalls that Investigator Marsherall testified that he saw the Mirage at approximately 8:40 p.m., after dark, traveling southbound on Almira Street and then travel southbound in a northbound lane. In addition, Investigator Marsherall testified that the vehicle's lights were turned off prior to coming to a stop at 50 Almira Street. Based upon Investigator Marsherall's observations, he concluded that the driver of the vehicle violated New York State Vehicle and Traffic Law §§ 1120(a) and 375(2)(a)(1). At some point thereafter, he radioed his observations to other RPD members describing the vehicle and indicating that the vehicle had violated the Vehicle and Traffic Law such that there was probable cause to stop the vehicle.

### Conclusions of Law Regarding Probable Cause to Conduct the Traffic Stop of Defendant's 2019 Mitsubishi Mirage on March 26, 2020.

**\*24** The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause[.]" U.S. Const. amend IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning" of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). However, "[t]he Fourth Amendment is not, of course, a guarantee against *all* searches and seizures, but only against

2022 WL 6786271

*unreasonable* searches and seizures." *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (emphasis in original). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren,* 517 U.S. at 810, 116 S.Ct. 1769.

Here, the government alleges that Defendant violated §§ 1120(a) and 375(2)(a) of New York State's Vehicle and Traffic Law. In relevant part, § 1120(a), titled "Drive on right side of roadways, exceptions," provides "(a) [u]pon all roadways of sufficient width a vehicle shall be driven upon the right half of the roadway" and then provides a list of exceptions not applicable here. N.Y. Veh. & Traf. Law § 1120(a).

Further, in relevant part, § 375(2)(a) provides:

> 2. (a) Every motor vehicle except a motorcycle, driven upon a public highway during the period from one-half hour after sunset to one-half hour before sunrise or at any other time when windshield wipers are in use, as a result of rain, sleet, snow, hail or other unfavorable atmospheric condition, and at such other times as visibility for a distance of one thousand feet ahead of such motor vehicle is not clear, shall display:
>
> > 1. at least two lighted head lamps on the front, one on each side, having light sources of equal power.

N.Y. Veh. & Traf. Law § 375(2)(a)(1).

The undersigned believes that Investigator Marsherall's testimony regarding his observations of the Mitsubishi Mirage on the evening of March 26, 2020, including driving on the wrong side of the street and turning off its lights while driving after dark, establish violations of §§ 1129(a) and 375(2)(a) of New York's Vehicle and Traffic Law. The undersigned therefore recommends that the District Court find that the government established that law enforcement had probable cause to stop Defendant's vehicle.

### Findings of Fact Regarding Probable Cause to Conduct a Warrantless Search of Defendant's 2019 Mitsubishi Mirage on March 26, 2020.

Upon pulling over Defendant's Mitsubishi Mirage on March 26, 2020, the officers involved indicated that they smelled marijuana and that marijuana was in plain view in that vehicle. (Gov't Resp. at 35, ECF No. 101.) They seized surgical masks,

a black ski mask, zip ties, two cellular phones, and the vehicle itself. (*Id.*)

Defendant indicates that he did not give the police permission to search his vehicle or take his cellular phone out of his car. (Standing Aff. ¶¶ 22, 29, ECF No. 120.)

The government initially argued that Defendant's standing affidavit submitted in connection with Defendant's prior counsel's omnibus motion was insufficient because Defendant failed to demonstrate standing to seek to suppress any evidence seized from the Mitsubishi Mirage. In addition, the government alleged that the prior standing affidavit did not challenge allegations that there was marijuana in the vehicle at the time of the stop." (Gov't Resp. to Suppl. Standing Aff. at 2, ECF No. 121.) However, Defendant submitted his supplemental standing affidavit (ECF No. 120) in which he appears to indicate that he owns the Mitsubishi Mirage, but he still did not address allegations of the presence of marijuana in the vehicle.

### Conclusions of Law Regarding Probable Cause to Conduct a Warrantless Search of Defendant's 2019 Mitsubishi Mirage on March 26, 2020.

**\*25** The "automobile exception" [12] to the Fourth Amendment "permits law enforcement to conduct a warrantless search of a readily mobile vehicle where there is probable cause to believe that the vehicle contains contraband." *Dixon,* 2010 WL 3167381, at \*3, quoting *United States v. Navas,* 597 F.3d 492, 497 (2d Cir. 2010), *cert. denied,* 562 U.S. 954, 131 S.Ct. 320, 178 L.Ed.2d 254 (2010); *United States v. Howard,* 489 F.3d 484, 492 (2d Cir. 2015), *cert. denied* 552 U.S. 1005, 128 S.Ct. 525, 169 L.Ed.2d 365 (2007) (same); *United States v. Gaskin,* 364 F.3d 438, 456 (2d Cir. 2004), *cert. denied,* 544 U.S. 990, 125 S.Ct. 1878, 161 L.Ed.2d 751 (2005) (same). "The scope of a warrantless search of an automobile ... is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *United States v. Ross,* 456 U.S. 798, 824, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). In addition, Courts in this Circuit have agreed that, under the automobile exception, "a generalized smell of marijuana provides police with the right to search a defendant's vehicle and any containers within the vehicle where marijuana might be stored." *United States v. Spain,* No. 18-cr-569 (CM), 2019 WL 948814, at \*3 (S.D.N.Y. Feb. 13, 2019) (internal quotation marks and citations omitted) (collecting cases). Further, the Second Circuit has explained that the smell of

marijuana odor can provide an "objective basis for suspecting legal wrongdoing." *United States v. Jenkins*, 452 F.3d 207, 214 (2d Cir. 2006), *cert. denied*, 549 U.S. 1008, 127 S.Ct. 528, 166 L.Ed.2d 392 (2006) (holding that the smell of marijuana provided an "independent basis for continuing to detain" the car and its occupants (citation omitted)).

12      The government also contends that "the search of the vehicle was justified ... as an inventory search." (Gov't's Resp. at 21, ECF No. 101.) However, beyond this statement, the government does not assert any factual allegations that would permit this Court to determine that an inventory search actually occurred and, if so, whether such search was "conducted in conformity with standard police procedures aimed at protecting the owner's property." *United States v. Dixon*, No. 09-CR-6046, 2010 WL 3167381, at *3 (W.D.N.Y. May 26, 2010), *report and recommendation adopted*, No. 09-CR-6046L, 2010 WL 3167380 (W.D.N.Y. Aug. 10, 2010). For this reason, the undersigned recommends that the District Court reject the government's argument that the inventory search exception provided law enforcement with the authority to conduct a warrantless search of the Mitsubishi Mirage.

Here, the undersigned believes that probable cause existed to search the vehicle because when law enforcement approached the Mitsubishi Mirage they "smell[ed] marijuana emanating from the car and observ[ed] marijuana in plain view in the car." *See United States v. Daniels*, No. 21-CR-81 (KAM), 2021 WL 4690837, at *8 (E.D.N.Y. Oct. 7, 2021) ("detectives had reasonable suspicion to approach the Altima ... during which probable cause developed, which justified the officers' arrest of the occupants and the search of the Altima, when the detectives observed [defendant] with a lit marijuana cigarette, confirmed the marijuana smell was emanating from the Altima, and saw what appeared to be narcotics in the vehicle in plain view, including the marijuana cigarette in the center console and packets of marijuana in the back seat."); *Dixon*, 2010 WL 3167381, at *3 ("The smell of burning marijuana gave the officers probable cause to search any area of the minivan where marijuana could be found.")

For the forgoing reasons, the undersigned recommends that the District Court find that probable cause existed to search the Mitsubishi Mirage pursuant to the automobile exception.

***Findings of Fact Regarding Probable Cause for the Issuance of the April 1, 2020, Warrant for the Search and Seizure of Defendant's Motorola E6 Cellular Phone.***

Defendant alleges that after law enforcement stopped and searched the Mitsubishi Mirage on March 26, 2020, they seized a Motorola E6 cell phone that was plugged into the charger of the vehicle at the time of the traffic stop. (Pullano Aff. ¶ 182, ECF No. 94.) Defendant contends that a search warrant obtained on April 1, 2020, for the search and seizure of his Motorola E6 cell phone is invalid and that any evidence resulting from a search of his cellular phone must be suppressed. (*Id.* ¶ 192.) Defendant only asserts standing to challenge the seizure of a Motorola E6 cell phone plugged into the charger, as the other cell phone seized on that date was on the person of his co-defendant, Eric Lowe. (*Id.* ¶¶ 182–183.)

**\*26** Defendant argues that the information contained in the affidavit of FBI Special Agent Theresa Lloyd submitted in support of the application for the issuance of a search warrant for his cellular phone failed to sufficiently allege probable cause—i.e., it did not provide a nexus between Defendant and the home robberies. (*Id.* ¶ 192.) Defendant claims that the only information mentioned in the affidavit in support of obtaining a warrant to search his cellular phone is found in paragraph 12, which discusses the fact that Officer Mackenzie saw Defendant's vehicle approximately thirty minutes prior to the robbery on Avenue E on March 25, 2020. (*Id.* ¶ 192.) Defendant asserts that this information misled the undersigned as the issuing United States Magistrate Judge, as Officer Mackenzie did not state whether Defendant was in the vehicle. (*Id.*) Defendant contends that Officer Mackenzie's report insinuates that Defendant either participated in the robbery on Avenue E on March 25, 2020, or that he was talking on the phone to the robbers directing them where to go in the house that they robbed. (*Id.* ¶ 160.)

On April 1, 2020, Special Agent Lloyd made an application to the undersigned for a search warrant related to the Motorola cellular phone. (Affidavit of FBI Special Agent Lloyd at Ex. G, p. 47, dated Apr. 1, 2020 ("Lloyd Aff."), ECF No. 94-1.) Special Agent Lloyd indicated in her affidavit that based on her experience, knowledge, and training (1) individuals who carry out home invasions often utilize cellular phones to plan and coordinate the invasions, (2) they keep stash houses for the proceeds of their illegal activity, (3) they often utilize cellular phones to contact coconspirators to sell the proceeds of their illegal activities, (4) they store names, telephone numbers, and other information in their cellular phones

related to their criminal activity, and (5) they often arrange to meet up after the illegal activity to share proceeds, arrange for payments and to discuss any ongoing law enforcement investigation regarding their illegal activities. (*Id.* at ¶ 5.)

Special Agent Lloyd detailed the two home invasions on March 25, 2020, on Avenue E and March 26, 2020, on Wellington Avenue. (*Id.* ¶¶ 8–18.) A witness of the first robbery on Avenue E indicated that the two males who robbed her appeared to be talking on a cell phone to someone who was telling them where to go in the house. (*Id.* ¶ 8.) They both wore black surgical masks. (*Id.*) The witness later identified co-defendant Eric Lowe as one of the individuals who robbed her at gun point. (*Id.* ¶ 11.) On March 25, 2020, Investigator Mackenzie was conducting surveillance on Avenue E for a different investigation. (*Id.* ¶ 12.) During this surveillance he ran the license plate of a gray Mitsubishi that was parked near his area of surveillance, which revealed that the vehicle belonged to Defendant, who resided at 953 Dewey Avenue. (*Id.*) A Ring doorbell camera captured video of the Wellington Avenue robbery, which depicted three suspects, two of whom were wearing face masks, one of whom was later identified as Eric Lowe. (*Id.* ¶¶ 16–17.) The suspects took a cellular phone from that location and the victim used the Find My iPhone Application later that day, which pinged at 50 Almira Street —the residence of Eric Lowe. (*Id.* ¶¶ 14, 18.)

On March 26, 2020, law enforcement conducting plain clothes surveillance at 50 Almira Street observed Defendant's gray Mitsubishi Mirage pull into the driveway at 50 Almira Street and saw an individual that looked like Eric Lowe get into that vehicle. (*Id.* ¶ 19.) Law enforcement stopped the vehicle after it committed several traffic violations and identified Defendant, Eric Lowe, and one other individual. (*Id.*) A search of the vehicle revealed surgical masks, a black ski mask, and zip ties. (*Id.* ¶ 20) Law enforcement executed a search warrant on 50 Almira Street on March 27, 2020, during which they found stolen items from the Wellington Avenue robbery. (*Id.* ¶ 22.)

***Conclusions of Law Regarding Probable Cause for the Issuance of the April 1, 2020, Warrant for the Search and Seizure of Defendant's Motorola E6 Cellular Phone.***

### a. Probable Cause.

**\*27** In her affidavit, Special Agent Lloyd established that there was a nexus between the two home invasions and Defendant. Special Agent Lloyd indicates that she knows from her experience, knowledge, and training that individuals

engaged in home robberies often utilize cellular phones to conduct the robberies, arrange for meetings after the robberies, and that the cellular phones often contain the names and contact information for coconspirators. She also indicated that Defendant's gray Mitsubishi Mirage was seen in the vicinity of the Avenue E robbery approximately thirty minutes before that robbery occurred. In addition, a witness of the Avenue E robbery indicated that the two men who robbed the home appeared to be talking to a third individual on a cellular phone. One of the individuals identified in both robberies was co-defendant Eric Lowe, and law enforcement saw Defendant's gray Mirage at Lowe's home at 50 Almira Street in the evening of March 26, 2020. In addition, when law enforcement pulled Defendant's vehicle over, they found Eric Lowe as well as surgical face masks, a black ski mask, and zip ties. As set forth in Special Agent Lloyd's affidavit, there was ample probable cause to believe Defendant was actively involved in robberies and that his Motorola E6 cellular phone would contain evidence relevant to his illegal activities.

### b. The Good Faith Exception Applies.

Even if the warrant lacked probable cause and Defendant's Fourth Amendment rights were violated when law enforcement searched Defendant's Motorola E6 cellular phone, the exclusionary rule does not operate to suppress the seized evidence. Defendant alleges that the issuing United State Magistrate Judge, here, the undersigned, was misled for the same reasons he alleges Judge Dinolfo was misled in issuing the search warrants for Defendant's Outlander and Defendant's residence located at 953 Dewey Avenue. (Pullano Aff. ¶ 195–197.) The undersigned recommends that the District Court reject this argument for the same reasons explained on pages 31 through 34, *infra.*

For these reasons, the undersigned recommends that the District Court find probable cause for the issuance of the search and seizure warrant for Defendant's Motorola E6 cellular phone and deny Defendant's motion to suppress any evidence seized from a search of the contents of the cellular phone.

***Findings of Fact Regarding Probable Cause for the Issuance of the April 21, 2020, Warrant to Search Defendant's 2019 Mitsubishi Mirage After it was Impounded.***

Defendant asserts that the federal search warrant obtained on April 21, 2020, to search the Mitsubishi Mirage is also invalid

and any evidence seized pursuant to that warrant must be suppressed. (*Id.* ¶ 163.)

On April 21, 2020, Special Agent Sean J. Martineck, ATF, provided the undersigned with a search warrant application for the search of Defendant's 2019 Mitsubishi Mirage, license plate number JLS-5469. (Affidavit of Special Agent Sean Martineck, sworn to Apr. 21, 2020, ("Martineck Aff."), ECF No. 94-1.) The "Schedule of Items to be Seized" included "Firearms and items indicative of firearm ownership possession or control, including but not limited to, ammunition, ammunition magazines, and holsters." (*Id.*) In his affidavit, Special Agent Martineck indicated that he was involved in investigating the home invasions committed by Defendant. (*Id.* ¶ 2.) He further indicated that he sought the warrant for the Mitsubishi Mirage on the basis that there was probable cause to believe it contained firearms or ammunition that would constitute evidence and instrumentalities related to the charges of Hobbs Act robbery/conspiracy and the 924(c) charge. (*Id.*)

Special Agent Martineck details the two robberies in his affidavit, including many of the same details included in Agent Lloyd's affidavit discussed above, such as that the two Avenue E robbers appeared to be talking to another male on a cell phone who was directing them where to go in the home and that Defendant's Mitsubishi Mirage was seen parked on Avenue E by law enforcement just prior to the robbery. (*Id.* ¶¶ 5, 9.) Special Agent Martineck indicated that "two males forced their way into [the] residence with handguns and robbed [the victim]." (*Id.* ¶ 5.) The victim of the Avenue E robbery picked out co-defendant Eric Lowe in a photo array on March 26, 2020. (*Id.* ¶ 8.)

Special Agent Martineck also included the details of the 64 Wellington Avenue robbery, addressing the fact that Ring doorbell camera footage showed three males at the time of the robbery, one of whom kicked down the door. (*Id.* at 13, 88 S.Ct. 1868.) He also stated that "[o]ne of the suspects held a knife to the female victim while the other pointed a gun at [another victim]." (*Id.* ¶ 11.) Co-defendant Erie Lowe was again identified as one of the robbers. (*Id.* ¶ 14.) An ATF confidential informant identified Defendant as the individual who kicked down the door as depicted in the Ring doorbell footage. (*Id.* ¶ 16.)

**\*28** Special Agent Martineck indicated that a victim of the 64 Wellington Avenue home invasion utilized her Find My iPhone Application on March 26, 2020, which pinged

at 50 Almira Street—Eric Lowe's residence—and how law enforcement observed Defendant's Mitsubishi Mirage travel to 50 Elmira Street later that day and pick up Eric Lowe. (*Id.* ¶¶ 15, 17.) After committing traffic violations law enforcement pulled the vehicle over, smelled marijuana, found Defendant, co-defendant Eric Lowe, and Hugh Cox, searched the vehicle, and then towed it to the Rochester Police Department Auto Pound as evidence. (*Id.* ¶¶ 17, 18, 19.)

After Defendant was charged in the present case, the government conducted a federal proffer with a cooperating defendant ("CD") (who was present inside Defendant's vehicle when law enforcement stopped it on March 26, 2020). (*Id.* ¶ 22.) The CD admitted to being present in Defendant's vehicle when it was pulled over, and indicated that the .22 caliber handgun utilized in the home invasions was brought by an individual named Jeff Steadman-Loyd, the third individual who the CD identified as having participated in the robberies. (*Id.* ¶ 23.) The CD indicated that when law enforcement pulled over the Mitsubishi Mirage, he and the other "co-conspirator" were returning the handgun to Steadman-Loyd and that the CD hid the handgun in the Mitsubishi Mirage's center console where the police did not search. (*Id.*)

### Conclusions of Law Regarding Probable Cause for the Issuance of the April 21, 2020, Warrant to Search Defendant's 2019 Mitsubishi Mirage After it was Impounded.

#### a. Probable Cause.

Here, the undersigned believes Special Agent Martineck established that there was ample probable cause supporting the issuance of the search warrant for the Mitsubishi Mirage once it was impounded.[13] Special Agent Martineck indicated that he was involved in investigating the home invasions committed by Defendant and his co-conspirators. He explained that Defendant's Mitsubishi Mirage was seen on Avenue E just prior to the robbery on that date, that Defendant was positively identified by a witness from the Wellington Avenue home invasion from Ring camera doorbell footage, and that co-defendant Eric Lowe had also been identified in connection with both robberies. Defendant's vehicle was seen picking Eric Lowe up in the evening of March 26, 2020, and he was in Defendant's vehicle when law enforcement pulled it over shortly thereafter. Importantly, Special Agent Martineck stated that a gun had been utilized in both home invasions and that the CD told law enforcement that he hid that handgun in the center console of Defendant's Mitsubishi Mirage when

law enforcement pulled that vehicle over on March 26, 2020. The CD also disclosed that the handgun belonged to the third co-conspirator that was not present in the vehicle (Defendant and Eric Lowe were both present in the vehicle at the time of the stop) and they were in the process of returning it to him when law enforcement stopped Defendant's vehicle. As set forth in Special Agent Martineck's affidavit, the undersigned believes there was ample probable cause to believe that the gun utilized in the home invasions would be found in Defendant's Mitsubishi Mirage. Based upon the forgoing, the undersigned recommends that the District Court find that the issuing United States Magistrate Judge, here, the undersigned, had a substantial basis to conclude that the April 21, 2020, search warrant was supported by probable cause and deny his motion to suppress any evidence resulting from the same.

13    Law enforcement did not need to obtain a warrant to conduct an inventory search of the vehicle once it was impounded. However, as noted in footnote 12, *infra,* the government did not provide any evidence or testimony that any inventory search was conducted in accordance with standardized procedures such that it could provide a basis for conducting a warrantless search of the Mitsubishi Mirage.

**b. The Good Faith Exception Applies.**

**\*29** Even if the warrant lacked probable cause and Defendant's Fourth Amendment rights were violated when law enforcement searched Defendant's 2019 Mitsubishi Mirage after it was impounded, the exclusionary rule does not operate to suppress the seized evidence. Defendant alleges that the issuing United State Magistrate Judge, here, the undersigned, was misled for the same reasons he alleges Judge Dinolfo was misled in issuing the search warrants for Defendant's Outlander and his residence located at 953 Dewey Avenue. (Pullano Aff. ¶ 171–174.) Accordingly, the undersigned recommends that the District Court reject this argument for the same reasons explained on pages 31 through 34, *infra.*

Based upon the forgoing, the undersigned recommends that the District Court find that the search warrant for Defendant's Mitsubishi Mirage was supported by probable cause and deny that portion of Defendant's motion seeking to suppress the handgun seized from that vehicle.

## CONCLUSION

Based on the forgoing, the undersigned recommends that the District Court

(1) Deny that aspect of Defendant's motion seeking to dismiss the Indictment on various grounds;

(2) Deny that aspect of Defendant's motion seeking to suppress physical evidence seized from 953 Dewey Avenue and the 2019 Mitsubishi Outlander;

(3) Deny that aspect of Defendant's motion seeking to suppress physical evidence seized from Defendant a Kia Sportage;

(4) Deny those aspects of Defendant's motion seeking to suppress any statements made by Defendant;

(5) Deny those aspects of Defendant's motion seeking to suppress identification testimony;

(6) Deny that aspect of Defendant's motion alleging lack of probable cause to conduct the traffic stop of Defendant's 2019 Mitsubishi Mirage on March 26, 2020;

(7) Deny that aspect of Defendant's motion alleging lack of probable cause to conduct a warrantless search of Defendant's 2019 Mitsubishi Mirage on March 26, 2020, and for suppression of evidence seized in connection therewith;

(8) Deny that aspect of Defendant's motion alleging lack of probable cause for the issuance of the April 1, 2020, warrant for the search and seizure of Defendant's Motorola E6 cellular phone and for suppression of any evidence resulting from a search of the contents of that phone;

(9) Deny that aspect of Defendant's motion alleging lack of probable cause for the issuance of the April 21, 2020, warrant to search Defendant's 2019 Mitsubishi Mirage after it was impounded and suppression of evidence resulting from that search; and

(10) Deny each and every other motion not specifically addressed herein.

Pursuant to 28 U.S.C. § 636(b)(1), the undersigned hereby

**ORDERS**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules of Civil Procedure for the Western District of New York, "[w]ritten objections ... shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72(b) may result in the District Court's refusal to consider the objection.**

  **\*30**  **IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 6786271

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**United States v. Forbes, Slip Copy (2022)**

2022 WL 4545256

2022 WL 4545256
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

UNITED STATES of America,

v.

Robert FORBES, Jr. a/k/a Ra Ra a/k/a Henny, Defendant.

Case # 20-CR-06140-FPG
|
Signed September 29, 2022

**Attorneys and Law Firms**

Brett A. Harvey, Robert Marangola, Government Attorneys, U.S. Attorney's Office, Rochester, NY, for United States of America.

Peter J. Pullano, Tully Rinckey, PLLC, Rochester, NY, for Defendant.

DECISION AND ORDER

FRANK P. GERACI, JR., United States District Court Judge

**BACKGROUND**

*1 On October 15, 2020, Defendant Robert Forbes, Jr. a/k/a Ra Ra a/k/a Henny was charged in a five-count indictment with Hobbs Act Conspiracy, Hobbs Act Robbery, Attempted Hobbs Act Robbery, and Use of a Firearm During and in Relation to a Crime of Violence. ECF No. 21. The charges relate to an attempted home invasion robbery at 222 Avenue E, Rochester, New York on March 25, 2020, and a home invasion robbery at 64 Wellington Avenue, Rochester, New York on March 26, 2020. ECF No. 68. By Order dated October 20, 2020, this case was referred to United States Magistrate Judge Mark W. Pedersen pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (b)(1)(B). ECF No. 23.

On August 12, 2021, a federal grand jury returned a superseding indictment (the "Indictment"), which charged Defendant with additional counts of Hobbs Act Robbery, Attempted Hobbs Act Robbery, and Using a Firearm During and in Relation to a Crime of Violence. ECF No. 68. The additional charges relate to a home invasion robbery at 225 Penhurst Drive, Rochester, New York on February 18, 2020,

and a home invasion robbery at 331 Conrad Drive, Rochester, New York on March 22, 2020. *Id.*

On October 25, 2021, Defendant filed an omnibus motion seeking dismissal of the Indictment on various grounds, and suppression of identification testimony, physical evidence, and statements. ECF No. 94. On November 19, 2021, the government responded in opposition to Defendant's omnibus motion. ECF No. 101. On February 17, 2022, Defendant filed a supplemental motion to suppress, ECF No. 120, and the government responded. ECF No. 121. On April 21, 2022, Defendant filed a second supplemental motion to suppress statements and identifications, ECF No. 128, and the government responded. ECF No. 129.

On June 10, 2022, Magistrate Judge Pedersen issued a Report and Recommendation ("R & R"), recommending that the District Court deny the aspects of Defendant's motion seeking to (1) dismiss the Indictment on various grounds; (2) suppress physical evidence seized from 953 Dewey Avenue and a 2019 Mitsubishi Outlander; (3) suppress physical evidence seized from a Kia Sportage; (4) suppress Defendant's statements; (5) suppress identification testimony; (6) suppress physical evidence seized from Defendant's Mitsubishi Mirage; and (8) suppress evidence obtained from Defendant's Motorola E6 cell phone after it was seized from Defendant's Mitsubishi Mirage and searched pursuant to a search warrant. ECF No. 135.

On August 15, 2022, Defendant timely objected to the R & R after filing numerous extension requests, largely renewing arguments made before Judge Pedersen, asserting that (1) the Indictment should be dismissed; (2) the physical evidence seized should be suppressed; and (3) Defendant's statements should be suppressed. [1] ECF No. 142. On August 29, 2022, the government filed its response to Defendant's objections in which it withdrew opposition to dismissal of Counts 5 and 7 of the Indictment. ECF No. 144. For the reasons explained below, the Court (1) adopts Magistrate Judge Pedersen's R & R in full, except with respect to Counts 5 and 7 of the Indictment; (2) dismisses Counts 5 and 7 of the Indictment; and (3) denies Defendant's motions.

---

[1]    The Court has analyzed the remaining, unopposed portions of Judge Pedersen's R & R and determines that they are free of clear error.

## LEGAL STANDARD

**\*2** A district court reviews those portions of an R & R to which a party has timely objected *de novo*. Fed. R. Crim. P. 59(b)(3). When a party does not object to a portion of an R & R or when the objections are conclusory, general, or without legal support, a district court reviews those portions for clear error. *See United States v. Preston*, 635 F. Supp. 267, 269 (W.D.N.Y. 2009).

After reviewing the R & R and the objections thereto, a district court "may accept, reject, or modify the recommendation." Fed. R. Crim. P. 59(b)(3). In addition, "[t]he Second Circuit has instructed that where a Magistrate Judge conducts an evidentiary hearing and makes credibility findings on disputed issues of fact, the district court will ordinarily accept those credibility findings." *United States v. Lawson*, 961 F. Supp. 2d 496, 499 (W.D.N.Y. 2013); *see also Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008).

## DISCUSSION

### I. Motion to Dismiss the Indictment on Various Grounds

#### a. Motion to Dismiss Counts 4 and 6 of the Indictment: Factual Insufficiency

Defendant argues that the Indictment fails to allege the essential elements of the crimes charged in the above counts in violation of his Fifth and Sixth Amendment rights. Defendant asserts that "[t]he indictment [ ] does no more than recite types of crimes, without any specific facts describing alleged criminal acts" and thus fails to provide notice of the charges against him. ECF No. 142 at 6. The Court disagrees.

Federal Rule of Criminal Procedure 7(c)(1) requires an indictment contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment must contain the "elements of the offense charged and fairly inform [ ] a defendant of the charge against which he must defend" and enable the defendant to "plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Resendiz-Ponce*, 549 U.S. 102, 108, 127 S.Ct. 782, 166 L.Ed.2d 591 (2007) (quoting *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)). "Nevertheless, 'an indictment need do little more than to track the language of the statute charged and state the time and place

(in approximate terms) of the alleged crime.' " *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992), *cert. denied*, 504 U.S. 926, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992)). "Generally, the indictment does not have to specify evidence or details of how the offense was committed. Simply put, the validity of an indictment is tested by its allegations, not by whether the Government can prove its case." *United States v. Walters*, 963 F. Supp. 2d 125, 130 (E.D.N.Y. 2013) (citations omitted); *see also United States v. Raniere*, 384 F. Supp. 3d 282, 301 (E.D.N.Y. 2019) ("[T]here is a difference between what the Government must prove at trial and what it must plead in the indictment.").

Judge Pedersen correctly concluded in his R & R that Counts 4 and 6 include sufficient factual allegations. The allegations contained in Counts 4 and 6 sufficiently track 18 U.S.C. § 1951(a) as charged in the Indictment.

Count 4 of the Indictment provides:

> On or about March 22, 2020, in the Western District of New York, the defendants, ROBERT FORBES, JR. a/k/a Ra Ra a/k/a Henny, and RAEKWON GREEN a/k/a Bundy a/ k/a Bundles, did unlawfully attempt to obstruct, delay and affect, commerce, as that term is defined in Title 18, United States Code, Section 1951(b) (3), and the movement of articles and commodities in commerce, by robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), in particular, the attempted robbery of controlled substances and United States currency derived from the sale of controlled substances belonging to a person engaged in the unlawful possession and distribution of controlled substances, from, and in the presence of, Victim B and Victim C, persons known to the Grand Jury. All in violation of Title 18, United States Code, Sections 1951(a) and 2.

**\*3** ECF No. 68 at 3.

Count 6 of the Indictment provides:

> On or about March 25, 2020, in the Western District of New York, the defendant, ROBERT FORBES, JR. a/k/a Ra Ra a/k/a Henny, did unlawfully attempt to obstruct, delay and affect, commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), and the movement of articles and commodities in commerce, by robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), in particular, the attempted robbery of controlled substances and United States currency belonging to a person believed by the defendant to be engaged in the unlawful possession and distribution of controlled substances, from, and in the presence of, Victim D, a person known to the Grand Jury. All in violation of Title 18, United States Code, Sections 1951(a) and 2.

*Id.* at 4.

Count and 4 and 6 include not only the language of the statute, but also specific factual allegations, such as the dates of the attempted robberies, their targets, and the place of the attempted robberies. That is all that the Rules require. For these reasons and the reasons more fully stated in Judge Pedersen's R & R, this aspect of Defendant's motion is denied.

### b. Motion to Dismiss Counts 2, 4, 6 and 8 of the Indictment: Failure to Allege Mens Rea

Next, Defendant argues that the Indictment fails to sufficiently allege the requisite mens rea. Specifically, Defendant contends that Counts 2, 4, 6 and 8—the Hobbs Act Robbery and Attempted Hobbs Act Robbery counts—"lack necessary allegations of criminal intent." ECF No. 142 at 6. The Court disagrees.

It is well settled that the statutory definition of "robbery" in 18 U.S.C. § 1951(b)(1) implies "knowing" and "willful" conduct, and an indictment so charging is sufficient even if it does not explicitly reference those terms. *United States v. Jackson*, 513 F. App'x 51, 55 (2d Cir. 2013) (summary order) (holding that "[a]lthough the indictment did not specifically contain the words 'knowingly' or 'willfully,' the plain and common-sense reading of the indictment put the defendant on notice of what the charges against him were, such that he was not prejudiced in the preparation of his defense"); *United States v. Tobias*, 33 F. App'x 547, 549 (2d Cir. 2002) ("The indictment tracked the language of 18 U.S.C. § 1951, using the term 'robbery,' which necessarily implies knowing and willful conduct."); *United States v. McGee*, No. 15-CR-6079 (JWF), 2017 WL 667199, at *2 (W.D.N.Y. Feb. 17, 2017) (holding that an indictment was "sufficient to assert the mens rea element of robbery even though it does not contain the words 'knowingly' or 'willfully' "), *report and recommendation adopted*, No. 15-CR-6079-FPG, 2017 WL 2880121 (W.D.N.Y. July 6, 2017); *United States v. McCoy*, 14CR-6181 EAW, 2016 WL 6952351, at *3-5 (W.D.N.Y. Nov. 28, 2016).

Despite the absence of the terms "knowingly" or "willfully", the Court agrees with Judge Pedersen's conclusion that the Indictment's inclusion of the term "robbery" and its statutory definition sufficiently alleges the requisite mens rea.[2] As Judge Pedersen explained in his R & R, the term "robbery," as used in all four Counts, implies "knowing" and "willful" conduct in satisfaction of the mens rea element. Counts 2, 4, 6, and 8 sufficiently track the language of 18 U.S.C. § 1951(b)(1). For these reasons, the Court denies this aspect of Defendant's motion.

2

> "Robbery" means "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining." 18 U.S.C. § 1951(b)(1).

### c. Motion for Dismissal of Counts 2 through 9 of the Indictment: Factual Insufficiency with Respect to "Interstate Commerce" and "Aiding and Abetting"

**\*4** Defendant again asserts that the Indictment fails to present evidence or factual allegations which would satisfy

the essential elements of each charge. *U.S. v. Jackson*, 749 F. Supp. 2d 19 (2nd Cir. 2010); *U.S. v. Hooker*, 841 F.2d 1225 (4th Cir. 1988) (en banc). Specifically, Defendant first argues that Counts 2 through 9 fail to specifically allege how Defendants attempted to interfere with or obstruct interstate commerce and, relatedly, asserts that his alleged misconduct does not satisfy the "interstate commerce" element of the Hobbs Act. Second, Defendant argues the Indictment lacks allegations as to how Defendant "aided and abetted" Counts 2 through 9. The Court disagrees.

With respect to Defendant's first argument, because the Hobbs Act criminalizes robberies that affect interstate commerce "in any way or degree," a defendant's alleged misconduct need only have a "de minimis" effect on interstate commerce. *United States v. Parkes*, 497 F.3d 220, 230 (2d Cir. 2007), *cert. denied*, 552 U.S. 1220, 128 S.Ct. 1320, 170 L.Ed.2d 133 (2008). Moreover, when an alleged robber attempts to steal drugs or drug proceeds from a drug dealer, "proof of such an attempt in itself supports the conclusion that the robber attempted to affect interstate commerce, and the robber is therefore convictable under the Hobbs Act." *United States v. Lee*, 834 F.3d 145, 152 (2d Cir. 2016), *cert. denied*, —— U.S. ——, 137 S. Ct. 1599, 197 L.Ed.2d 725 (2017). In short, because the Indictment includes allegations that Defendant targeted drug proceeds and controlled substances, its allegations are sufficient and adequately specific to allege a nexus to interstate commerce as required by the Hobbs Act, as Judge Pedersen correctly concluded. This aspect of Defendant's motion is accordingly denied.

With respect to Defendant's claim that the Indictment lacks allegations as to how Defendant "aided and abetted" the crimes such that he can adequately defend against the charges, the Court holds that the Indictment's citation to 18 U.S.C. § 2 in each of those counts puts Defendant on notice that aiding and abetting is a theory that the government might pursue at trial. *United States v. Weintraub*, 27 F. App'x 54, 56 (2d Cir. 2001) ("[The defendant] could not have been surprised by the government's reliance on the aiding-and-abetting theory because the indictment cited the aiding-and-abetting statute ...18 U.S.C. § 2.") Moreover, as the government correctly argued in its response to Defendant's motion, "it is well established that a trial judge may properly give an aiding and abetting instruction even if the indictment does not expressly charge a violation of 18 U.S.C. § 2." *United States v. Eisner*, 59 F. App'x 379, 382 (2d Cir. 2003), citing *United States v. Mucciante*, 21 F.3d 1228, 1234 (2d Cir. 1994)

(internal citations omitted). For these reasons, this aspect of Defendant's motion is denied.

### d. Motion to Dismiss Counts 3, 5, 7 and 9 of the Indictment: Factual Insufficiency of Underlying Hobbs Act Charges and "Crimes of Violence"

Defendant argues that the above counts charging Defendant with "Use of a Firearm During and in Relation to a Crime of Violence" should be dismissed because the factual allegations of the underlying crimes, Hobbs Act Robbery and Attempted Hobbs Act Robbery, as charged in Counts 2, 4, and 8, are insufficient. ECF No. 142 at 14. Defendant argues further that Counts 3, 5, 7, and 9 should be dismissed because the government's allegations of "attempting" Hobbs Act Robbery do not qualify as "crimes of violence" under 18 U.S.C. § 924(c). ECF No. 142 at 15.

Defendant's first argument is without merit. Because the Court has concluded that the factual allegations set forth by the government in Counts 2, 4, 6, and 8 are sufficient to support an Indictment for Hobbs Act Robbery or Attempted Hobbs Act Robbery, Counts 3, 5, 7, and 9—crimes charged in furtherance of Hobbs Act Robbery or Attempted Hobbs Act Robbery—also survive Defendant's sufficiency challenge. The Court accordingly denies this aspect of Defendant's motion.

**\*5** While these Counts survive dismissal for insufficiency for the reasons stated above, Defendant's motion to dismiss with respect to Counts 5 and 7 is granted on other grounds. The underlying crime for each Count, contained within Counts 4 and 6 charging Attempted Hobbs Act Robbery, is not a "crime of violence" for the purposes of 18 U.S.C. § 924(c)(1)(A)(ii). The Supreme Court recently decided, after the filing of Judge Pedersen's R & R, that Attempted Hobbs Act Robbery does not qualify as a "crime of violence" under 18 U.S.C. § 924(c)(3)(A). *United States v. Taylor*, —— U.S. ——, 132 S. Ct. 2015, 2021-22 (2022). The government has withdrawn its opposition to dismissal of such charges. Accordingly, Counts 5 and 7 are dismissed.

### e. Motion to Dismiss Count 1 for Multiplicity

Defendant argues that Count 1 of the Indictment is multiplicitous of Counts 2, 4, 6, and 8 because "Count 1 charges a 'general conspiracy' and Counts 2, 4, 6, and 8 'have their own conspiracy element directly in the counts of the indictment.' " ECF No. 142 at 27. However, as Judge Pedersen correctly explained in his R & R, because

the crime charged in Count 1—Hobbs Act Conspiracy—requires an agreement between those acting together and such an agreement is not an element of the crime charged in Counts 4 and 6, Attempted Hobbs Act Robbery, Count 1 is not multiplicitous of Counts 4 and 6. Relatedly, because a defendant could be charged with Counts 2 and 8—Hobbs Act Robbery—without a charge of conspiracy, such as the charge included in Count 1, Count 1 is not multiplicitous of Counts 2 and 8. For these reasons, the Court denies this aspect of Defendant's motion.

## II. Motion to Suppress Physical Evidence

Defendant argues the search warrants issued by Monroe County Judge Vincent Dinolfo to search Defendant's 953 Dewey Avenue residence and Defendant's 2019 Mitsubishi Outlander (the "Outlander") are invalid because they are not supported by probable cause and any evidence obtained in the authorized searches must be suppressed. For the reasons set forth below, the Court disagrees.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "To establish probable cause to search a residence, two factual showings are necessary—first, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located at the residence." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). Here, the parties dispute whether probable cause existed to believe that evidence of the crime would be located at 953 Dewey Avenue and in the Outlander. "[P]robable cause to search a place exists if the issuing judge finds a 'fair probability that contraband or evidence of a crime will be found in a particular place' and a federal court must apply a 'totality-of-the-circumstances analysis' in pursuing this inquiry." *United States v. Ponce*, 947 F.2d 646, 650 (2d Cir. 1991), *cert. denied*, 503 U.S. 943, 112 S.Ct. 1492, 117 L.Ed.2d 633 (1992) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). When reviewing the validity of a search warrant, the duty of [the] court ... is "simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing] that probable cause existed.' " *Gates*, 462 U.S. at 238-39, 103 S.Ct. 2317 (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)).

Here, the search warrant application submitted by Rochester Police Department Investigator Mark Rohr established probable cause to search both 953 Dewey Avenue and the Outlander. Investigator Rohr's supporting affidavit stated, among other things, that a vehicle—a gray Mitsubishi sedan later identified as a Mitsubishi Mirage—with license plate number JSL5469 was observed by Rochester Police Department Investigator Andrew Mackenzie on March 25, 2020 in front of the 200 Avenue E location shortly before the first home invasion of 222 Avenue E. A license plate database search revealed that the vehicle was registered to Defendant, who resided at 953 Dewey Avenue.

**\*6** Further, on March 26, 2020, at 12:28 a.m., law enforcement responded to the second home invasion at 64 Wellington Avenue in which, according to the victims, two males, one of whom was armed with a handgun, kicked in the door, entered the residence, and stole various items of personal property from the victims, including two cell phones. *See* ECF No. 94-1 at 11. Investigator Rohr recognized co-defendant Eric Lowe from a Ring doorbell video obtained from the residence. In addition, on March 26, 2020, at 8:00 p.m., law enforcement observed Defendant's Mitsubishi Mirage pull into the driveway of co-defendant Lowe's residence, the address of which was obtained from a victim's "Find My iPhone" app for one of the cell phones stolen during the robbery. Further, Investigator Rohr noted in his affidavit that Defendant was on parole and his parole address was 953 Dewey Avenue. Thus, considering the totality of the circumstances, the Court finds that the search warrant application prepared by Investigator Rohr, an experienced investigator, sufficiently established probable cause to search Defendant's residence for evidence of the robberies.

In addition, while the Outlander does not appear to have been directly involved in either of the above home invasions, Investigator Rohr's affidavit sets forth evidence connecting Defendant to the Outlander. *See* ECF No. 94-1 at 13. Specifically, an ATF federal contracted confidential informant identified Defendant from Ring doorbell camera footage from the home invasion at the 64 Wellington Avenue residence on March 26, 2020. The same ATF confidential informant stated that Defendant had used an Outlander for numerous home invasion robberies and kept a handgun in an Outlander with license plate number JJP6649, which is registered to the Defendant. Other evidence adduced by the government supports probable cause for the issuance of the warrant, but the Court finds the above evidence more than sufficient to establish the requisite probable cause to search the vehicle and residence.

For these reasons, the Court holds that the totality of the circumstances provided a fair probability to Judge Dinolfo

that contraband or evidence of a crime would be found in the Outlander and Defendant's 953 Dewey Avenue residence. That is, Judge Dinolfo's determination that the search warrants were supported by probable cause was reasonable. Because the Court concludes that the search warrants were supported by probable cause, the Court does not address the government's "good faith exception" argument. This aspect of Defendant's motion is accordingly denied.

### III. Motion to Suppress All Evidence from Defendant's April 1, 2020 Stop

Defendant argues for suppression of evidence obtained from law enforcement's search of a Kia Sportage that occurred on April 1, 2020 after Defendant led law enforcement on a high-speed chase in the vehicle and law enforcement stopped the vehicle for traffic infractions. Defendant also seeks a hearing to challenge the validity of the stop. For the reasons set forth below, the Court rejects Defendant's arguments.

As a general matter, a "defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates this his Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Padilla*, 508 U.S. 77, 81, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993) (citing *Alderman v. United States*, 394 U.S. 165, 171-72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) (additional citations omitted)). A defendant may invoke the protection of the Fourth Amendment only where the government has "violated the defendant's own constitutional rights," as opposed to the rights of another. *United States v. Payner*, 447 U.S. 727, 731, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980). With respect to a search of a vehicle, a defendant "must show, among other things, a legitimate basis for being in [the vehicle], such as permission from the owner." *United States v. Ponce*, 947 F.2d 646, 649 (2d Cir. 1991), *cert. denied*, 503 U.S. 943, 112 S.Ct. 1492, 117 L.Ed.2d 633 (1992) (citation omitted); *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980) (finding defendant could not object to the search of a car where he had demonstrated "neither ownership of the [vehicle], nor license from the owner to possess the [vehicle]."). A defendant must demonstrate receipt of such permission from the owner. *Sanchez*, 635 F.2d at 64. "Mere control over a vehicle" is insufficient. *United States v. Ruggiero*, 824 F. Supp. 379, 392 (S.D.N.Y. 1993), *aff'd*, 44 F.3d 1102 (1995).

**\*7** As Judge Pedersen correctly observed in his R & R, Defendant stated that he "was driving in [his] brother Darius Taylor's 2019 Kia Sportage." ECF No. 135 at 34. Defendant

provides no proof that his brother owned the Kia Sportage and, even if such proof were provided, Defendant did not state that he received permission to drive the vehicle. For these reasons, Defendant lacks standing to move to suppress evidence seized from the Sportage because he had no Fourth Amendment privacy interest in that vehicle at the time of the search. This aspect of Defendant's motion is accordingly denied.

### IV. Motion to Suppress Physical Evidence: Cell Phone and Contents

Law enforcement seized a Motorola E6 cell phone from Defendant's Mirage after it was stopped for traffic infractions on March 26, 2020, while Defendant and co-defendant Lowe were in the car, and later impounded. Defendant argues that the search warrant obtained on April 1, 2020, after the Mirage was impounded, authorizing the search and seizure of the Motorola E6 cell phone is invalid and any evidence resulting from a search of the phone should be suppressed. Defendant argues that the information contained in the affidavit of FBI Special Agent Theresa Lloyd submitted in support of the warrant application failed to establish probable cause because it failed to establish a nexus between Defendant and the alleged home robberies. For the reasons set forth below, the Court rejects Defendant's arguments.

In her April 1, 2020 warrant application, Special Agent Lloyd sufficiently established probable cause that the Motorola E6 cell phone may contain evidence relevant to the home invasions on March 25, 2020 at 222 Avenue E and on March 26, 2020 at 64 Wellington Avenue. *See* ECF No. 94-1 at 48. In her affidavit, Special Agent Lloyd stated that, from her experience, knowledge, and training, individuals who perpetrate home robberies often utilize cell phones to conduct the robberies and arrange for meetings after the robberies, and that the phones often contain the names and contact information for coconspirators. She also indicated that Defendant's Mirage was seen by Rochester Police Department Investigator Andrew Mackenzie near the alleged Avenue E robbery approximately thirty minutes before that robbery occurred. In addition, a witness of the Avenue E robbery indicated that the two men who robbed the home appeared to be talking to a third individual on a cell phone. One of the individuals identified in both robberies was co-defendant Eric Lowe, and law enforcement saw Defendant's gray Mirage at Lowe's home the night of March 26, 2020. In addition, when law enforcement pulled the Mirage over, they found co-defendant Eric Lowe, as well as surgical face masks,

a black ski mask, and zip ties, which Special Agent Lloyd indicated in her experience were used during robberies.

For these reasons and the reasons explained by Judge Pedersen in his R & R, the warrant application in question sufficiently established a nexus between the two home invasions and Defendant, such that Defendant's cell phone may contain evidence relevant to the alleged crimes. The search and seizure warrant authorized for Defendant's Motorola E6 cell phone was supported by probable cause. This aspect of Defendant's motion is accordingly denied.

**V. Motion to Suppress Identification Testimony**

Defendant moves to suppress identification testimony on the basis that the identification procedure—a six-person photo array—used to identity Defendant was unduly suggestive. Defendant argues that the array was unduly suggestive because Defendant is in the "lower central photo;" the lighting is different in Defendant's photo such that Defendant is "highlighted;" the other individuals had notably "more facial hair" than him; and every individual pictured except Defendant had a mustache. Defendant also moves for suppression of Defendant's identification from a single photo of Defendant on an agent's smart phone. For the reasons below, the Court rejects Defendant's arguments.

**\*8** As a general matter, "[w]hen the appearance of participants in a lineup is not uniform with respect to a given characteristic, the principal question in determining suggestiveness is whether the appearance of the accused [ ] so stood out from all of the other[s] [sic] ... as to suggest to an identifying witness that [that person] was more likely to be the culprit." *United States v. Wong*, 40 F.3d 1347, 1359-60 (2d Cir. 1994) (internal quotation marks and citations omitted, emphasis in original), *cert. denied*, 514 U.S. 1113, 115 S.Ct. 1968, 131 L.Ed.2d 858 (1995). Further, "[t]here is no requirement that a suspect in a lineup be surrounded by people identical in appearance." *United States v. Brown*, 167 F. Supp. 3d 447, 450 (W.D.N.Y. 2016) (citation omitted).

As Judge Pedersen correctly concluded in his R & R, the photo array was not unduly suggestive. The photo array contained six photos of African American males of a similar age and build, similar hair style and length, and all possessed some facial hair. Defendant does not suggest how his placement in the lower center of the array is suggestive, nor does Defendant cite any legal support for such a proposition. Moreover, Defendant's skin tone strongly resembles that of the other five individuals included in the array. The lighting

in at least three other photos is similar in brightness to that of Defendant, which defeats Defendant's argument that the photo array was unduly suggestive due to the lighting and depiction of two darker-skinned individuals. *United States v. Bautista*, 23 F.3d 726, 731 (2d Cir. 1994) ("While it is true that the photograph of Minier-Contreras is slightly brighter and slightly more closeup than the others, we find that these differences did not render the array suggestive."); *Brown*, 167 F. Supp. 3d at 450 ("The other individuals pictured in the array have complexions similar and different than Defendant's in terms of darkness/lightness, but all appear to have similar racial complexions, and the differences in the shades of some of the complexions of some of the individuals depicted does not render the photo array unduly suggestive.")

For these reasons and the reasons stated in Judge Pedersen's R & R, the Court denies this aspect of Defendant's motion. In addition, because the government represented that it does not intend to call the witness who made the separately challenged identification referenced above, the Court finds this aspect of Defendant's motion moot.

**VI. Motion to Suppress Statements**

Defendant argues that "all oral and written statements taken by law enforcement starting on April 1, 2020" should be suppressed. ECF No. 142 at 41. Defendant contends that his statements were made involuntarily and in violation of his Fifth Amendment right against self-incrimination, and therefore, the statements should be suppressed.

Defendant was brought into custody on April 1, 2020, after leading police on a high-speed chase and crashing the Kia Sportage he was driving into a marked police vehicle. Defendant argues that his post-arrest participation in an interview with law enforcement from approximately 10:22 p.m. to 4:20 a.m. was involuntary because he was experiencing significant pain as a result of dog bites he sustained on his right leg—injuries law enforcement was aware of. Defendant claims that law enforcement represented that he would be treated with leniency for his apparent parole violations if he cooperated with law enforcement's questioning, again rendering his participation in the interview involuntary. Defendant's arguments are without merit.

A defendant's statements are voluntary if they are "the product of an essentially free and unconstrained choice[.]" *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). "A statement is involuntary when it [is] extracted by threats, violence or express or

2022 WL 4545256

implied promises sufficient to overbear the [suspect's] will and critically impair his capacity for self-determination." *United States v. LeBrun,* 363 F.3d 715, 724 (8th Cir. 2004). The government bears the burden of demonstrating that the defendant's statements were voluntary. *United States v. Capers,* 627 F.3d 470, 479 (2d Cir. 2010). To determine whether a defendant's statements were made voluntarily, courts look to the totality of the circumstances surrounding the statements. *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir. 1991).

**\*9** Statements made by an injured or hospitalized individual like Defendant are voluntary where, like here, a defendant is "lucid and able to engage the agents in coherent conversation despite the pain attendant to her injury." *United States v. Siddiqui,* 699 F.3d 690, 707 (2d Cir. 2012), *cert. denied,* 569 U.S. 986, 133 S.Ct. 2371, 185 L.Ed.2d 1089 (2013). "Courts tend to view a hospitalized defendant's statements as voluntary where the defendant was lucid and police conduct was not overbearing." *Id.*; *see also Pagan v. Keane,* 984 F.2d 61, 63 (2d Cir. 1993) (finding the defendant's post-*Miranda* statements voluntary where, despite having undergone surgery for significant injuries due to gunshot wounds twenty hours prior, a police officer that conducted the interview described the defendant as "very alert [and] able to answer all our questions with no problem," despite being in a weakened condition, the defendant tried to blame an accomplice demonstrating he understood the nature of the police questioning, and where medical records described him as "awake, alert, and orientated").

With respect to Defendant's argument that the pain he experienced during the police interview rendered his statements involuntary, the Court concludes that the totality of the circumstances does not support a finding that Defendant's statements were made involuntarily. As Judge Pedersen correctly observed, Defendant apparently fell asleep and can be heard snoring around 12:02 a.m., as well as at different times after the police interview was complete, which tends to suggest that Defendant was not in such excruciating pain from his injuries such that his statements may be held to be involuntary. In addition, Defendant provided coherent, timely answers to law enforcement's questions during the interview. Law enforcement signaled their awareness of Defendant's injuries in the interview by asking how he was doing and providing a chair to elevate Defendant's injured leg, but nothing in law enforcement's conduct suggests Defendant's pain or alleged exploitation of the pain factored into Defendant's choice to participate in the police interview.

Similarly, Defendant's statements were not involuntary because of law enforcement's representations to him. It is well established that "[m]aterial misrepresentations based on unfulfillable or other improper promises might perhaps overbear a defendant's will," *United States v. Ruggles,* 70 F.3d 262, 265 (2d Cir. 1995), insofar as "they overcome his desire to remain silent," *United States v. Gaines,* 295 F.3d 293, 299 (2d Cir. 2002). Courts should not, however, imply an improper promise or misrepresentation from vague or ambiguous statements by law enforcement officers, especially with respect to promises of leniency. *See id.* ("[V]ague promises of leniency for cooperation ... generally will not, without more, warrant a finding of coercion."); *United States v. Jaswal,* 47 F.3d 539, 542 (2d Cir. 1995) ("Generally, promises of leniency will not render a confession involuntary.").

Defendant's argument that law enforcement coerced his statements with promises of leniency with respect to Defendant's parole violations is without merit. The totality of the circumstances surrounding Defendant's interview suggest that while law enforcement did offer anecdotes of leniency others had received, law enforcement did not promise or guarantee, directly or indirectly, any type of sentence or punishment to Defendant such that Defendant's statements could be held to be involuntarily given. The evidence shows that while Defendant was told by law enforcement that a defendant's cooperation ordinarily results in some leniency from a prosecutor, he was alternatively informed by Agent Martineck that Defendant was certain to receive "time" for his alleged violations. Even if law enforcement's general statements of potential leniency could have influenced Defendant to participate, law enforcement's conduct in this respect was not so overbearing as to render Defendant's statements involuntary. Law enforcement affirmatively informed Defendant that he would not be spared punishment. The Court accordingly holds that Defendant's statements were not involuntary. For these reasons, this aspect of Defendant's motion is denied.

## CONCLUSION

**\*10** For the foregoing reasons, the Court ADOPTS Magistrate Judge Pedersen's R & R, ECF No. 135, in all respects. Counts 5 and 7 are DISMISSED. Except with respect to Counts 5 and 7, Defendant's motion, ECF No. 94, is DENIED.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 4545256

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 5232749
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Stephen KELLY, Plaintiff,

v.

Jeffrey M. GUZY, Defendant.

No. 8:20-CV-721 (GTS/CFH)
|
Signed 11/10/2021

**Attorneys and Law Firms**

Stephen Kelly, 18-A-3202, Gouverneur Correctional Facility, P.O. Box 480, Gouverneur, New York 13642, Plaintiff pro se.

**REPORT-RECOMMENDATION AND ORDER**

Christian F. Hummel, United States Magistrate Judge

### I. Background

 *1  Plaintiff pro se Stephen Kelly commenced this action on June 29, 2020, with the filing of a complaint and application to proceed in forma pauperis. See Dkt. Nos. 1, 2. In a Report-Recommendation & Order dated September 21, 2020, the undersigned: (1) granted plaintiff's in forma pauperis application, (2) recommended that the Town of Colonie Police Department be dismissed as a defendant with prejudice, and (3) recommended that the complaint otherwise be dismissed without prejudice and with leave to amend. See Dkt. No. 5. On October 15, 2020, plaintiff filed an amended complaint. On November 3, 2020, Chief Judge Suddaby adopted the Report-Recommendation & Order in its entirety. See Dkt. No. 7. Presently before the Court is review of plaintiff's amended complaint pursuant to 28 U.S.C. § 1915.

### II. Initial Review of Amended Complaint

#### A. Legal Standard

Section 1915 of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Thus, it is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting him to proceed with his action.

Where, as here, the plaintiff proceeds pro se, "the court must construe his submissions liberally and interpret them to raise the strongest arguments that they suggest." Kirkland v. Cablevision Sys., 760 F.3d 223, 224 (2d Cir. 2014) (per curiam) (internal quotation marks omitted). However, this does not mean the Court is required to accept unsupported allegations that are devoid of sufficient facts or claims. Although detailed allegations are not required at the pleading stage, the complaint must still include enough facts to provide the defendants with notice of the claims against them and the grounds upon which these claims are based. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic v. Twombly, 550 U.S. 544, 555-56 (2007). Ultimately, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.

Pleading guidelines are set forth in the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Specifically, Rule 8 provides that a pleading which sets forth a claim for relief shall contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "The purpose ... is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." Flores v. Graphtex, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (internal quotation marks and citations omitted). Rule 8 also requires the pleading to include:

 *2  (1) a short and plain statement of the grounds for the court's jurisdiction ...

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought....

FED. R. CIV. P. 8(a). Although "[n]o technical form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct." Id. at 8(d).

Further, Rule 10 of the Federal Rules provides in pertinent part that:

> [a] party must state its claims or
> defenses in numbered paragraphs,
> each limited as far as practicable to
> a single set of circumstances. A later
> pleading may refer by number to
> a paragraph in an earlier pleading.
> If doing so would promote clarity,
> each claim founded on a separate
> transaction or occurrence – and each
> defense other than a denial – must be
> stated in a separate count or defense.

FED. R. CIV. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Flores, 189 F.R.D. at 54 (internal quotation marks and citations omitted). A complaint that fails to comply with the pleading requirements "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). As the Second Circuit has held, "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citations omitted). However, "[d]ismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citations omitted). In such cases of dismissal, particularly when reviewing a pro se complaint, the court generally affords the plaintiff leave to amend the complaint. See Simmons v. Abruzzo, 49 F.3d 83, 86-87 (2d Cir. 1995). A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted).

**B. Amended Complaint**

Plaintiff's amended complaint is essentially identical to his original complaint, the only cognizable difference is that in place of the Town of Colonie Police Department, plaintiff inserts defendant Guzy. See generally Dkt. No. 6. In summary, plaintiff contends that on September 6, 2017, defendant Guzy accused plaintiff of knowingly possessing stolen property. See id. at 3. Plaintiff contends that when he purchased the allegedly stolen bicycle, "there was no indication that it may have been stolen" and he had no reason to believe as such. Id. at 3. Plaintiff further contends that Guzy accused him of knowingly possessing a stolen laptop "which was never reported stolen." Id. Plaintiff contends that the lack of "factual allegations that established that I was aware of the property as having ben [stolen], or as to how, where, and when a theft occurred, [ ] suggests a coerced affidavit." Id.

**\*3** Plaintiff further contends that, as "[t]he charges were in the process of being dismissed in Colonie Court before being transferred to Albany County Court" when "Judge Carter neglected to address their factual sufficiency." Dkt. No. 6 at 3. At some unspecified point thereafter, the charges were suppressed, and then dismissed on December 11, 2018. Id. Plaintiff alleges "false arrest for the first charge" and "false arrest for the second charge." Id. Plaintiff seeks "$250,000 for both claims." Id.

**1. Judicial Immunity**

First, insofar as plaintiff may be seeking to bring a claim against Judge Carter, who plaintiff does not name as a defendant in the caption nor explicitly set forth any claims against, it is recommended that any such claim be dismissed with prejudice as barred by the doctrine of judicial immunity. It is well-settled that judges enjoy absolute immunity from suits for acts performed pursuant to their judicial duties. See Cruz v. New York, No. 5:17-CV-00510 (BKS/TWD), 2017 WL 6021838, at \*18 (N.D.N.Y. Oct. 27, 2017)[1] (citation omitted). "Immunity from suit is overcome in only two narrow circumstances[:] [ (1)] a judge is not immune from liability for non-judicial actions, i.e., actions not taken in a judge's judicial capacity[;(2)] a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." Id. The Supreme Court of the United States has " 'generally concluded that acts arising out of, or related to, individual cases before the judge are judicial in nature.' " Id. (quoting Bliven v. Hunt, 579 F.3d 204, 210 (2d Cir. 2009)).

2021 WL 5232749

[1] Copies of unpublished cases cited within this Report-Recommendation & Order have been provided to plaintiff pro se.

Plaintiff's statement about Judge Carter is sparse, amounting to one line in the amended complaint. See Dkt. No. 6 at 3. Even if plaintiff is attempting to say that Judge Carter's actions somehow deprived him of a constitutional right – such as due process – by declining to address the factual sufficiency of charges against plaintiff, such an act clearly arises out of, or relates to, a case before the judge. See id.; see also Green v. Maraio, 722 F.2d 1013, 1016 (2d Cir. 1983) (holding that "a judge defending against a section 1983 action is entitled to absolute judicial immunity from damages liability for acts performed in his judicial capacity") (citing Dennis v. Sparks, 499 U.S. 24, 27 (1980); Supreme Court of Virginia v. Consumers Union of the U.S., Inc., 446 U.S. 719, 734-35 (1980); Stump v. Sparkman, 435 U.S. 349, 360 (1978)); see also Anonymous v. Kaye, 987 F. Supp. 131, 135 (N.D.N.Y. 1997). Accordingly, as any claim plaintiff may be seeking to raise against Judge Carter relating to his apparent failure to address the "factual sufficiency" of charges against plaintiff – even if repleaded to provide additional clarification and factual support – would necessarily fail due to judicial immunity, it is recommended this apparent claim be dismissed with prejudice.

### 2. False Arrest

Liberally construed, plaintiff's amended complaint appears to seek to bring a claim against defendant Guzy for false arrest in violation of the Fourth Amendment, pursuant to 42 U.S.C. § 1983. See Dkt. No. 6; Bryant v. City of New York, 404 F.3d 128, 135-36 (2d Cir. 2005) (quoting Albright v. Oliver, 510 U.S. 266, 273 (1994) (plurality opinion)).[2] As this Court's prior Report-Recommendation & Order noted, it is possible plaintiff also seeks to proceed on a claim of false arrest under New York State law.[3]

[2] Plaintiff's Amended Complaint is submitted on a form pro se complaint, where he indicates, by checking a box, that he seeks to bring his claim pursuant to 42 U.S.C. § 1983. See Dkt. No. 6 at 1.

[3] Plaintiff's amended complaint does not explicitly indicate that he seeks to bring a claim for false arrest under New York State law. However, interpreting the complaint liberally to raise the

strongest arguments it suggests, as this Court must in light of the special solicitude due to plaintiff, the undersigned finds this a liberal interpretation of the amended complaint warranted.

**\*4** "The elements of a claim for false arrest under § 1983 are substantially derived from New York law." Hawthorne v. City of Albany, No. 1:17-CV-00716 (GTS/TWD), 2017 WL 3822112, at \*6 (N.D.N.Y. July 25, 2017), report and recommendation adopted sub nom. Hawthorne v. Ruecker, No. 1:17-CV-0716 (GTS/TWD), 2017 WL 4351520 (N.D.N.Y. Oct. 2, 2017). "A plaintiff claiming false arrest must establish that: (1) the defendant intended to confine him; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." Id. The United States Supreme Court has made clear that a false arrest claim "consists of detention without legal process...." Wallace v. Kato, 549 U.S. 384, 389 (2007). "Probable cause is a complete defense to a false arrest claim." Hawthorne, 2017 WL 3822112, at \*6 (citing Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996); see Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). Probable cause exists where the officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000). "The court looks only to the information the arresting officer had at the time of the arrest." Peterson v. County of Nassau, 995 F. Supp. 305, 313 (E.D.N.Y. 1998). "Once an officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." Ricciuti v. N.Y.C. Trans. Auth., 124 F.3d 123, 128 (2d Cir. 1997).

Here, plaintiff alleges that defendant Guzy had no information suggesting that the items were stolen or that there existed anything to support a determination that plaintiff knew or should have known that they were stolen. Mindful of the Second Circuit's instruction that a pro se plaintiff's pleadings must be liberally construed, if it is the case at the time of the arrest that the arresting officer had no knowledge or any reason to believe that the items were stolen, it is possible that there as no probable cause. Thus, based on the – albeit sparse – facts plaintiff has provided, it is not clear that probable cause existed.

As for the confinement prong, it is not entirely clear whether plaintiff was arrested or taken into physical custody absent

his consent or justification. See Lacey v. Yates County, 30 F. Supp. 3d 213, 226 (W.D.N.Y. 2014) ("The heart of a false arrest claim is a being taken into physical custody."). However, given that plaintiff contends that he was charged with possession of stolen property, and that these charges were reviewed by a judge, the undersigned finds it appropriate – in light of special solicitude – to assume at this early juncture [4] that plaintiff was in "custody" within the meaning of the Fourth Amendment. See, e.g., Delaney v. City of Albany, No. 1:18-CV-1259 (LEK/ATB), 2019 WL 125769, at *2 (N.D.N.Y. Jan. 7, 2019). Accordingly, plaintiff has pleaded enough for this claim to proceed beyond the initial review stage.

[4]     The undersigned declines to reach whether plaintiff's pleadings would survive a properly-filed dispositive motion on this ground.

### 3. Malicious Prosecution

"To prevail on a Section 1983 claim for malicious prosecution, 'a plaintiff must show a violation of his rights under the Fourth Amendment ... and must establish the elements of a malicious prosecution claim under state law.' " Butler v. Hesch, 286 F. Supp. 3d 337, 355 (N.D.N.Y. Feb. 15, 2018) (quoting Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010) (citations omitted)). "The elements of a malicious prosecution claim under § 1983 are substantially the same as the elements under New York law." Hawthorne, 2017 WL 3822112, at *6.

To state a malicious prosecution claim under New York law, the plaintiff must allege facts plausibly showing: (1) the initiation of a criminal proceeding; (2) its termination favorably to plaintiff; (3) lack of probable cause; and (4) malice. Manganiello v. City of N.Y., 612 F.3d 149, 161 (2d Cir. 2010). In addition, the Second Circuit requires that a plaintiff demonstrate that there was a "post arraignment seizure," since a § 1983 malicious prosecution claim is "grounded ultimately on the Fourth Amendment's prohibition of unreasonable seizures." Swartz v. Insogna, 704 F.3d 105, 112 (2d Cir. 2013).

*5 Id.

Blacks's Law Dictionary defines "criminal proceeding" as "[a] judicial hearing, session, or prosecution in which a court adjudicates whether a person has committed a crime or, having already fixed guilt, decides the offender's

punishment; at a criminal hearing or trial." Black's Law Dictionary (10th ed. 2014). Courts have recognized that entrance of a guilty plea is part of a criminal proceeding. See Florida v. Nixon, 543 U.S. 175, 187 (2004) ("A guilty plea ... is an event of signal significance in a criminal proceeding.") (citations omitted); Davila v. United States, 07-CV-1320, 2008 WL 906691, at *12 (E.D.N.Y. Mar. 31, 2008) (noting that the competency requirement "applies throughout all stages of the criminal proceedings, including the guilty plea").

Cantey v. Martinez, No. 1:1-6CV-0014 (GTS/CFH), 2018 WL 2778268, at *6 (N.D.N.Y. June 6, 2018).

The Second Circuit has held that although "police officers do not generally "commence or continue" criminal proceedings against defendants, a claim for malicious prosecution can still be maintained against a police officer if the officer is found to 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.' " Bermudez v. City of New York, 790 F.3d 368, 377 (2d Cir. 2015) (quotations omitted). "This element might be satisfied by, for example, showing that an officer generated witness statements or was regularly in touch with the prosecutor regarding the case." Id. (citation omitted).

Butler v. Hesch, 286 F. Supp. 3d 337, 356 (N.D.N.Y. 2018).

Here, plaintiff pleads no facts to suggest that defendant Guzy "commenced or continue[d]" criminal proceedings against him. Entirely lacking from the amended complaint are any allegations that Guzy played an "active role" in the prosecution – as opposed to the initiation -- of criminal charges against plaintiff. Butler, 286 F. Supp. 3d at 256. Further unclear is whether plaintiff experienced a "post-arraignment seizure." Hawthorne, 2017 WL 3822112, at *6.

As plaintiff has set forth no factual allegations relating to his malicious prosecution claim, and it is not clear whether plaintiff even intends to proceed with such a claim, it is recommended that, insofar as plaintiff's amended complaint may be liberally interpreted as seeking to bring a claim for malicious prosecution against defendant Guzy under the Fourth Amendment and/or New York State law, such claims be dismissed without prejudice. [5]

[5]     Should the District Judge adopt this Report-Recommendation & Order, permitting plaintiff file

a second amended complaint, plaintiff is advised that any second amended complaint will supersede and replace the amended complaint in its entirety. Plaintiff is not permitted to incorporate any portion of earlier complaints by reference and may not attempt to replead claims already dismissed by this Court with prejudice. Failure to include any facts, claims, or defendants in any second amended complaint will be deemed abandonment of such facts, claims, or defendants.

## III. Conclusion

**\*6** Wherefore, for the reasons set forth herein, it is hereby

**ORDERED**, that plaintiff's false arrest claims **proceed,** and it is

**RECOMMENDED**, that plaintiff's apparent malicious prosecution claims be **DISMISSED WITHOUT PREJUDICE**; and it is further

**RECOMMENDED**, that, insofar as plaintiff's amended complaint may be read as seeking to raise a claim against Judge Carter, such claim be **DISMISSED with prejudice** as barred by the doctrine of judicial immunity; and it is

**ORDERED**, that, following the District Judge's ruling on this Report-Recommendation & Order, the Clerk of the Court return the case to the magistrate judge to address whether service is appropriate at that time; and it is

**ORDERED**, that the Clerk serve this Report-Recommendation & Order on plaintiff in accordance with the Local Rules

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has **FOURTEEN (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. See Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a). [6]

[6]    If you are proceeding pro se and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

**All Citations**

Slip Copy, 2021 WL 5232749

---

**End of Document**          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 160305
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Stephen KELLY, Plaintiff,

v.

Jeffrey M. GUZY, Defendant.

8:20-CV-0721 (GTS/CFH)
|
Signed 01/18/2022

**Attorneys and Law Firms**

STEPHEN KELLY, 18-A-3202, Plaintiff, Pro Se, Gouverneur Correctional Facility, P.O. Box 480, Gouverneur, New York 13642.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

 **\*1** Currently before the Court, in this *pro se* civil rights action filed by Stephen Kelly ("Plaintiff") against Jeffrey M. Guzy ("Defendant"), is United States Magistrate Judge Christian F. Hummel's Report-Recommendation reviewing the pleading sufficiency of Plaintiff's Amended Complaint (Dkt. No. 6), and recommending that any claims asserted therein against Judge Carter be dismissed with prejudice as barred by the doctrine of judicial immunity, that Plaintiff's Section 1983 malicious prosecution claim be dismissed without prejudice, and that his Fourth Amendment false arrest claim survive the Court's sua sponte review. (Dkt. No. 8.)

Plaintiff has not filed an Objection to the Report-Recommendation, and the deadline by which to do so has expired. (*See generally* Docket Sheet.) After carefully reviewing the relevant papers herein, the Court can find no clear error in Magistrate Judge Hummel's thorough Report-Recommendation:[1] Magistrate Judge Hummel employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Report-Recommendation is accepted and adopted in its entirety for the reasons set forth therein.

[1]     When no objection is made to a report-recommendation, the Court subjects that report-

recommendation to only a clear-error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a clear-error review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Hummel's Report-Recommendation (Dkt. No. 8) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that, to the extent that Plaintiff's Amended Complaint (Dkt. No. 6) attempts to assert any claims against Judge Carter, those claims are *sua sponte* **DISMISSED** with **prejudice** for failure to state a claim as barred by the doctrine of judicial immunity;[2] and it is further

[2]     The Court notes that, at least in the Second Circuit, a dismissal based on the doctrine of judicial immunity arises under Fed. R. Civ. P. 12(b)(6) (which permits the dismissal to be with prejudice) and not Fed. R. Civ. P. 12(b)(1) (which permits the dismissal to be merely without prejudice). *See Butcher v. Wendt*, 975 F.3d 236, 241 (2d Cir. 2020) ("Because Butcher's claims against Justice Farneti are barred by absolute judicial immunity, they were correctly dismissed under Rule 12(b)(6).").

**ORDERED** that Plaintiff's Section 1983 malicious prosecution claim in his Amended Complaint is **DISMISSED without prejudice** to refiling during the pendency of this action upon a successful motion to amend pursuant to Fed. R. Civ. P. 15 and Local Rule 15.1; and it is further

 **\*2** **ORDERED** that Plaintiff's Fourth Amendment false arrest claim **SURVIVES** the Court's *sua sponte* review of his Amended Complaint; and it is further

**ORDERED** that the case is returned to Magistrate Judge Hummel to address whether service of process is appropriate at this time.

2022 WL 160305

**All Citations**

Slip Copy, 2022 WL 160305

---

**End of Document**                                       © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3267908
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Nicholas OUDEKERK, Plaintiff,

v.

Glens Falls Police Officer DOE 1; Glens Falls Police
Officer Doe 2; and Warren Prosecutor Doe, Defendants.

5:23-cv-00288 (BKS/TWD)
|
Signed May 5, 2023

**Attorneys and Law Firms**

NICHOLAS OUDEKERK, 21-A-1295, Auburn Correctional
Facility, P.O. Box 618, Auburn, NY 13021, Plaintiff, pro se.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**\*1** The Clerk has sent to the Court a civil complaint filed
by *pro se* plaintiff Nicholas Oudekerk ("Plaintiff") pursuant
to 42 U.S.C. § 1983. (Dkt. No. 1.) Plaintiff, who is currently
incarcerated at the Auburn Correctional Facility, has not paid
the filing fee for this action and seeks leave to proceed
*in forma pauperis* ("IFP"). (Dkt. No. 2.) He also requests
the appointment of counsel. (Dkt. No. 5.) For the reasons
discussed below, the Court grants Plaintiff's IFP application
and recommends that Plaintiff's complaint be accepted in part
for filing.

**I. IFP APPLICATION**
"28 U.S.C. § 1915 permits an indigent litigant to commence
an action in a federal court without prepayment of the filing
fee that would ordinarily be charged." *Cash v. Bernstein*,
No. 09-CV-1922, 2010 WL 5185047, at \*1 (S.D.N.Y. Oct.
26, 2010).[1] "Although an indigent, incarcerated individual
need not prepay the filing fee at the time of filing, he must
subsequently pay the fee, to the extent he is able to do so,
through periodic withdrawals from his inmate accounts." *Id.*
(citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*,
607 F.3d 18, 21 (2d Cir. 2010)).

[1]   The Court has reviewed Plaintiff's litigation history
on the Federal Judiciary's Public Access to
Court Electronic Records ("PACER") Service. *See*
http://pacer.uspci.uscourts.gov. It does not appear
Plaintiff had accumulated three strikes for purposes
of 28 U.S.C. § 1915(g) as of the date this action was
commenced.

Because Plaintiff has met the statutory requirements of 28
U.S.C. § 1915(a), and has filed the inmate authorization form
required in this District, he is granted permission to proceed
IFP. (Dkt. Nos. 2, 3.[2])

[2]   Plaintiff should note that, although the Court has
granted his application to proceed IFP, he will still
be required to pay fees that he may incur in this
action, including copying and/or witness fees.

**II. SUFFICIENCY OF THE COMPLAINT**
Having found Plaintiff meets the financial criteria for
commencing this action IFP, and because he seeks relief from
an officer or employee of a governmental entity, the Court
must consider the sufficiency of the allegations set forth in the
complaint in light of 28 U.S.C. §§ 1915(e) and 1915A.

**A. Standard of Review**
Sections 1915 and 1915A "provide an efficient means by
which a court can screen for and dismiss legally insufficient
claims." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007)
(citing *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)).
The Court shall dismiss a complaint in a civil action if the
Court determines it is frivolous, malicious, fails to state a
claim on which relief may be granted, or seeks monetary relief
against a defendant who is immune from such relief. *See* 28
U.S.C. § 1915(e)(2)(B)(i)-(iii); 28 U.S.C. § 1915A(b)(1)-(2).

A claim is frivolous when it "lacks an arguable basis either in
law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989),
*abrogated on other grounds by Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007); *see also Denton v. Hernandez*, 504 U.S.
25, 33 (1992) (holding that "a finding of factual frivolousness
is appropriate when the facts alleged rise to the level of the
irrational or the wholly incredible"); *Livingston v. Adirondack
Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ("[A]n action
is 'frivolous' when either: (1) the factual contentions are
clearly baseless ... or (2) the claim is based on an indisputably
meritless legal theory.").

**\*2** A complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This short and plain statement of the claim must be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The statement of the claim must do more than present "an unadorned, the-defendant-harmed-me accusation." *Id.* It must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555; *see also* Fed. R. Civ. P. 8(a)(2).

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In reviewing a *pro se* complaint, the court has a duty to show liberality toward *pro se* litigants. *See Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990). The court should exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (emphasis in original) (citations omitted). While the Court will generally afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal, leave to amend pleadings may be denied when any amendment would be futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

### B. Summary of the Complaint

Plaintiff utilized the Court's form complaint for civil rights actions under Section 1983 and attached additional pages to elaborate upon his claims against defendants Glens Falls Police Officer Doe 1, Glens Falls Police Officer Doe 2, and Warren Prosecutor Doe [3] (together "Defendants"). (*See* Dkt. No. 1.) Defendants are sued individually and in their official capacities. *Id.* at 1. Plaintiff asserts allegations of wrongdoing related to his arrest on February 18, 2020. *Id.* at 4.

[3]   Plaintiff also refers to Warren Prosecutor Doe as the Assistant Prosecutor for Warren County Prosecutor's Office and the Warren County Prosecutor.

On February 18, 2020, Plaintiff was arrested at his home by Glens Falld Police Officers Doe 1 and Doe 2. *Id.* at 2. "This arrest was for crimes [Plaintiff] did not commit" including "obstruction of breathing [and] blood flow" and "false imprisonment" of another individual. *Id.*

Plaintiff alleges the arrest was made in violation of his rights under the Fourth, Eighth, and Fourteenth Amendments because (1) Plaintiff did not commit the crimes, and (2) the alleged victim told the police she did not call 911, no crime was committed against her, and she wanted the police to leave. *Id.* Further, the police did not have a warrant or consent to enter Plaintiff's home. *Id.* Plaintiff alleges the police were "deliberately indifferent" because there was "no ground[s] for an arrest." *Id.* Warren Prosecutor Doe also "motioned" the Court for an order of protection, which prevented Plaintiff from being around the alleged victim. *Id.* at 7.

**\*3** In March of 2020, Plaintiff "was informed by the public defender that the charges/order of protection would be dismissed" stemming from the February 18, 2020, arrest. *Id.* However, the charges and order of protection were not dismissed until October of 2020. *Id.* at 8-9.

Through his first cause of action, Plaintiff alleges Glens Falls Police Officers Doe 1 and Doe 2 entered his home "without probable cause" and "arrested" him for "charges that were dismissed later" in violation of the Fourth Amendment. *Id.* at 10. In his second cause of action, Plaintiff claims Glens Falls Police Officers Doe 1 and Doe 2 "punished" him "with a false arrest" based on charges he did not commit in violation of the Eighth Amendment. *Id.* Through his third cause of action, Plaintiff alleges the Warren County Prosecutor violated his "due process" rights and his "rights to life, liberty, [and] property when they took 7 months to dismiss the charges [and] order of [protection]." *Id.* In his fourth cause of action, Plaintiff references the Eighth Amendment and claims the Warren County Prosecutor violated his rights against "cruel [and] unusual punishment" by "taking 7 months" to dismiss the charges and order of protection. *Id.* at 11. Plaintiff alleges the delay, allegedly due to Covid-19 related issues, "was a tactic used to punish" him for crimes he did not commit. *Id.*

Liberally construed, Plaintiff alleges (1) Glens Falls Police Officers Doe 1 and Doe 2 falsely arrested, falsely imprisoned, and maliciously prosecuted [4] him; and (2) Warren Prosecutor Doe denied Plaintiff due process and acted with deliberate indifference. [5] Plaintiff seeks significant monetary damages. *See id.* at 10-11. For a complete statement of Plaintiff's claims, reference is made to the complaint.

[4]     Because Plaintiff alleges he was arrested but never convicted, the Court construes the complaint as asserting a malicious prosecution claim under the Fourth Amendment. *See Lanning v. City of Glens Falls*, 908 F.3d 19, 28 (2d Cir. 2018) ("A § 1983 claim for malicious prosecution essentially alleges a violation of the plaintiff's right under the Fourth Amendment to be free from unreasonable seizure."). Courts have consistently recognized that "the Eighth Amendment does not apply 'until after conviction and sentence.' " *Wright v. New York City*, No. 09-cv-2452, 2012 WL 4057958, at *3 (E.D.N.Y. Sept. 14, 2012) (quoting *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999)); *see also Lindsey v. Butler*, 43 F. Supp. 3d 317, 325 (S.D.N.Y. 2014) ("the Eighth Amendment attaches only after conviction"). Plaintiff's allegations against the arresting police officers, therefore, do not implicate the Eighth Amendment.

[5]     Similarly, because Plaintiff claims the false charges were eventually dismissed, Plaintiff's allegations against the prosecutor do not implicate the Eighth Amendment. *See Graham v. Connor*, 490 U.S. 386, 395 n. 10 (1989).

### C. Analysis

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which establishes a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990).

To state a valid claim under 42 U.S.C. § 1983, a plaintiff must allege that the challenged conduct: (1) was attributable to a person acting under color of state law; and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Whalen v. Cty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997). To establish liability under the statute, a plaintiff must plead that each government official defendant violated the Constitution through that

official's own individual actions. *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). An official may not be held liable for constitutional violations simply because he held a high position of authority. *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016). "Section 1983 claims against municipal employees sued in their official capacity are treated as claims against the municipality itself." *Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 361 (W.D.N.Y. 2021). A municipality cannot be held liable under Section 1983 unless the challenged action was undertaken pursuant to a municipal policy, custom, or practice. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

### 1. Defendant Warren Prosecutor Doe

 **\*4**   The Court liberally construes Plaintiff's complaint as alleging due process and deliberate indifference claims against Warren Prosecutor Doe. Prosecutors enjoy "absolute immunity from § 1983 liability for those prosecutorial activities intimately associated with the judicial phase of the criminal process." *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987). The immunity covers "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995). This includes such functions as "deciding whether to bring charges and presenting a case to a grand jury or a court, along with the tasks generally considered adjunct to those functions, such as witness preparation, witness selection, and issuing subpoenas," *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013), and whether and when to drop charges. *Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981). "This immunity attaches to conduct in court, as well as conduct 'preliminary to the initiation of a prosecution and actions apart from the courtroom.' " *Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 431 n.33 (1976)).

"[O]nce a court determines that challenged conduct involves a function covered by absolute immunity, the actor is shielded from liability for damages regardless of the wrongfulness of his motive or the degree of injury caused." *Bernard v. Cty. of Suffolk*, 356 F.3d 495, 503 (2d Cir. 2004) (citing *Cleavinger v. Saxner*, 474 U.S. 193, 199-200 (1985)). Absolute immunity extends even to a prosecutor who "conspir[es] to present false evidence at a criminal trial. The fact that such a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial, because the immunity attaches to his function, not to the manner in which he performed

it." *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (cleaned up). Immunity even extends to "the falsification of evidence and the coercion of witnesses," *Taylor*, 640 F.2d at 452, "the knowing use of perjured testimony," "the deliberate withholding of exculpatory information," *Imbler*, 424 U.S. at 431 n.34, the "making [of] false or defamatory statements in judicial proceedings," *Burns v. Reed*, 500 U.S. 478, 490 (1991), and "conspiring to present false evidence at a criminal trial," *Dory*, 25 F.3d at 83.

Here, the only conduct Plaintiff alleges against Warren Prosecutor Doe is in connection with her prosecution of Plaintiff. Her decision to continue to prosecute him, notwithstanding his claims of innocence or any other misconduct related to the prosecution, does not deprive Warren Prosecutor Doe of absolute prosecutorial immunity. As stated above, the decision whether to prosecute regardless of the motivation for that decision, along with the decision whether and when to drop charges are protected by absolute immunity. Thus, Warren Prosecutor Doe is immune from suit and liability based on absolute prosecutorial immunity.

Moreover, "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county.' " *Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir. 1993) (quoting *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988), *cert. denied*, 488 U.S. 1014 (1989)); *see also Rich v. New York*, No. 21-CV-3835, 2022 WL 992885, at *5 n.4 (S.D.N.Y. Mar. 31, 2021) ("[A]ny claims Plaintiff may raise against the [District Attorney] Defendants in their 'official capacity' would be precluded by immunity under the Eleventh Amendment."); *Gentry v. New York*, No. 21-CV-0319, 2021 WL 3037709 (GTS/ML), at *6 (N.D.N.Y. June 14, 2021) (recommending dismissal of the plaintiff's claims against the defendant assistant district attorneys in their official capacities—which were effectively claims against the State of New York—as barred by the Eleventh Amendment), *report-recommendation adopted*, 2021 WL 3032691 (N.D.N.Y. July 19, 2021).

**\*5** For these reasons, the Court recommends dismissing Plaintiff's claims against Warren Prosecutor Doe with prejudice pursuant to 28 U.S.C. §§ 1915(e)(i)-(iii) and 1915A(b)(1)-(2). *See Collazo v. Pagano*, 656 F. 3d 131, 134 (2d Cir. 2011) (holding that claim against prosecutor is frivolous if it arises from conduct that is "intimately associated with the judicial phase of the criminal process").

## 2. Defendants Glens Falls Police Officers Doe 1 and Doe 2

The Court liberally construes Plaintiff's complaint as alleging false arrest, false imprisonment, and malicious prosecution claims against the officers. "A Section 1983 claim for false arrest [or false imprisonment] rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Cea v. Ulster Cty.*, 309 F. Supp. 2d 321, 329 (N.D.N.Y. 2004) (quoting (quoting *Sulkowska v. City of N.Y.*, 129 F. Supp. 2d 274, 287 (S.D.N.Y. 2001)). Such claims are one and the same because "[f]alse arrest and false imprisonment overlap; the former is a species of the latter." *Wallace v. Kato*, 549 U.S. 384, 388 (2007).

The elements of a claim for false arrest under § 1983 are the same elements as a claim for false arrest under New York law. *Lewis v. City of New York*, 18 F. Supp. 3d 229, 235 (E.D.N.Y. 2014) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). "Under New York law, the elements of a false arrest and false imprisonment claim are: '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.' " *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (quoting *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016)). "For purposes of the privilege element of a false arrest and imprisonment claim, an act of confinement is privileged if it stems from a lawful arrest supported by probable cause." *De Lourdes Torres v. Jones*, 26 N.Y.3d 742, 759 (N.Y. 2016); *accord Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) ("Probable cause is a complete defense to an action for false arrest.") (citation and internal quotation marks omitted).

"To prevail on a Section 1983 claim for malicious prosecution, 'a plaintiff must show a violation of his rights under the Fourth Amendment ... and must establish the elements of a malicious prosecution claim under state law.' " *Butler v. Hesch*, 286 F. Supp. 3d 337, 355 (N.D.N.Y. Feb. 15, 2018) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (citations omitted)). "The elements of a malicious prosecution claim under § 1983 are substantially the same as the elements under New York law." *Kelly v. Guzy*, No. 8:20-cv-721 (GTS/CFH), 2021 WL 5232749, at *4 (N.D.N.Y. Nov. 10, 2021), *report-recommendation adopted*, 2022 WL 160305 (N.D.N.Y. Jan. 18, 2022).

To state a malicious prosecution claim under New York law, the plaintiff must allege facts plausibly showing: (1) the initiation of a criminal proceeding; (2) its termination favorably to plaintiff; (3) lack of probable cause; and (4) malice. *Manganiello v. City of N.Y.*, 612 F.3d 149, 161 (2d Cir. 2010). "Under New York law, police officers 'initiate' prosecution by filing charges or other accusatory instruments." *Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010). A police officer may also be liable for malicious prosecution when he provides false information. *Watkins v. Town of Webster*, 592 F. Supp. 3d 96, 113 (W.D.N.Y. 2022).

**\*6** Out of an abundance of caution, and mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *Sealed Plaintiff*, 537 F.3d at 191, the Court recommends that Plaintiff's Fourth Amendment false arrest, false imprisonment, and malicious prosecution claims against defendants Glens Falls Police Officers Doe 1 and Doe 2 in their individual capacities survive initial review and require a response. [6] The Court expresses no opinion concerning whether these claims can survive a properly filed motion to dismiss or motion for summary judgment, or whether he may prevail at trial. [7]

[6]    If Plaintiff wishes to pursue his claims against either of the unknown Glens Falls Police Officers, he must take reasonable steps to ascertain through discovery the identity of that individual. Upon learning the identity of an unnamed defendant, Plaintiff must amend the operative complaint to properly name that person as a party. If plaintiff fails to ascertain the identity of the Doe defendant so as to permit timely service of process, all claims against that individual will be dismissed. Rule 4 of the Federal Rules of Civil Procedure require that a party be served within 90 days of issuance of the summons, absent a court order extending that period. Fed. R. Civ. P. 4(m). The Local Rules shorten the time for service from 90 days under Rule 4(m) to 60 days. L.R. 4.1(b).

[7]    Because the failure to file an action within the limitations period is an affirmative defense, a plaintiff is generally not required to plead that the action is timely filed. *See Abbas*, 480 F.3d at 640. *Sua sponte* dismissal is appropriate, however, where the existence of an affirmative defense, such

as the statute of limitations, is plain from the face of the pleading. *See Walters v. Indus. and Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011). Although the complaint was received for filing on March 3, 2023, it is dated December 27, 2022. (Dkt. No. 1.) Following the prison mailbox rule and applying the presumption that Plaintiff delivered the complaint to a prison official on the date it was signed, Plaintiff filed his complaint in this action for statute of limitations purposes on December 27, 2022. *See Houston v. Lack*, 487 U.S. 266, 271 (1988) (a *pro se* litigant's papers are deemed to have been filed when they are placed in the hands of a prison official for mailing); *Johnson v. Coombe*, 156 F. Supp. 2d 273, 277 (S.D.N.Y. 2001) (where it is unclear when the complaint was given to prison officials, absent evidence to the contrary, the court assumes the complaint was given to prison officials the date it was signed). Accordingly, the Court assumes, for purposes of this Report-Recommendation only, that Plaintiff's Section 1983 claims are timely.

However, insofar as the complaint asserts claims against defendants Glens Falls Police Officers Doe 1 and Doe 2 in their official capacities, the Court recommends that such claims be dismissed as Plaintiff has alleged no facts suggesting the existence of a municipal policy, custom, or practice. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (requiring allegations of "a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation" in a claim against a municipal employee in his official capacity).

### D. Service of Process

The Court notes that if the above recommendations are adopted, only Glens Falls Police Officers Doe 1 and Doe 2 remain as defendants. The U.S. Marshals, however, cannot effect service on a "Doe" defendant. The Second Circuit has instructed that district courts should assist incarcerated *pro se* plaintiffs in identifying Doe defendants. *See Valentin v. Dinkins*, 121 F.3d 72, 76 (2d Cir. 1997) (explaining that a "district court may pursue any course that it deems appropriate to a further inquiry into the identity" of a Doe defendant in assisting a *pro se* plaintiff). In this case, Plaintiff has identified the date and location of the alleged incident.

**\*7** Accordingly, in deference to Plaintiff's status as an incarcerated, *pro se* litigant, and mindful of the Court's

obligation to assist such litigants in identifying unknown defendants, the Court recommends that City of Glens Falls Chief of Police, Jarred M. Smith, be named as a defendant in the action solely so that service may proceed and issue may be joined. Once issued is joined, Plaintiff must seek, through discovery, the identity of the Doe defendants. *See, e.g., Paralta v. Doe*, No. 04-CV-6559, 2005 WL 357358, at *2 (W.D.N.Y. Jan. 24, 2005) (permitting the addition of the superintendent to facilitate service and discovery to uncover the identities of the unknown defendants). By recommending this measure, the Court does not suggest in any way that the City of Glens Falls Chief of Police was personally involved in the constitutional deprivations alleged in Plaintiff's complaint or is otherwise subject to liability for the acts giving rise to Plaintiff's claims.

### III. APPOINTMENT OF COUNSEL

Plaintiff requests the appointment of counsel. (Dkt. No. 5.) Plaintiff states that as of May 25, 2023, he will no longer be incarcerated and will be without a residence, income, and access to a law library. *Id.* at 1. He is disabled and uneducated. *Id.* at 2.

There is no right to appointment of counsel in civil matters. *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994). Title 28 of United States Code Section 1915 specifically provides that a court may request an attorney to represent any person "unable to afford counsel." 28 U.S.C. § 1915(e)(1). Appointment of counsel must be done carefully in order to preserve the "precious commodity" of volunteer lawyers for those litigants who truly need a lawyer's assistance. *Cooper v. A. Sargenti, Inc.*, 877 F.2d 170, 172-73 (2d Cir. 1989).

In *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335 (2d Cir. 1994), the Second Circuit reiterated the factors that a court must consider in ruling upon such a motion. In deciding whether to appoint counsel, the court should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider a number of other factors in making its determination. *Id.* at 1341 (quoting *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986)). However, prior to evaluating a request for an appointment of counsel, the plaintiff must make a threshold showing that he is unable to obtain counsel through the private sector or public interest firms. *See Cooper*, 877 F.2d at 173-74.

Here, Plaintiff has not set forth any information detailing his attempts to find an attorney. (*See* Dkt. No. 5.) Moreover,

before counsel is assigned, it must be determined whether Plaintiff's claims are likely to be of substance. *See Terminate Control Corp.*, 28 F.3d at 1341. This action was only recently commenced. Because it is too early in the proceedings for the Court to assess the merits of the action, Plaintiff's motion for counsel (Dkt. No. 5) is denied without prejudice and with leave to renew. [8]

[8]    Any future motion for counsel must be accompanied by evidence of the efforts that Plaintiff has taken to retain counsel on his own, either in the public or private sector.

### IV. SWORN STATEMENT OF FACTS

The Court has reviewed the "Sworn Statement of Facts" filed December 8, 2023. (Dkt. No. 6.) The Court does not construe this document as amending the complaint. To the extent Plaintiff raises new issues and/or complaints about Auburn Correctional Facility, these new complaints are not part of the present action. Plaintiff should address any new complaints through the facility's grievance or other complaint process.

### V. CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that Plaintiff's application to proceed IFP (Dkt. No. 2) is **GRANTED**; and it is further

**RECOMMENDED** that the Clerk provide the superintendent of the facility designated by Plaintiff as his current location with a copy of Plaintiff's Inmate Authorization (Dkt. No. 3), and notify the official that this action has been filed and that Plaintiff is required to pay to the Northern District of New York the statutory filing fee of $350, over time, pursuant to 28 U.S.C. § 1915; and it is further

 **\*8 RECOMMENDED** that the Clerk provide a copy of Plaintiff's Inmate Authorization (Dkt. No. 3) to the Financial Deputy of the Clerk's Office; and it is further

**RECOMMENDED** that the complaint (Dkt. No. 1) be accepted for filing in part; and it is further

**RECOMMENDED** that Plaintiff's claims against Warren Prosecutor Doe be **DISMISSED WITH PREJUDICE** and that Warren Prosecutor Doe be **TERMINATED** as a defendant; and it is further

Case 5:23-cv-00508-GTS-TWD   Document 12   Filed 06/29/23   Page 117 of 135

**RECOMMENDED** that Plaintiff's Fourth Amendment false arrest/false imprisonment and malicious prosecution claims against Glens Falls Police Officers Doe 1 and Doe 2, in their individual capacities, survive initial review and require a response; and it further

**RECOMMENDED** that Plaintiff's Fourth Amendment false arrest/false imprisonment and malicious prosecution claims against Glens Falls Police Officers Doe 1 and Doe 2, in their official capacities, be **DISMISSED**; and it is further

**RECOMMENDED** the Clerk **ADD** the City of Glens Falls Chief of Police, Jarred M. Smith, as a defendant **FOR PURPOSES OF SERVICE AND DISCOVERY ONLY**; and it is further

**RECOMMENDED** that the Clerk be directed to issue a summons and forward it, along with a copy of the complaint to the United States Marshal for service upon City of Glens Falls Chief of Police, Jarred M. Smith, as set forth herein; and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 5) is **DENIED WITHOUT PREJUDICE WITH LEAVE TO RENEW**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[9] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

[9]     If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 3267908

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 3858398
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Shariff ABBAS, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 10–CV–0141S.
|
Signed Aug. 1, 2014.

**Attorneys and Law Firms**

Shariff Abbas, Flushing, NY, pro se.

**DECISION and ORDER**

WILLIAM M. SKRETNY, Chief Judge.

**INTRODUCTION**

*1 Plaintiff Shariff Abbas commenced this *pro se* action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et seq., and other federal laws, alleging violation of his rights while detained at the Buffalo Federal Detention Facility ("BFDF") in Batavia, the Albany County Jail and the Perry County Correctional Center ("PCCC") in Uniontown, Alabama. Currently before the Court for review pursuant to 28 U.S.C. § 1915(e)(2)(B) is plaintiff's amended complaint [1], submitted in response to the Court's Order filed on August 16, 2013 ("August 16 Order") (Docket No. 6), which reviewed plaintiff's original complaint (Docket No. 4), dismissed several of the claims asserted therein, and granted plaintiff leave to file an amended complaint. For the reasons set forth below, plaintiff's FTCA claims against the United States related to his treatment at the BFDF may proceed and his remaining claims will be dismissed.

[1]    Plaintiff's amended complaint is accompanied by two voluminous bound volumes of exhibits captioned "Exhibit [sic] Part 1", containing a Table of Contents and exhibits 1–18 and "Exhibit Part 2", containing a Table of Contents and exhibits 19–40. Given the voluminous nature of the exhibits, numbering hundreds of pages, and

the manner in which they are bound, which would make scanning them very difficult, the Court has not required the Clerk's Office to scan them into the court's electronic filing system. They will instead be maintained in paper form in a separate file in the Clerk's Office. *See* note to Docket No. 6.

**DISCUSSION**

A. *Bivens Claims*

The August 16 Order directed, *inter alia,* that plaintiff's FTCA claims stemming from his detention at the Albany County Jail and the PCCC be dismissed; that plaintiff be granted leave to file an amended complaint adding *Bivens* [2] or other federal claims against individual deportation officers and other personnel at BFDF who he alleges violated his rights; and that in the even he failed to timely file an amended complaint as directed, the Court would issue an Order directing service of the complaint upon the United States as the sole defendant to his medical malpractice claims brought under the FTCA. (Docket No. 5).

[2]    *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

The August 16 Order noted that in addition to his FTCA claims, plaintiffs original complaint asserted a variety of violations of his constitutional rights by individual deportation officers and other personnel during his periods of detention at BFDF and that these claims would be actionable against individual defendants under the *Bivens* doctrine, which allows a plaintiff to pursue constitutional claims against federal officials in their individual capacities for actions taken under color of federal law. *See Lombardi v. Whitman,* 485 F.3d 73, 78 (2d Cir.2007) ("[W]here an individual 'has been deprived of a constitutional right by a federal agent acting under color of federal authority,' the individual may bring a so-called *Bivens* action for damages against that federal agent in an individual capacity, provided that Congress has not forbidden such an action and that the situation presents 'no special factors counseling hesitation in the absence of affirmative action by Congress.' ") (internal citations omitted) (quoting *Thomas v. Ashcroft,* 470 F.3d 491, 496 (2d Cir.2006). The Court determined, however, that the *Bivens* claims could not proceed because of plaintiff's failure to name the individual custody officers and other officials who are alleged to have violated his rights as defendants in

the caption of the complaint, as required by Rule 10(a) of the Federal Rules of Civil Procedure:

**\*2** The Court cannot allow such *Bivens* claims to proceed, however, because of plaintiff's failure to name the individual custody officers and other officials who are alleged to have violated his rights as defendants in the caption of the complaint. Rule 10 of the Federal Rules of Civil Procedure provides that "[t]he title of the complaint must name all the parties" Fed.R.Civ.P. 10(a). Therefore, a party that is not named in the caption of a complaint or amended complaint is not a party to the action.

(August 16 Order at 16) (citations omitted). The Court proceeded to note that plaintiff's failure to name in the caption of the complaint the individual defendants against whom he wished to assert *Bivens* claims would make it infeasible for the Court to determine which of the individual custody officers mentioned in the body of the complaint should be deemed to be defendants to such claims, given the often ambiguous nature of his reference to such individuals. (*Id.* at 16–17). The Court therefore concluded that "[t]he way to remedy plaintiff's failure to name as defendants in the caption of his complaint those individuals against whom he may seek to assert *Bivens* claims, as suggested by the allegations set forth in the body of the complaint, is to afford him leave to file an amended complaint which conforms to the requirements of Rule 10(a)." (*Id.* at 17) (citations omitted). "Accordingly, plaintiff will be afforded the opportunity to file, as directed below, an amended complaint in which he shall name in the caption of the complaint, each of the individuals against whom he intends to assert a *Bivens* claim or claims, in a manner that conforms to the requirements of Rules 8(a) and 10(a) of the Federal Rules of Civil Procedure." (*Id.*).

The Court accordingly directed, in the Conclusion of the August 16 Order, that plaintiff be given leave to file an amended complaint conforming to the requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure, and the Court again explicitly advised plaintiff of his duty to list all defendants in the caption of the complaint:

> Plaintiff is reminded, as explained above, that if he wishes to assert *Bivens* or other claims against defendants other than the United States in the amended complaint, *he must name those individuals in the caption of the amended complaint* and set forth

specific allegations with respect to how those individuals violated his rights.

(*Id.* at 21). (emphasis added).

While plaintiff's amended complaint contains allegations that would support *Bivens* claims (*see* Amended Complaint, ¶¶ 17–42 *passim* ),[3] it does not name in the caption of the complaint any individuals against whom plaintiff is seeking to assert *Bivens* clams, nor does the section of the complaint captioned "PARTIES" list any individual defendants. While plaintiff does, in the section of the amended complaint captioned "CONCLUSION", set forth a list of "Federal Employees from (BFDF) Health Division" (Amended Complaint ¶ 57), which includes individuals mentioned elsewhere in the amended complaint in connection with plaintiff's allegations that would be relevant to *Bivens* claims, the individuals named therein are not listed as defendants in the caption of the amended complaint or in plaintiff's recital of the parties to this action at the beginning of the amended complaint; as noted *supra,* plaintiff lists only one defendant-the United States-in the complaint caption and in his recital of the parties. Moreover, plaintiff's statement of relief sought at the end of the amended complaint (captioned "PRAYER") demands judgment "against *the defendant.*" (*Id.* at p. 16) (emphasis added).[4]

3       Plaintiff divides his claims into two sections of the amended complaint, namely "Medical Malpractice" (Amended Complaint, p. 3–5, ¶¶ 8–16), which contains allegations supportive of his FTCA claims, and "U.S. D.H.S.-ICE Agency and Custody Officers Abuses" (*Id.* at p. 5–14, ¶¶ 17–56), which contains allegations supportive of his *Bivens* constitutional claims. The Court notes, however, that a number of the allegations set forth in the "Federal Agency and Custody Officers Abuses" section of the complaint are relevant to his FTCA malpractice claims. *See, e.g.,* Amended Complaint, ¶ 21.

4       Plaintiff's failure to include in the caption of the amended complaint the names of any defendants against whom he is asserting *Bivens* claims is not the only instance of his disregard of the Court's directives regarding the form and content of his

amended complaint. The August 16 Order noted that many of the *Bivens* claims that plaintiff's allegations would support against individuals identified in the body of the complaint appeared to be barred by the statute of limitations. August 16 Order at 18. The Court accordingly directed as follows:

> In the amended complaint that plaintiff will be given leave to file, as provided below, in which he must demonstrate either that his *Bivens* claims stemming from his incarceration at BFDF are timely or, if any such Bivens claims are untimely, he must allege facts demonstrating why equitable tolling should be applied to the statute of limitations periods for such claims.

(August 16 Order at 19). As noted *supra,* the August 16 Order provided that plaintiff would be given leave to file an amended complaint with respect to his *Bivens* claims, and plaintiff was further advised, in this regard, "that he should address the timeliness of any *Bivens* claims that he asserts in the amended complaint and any argument as to why the limitations period applicable to such claims should be equitably tolled." (August 16 Order at 21). However, plaintiff's amended complaint does not address the timeliness issue or offer any basis for equitable tolling of the limitations period. Given the Court's dismissal herein of the *Bivens* claims based upon plaintiff's failure to identify the defendants against whom he seeks to assert such claims, the Court need not further address the timeliness issue.

Plaintiff further disregarded the August 16 Order to the extent that he reasserts claims stemming from his detention at the Albany County Jail from February 21, 2006–March 21, 2006, and the Perry County Correctional Center ("PCCC") in Uniontown Alabama from August 5, 2006–February 9, 2007. (Amended Complaint at ¶¶ 14, 15, 28–40). The August 16 Order dismissed the claims stemming from plaintiff's incarceration at those facilities pursuant to 28 U.S.C. § 1406(a) for improper venue. (August 16 Order at 13–14). Those claims remain dismissed.

**\*3** The Court's duty to construe liberally the pleadings of *pro se* litigants does not absolve *pro se* litigants from the duty to comply with the requirements of the Federal Rules

of Civil Procedure and court orders issued pursuant to those rules. *See, e .g., Caidor v. Onondaga County,* 517 F.3d 601, 605 (2d Cir.2008) (noting that *pro se* litigants are required to familiarize themselves with procedural rules and comply with such rules); *McDonald v. Head Criminal Court Supervisor Officer,* 850 F.2d 121, 124 (2d Cir.1988) ("[W]hile *pro se* litigants may in general deserve more lenient treatment than those represented by counsel, all litigants, including *pro ses,* have an obligation to comply with court orders. When they flout that obligation they, like all litigants, must suffer the consequences of their actions.")). As discussed *supra,* this Court's previous order explained to plaintiff the requirement of Rule 10(a) that all defendants to an action be named and identified as such in the caption to the complaint, and the Court afforded him the opportunity to cure the defect in his initial complaint by filing an amended complaint naming all defendants. Plaintiff has inexplicably failed to comply with the Court's order and the requirement of Rule 10(a). Accordingly, to the extent that plaintiff seeks to bring *Bivens* claims against individual Custody Officers and other BFDF officials, *see* Amended Complaint, ¶ 58 ("Plaintiff want [sic] this Court to bring Justice against Federal Agency Employees who Violate constitutional law against Plaintiff's rights"), such claims must be dismissed in light of his failure to name those individuals as defendants in the caption of the amended complaint. *See, e.g., Ferdik v. Bonzelet,* 963 F.2d 1258, 1262–63 (9th Cir.1992) (dismissing action for refusal to comply with court orders to name defendants in the caption as required by Rule 10(a)).

Moreover, as explained in the August 16 Order (pp. 14–15), constitutional claims under *Bivens* cannot be brought against the only defendant named in the complaint, the United States. *See Robinson v. United States Bur. Of Prisons,* 244 F.Supp.2d 57, 66 (N.D.N.Y.2003) ("[A] *Bivens* action may not be maintained against the United States.") (citing *Washington v. DEA,* 183 F.3d 868, 872 n. 8 (8th Cir.1999). Nor can constitutional claims be asserted against the United States under the FTCA. *See Washington,* 183 F.3d at 873; *Russ v. United States,* 62 F.3d 201, 204 (7th Cir.1995) ("[C]onstitutional wrongs cannot be remedied through the FTCA,") (citing *FDIC v. Meyer,* 510 U.S. 471, 476, 114 S.Ct. 996, 1001–02, 127 L.Ed.2d 308(1994)).

Plaintiff having thus having failed to name a proper defendant to his *Bivens* claims, the Court concludes that his *Bivens* claims must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim on which relief can be granted.

B. *Treaty Claims*

The Conclusion section of the amended complaint invokes, as a basis for relief against defendant United States not raised in plaintiffs original complaint, treaties to which the United States is a signatory. Specifically, the amended complaint states "At such time and places the United States violates International Laws as A[sic] result the United States are not in compliance with Refugee Convention Requirements or The United Nations Convention against Torture Prohibitions." (Amended Complaint, § 57). It is well established that the United Nations Convention Against Torture and Other Cruel, Inhumane or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, 23 I.L.M. 1027, ("CAT") does not give rise to a private right of action. *Renkel v. United States,* 456 F.3d 640, 644 (6th Cir.2006) ("As the Articles [of CAT] are not self-executing, they do not create private rights of action; therefore, any private lawsuit seeking to enforce the United States' obligations under the Convention must be based on domestic law."); *Wolinski v. Junious,* 2012 U.S. Dist. LEXIS 65889, at *18–19,2012 WL 1657576 (E.D.Cal. May 10, 2012) ("The CAT does not give rise to a private right of action because it is not self-executing.) (citing *Akhtar v. Reno,* 123 F.Supp.2d 191, 196 (S.D.N.Y.2000),

**\*4** The United Nations Convention Relating to the Status of Refugees, adopted July 28, 1951, art. 26, 19 U.S.T. 6259, 6576, 189 U.N.T.S. 150, 172 ("Refugee Convention") likewise does not create a private right of action. *United States v. Casaran–Rivas,* 311 Fed. Appx. 269, 272 (11th Cir.2009) (unpublished) ("[A]rgument that the indictment violated the refugee Convention and CAT Treaty is without merit, as the Refuge[e] Convention and CAT Treaty are not self-executing, or subject to relevant legislation, and, therefore, do not confer upon aliens a private right of action to allege a violation of their terms."); *Reyes–Sanchez v. Ashcroft,* 261 F.Supp.2d 276, 288–89 (S.D.N.Y.2003) ("Because the Refugee Convention is not self-executing, it does not create individual rights.").

Accordingly, plaintiff's claims against the United States under CAT and Refugee Convention are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim on which relief may be granted.

C. *FTCA Claims*

The medical malpractice-related claims under the FTCA asserted by plaintiff in the amended complaint and stemming from his detention at BFDF may go forward against defendant United States. [5]

[5] As explained in the August 16 Order, plaintiff's allegations of medical malpractice and the failure to properly treat his serious medical condition are clearly cognizable under the FTCA when asserted against the United States. (August 16 Order at 6).

### *ORDER*

IT IS HEREBY ORDERED, that plaintiff's *Bivens* claims are dismissed with prejudice;

FURTHER, that plaintiff's claims under CAT and the Refugee Convention are dismissed with prejudice;

FURTHER, that the Clerk of the Court is directed to complete, on plaintiff's behalf, and to issue, a summons for service of process on defendant United States of America;

FURTHER, the Clerk of the Court is directed to send copies of the Summons, Amended Complaint, [6] and this Order by certified mail to the following, pursuant to Rule 4(i) of the Federal Rules of Civil Procedure:

[6] As explained in n. 1, *supra,* plaintiff's voluminous exhibits to the amended complaint are maintained in paper form in a separate file folder in the Clerk's Office.

• Attorney General of the United States, Main Justice Building, 10th and Constitution Avenues N.W., Washington, DC 20530;

• Civil Process Clerk, United States Attorney for the Western District of New York, United States Attorney's Office, USAO/WDNY, 138 Delaware Avenue, Buffalo, New York 14202.

SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 3858398

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2375814
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Vidal WHITLEY, Plaintiff,

v.

Major KRINSER, Sgt. Robin Brown, Captain Winters,
Corporal Conklin, Deputy Johnson, Lt. Prinzi, Corporal
Carlo, Lt. Santillo, Sgt. Garcia, Major Kasacey,
Corporal Peck, and Deputy Galling, Defendants.

No. 06-CV-0575F.
|
Aug. 15, 2007.

**Attorneys and Law Firms**

Vidal Whitley, Willard, NY, pro se.

**DECISION and ORDER**

WILLIAM M. SKRETNY, United States District Judge.

**INTRODUCTION**

*\*1* By an Order dated February 8, 2007, plaintiff *pro se* Vidal Whitley was granted permission to file a second amended complaint in this action pursuant to 42 U.S.C. § 1983 to specifically address issues relating to defendants Kasacey, Krinser and Peck. For the reasons stated below, plaintiff's second amended complaint is dismissed and the amended complaint is allowed to go forward at this stage against all named defendants except as to defendants Krinser, Kasacey and Peck.

**DISCUSSION**

Section 1915(e) (2)(B) of 28 U.S.C. provides that the Court shall dismiss a case in which *in forma pauperis* status has been granted if, at any time, the Court determines that the action "(ii) fails to state a claim upon which relief may be granted." Based on its evaluation of the complaint, the Court finds that plaintiff's claims against defendants Krinser, Kasacey and Peck must be dismissed pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) because they fail to state a claim upon which relief

may be granted. Despite direction to specify what Krinser, Kasacey and Peck were responsible for, plaintiff's second amended complaint does not allege sufficient facts to state claims against Krinser, Kasacey and Peck.

In addition, plaintiff was directed that his second amended complaint "should name in the caption all of the people plaintiff wishes to hold responsible for each violation. Plaintiff has alleged that people who are not named in the caption were responsible for violation his rights. However, if these people are not also named in the caption of the second amended complaint, they will not be defendants in the case." (Docket No. 11.) Because plaintiff has not named any additional defendants in the second amended complaint, has not included the allegations against the remaining defendants named in his amended complaint, and has failed to state a claim against Krinser, Kasacey and Peck, the second amended complaint is dismissed in its entirety. However, because of plaintiff's *pro se* status and his minimal literacy, the Court will deem the amended complaint the operative pleading in this case and allow it to proceed against all named defendants except Krinser, Kasacey and Peck.

**CONCLUSION**

For the reasons set forth above, plaintiff's claims against defendants Krinser, Kasacey and Peck are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and the amended complaint shall be served on the remaining defendants set forth in the caption above.

**ORDER**

IT HEREBY IS ORDERED, that the claims against Krinser, Kasacey and Peck are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B); and,

FURTHER, the Clerk of the Court is directed to correct the docket to reflect that Sgt. Robin Brown, Captain Winters, Corporal Conklin, Deputy Johnson, Lt. Prinzi, Corporal Carlo, Lt. Santillo, Sgt. Garcia and Deputy Galling are defendants in this action; and,

FURTHER, the Clerk of the Court is directed to cause the U.S. Marshal to serve the amended complaint (Docket No. 10) and this Order upon the remaining defendants, Sgt. Robin Brown, Captain Winters, Corporal Conklin, Deputy Johnson, Lt.

2007 WL 2375814

Prinzi, Corporal Carlo, Lt. Santillo, Sgt. Garcia and Deputy Galling.

**All Citations**

**\*2**  SO ORDERED.

Not Reported in F.Supp.2d, 2007 WL 2375814

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 4225226
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jerry RAMRATTAN, Plaintiff,

v.

The State of NEW YORK, et al., Defendants.

9:22-CV-0025 (GTS/ATB)
|
Signed September 13, 2022

**Attorneys and Law Firms**

JERRY RAMRATTAN, Plaintiff, pro se, 12-A-0608, Eastern
NY Correctional Facility, Box 338, Napanoch, NY 12458.

**DECISION AND ORDER**

GLENN T. SUDDABY, United States District Judge

**I. INTRODUCTION**

**\*1** In December 2021, plaintiff Jerry Ramrattan ("plaintiff")
filed a pro se complaint pursuant to 42 U.S.C. § 1983
("Section 1983"), the Americans with Disabilities Act
("ADA"), 42 U.S.C. § 12101, et seq., and Section 504 of the
Rehabilitation Act ("RA") asserting claims arising out of his
confinement in the custody of the New York State Department
of Corrections and Community Supervision ("DOCCS").
Dkt. No. 2 ("Compl."). Plaintiff, who was confined at Eastern
Correctional Facility ("Eastern C.F.") at the time he filed the
action, did not pay the statutory filing fee and sought leave
to proceed in forma pauperis ("IFP"). Dkt. No. 13 ("IFP
Application"). In a Decision and Order filed on May 2, 2022
(the "May Order"), the Court held plaintiff's IFP application
in abeyance pursuant to the "three strikes" rule set forth in 28
U.S.C. § 1915(g) ("Section 1915(g)"). Dkt. No. 17. In light
of his pro se status, plaintiff was afforded thirty (30) days in
which to either (i) file an amended complaint demonstrating
that the "imminent danger" exception in Section 1915(g) was
applicable, or (ii) pay the Court's filing fee of four hundred
and two dollars ($402.00) in full. Id.

On July 1, 2022, plaintiff filed a second IFP Application and
an amended complaint. Dkt. No. 21 ("Sec. IFP Application");
Dkt. No. 22 ("Am. Compl."). In a Decision and Order filed
on July 13, 2022, the Court denied plaintiff's second IFP
application pursuant to Section 1915(g) because the amended

complaint lacked any allegations which plausibly suggested
that plaintiff was at risk of suffering a serious physical
injury when he commenced this action. Dkt. No. 23. Because
plaintiff had already been afforded an opportunity to amend
his complaint, he was advised that if he wished to proceed
with the action he must, within thirty (30) days, pay the
statutory filing fee of four hundred and two dollars ($402.00)
in full. Id.

On August 1, 2022, plaintiff paid the statutory filing fee.
Presently before the Court for review are the amended
complaint (Dkt. No. 22), plaintiff's motion for counsel (Dkt.
No. 11), and plaintiff's motion for a preliminary injunction
(Dkt. No. 20).

**II. SUFFICIENCY OF THE AMENDED COMPLAINT**

**A. Standard of Review**

Under 28 U.S.C. § 1915A, a court must review any
"complaint in a civil action in which a prisoner seeks redress
from a governmental entity or officer or employee of a
governmental entity" and must "identify cognizable claims or
dismiss the complaint, or any portion of the complaint, if the
complaint ... is frivolous, malicious, or fails to state a claim
upon which relief may be granted; or ... seeks monetary relief
from a defendant who is immune from such relief." 28 U.S.C.
§ 1915A(b); see also Carr v. Dvorin, 171 F.3d 115, 116 (2d
Cir. 1999) (per curiam) (Section 1915A applies to all actions
brought by prisoners against government officials even when
plaintiff paid the filing fee).

When reviewing a complaint, the court may also look to the
Federal Rules of Civil Procedure. Rule 8 of the Federal Rules
of Civil Procedure provides that a pleading that sets forth a
claim for relief shall contain "a short and plain statement of
the claim showing that the pleader is entitled to relief." Fed. R.
Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of
the claim being asserted so as to permit the adverse party the
opportunity to file a responsive answer, prepare an adequate
defense and determine whether the doctrine of res judicata is
applicable." Hudson v. Artuz, No. 95 CIV. 4768, 1998 WL
832708, at *1 (S.D.N.Y. Nov. 30, 1998) (quoting Brown v.
Califano, 75 F.R.D. 497, 498 (D.D.C. 1977)).

**\*2** A court should not dismiss a complaint if the plaintiff
has stated "enough facts to state a claim to relief that is
plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S.
544, 570 (2007). "A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (quoting Fed. Rule Civ. Proc. 8(a)(2)). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

While pro se parties are held to less stringent pleading standards, the Second Circuit has held that "district courts may dismiss a frivolous complaint sua sponte even when the plaintiff has paid the required filing fee." *See Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000). Indeed, "district courts are especially likely to be exposed to frivolous actions and, thus, have [a] need for inherent authority to dismiss such actions quickly in order to preserve scarce judicial resources." *Id.* at 364. A cause of action is properly deemed frivolous "where it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

The Court will construe the allegations in the amended complaint with the utmost leniency. *See, e.g.*, *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (holding that a pro se litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers.").

### B. Summary of the Amended Complaint [1]

[1] The amended complaint includes exhibits. *See* Dkt. No. 22-1 through 22-5. To the extent that the exhibits are relevant to the incidents described in the amended complaint, the Court will consider the amended complaint as well as any documents attached as exhibits. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference).

The following facts are set forth as alleged by plaintiff in his amended complaint.

Plaintiff, a legally blind inmate, requested and received reasonable accommodations for his visual/hearing impairments. Am. Compl. at 2. In September 2019, plaintiff was transferred to Eastern C.F. and assigned to the Sensorial Disability Unit ("SDU"). *Id.* at 2. Shortly after arriving at Eastern C.F., plaintiff encountered difficulties accessing his accommodations; specifically with defendant Interpreter Heidi Lewis ("Lewis"). *Id.* at 4. As a result, plaintiff "notified" outside agencies. *Id.*

On January 16, 2020, plaintiff was interviewed by a representative affiliated with "Disability Rights New York" and advocates from Legal Aid Society. Am. Compl. at 5. The same day, administrators "notified" defendant Dr. Mikhail Gusman ("Gusman"). [2] *Id.* Gusman began "probing into plaintiff's medical files [...] to find a way to remove him from SDU and strip[ ] him" of his reasonable accommodations. *Id.* On January 16, 2020, Gusman and defendant Deputy Superintendent of Programs Cheryl Morris ("Morris") directed Lewis to confiscate plaintiff's accommodations and to transfer plaintiff to general population. *Id.*; Dkt. No. 22-1 at 9-12. Lewis confiscated plaintiff's cane, talking watch, lamp, lighted magnifying glass, head phones, talking calculator, digital book player, sunglasses, and hat. Am. Compl. at 5-6. Additionally, the following services were discontinued: access to the SDU computer in the law library and recreational basement; access to the resource room for the visually/hearing impaired, and a mobility sight guide. *Id.* at 6. On January 17, 2020, plaintiff was transferred to general population. Am. Compl. at 3-4.

[2] The amended complaint lacks facts related to the sum and substance of the alleged "notification."

**\*3** In June 2020, plaintiff renewed his request for reasonable accommodations. Dkt. No. 22-3 at 111, 114. Gusman executed the "medical verification" indicating that plaintiff, "refused optometry consult." *Id.* Plaintiff's request was denied. *Id.*

In February 2021, plaintiff filed another request for reasonable accommodations. Dkt. No. 22-3 at 102. Gusman noted "no medical verification" on file and plaintiff's request was denied. *Id.*

In September 2021, plaintiff submitted a third request for accommodations. Dkt. No. 22-2 at 17-18. Lewis' signature appears on the request. *Id.* Gusman denied plaintiff's request noting, "non-significant hearing loss" and "no medical verification on file." *Id.*

Construed liberally, [3] plaintiff asserts the following: (1) First Amendment retaliation claims against Gusman and Morris; (2) Eighth Amendment deliberate medical indifference claims; (3) ADA claims; and (4) state law claims. *See generally* Am. Compl. Plaintiff seeks monetary damages and for an order directing defendants to restore all reasonable accommodations. *Id.* at 15. For a complete statement of plaintiff's claims and the facts he relies on in support of those claims, reference is made to the amended complaint.

[3]    The Court is mindful of the Second Circuit's instruction that a pleading by a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that it suggests. *See, e.g., Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts" that a pro se plaintiff's pleadings must be construed liberally); *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir. 2005) ("We leave it for the district court to determine what other claims, if any, [plaintiff] has raised. In so doing, the court's imagination should be limited only by [plaintiff's] factual allegations, not by the legal claims set out in his pleadings."); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994) ("[W]e read [a pro se litigant's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest.").

### III. ANALYSIS

#### A. Eleventh Amendment

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *see also Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890).

Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer,* 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through Section 1983, *see Quern v. Jordan,* 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the type of claims asserted in Plaintiff's complaint. *See generally Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38-40 (2d Cir. 1977); *see also Dawkins v. State of New York,* No. 93-CV-1298 (RSP/GJD), 1996 WL 156764 at *2 (N.D.N.Y. 1996).

*\*4*  Accordingly, plaintiff's claims against the State of New York is dismissed as plaintiff seeks relief from a defendant immune from suit under section 1983. *See LeGrand v. Evan,* 702 F.2d 415, 417 (2d Cir. 1983); *see also Dicks v. Binding Together, Inc.,* No. 03 CIV 7411, 2007 WL 1462217, at *5 (S.D.N.Y. May 18, 2007) (dismissing the plaintiff's claims for prospective injunctive relief against the State of New York as barred by the Eleventh Amendment) *aff'd in part sub nom. Dicks v. Chow,* 382 Fed. App'x 28 (2d Cir. 2010); *see also deBroize v. New York State,* No. 99-CV-0904 (NAM), 2001 WL 1217192, at *3 (N.D.N.Y. Sept. 21, 2001) (dismissing ADA claims against State of New York). Similarly, plaintiff's claims for monetary damages pursuant to section 1983 against defendants in their official capacities are barred by the Eleventh Amendment and are dismissed with prejudice pursuant. *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985) (a claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by the Eleventh Amendment); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities.").

#### B. First Amendment - Retaliation

Plaintiff asserts that Gusman and Morris retaliated against plaintiff for complaints to "outside agencies" and confiscated plaintiff's reasonable accommodations.

To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (1) the speech or conduct at issue was "protected;" (2)

2022 WL 4225226

the defendants took "adverse action" against the plaintiff – namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004). The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dawes*, 239 F.3d at 491, *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

The Second Circuit has defined "adverse action" as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill*, 389 F.3d at 381 (citation omitted) (omission in original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.; see also Ford v. Palmer,* 539 Fed. App'x 5, 7 (2d Cir. 2013) ("The Court must apply the "objective test [for First Amendment retaliation] [...] even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits."). Conduct that is de minimis does not give rise to actionable retaliation. *Dawes*, 239 F.3d at 493. What is de minimis varies according to context. *Id.* "Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.* at 491 (*quoting Thaddeus-X v. Blatter*, 175 F.3d 378, 386-87 (6th Cir. 1999) (en banc) (per curiam)). If a retaliatory act against an inmate would not be likely to "chill a person of ordinary firmness from continuing to engage" in a protected activity, "the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Id.* at 493.

**\*5** A plaintiff can establish a causal connection that suggests retaliatory intent by showing that his protected activity was close in time to the complained-of adverse action. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2001) (citations omitted). While there is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a

causal relationship," *Gorman-Bakos v. Cornell Coop. Extn. of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001), "the interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months." *Ashok v. Barnhart*, 289 F.Supp.2d 305, 314 (E.D.N.Y. 2003).

Upon review and with due regard for plaintiff's status as a pro se litigant, the Court finds that plaintiff's First Amendment retaliation claims against Gusman and Morris survive initial review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### C. Eighth Amendment - Deliberate Medical Indifference

Plaintiff alleges that Gusman was deliberately indifferent to his serious medical needs. Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. at 102, 104 (1976). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle*, 429 U.S. at 104). "First, the alleged deprivation must be, in objective terms, sufficiently serious." *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted). Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). "Second, the defendant must act with a sufficiently culpable state of mind," *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted); that is, the plaintiff must demonstrate that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837; *see also Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) (With respect to the subjective element, a plaintiff must also demonstrate that defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' ").

Even assuming that plaintiff suffered from serious medical needs, plaintiff does not set forth facts to plausibly suggest that defendant denied him medical care for those needs. Plaintiff does not allege that he requested, and was denied, medical care from Gusman. There is nothing in the amended

complaint to suggest that defendant knew of and disregarded an excessive risk to plaintiff's health. Plaintiff's allegations, even when generously construed, fail to state any deliberate indifference claim against defendant.

Accordingly, plaintiff's Eighth Amendment medical indifference claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915A for failure to state a claim upon which relief may be granted.

### D. ADA and RA

Title II of the ADA provides, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the RA, "protects a 'qualified individual with a disability' from exclusion of participation, denial of the benefits, or subjection to discrimination 'under any program or activity receiving Federal financial assistance,' because of the individual's disability." *Harrington v. Vadlamudi*, No. 9:13-CV-0795(LEK/RFT), 2014 WL 4829483, at *3 (N.D.N.Y. Sept. 29, 2014) (citing 29 U.S.C. § 749(a)). The ADA and RA are applicable to inmates in state correctional facilities. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998). To successfully plead a Title II or RA claim, a plaintiff must establish three elements: (1) the plaintiff is a qualified individual with a disability, (2) the defendant is subject to the ADA or Rehabilitation Act, and (3) based on the plaintiff's disability, the plaintiff was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003); *Allah v. Goord*, 405 F.Supp.2d 265, 274 (S.D.N.Y. 2005).

**\*6** Generally, under the ADA and RA, a state official may not be sued in their individual capacity. *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) ("Insofar as *Garcia* is suing the individual defendants in their individual capacities, neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials.").

In the Second Circuit, it is unsettled whether an individual defendant can be sued in their official capacity to defend against ADA or Rehabilitation Act claims. *See Monroe v. Gerbing*, 16-CV-2818, 2017 WL 6614625, at *15 (S.D.N.Y. Dec. 27, 2017) (collecting cases illustrating the inconsistent holdings as to whether individuals, in their official capacity, can be sued under the ADA or RA). On one hand, generally, some district courts within the Second Circuit have held that the ADA and RA do not provide for liability against defendants in their official capacities. *Id.* In limited instances, the Second Circuit has allowed "an ADA claim for damages against a state (or state agency or official)" to proceed but only "if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability." *Id.*; *Garcia*, 280 F.3d at 112. On the other hand, some district courts within the Second Circuit have allowed for a defendant to be sued in their official capacity under the ADA and Rehabilitation Act for injunctive relief, but not for damages. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (permitting a claim against individual defendants to be asserted only if the plaintiff was seeking injunctive relief). Under the ADA, an individual can be sued for injunctive relief in their official capacity because the individual is effectively a "public entity" where "the government is the real party in interest in an official capacity suit." *Henrietta D.*, 331 F.3d at 288.

Upon review and with due regard for plaintiff's status as a pro se litigant, the Court finds that plaintiff's ADA and RA claims survive initial review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### E. State Law Claims

District courts have supplemental jurisdiction over all state law claims that are so related to federal claims over which they exercise original jurisdiction that they form part of the same case or controversy under Article III of the Constitution. 28 U.S.C. § 1367(a) (2000).

### 1. Negligence

"Under New York law ... a plaintiff must establish three elements to prevail on a negligence claim: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 177 (2d Cir. 2013) (quoting *Alfaro v. Wal–Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000)).

Because plaintiff's negligence claim arises out of the same facts upon which his federal claims are based, the Court will exercise supplemental jurisdiction over this claim.

### 2. Intentional Infliction of Emotional Distress

The statute of limitations for intentional torts such as intentional infliction of emotional distress is one year in New York. N.Y.C.P.L.R. § 215(3). Plaintiff's intentional infliction of emotional distress claims are based on the same conduct that gives rise to his federal claims. Because plaintiff filed his complaint on October 28, 2021, plaintiff's state law claim for intentional infliction of emotional distress is untimely filed and therefore dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. [4]

[4]   Following the mailbox rule and applying the presumption that plaintiff delivered the complaint to a prison official on the date it was signed. *See Houston v. Lack*, 487 U.S. 266, 271 (1988) (a pro se litigant's papers are deemed to have been filed when they are placed in the hands of a prison official for mailing); *Johnson v. Coombe*, 156 F.Supp.2d 273, 277 (S.D.N.Y. 2001) (where it is unclear when the complaint was given to prison officials, absent evidence to the contrary, the court assumes the complaint was given to prison officials the date it was signed).

### IV. MOTION FOR COUNSEL

**\*7**  Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin*, 114 F.3d 390, 392-93 (2d Cir. 1997). Instead, a number of factors must be considered by the Court when ruling on such a motion. *Hendricks*, 114 F.3d at 392. As a threshold matter, the Court should ascertain whether the indigent's claims seem likely to be of substance. *Id.* (citing *Hodge v. Police Officers*, 802 F.2d 58, 61-62 (2d Cir. 1986)). If so, the following should then be considered:

> [T]he indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case,

the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Hodge*, 802 F.2d at 61-62; *accord, Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341 (2d Cir. 1994). None of the foregoing factors are controlling in a particular case, and each case must be decided on its own facts. *Velasquez v. O'Keefe*, 899 F.Supp. 972, 974 (N.D.N.Y. 1995) (McAvoy, J.) (citing *Hodge*, 802 F.2d at 61).

This action is in its earliest stages. Indeed, this Decision and Order accepts for filing the amended complaint pursuant to Section 1915A – a threshold ruling that expresses no opinion whatsoever on the likely substance of the limited claims that survive initial review. Moreover, defendants have not yet been served or answered. On that basis alone plaintiff's motion is denied.

### V. MOTION FOR PRELIMINARY INJUNCTION

Plaintiff seeks an order directing defendants to allow him access to the SDU computer. *See* Dkt. No. 20.

Preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The standard a court must utilize in considering whether to grant a request for injunctive relief is well-settled in this Circuit. *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35, 38 (2d Cir. 2010). To prevail on a motion for preliminary injunctive relief, a plaintiff must demonstrate irreparable harm and either a substantial likelihood of success on the merits of the claim, or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor. *Id.* at 35; *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405-06 (2d Cir. 2011). However, when the moving party seeks a "mandatory injunction that alters the status quo by commanding a positive act," the burden is even higher. *Id.*; *see also Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996). Thus, a mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary

relief." *Citigroup Global Mkts.*, 598 F.3d at 35 n.4 (internal quotation marks omitted). The same standards used to review a request for a preliminary injunction govern consideration of an application for a temporary restraining order. *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992); *Perri v. Bloomberg*, No. 06-CV-0403, 2008 WL 2944642, at * 2 (E.D.N.Y. July 31, 2008). The district court has wide discretion in determining whether to grant a preliminary injunction. *Moore*, 409 F.3d at 511.

**\*8** Construing plaintiff's motion in the light most favorable to him as a pro se plaintiff, the Court finds that he has failed to substantiate any allegations of irreparable harm with evidence in admissible form or to demonstrate, with evidence, a likelihood of success on the merits of his underlying claims, or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor. *See Hancock v. Essential Res., Inc.*, No. 91-Civ-0213, 792 F.Supp. 924, 928 (S.D.N.Y. Apr. 28, 1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Additionally, since defendants have not yet answered, and, indeed, have not even been served, the Court cannot ascertain plaintiff's likelihood of success, or whether he has otherwise met the standard for issuance of preliminary injunctive relief.

For the foregoing reasons, plaintiff's motion for preliminary injunctive relief is denied in its entirety.

## VI. SERVICE OF PROCESS
In this case, plaintiff paid the entire filing fee for this action. As a result, plaintiff is responsible for serving the summonses and amended complaint on the defendants. Rule 4 of the Federal Rules of Civil Procedure provides that "[a]t the plaintiff's request, the court may order that service be made by a United States marshal or deputy marshal or by a person specially appointed by the court." Fed. R. Civ. P. 4(c)(3). In order to advance the disposition of this action, and in light of the fact that plaintiff is proceeding pro se, to effectuate service by the United States Marshal, plaintiff must (1) pay the service fee due to the U.S. Marshal in full in advance;[5] and (2) provide all necessary papers for service, including a completed U.S. Marshals Form and summons form (both of which may be obtained from the Office of the Clerk of the Court) for the defendants, and a copy of the complaint for the defendants. Plaintiff is directed to send the service documents and payment of the service fee to the Clerk of the United States District Court, Northern District of New York,

7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367, to be forwarded by the Clerk to the U.S. Marshal.

[5]   Payment of the service fee must be made by money order or certified check payable to "U.S. Marshal." For service by mail, the fee is $8.00 per summons and complaint. The cost of service by mail on the remaining defendants is $24.00. Plaintiff is advised that if initial service is unsuccessful, he will be required to pay the U.S. Marshal any additional fees, also in advance, for subsequent service attempts according to the fee schedule set by the U.S. Marshal.

## VII. CONCLUSION
**WHEREFORE**, it is hereby

**ORDERED** that the following claims are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915A for failure to state a claim upon which relief may be granted: (1) claims against the State of New York; and (2) claims for monetary damages pursuant to section 1983 against defendants in their official capacities; and it is further

**ORDERED** that the following claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915A for failure to state a claim upon which relief may be granted: (1) Eighth Amendment deliberate medical indifference claims; and (2) state law claim for intentional infliction of emotional distress;[6] and it is further

[6]   If plaintiff wishes to pursue any claim dismissed without prejudice, he is advised to that, if accepted for filing, any amended complaint will entirely replace the original complaint and incorporation of prior claims is not permitted.

**ORDERED** that the following claims survive the Court's sua sponte review under 28 U.S.C. § 1915A and requires a response: (1) First Amendment retaliation claims; (2) ADA and RA claims; and (3) negligence claims; and it is further

**\*9** **ORDERED** that the State of New York is **DISMISSED** as a defendant herein; and it is further

**ORDERED** that plaintiff is afforded an opportunity to request an order of this Court directing service by the U.S. Marshal and provide payment of the service fee to the U.S.

Marshal in full by money order or certified check; and it is further

**ORDERED** that upon plaintiff's request for assistance with service of process, the Clerk shall return the file to the Court for further review; and it is further

**ORDERED** that if plaintiff does not request for assistance with service of process **within twenty (20) days** of the filing date of this Decision and Order, the Clerk shall issue a summonses and forward them to plaintiff, who shall be responsible for effecting service of process on defendants. Upon issuance of the summonses, the Clerk shall send a copy of the summonses and amended complaint to the Office of the New York Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that defendants or their counsel, file a response to the amended complaint as provided for in the Federal Rules of Civil Procedure after service of process upon them; and it is further

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; their failure to do so will result in the dismissal of his action**; and it is further

**ORDERED** that plaintiff's motion for counsel (Dkt. No. 11) is **DENIED** and it is further

**ORDERED** that plaintiff's motion for preliminary injunctive relief (Dkt. No. 20) is **DENIED** and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on plaintiff in accordance with the Local Rules.

**All Citations**

Slip Copy, 2022 WL 4225226

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 16744278
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jerry RAMRATTAN, Plaintiff,

v.

GUZMAN, Ms. Lewis and Ms. Morris, Defendants.

9:22-CV-0025 (GTS/ATB)
|
Signed November 7, 2022

**Attorneys and Law Firms**

JERRY RAMRATTAN, Plaintiff, pro se, 12-A-0608, Eastern NY Correctional Facility, Box 338, Napanoch, NY 12458.

**DECISION AND ORDER**

GLENN T. SUDDABY, United States District Judge

**I. INTRODUCTION**

**\*1** Plaintiff Jerry Ramrattan ("plaintiff") commenced this action by filing a pro se complaint pursuant to 42 U.S.C. § 1983 ("Section 1983"), the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and Section 504 of the Rehabilitation Act ("RA"). Dkt. No. 1 ("Compl."). Plaintiff also filed a motion for a preliminary injunction seeking an order allowing his access to the "SDU" computer. Dkt. No. 20. In a Decision and Order filed on September 13, 2022, following review of the complaint in accordance with 28 U.S.C. § 1915A(b), the Court directed defendants to respond to the complaint. Dkt. No. 26 (the "September Order"). The Court also denied plaintiff's request for preliminary injunctive relief. *Id.*

On October 27, 2022, plaintiff submitted a letter which the Court has liberally construed as a request to reconsider the portion of the September Order that denied plaintiff's motion for a preliminary injunction. Dkt. No. 31.

**II. MOTION FOR RECONSIDERATION**

"A court may justifiably reconsider its previous ruling if: (1) there is an intervening change in the controlling law; (2) new evidence not previously available comes to light; or (3) it becomes necessary to remedy a clear error of law or to prevent manifest injustice." *Delaney v. Selsky*, 899 F. Supp. 923, 925

(N.D.N.Y. 1995) (citing *Doe v. New York City Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983)). "The standard for granting a motion for reconsideration is strict[.]" *Shrader v. CSX Transportation, Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). A motion for reconsideration "should not be granted where the moving party seeks solely to relitigate an issue already decided." *Id.* Furthermore, a motion for reconsideration is not to be used for "presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.' " *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998).

Plaintiff seeks reconsideration of the portion of the September Order that denied his motion for a preliminary injunction arguing that the injunction is necessary to "stop the abuse of power by those who can help me and give me all I may need to help myself." *See* Dkt. No. 31 at 2. Plaintiff does not argue that there has been an intervening change in the controlling law or that new evidence necessitates reconsideration. While plaintiff disagrees with the September Order, he has not made any showing that reconsideration is warranted. Plaintiff has not cited to any caselaw which would mandate that the September Order be vacated nor has he articulated any clear legal error. Plaintiff's allegations do not alter the outcome of the Court's decision and the motion does not establish that the Court disregarded facts that resulted in manifest injustice. *See, e.g., Banco de Seguros Del Estado v. Mut. Marine Offices, Inc.*, 230 F.Supp.2d 427, 431 (S.D.N.Y. 2002) (denying motion for reconsideration where movant "reargue[d] the points it made during the initial briefing and ... explain[ed] to the Court how its analysis is 'erroneous' "); *United States v. Delvi*, 2004 WL 235211 (S.D.N.Y. Feb. 6, 2004) (denying motion for reconsideration where movant "point[ed] to no facts or law that the Court overlooked in reaching its conclusion, and instead simply reiterate[d] the facts and arguments that the Court already considered and rejected"). Therefore, plaintiff's motion for reconsideration (Dkt. No. 31) is denied.

**III. CONCLUSION**

**\*2** **WHEREFORE**, it is hereby

**ORDERED** that plaintiff's motion for reconsideration and for entry of default (Dkt. No. 31) is **DENIED**; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order in accordance with the Local Rules.

**Ramrattan v. Guzman, Slip Copy (2022)**

2022 WL 16744278

**All Citations**

Slip Copy, 2022 WL 16744278

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 532457
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Zev YOURMAN, Plaintiff,

v.

VERIZON COMMUNICATIONS, Joseph Santos,
Brian Bloodgood, Nakis Thomas, Marian Watkins, Hans
Vestberg, Ronan Dunne, and J. Does 1-50, Defendants.

20-cv-336 (BMC)
|
Signed 02/02/2020
|
Filed 02/03/2020

**Attorneys and Law Firms**

Zev Yourman, Brooklyn, NY, pro se.

### MEMORANDUM DECISION AND ORDER

COGAN, District Judge.

 **\*1**  Plaintiff *pro se* brings this action for inadequate service on his telephone line pursuant to 47 U.S.C. §§ 206, 207 and 406 and 28 U.S.C. § 1367(a). The Court grants plaintiff's application to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915. For the reasons set forth below, the complaint may proceed against defendants Verizon Communications and Joseph Santos. The remaining counts and defendants, however, are dismissed.

### BACKGROUND

Plaintiff alleges that his Lifeline telephone service through Verizon has been shut off since the summer of 2018, despite his repeated efforts to have Verizon fix the issue. He claims Verizon "fraudulently informed" him the problem was with his line in the apartment. On October 10, 2018, in response to plaintiff's complaints, Verizon sent one of its repairmen, Joseph Santos, to plaintiff's apartment. However, during this futile attempt to resolve the problem, Santos damaged plaintiff's apartment, left his tools, and failed to complete any work. Plaintiff alleges that the damage "caused to [his] apartment will cost at least $80,000 to repair, not including

other damages" and that the lack of telephone service has "cut [him] off from society."

### DISCUSSION

Although *pro se* complaints are "held to less stringent standards than formal pleadings drafted by lawyers," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotation marks and citation omitted), even a *pro se* complaint must plead "enough facts to state a claim to relief that is plausible on its face," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007), and to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Moreover, pursuant to the *in forma pauperis* statute, the Court must dismiss an action if it determines that it "is frivolous or malicious," or "fails to state a claim upon which relief may be granted," 28 U.S.C. § 1915(e)(2)(B) (i)-(ii).

Section 207 of the Communications Act allows "[a]ny person claiming to be damaged by any common carrier ... [to] bring suit for recovery of the damages ... in any district court of the United States[.]" 47 U.S.C. § 207. See Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc., 550 U.S. 45, 52-55 (2007). The statute, however, does not provide for liability against individuals, so the complaint is dismissed as to the following Verizon employees: Brian Bloodgood, Nakis Thomas, Marian Watkins, Hans Vestberg, Ronan Dunne and John Does 1-50. Plaintiff's claim that he has been deprived of telephone service can proceed against Verizon because it is a "common carrier" under 47 U.S.C. § 153(11).

Section 1367(a) of Title 28, United States Code, grants federal courts supplemental jurisdiction over all claims that are so related to claims in the action within its original jurisdiction that the related claims form part of the same case or controversy under Article III of the Constitution. "The state and federal claims must derive from a common nucleus of operative fact." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966). "[O]nce it is determined that a supplemental claim is related to the claim within the court's original jurisdiction such that they form the same case or controversy, supplemental jurisdiction over the related claim is mandatory." Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir. 1998).

 **\*2**  According to the complaint, Santos caused damage to plaintiff's apartment and property after he responded to

**Yourman v. Verizon Communications, Slip Copy (2020)**

2020 WL 532457

plaintiff's complaints to Verizon. Plaintiff's federal claim against Verizon resulted from Santos' inability to fix plaintiff's telephone service. Thus, the two claims are related, arising from the same set of facts, and the Court will exercise supplemental jurisdiction over plaintiff's property damage claim against Santos.

**CONCLUSION**

Defendants Brian Bloodgood, Nakis Thomas, Marian Watkins, Hans Vestberg, Ronan Dunne and John Does 1-50 are dismissed from the action pursuant to 28 U.S.C. § 1915(e)(2)(B). No summonses shall issue against these defendants. However, the complaint may proceed against defendants Verizon Communications and Joseph Santos. The Court directs the Clerk of Court to issue summonses against these defendants and directs the United States Marshals Service to serve the summonses and complaint on them. The Court refers this matter to Magistrate Judge Lois Bloom for pretrial supervision.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 532457

---

End of Document © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.    2